**APPENDIX TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# INDEX

Writ Appeal Petition for Review of ACCA Decision on Appl for Extraordinary Relief
(filed in C.A.A.F. June 26, 2012) .......................................................................... A-001

Joint Appendix (filed in C.A.A.F. June 26, 2012).................................................. A-044

    Order, *Center for Constitutional Rights v. United States*,
    Army Misc. 20120514 (Army Ct. Crim. App. 21 June 2012).......................... A-046

    Declaration of Shayana Kadidal (18 May 2012) ............................................ A-047

        Ex. A: Letter from CCR to Judge Lind
        (21 Mar. 2012) ...................................................................... A-055

        Ex. B: Letter from CCR to David Coombs
        (23 Apr. 2012)........................................................................ A-059

        Ex. C: Letter from Reporter's Committee for
        Freedom of the Press to Jeh Johnson,
        General Counsel for the Department of Defense
        (12 Mar. 2012) ...................................................................... A-063

    Erratum to Declaration of Shayana Kadidal .................................................. A-068

    Declaration of Kevin Gosztola (23 May 2012)................................................ A-069

    Declaration of Alexa O'Brien (14 June 2012)................................................ A-071

    Manual for Military Commissions (2010), R.C.M. 802 .................................... A-075

    Defense Motion to Record and Transcribe All R.C.M. 802 Conferences
    (2 June 2012)................................................................................................ A-077

    Charge Sheet, *United States v. Manning*
    (rec'd 3 Feb 2012)........................................................................................ A-080

Gov't response brief (filed in C.A.A.F. July 5, 2012)........................................... A-089

Reply Brief (filed in C.A.A.F. Jul. 13, 2012) ...................................................... A-108

Transcript of trial court's ruling (filed with C.A.A.F. on Aug. 2, 2012)................ A-147

Petitioner-Appellants' response to interlocutory order of 24 July 2012
(filed in C.A.A.F. August 24, 2012) .................................................................... A-178

Order regarding post-oral argument supplemental briefing
(C.A.A.F. Oct. 12, 2012) ......................................................................................... A-188

Petitioners' Post-Argument Supplemental Brief (filed in C.A.A.F. Oct. 22, 2012).............. A-190

    Supplemental declaration of Shayana Kadidal ................................................ A-234

Government Post-Argument Supplemental Brief (filed in C.A.A.F. Oct. 31, 2012) ............. A-276

Declaration of Ed Pilkington, Chief Reporter, *The Guardian* ................................. A-302

Motion to Supplement Record and Supplemental Gosztola Declaration
(filed in C.A.A.F. March 4, 2013) .......................................................................... A-319

Opinion of the Court of Appeals for the Armed Forces (including two dissenting opinions)
(C.A.A.F. Apr. 16, 2013)....................................................................................... A-331

IN THE UNITED STATES COURT OF APPEALS
FOR THE ARMED FORCES

```
-------------------------------- x
                                 :
                                 :
CENTER FOR CONSTITUTIONAL RIGHTS, :
GLENN GREENWALD, JEREMY SCAHILL,  : Crim. App. Misc.
THE NATION, AMY GOODMAN, DEMOCRACY : Dkt. No. 20120514
NOW!, CHASE MADAR, KEVIN GOSZTOLA, :
JULIAN ASSANGE, and WIKILEAKS,    :
                                 : General Court Martial
                     Appellants, : United States v. Manning,
                                 : Ft. Meade, Maryland
              v.                 :
                                 :
                                 : Dated: 26 June 2012
UNITED STATES OF AMERICA and CHIEF :
JUDGE COL. DENISE LIND,          :
                                 :
                     Appellees.  :
                                 :
-------------------------------- x
```

## WRIT–APPEAL PETITION FOR REVIEW OF ARMY COURT OF CRIMINAL APPEALS DECISION ON APPLICATION FOR EXTRAORDINARY RELIEF AND SUPPORTING MEMORANDUM OF LAW

### Preamble

In order to enforce the guarantees of the First Amendment to the United States Constitution, Appellants the Center for Constitutional Rights ("CCR"), Glenn Greenwald, Jeremy Scahill, *The Nation*, Amy Goodman, *Democracy Now!*, Chase Madar, Kevin Gosztola, Julian Assange, and the Wikileaks media organization (collectively, "Petitioner-Appellants"),[1] by and through their under-

---

[1]    The Center for Constitutional Rights is a nonprofit public interest law firm also engaged in public education, outreach and advocacy. Glenn Greenwald is a lawyer and prolific columnist and author on national security, civil liberties and First Amendment issues for Salon.com and other national media outlets. Jeremy Scahill is the National Security Correspondent for *The Nation*,

signed counsel, respectfully appeal the denial of their petition to the Army Court of Criminal Appeals for extraordinary relief, seeking public access to documents in the court-martial proceedings against Pfc. Bradley Manning, including papers filed by the parties, court orders, and transcripts of the proceedings, and to proceedings taking place in R.C.M. 802 conferences outside of public view.

## History of the Case

Petitioner-Appellants wrote two letters to the trial court in the *Manning* proceedings seeking the relief requested here. *See* Declaration of Shayana Kadidal (attached to original petition and in the Joint Appendix), Ex. A & B (JA-10-13 and 14-17). The trial court received them into the record, construed the second letter as a motion to intervene for purposes of seeking the relief requested, and, finding no entitlement to relief on the merits, denied the motion to intervene. Petitioner-Appellants then sought extraordinary relief from the Army Court of Criminal Appeals, filing a petition on 23 May 2012 pursuant to the All Writs Act,

---

the oldest continuously published weekly magazine in the United States. Amy Goodman is the host of *Democracy Now!*, an independent foundation and listener-supported news program broadcast daily on over 950 radio and television outlets and the Internet. Chase Madar is an attorney, a contributing editor to *The American Conservative* magazine, and the author of *The Passion of Bradley Manning: The Story of the Suspect behind the Largest Security Breach in U.S. History*. Kevin Gosztola is a writer for Firedoglake, a website engaged in news coverage with a specific emphasis on criminal trial issues. Julian Assange is publisher of the Wikileaks media organization.

APPENDIX A-002

28 U.S.C. § 1651(a), Rules 2(b) and 20 of the Courts of Criminal Appeals Rules of Practice and Procedure, and Rules 20.1 and 20.2 of the A.C.C.A. Rules. By order issued on 30 May 2012, the Army Court of Criminal Appeals ordered the government to respond to respond to Petitioners on all but the R.C.M. 802 issues. The government's brief, filed on 8 June 2012, did not contest that the First Amendment right of public access applies to documents in courts-martial and took no issue with Petitioners' factual description of the *Manning* proceedings. Instead, it made essentially one argument: extraordinary relief is inappropriate because the Freedom of Information Act (FOIA) allows for access (albeit non-contemporaneous access) to the documents at issue. Petitioners' reply was filed on 15 June 2012.

On 21 June 2012, without oral argument, the court issued a one-sentence order, stating: "On consideration of the Petition for Extraordinary Relief in the Nature of a Writ of Prohibition and Mandamus the petition is DENIED."

## **Relief Sought**

(1) Petitioner-Appellants request a writ of mandamus and prohibition to compel the trial court to grant public access to documents filed in *United States v. Manning*, including without limitation (a) all papers and pleadings filed by the parties, including particularly the government's motion papers and re-

APPENDIX A-003

sponses to defense motions,[2] (b) court orders, and (c) transcripts of all proceedings, and that any further restrictions on public access to the proceedings or documents therein only occur following notice to the public of any contemplated restrictions, an opportunity for interested parties to be heard, and case-by-case specific findings of necessity after consideration of less-restrictive alternatives; and

(2) Petitioner-Appellants request a writ of mandamus and/or prohibition ordering the trial judge to reconstitute past R.C.M. 802 conferences in the *Manning* case in open court, in a matter not inconsistent with the First Amendment right of public access, and to conduct all future conferences in a matter not inconsistent with the First Amendment right of public access.

Petitioner-Appellants request oral argument.

## Issues Presented

1.   Whether the First Amendment right of public access (or other public-access rights) applies and guarantees access to the documents Petitioner-Appellants seek (judicial orders, filings, and transcripts) in a timely fashion, contemporaneous with the proceedings to which they relate.

---

[2]    Redacted versions of certain motions filed by defense counsel have already been disclosed publicly on the website of defense counsel, apparently by agreement of the parties. Kadidal Decl. at ¶ 11 (JA-5). Thus, at present, the public's continued access to even these defense filings is subject to the willingness of defense counsel to have them made public.

4

2.   Whether First Amendment principles apply to future document sealings going forward, including (a) the right to public notice of a request for sealing, (b) opportunity for interested parties to be heard, and (c) that the trial court be required to ultimately justify any restrictions on public access with case-by-case specific findings of necessity after consideration of less-restrictive alternatives.

3.   Whether past R.C.M. 802 conferences should be reconstituted on the public record.

4.   Whether public access to future R.C.M. 802 conferences should be governed by First Amendment principles.

### Statement of Facts

On November 28, 2010, the Wikileaks media organization and its publisher Julian Assange commenced reporting on thousands of allegedly classified and unclassified U.S. State Department diplomatic cables. The cables were also published by other national and international media organizations, including *The New York Times*, *The Guardian*, *Der Spiegel*, *Le Monde*, and *El Pais*. Federal prosecutors have reportedly convened a grand jury in the Eastern District of Virginia to investigate whether Mr. Assange conspired with Pfc. Bradley Manning to violate the Espionage Act of 1917, 18 U.S.C. § 793 *et seq.*, and other federal laws.

Pfc. Manning was arrested in May 2010 in Iraq on suspicion that he provided the diplomatic cables (and possibly other alleg-

5

APPENDIX A-005

edly classified information) to Mr. Assange and/or Wikileaks. An Article 32 investigation was conducted at Fort Meade, Maryland, in December 2011, largely outside the public view,[3] and all charges were referred to a general court-martial in February 2012.

Pfc. Manning now faces a court-martial for offenses including aiding the enemy in violation of Article 104 of the Uniform Code of Military Justice.  These offenses are serious but as yet wholly unproven.  There is disturbing evidence that the government subjected Pfc. Manning to conditions of confinement and treatment reminiscent of the worst abuses of detainees at Guantánamo Bay, including prolonged isolation, sensory deprivation, forced nudity, and other torture or cruel, inhuman and degrading practices.

It is therefore not surprising that the court-martial of Pfc. Manning has generated a hurricane of worldwide media attention, most of which has not abated.  Strikingly, however, and in marked contrast to the vigor with which senior U.S. government officials have themselves publicly condemned, pursued and sought to punish Pfc. Manning, Mr. Assange, and others associated with Wikileaks, the public has been largely denied access to even non-classified documents filed in Pfc. Manning's court-martial that

---

[3]   Some of the current Petitioner-Appellants sought assurances of access to the Article 32 hearings, which were denied. *See Assange v. United States*, Misc. No. 12-8008/AR, 2012 CAAF LEXIS 42 (C.A.A.F. Jan. 11, 2012).

APPENDIX A-006

would shed light on the serious claims made about Pfc. Manning. As described in the declaration of CCR Senior Managing Attorney Shayana Kadidal (JA-2-9, attached to the original petition, and recording his personal observations of certain proceedings before the *Manning* Court Martial), the government's motion papers have not been disclosed in any form.  Kadidal Decl. ¶ 4 (JA-3). Several important substantive issues have also been addressed and resolved, outside the public view, in Rule 802 conferences, including entry of a case management order, a pretrial publicity order and a protective order for classified information.  *Id*. ¶¶ 13, 14 (JA-5-6) and Ex. A (JA-10-13). The Court's own orders on these and other subjects have not been published. Id. ¶ 14 (JA-6). Moreover, no transcripts of these proceedings have been made available to the public. *Id*. ¶ 4, 6, 9 (JA-3-5). Finally, during the pendency of the petition in the A.C.C.A., the defense moved to have all Rule 802 conferences recorded and transcribed. *See* Declaration of Alexa O'Brien (JA-26-29, attached to reply brief below). That motion was denied.

All of this has occurred (or rather not occurred) despite written requests by Petitioner-Appellants and other media organizations to the Court seeking public access. *Id*. Exs. C (Reporters' Committee Letter, JA-18-22) & A & B (CCR Letters, JA-10-17). The Court construed the last of those letters from CCR as a motion to intervene in the proceedings for the purpose of seeking

7

to vindicate the right of public access to the proceedings, a motion which the Court denied. Kadidal Decl. at ¶ 8 (JA-4).

Although the public may attend portions of Pfc. Manning's court-martial proceedings (notably excluding Rule 802 confer-ences), public access to documents has been inexplicably denied in what is arguably one of the most controversial, high-profile court-martials since the trial of LT William Calley for the My Lai Massacre in Vietnam, and the most important case involving the alleged disclosure of classified information since the Penta-gon Papers. Indeed, the restrictions on access to these basic documents in the case have made it exceedingly difficult for cre-dentialed reporters to cover the proceedings consistent with their journalistic standards and obligations. *See* Declaration of Kevin Gosztola (JA-24-25, attached to the original petition) at ¶¶ 4-8. These restrictions not only plainly violate the First Amendment and the common law, they undermine the legitimacy of this important proceeding.

As noted above, in its response brief addressing the right of public access to the documents Petitioner-Appellants re-quested, the government took no issue with Petitioner-Appellants' factual description of the *Manning* proceedings.

## Reasons Why Writ Should Issue

Criminal proceedings, including court-martial proceedings, must be open to the public except in limited circumstances.

APPENDIX A-008

R.C.M. 806(a).  The First Amendment requires public access unless the government demonstrates that closure is necessary to further a compelling government interest and narrowly tailored to serve that interest, and the Court makes specific findings that closure is warranted.  The government bears a similarly high burden in attempting to limit public access to documents filed in connection with criminal proceedings.  *See In re Wash. Post Co.*, 807 F.2d 383, 390–91 (4th Cir. 1986) (citing cases).[4]

In *United States v. Manning*, the press and public have not had access to any of the government's motions, responses to defense briefs, or filings in the case beyond the initial charges – even in redacted form. No transcripts of any proceedings in the case have been published – even for proceedings that occurred in open court. Nor have any orders of the Court been published. The government has not provided – and cannot provide – any legal basis for withholding these documents from the public. Nor does it appear that the Court made any of the requisite findings that could support closing these proceedings or denying access to the documents at issue, or provided notice of such envisioned closures and opportunity to object to the press and public.

These violations are particularly egregious in light of the First Amendment's mandate that even temporary deprivations of the

---

[4]    The common law also allows the press and public a right of access to judicial documents. *Id.* Petitioner-Appellants rely on both the First Amendment and the common law.

9

APPENDIX A-009

right of public access constitute irreparable harm, and given the Supreme Court's frequent pronouncements that openness promotes not just public confidence in the criminal process but also accuracy in factfinding and ultimate outcomes. The First Amendment thus demands contemporaneous access to documents and proceedings in cases like *Manning* while the proceedings are taking place. The denial of the public's First Amendment rights by the trial court and the A.C.C.A. is clearly erroneous and amounts to an usurpation of authority. Accordingly, this Court should grant Petitioner–Appellants' requested relief.

## I.   __The Public Has a Presumptive Right to Access to Documents in Criminal Proceedings__

The Court's authority to act on the merits of this motion and grant Petitioner–Appellants the requested relief is clear. *See Denver Post Co. v. United States*, Army Misc. 20041215 (A.C.C.A. 2005), *available at* 2005 CCA LEXIS 550 (exercising jurisdiction and granting writ of mandamus to allow public access to Article 32 proceedings); *United States v. Denedo*, 556 U.S. 904 (2009).

The right of public access is rooted in the common law and the First Amendment to the United States Constitution.  *See*, *e.g.*, *Nixon v. Warner Commc'ns*, Inc., 435 U.S. 589, 597 (1978); *In re Washington Post Co.*, 807 F.2d 383, 390–91 (4th Cir. 1986); *Washington Post Co. v. Robinson*, 935 F.2d 282, 287–88 (D.C. Cir.

10

APPENDIX A-010

1991).  It includes not only the right to attend court proceedings but also the right to freely access court documents.  *See Washington Post Co. v. Robinson*, 935 F.2d 282, 287 (D.C. Cir. 1991) ("The First Amendment guarantees the press and the public a general right of access to court proceedings and court documents unless there are compelling reasons demonstrating why it cannot be observed.") (citing cases).  Every Circuit Court to consider the question has ruled that the First Amendment right of public access to judicial proceedings also extends to judicial records (or has assumed without deciding that such a right exists).[5]

---

[5]      Of the thirteen federal Courts of Appeals, only the Federal Circuit has not considered the issue, and only the Tenth has not decided it outright: *See Globe Newspaper Co. v. Pokaski*, 868 F.2d 497 (1st Cir. 1989); *In re Globe Newspaper Co.,* 729 F.2d 47 (1st Cir. 1984) (bail hearings); *United States v. Haller*, 837 F.2d 84 (2d Cir. 1988) (plea agreements); *In re New York Times Co.*, 828 F.2d 110 (2d Cir. 1987), *cert. denied,* 485 U.S. 977 (1988); *United States v. Smith*, 787 F.2d 111, 116 (3d Cir. 1986) and 776 F.2d 1104 (3d Cir. 1985); *In re Washington Post Co.*, 807 F.2d 383 (4th Cir. 1986); *Hearst Newspapers, L.L.C. v. Cardenas-Guillen*, 641 F.3d 168, 172, 176-77 (5th Cir. 2011) (finding First Amendment right in favor of media petitioners seeking, inter alia, unsealing of records); *Applications of NBC*, 828 F.2d 340 (6th Cir. 1987); *United States v. Ladd (In re Associated Press)*, 162 F.3d 503 (7th Cir. 1998); *United States v. Peters*, 754 F.2d 753, 763 (7th Cir. 1985) (trial exhibits); *In re Search Warrant for Secretarial Area Outside Office of Gunn*, 855 F.2d 569 (8th Cir. 1988)(documents filed to support search warrant); *Oregonian Publ'g Co. v. United States Dist. Court*, 920 F.2d 1462 (9th Cir. 1990); *Associated Press v. United States Dist. Court*, 705 F.2d 1143 (9th Cir. 1983); *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1028-31 (11th Cir. 2005) (mandating First Amendment access to sealed docket and judicial records in criminal case); *Washington Post v. Robinson*, 935 F.2d 282, 287-88 (D.C. Cir. 1991); *cf. United States v. McVeigh*, 119 F.3d 806, 811 (10th Cir. 1997) ("assum[ing] without deciding that access to judicial documents is governed by the analysis articulated in *Press-Enterprise II*");

11

APPENDIX A-011

Indeed, the spectacular degree of unanimity in the federal Courts of Appeals noted in the preceding footnote means that throughout the federal system, district courts are obliged to apply First Amendment principles to govern public access to judicial documents. That has implications for court-martial practice under the U.C.M.J. as well, for Congress has mandated in section 36 of the U.C.M.J. that

> [p]retrial, trial, and post trial procedures ... for cases arising under [the U.C.M.J.] triable in courts-martial ... may be prescribed by the President by regulations which shall, so far as he considers practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts....

10 U.S.C. 836(a). This Court has repeatedly enforced standards derived from the uniform practice of the federal district courts, and there is no reason for it not to do so here as well. *See, e.g., United States v. Nieto*, 66 M.J. 146, 150 (C.A.A.F. 2008) (looking to "generally applicable standard for considering this question in the trial of criminal cases" in district courts); *United States v. Valigura*, 54 M.J. 187, 191 (C.A.A.F. 2000)

---

*Riker v. Federal Bureau of Prisons*, 315 Fed. Appx. 752, 756 (10th Cir. 2009) (unpublished opinion) (same); *United States v. Gonzales*, 150 F.3d 1246, 1255-61 (10th Cir. 1998) (finding certain CJA records to be administrative not judicial in nature; as to others, assuming without deciding *Press-Enterprise* applies), *cert. denied*, 525 U.S. 1129 (1999).

The Federal Circuit has not addressed the First Amendment argument, but recognizes a common-law right of access. *See In re Violation of Rule 28(d)*, 635 F.3d 1352, 1357 (Fed. Cir. 2011). Of course, the federal circuit never hears criminal cases within its jurisdiction. *See* 28 U.S.C. § 1295 (setting forth jurisdiction).

12

("Congress intended [with § 836] that, to the extent 'practicable,' trial by court-martial should resemble a criminal trial in a federal district court."); *United States v. St. Blanc*, 70 M.J. 424, 429 (C.A.A.F. 2012) ("Nothing in the MCM or UCMJ suggests any reason for this Court to part ways with the federal courts" (citing U.C.M.J. § 36)); *Loving v. United States*, 64 M.J. 132, 140 (C.A.A.F. 2006) (applying *Teague* retroactivity analysis from federal courts, citing § 836); *United States v. Dowty*, 60 M.J. 163, 172 (C.A.A.F. 2004) (applying "federal rule" as to jury selection, citing § 836). Nothing in R.C.M. 806's open trial mandate indicates that the executive bears a contrary intent. *See* R.C.M. 806 ("courts-martial shall be open to the public").

The right of public access exists primarily to ensure that courts have a "measure of accountability" and to promote "confidence in the administration of justice." *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995). Access to information is especially important when it concerns matters relating to national defense and foreign relations, where public scrutiny is the only effective restraint on government. *See New York Times v. United States*, 403 U.S. 713, 728 (1971) (Stewart, J., concurring) ("In the absence of the governmental checks and balances present in other areas of our national life, the only effective restraint upon executive policy and power in the areas of national defense and international affairs may lie in an enlightened citizenry --

13

APPENDIX A-013

in an informed and critical public opinion which alone can here protect the values of democratic government.").

The Supreme Court has also repeatedly stated that openness has a positive effect on the truth-determining function of proceedings. *See Gannett Co. v. DePasquale*, 443 U.S. 368, 383 (1979) ("Openness in court proceedings may improve the quality of testimony, induce unknown witnesses to come forward with relevant testimony, cause all trial participants to perform their duties more conscientiously"); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 596 (1980) (open trials promote "true and accurate fact-finding") (Brennan, J., concurring); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606 (1982) ("[P]ublic scrutiny enhances the quality and safeguards the integrity of the factfinding process."); *see also Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1179 (6th Cir. 1983) (*Gannett*'s beneficial "fact-finding considerations" militate in favor of openness "regardless of the type of proceeding"). This effect is tangible, not speculative: the Court has held that openness can affect outcome. Accordingly, if the government attempts to restrict or deny the right of access, it bears the strictest of burdens: it must show that the limitation is necessary to protect a compelling government interest and is narrowly tailored to serve that interest. *See*, *e.g.*, *Robinson*, 935 F.2d at 287.

14

Moreover, public access must be contemporaneous with the ac-
tual proceedings in order to maximize this error-correcting as-
pect of openness. The Supreme Court has long held that contempo-
raneous access to criminal proceedings is necessary to serve the
various functions – public legitimation, diligent and upstanding
official behavior, and error-correction – that public access has
traditionally served. As early as 1948 the Court had announced
that "[t]he knowledge that every criminal trial is subject to
*contemporaneous review* in the forum of public opinion is an ef-
fective restraint on possible abuse of judicial power." *In re
Oliver*, 333 U.S. 257, 270 (1948) (emphasis added). *Oliver* was
decided under the Due Process Clause but federal courts have ex-
tended the contemporaneous access principle to Sixth Amendment
cases where defendants sought to make proceedings and information
public. *Huminski v. Corsones*, 386 F.3d 116, 143 (2d Cir. 2004),
*as amended on reh'g*, 396 F.3d 53 (2d Cir. 2005) ("Sixth Amendment
guarantees ... the right to a public trial principally to protect
the defendant from prosecutorial and judicial abuses by permit-
ting contemporaneous public review of criminal trials."); *United
States v. Wecht*, 537 F.3d 222, 229-30 (3d Cir. 2008) ("Although
post-trial release of information may be better than none at all,
the value of the right of access would be seriously undermined if
it could not be contemporaneous."); *Grove Fresh Distributors,
Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994)

15

("In light of the values which the presumption of access endeavors to promote, a necessary corollary to the presumption is that once found to be appropriate, access should be immediate and contemporaneous. ... The newsworthiness of a particular story is often fleeting. To delay or postpone disclosure undermines the benefit of public scrutiny and may have the same result as complete suppression.").

Legitimacy, accountability, accuracy: these three principles motivating the Sixth Amendment right of contemporaneous access are the same values cited by the Supreme Court in support of the First Amendment right of public access recognized in *Richmond Newspapers* and its progeny. While the number of cases involving a (1) First Amendment right of access (2) specifically to documents and (3) simultaneously opining on the contemporaneous access issue is small, there are federal cases that specifically note that such access must be contemporaneous to be effective. *See Chicago Tribune Co. v. Ladd (In re AP)*, 162 F.3d 503, 506 (7th Cir. 1998) (in case involving request for access to "various documents that were filed under seal," Court of Appeals noted that "the values that animate the presumption in favor of access require as a 'necessary corollary' that, once access is found to be appropriate, access ought to be 'immediate and contemporaneous'"); *United States v. Smalley*, 9 Media L. Rep. 1255, 1256 (N.D. Tex. 1983) (newspapers' "motions for contemporaneous access" to transcripts

16

of evidence "now being introduced" at trial granted per First
Amendment; "without contemporaneous access to the transcripts ...
the press would be foreclosed from reporting at all on a signifi-
cant portion of the prosecution's evidence"); *see also Associated
Press v. United States Dist. Court for Cent. Dist.*, 705 F.2d 1143
(9th Cir. Cal. 1983) (even a 48-hour presumptive sealing period
for documents (designed by district court to allow parties to
make more permanent closure motion) violates First Amendment
right of public access).

These principles are especially relevant in cases involving
media plaintiffs. The failure to publish the court orders, gov-
ernment briefs, and transcripts here has uncontestedly had an
inhibiting effect on the ability of the press to report on the
Manning court-martial. *See* Gosztola Decl. at ¶¶ 3-9 (JA-24-25).
The Supreme Court's prior restraint cases make clear that the
blanket ban on prior restraints is motivated in part by the need
to have timely reporting on matters of public interest, without
which this important check on judicial error will no longer func-
tion:

> the order at issue [here, prohibiting publication of
> certain facts derived either from public judicial pro-
> ceedings or independent sources] – like the order re-
> quested in [the Pentagon Papers case] – does not pro-
> hibit but only postpones publication.  Some news can be
> delayed ... without serious injury [for editorial rea-
> sons, but d]elays imposed by governmental authority are
> a different matter. ... As a practical matter ... the
> element of time is not unimportant if press coverage is

APPENDIX A-017

> to fulfill its traditional function of bringing news to the public promptly.

*Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 560–61 (1976). All of this is consistent with the general First Amendment principle that the loss of First Amendment rights "for even minimal periods of time" constitutes irreparable harm, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971)), allowing press petitioners to seek preliminary injunctions against measures restricting such First Amendment rights of public access, and to immediately appeal denials of public access under the collateral order rule (*see Wecht*, *supra*).

## II.   Neither the Government Nor the Court Have Identified Any Compelling Interest That Would Overcome the Very Strong Presumption in Favor of Public Access

Even in cases assertedly implicating national security, the First Amendment demands that "[d]ocuments to which the public has a qualified right of access may be sealed only if 'specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" *United States v. Aref*, 533 F.3d 72, 82 (2d Cir. 2008) (quoting *Press-Enter. Co*, 478 U.S. at 13–14). "[A] judge must carefully and skeptically review sealing requests to insure that there really is an extraordinary circumstance or compelling need" for the request. *Video Software Dealers Ass'n v. Orion Pictures Corp.*, 21 F.3d 24, 27 (2d Cir. 1994). In assessing whether denial of public access is narrowly tailored, courts must "con-

18

sider less drastic alternatives to sealing the documents, and ...
provide specific reasons and factual findings supporting [the]
decision to seal the documents and for rejecting the alterna-
tives." *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 302 (4th Cir.
2000) (citations omitted); *see also United States v. Hershey*, 20
M.J. 433, 436 (C.M.A. 1985). The Supreme Court has stated that
when a trial court finds that the presumption of access has been
rebutted by some countervailing interest, that "interest is to be
articulated along with findings specific enough that a reviewing
court can determine whether the closure order was properly en-
tered." *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 510
(1984).

The public is also entitled to notice of a party's request
to seal the judicial record and to an opportunity to object to
the request. *See In re Washington Post Co.*, 807 F.2d 383, 390–91
(4th Cir. 1986) (any motion or request to seal a document or oth-
erwise not disclose a document to the public must be "docketed
reasonably in advance of [its] disposition so as to give the pub-
lic and press an opportunity to intervene and present their ob-
jections to the court." (quoting *In re Knight Publishing Co.*, 743
F.2d 231, 234 (4th Cir. 1984))); *In re Knoxville News-Sentinel
Co.*, 723 F.2d 470, 474–76 (6th Cir. 1983); *United States v. Cri-
den*, 675 F.2d 550, 557–60 (3d Cir. 1982) (due process requires
that the public be given some notice that closure may be ordered

19

in a criminal proceeding to give the public and press an opportunity to intervene and present their objections to the court).

The common law right of access to documents is nearly coterminous with the First Amendment.  A common law right attaches where documents are properly considered "judicial documents," including at a minimum documents that play a role in determining the litigants' substantive rights. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) (including documents "relevant to the performance of the judicial function and useful in the judicial process"); *see also United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995) (noting varying standards in different circuits). The motions, transcripts and orders at issue here clearly qualify as "judicial." The presumption in favor of public access to such documents will be given the strongest weight possible. *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 140 (2d Cir. 2004) ("presumptive right to 'public observation' is at its apogee when asserted with respect to documents relating to 'matters that directly affect an adjudication.'" (quoting *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995))). Under the common law standard, the public interest favoring access must be "heavily outweighed" by the other asserted interests to overcome the presumption in favor of public access. *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 302 (4th Cir. 2000) (citations omitted); *see also Stone v. Univ. of Maryland Medical Sys. Corp.*, 855 F.2d 178, 180–81

APPENDIX A-020

(4th Cir. 1988). "[O]nly the most compelling reasons can justify non-disclosure of judicial records." *Gitto v. Worcester Telegram & Gazette Corp. (In re Gitto Global Corp.)*, 422 F.3d 1, 6 (1st Cir. 2005); *In re Knoxville News-Sentinel Co.*, 723 F.2d 470, 474-476 (6th Cir. 1983) ("Appellants seek to vindicate a precious common law right, one that predates the Constitution itself. While the courts have sanctioned incursions on this right, they have done so only when they have concluded that 'justice so requires.' To demand any less would demean the common law right.").

In *United States v. Scott*, 48 M.J. 663 (Army Ct. Crim. App. 1998), *pet'n for rev. denied*, 1998 CAAF LEXIS 1459 (C.A.A.F. 1998), the Army Court of Criminal Appeals applied standards for access to documents identical to the First Amendment standards. The *Scott* Court did not explicitly *state* that the First Amendment applied to documents — as eleven federal Courts of Appeal have done — nor did it explicitly assert that it was applying some alternate standard derived from the common law. But the court clearly applied the same test that would have applied had it expressly found the First Amendment applicable. First, it criticized the trial court for ordering sealing of documents without finding factual support for a compelling interest, stating that the "party seeking closure must advance an overriding interest that is likely to be prejudiced," *id*. at 666, and that that interest must "be articulated along with findings specific enough

21

APPENDIX A-021

that a reviewing court can determine whether the closure order was properly entered," *id*. at 665–66. The *Scott* court found no factual findings in the record supporting a finding that a compelling interest was present: instead, the "military judge sealed the entire stipulation" — the contested document — "on the basis of an unsupported conclusion rather than on the basis of an overriding interest that is likely to be prejudiced if the exhibit is not sealed." *Id*. at 666. Moreover, "[r]ather than narrowly tailoring the order to seal those portions" that implicated any compelling interest, *id*. at 667 n.4, the trial judge erroneously sealed the "entire" document and all its enclosures, *id*. These are exactly the same standards that a court would apply under the First Amendment, as the court noted earlier in the *Scott* opinion.[6] Because the trial judge left "no basis evident in the record of trial [on appeal] that would justify sealing," *id*. at 667, the court found the trial court had committed an abuse of discretion, and vacated the order of sealing. At least one federal court, citing the A.C.C.A.'s decision in *Scott*, 48 M.J. at 665, 666, has implied that that decision recognized a First Amendment right of access. *See Dayton Newspapers, Inc. v. United States Dep't of the Navy*, 109 F. Supp. 2d 768, 772 (S.D. Ohio 1999).

---

[6]     *Scott* noted that the First Amendment demands that "closure must be narrowly tailored to protect [the asserted compelling] interest[, and the] trial court must consider reasonable alternatives to closure [and] must make adequate findings supporting the closure to aid in review." 48 M.J. at 666 n.2.

APPENDIX A-022

None of these necessary elements — public notice and opportunity to be heard, consideration of less-drastic alternatives (as part of a narrow-tailoring or common-law inquiry), and specific reasoning supported by factual findings supporting the decision and rejecting less-restrictive alternatives — appear to have been satisfied by the court in Pfc. Manning's case.

To begin with, no public notice of any motion by the government to seal parts of the judicial record here was made such that members of the press and public would have an opportunity to object. Moreover, the Center's legal representative at the April 23 hearing was not given the opportunity to address the court. Kadidal Decl. ¶ 8 (JA–4). If there had been notice and an opportunity to be heard, this Court might now be reviewing a record of the trial Court's reasoning, sharpened by adversarial challenge, and any factual support for its conclusions. The government bears the burden of proof, and "must demonstrate a compelling need to exclude the public ... the mere utterance by trial counsel is not sufficient." *United States v. Hershey*, 20 M.J. 433, 436 (C.M.A. 1985). Here, there is no evidence that the government met this heavy burden.

From the existing public record, there is no evidence that any consideration of alternatives took place below. Redaction of sensitive information is the most commonplace alternative used by the courts to allow partial public disclosure of documents con-

23

APPENDIX A-023

taining sensitive information. However, there is no indication
that the trial court even considered this simple expedient to
allow publication of redacted versions of government filings,
transcripts and its own orders here. No transcripts have been
released and there is currently no schedule contemplated for pub-
lication of redacted transcripts, despite the fact that several
hearings have been entirely open to the public. Kadidal Decl.
¶ 14 (JA-6). Needless to say, there can be no justification for
the court's failure to publish transcripts of proceedings taking
place in open court. Similarly, the court has read into the re-
cord several of its own orders. Kadidal Decl. ¶ 14 (JA-6); Gosz-
tola Decl. ¶ 4 (JA-24). There can be no possible justification
for not making those orders available to the general public by
publishing them in document form as well.[7]

We have no reason to believe that the court made some docu-
ment-specific finding of justification for restricting all access
to each of these documents, after careful consideration of less-
restrictive alternatives, and has kept those orders under seal.
But even if that were the case, without any reference to such
findings being available on the public record, the press and pub-
lic have no ability to challenge on appeal whatever specific ra-

---

[7]     Similarly, there should be no possible justification for a
complete bar on access to every last word of the government fil-
ings in this case, especially since the government appeared to
quote from portions of its briefs during the hearing on April
23d. Kadidal Decl. ¶ 12 (JA-5).

APPENDIX A-024

tionale for restricted access the court relied on. The law for-
bids courts from so immunizing their decisions to seal parts of
their records from both immediate public scrutiny and later ap-
pellate challenge to the decision to seal. See *United States v.
Ortiz*, 66 M.J. 334, 340 (C.A.A.F. 2008) ("this Court, following
the lead of the United States Supreme Court, requires that a mil-
itary judge make *some* findings from which an appellate court can
assess whether the decision to close the courtroom was within the
military judge's discretion... On the current state of the record
we have no way of knowing the military judge's reasons or reason-
ing for [closure] ... mak[ing] it impossible to determine whether
the military judge properly balanced" interests at stake).

There is also no indication that the court is withholding
publications of the filings, transcripts and orders pending fur-
ther review to ensure that no sensitive information that inadver-
tently slipped into the public record in open court is subse-
quently republished by the court. The court has not indicated
that transcripts, for example, will eventually be produced in
redacted form before the end of Pfc. Manning's trial. Even if
this were the case, it is reversible error for a court to with-
hold from the public each and every document filed, subject to
further review and disclosure, because such procedures "impermis-
sibly reverse the 'presumption of openness' that characterizes
criminal proceedings 'under our system of justice." *Associated*

25

*Press v. District Court*, 705 F.2d 1143, 1147 (9th Cir. 1983)
(quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573
(1980)). It is "irrelevant" that some of the pretrial documents
might only be withheld under such a scheme for a short time, *id.*,
as the loss of First Amendment rights in this context "for even
minimal periods of time" constitutes irreparable harm. *Elrod v.
Burns*, 427 U.S. 347, 373 (1976) (citing *New York Times Co. v.
United States*, 403 U.S. 713 (1971)).

The contrast with the degree of public access provided for
in the military commissions underway at Guantánamo is striking.
Courtroom proceedings at Guantanamo are open to public observers
and also available for live viewing domestically via closed cir-
cuit television. Transcripts of these courtroom proceedings are
posted in a time frame comparable to that provided for high-
profile criminal trials in the Article III courts; transcripts of
the arraignment of the accused 9/11 conspirators were posted on
the public website within hours. Court orders and submissions by
the parties are routinely posted in redacted form on the website
for the Military Commissions, http://www.mc.mil/, within a maxi-
mum of fifteen days even where classification review and redac-
tion occurs, and 24 hours where no classification review takes
place. Rules mandating access to orders, transcripts, filings,
and other materials are all provided for in the published *Regula-*

26

APPENDIX A-026

*tion for Trial by Military Commission*. Kadidal Decl. ¶¶ 18–19 (JA-7-9).

For all practical purposes, the trial court effectuated a blanket closure order over the proceedings in this case. Those few members of the public who are able to visit the courtroom are given access to the open court proceedings, and certain redacted defense filings are available on the internet. But as to the rest of the documents at issue here, a blanket bar on public access has been the rule. Confronted with similarly broad closures lacking specific justification on the record, the Court of Military Appeals reversed a conviction for contact with foreign agents and attempted espionage. *United States v. Grunden*, 2 M.J. 116, 120–21 (C.M.A. 1977) ("the public was excluded from virtually the entire trial as to the espionage charges.... [B]lanket exclusion ... from all or most of a trial, such as in the present case, has not been approved by this Court"); *id.* at 121 ("In excising the public from the trial, the trial judge employed an ax in place of the constitutionally required scalpel."); *see also United States v. Ortiz*, 66 M.J. 334, 342 (C.A.A.F. 2008) (reversing conviction for failure of trial court to engage in process of applying *Press-Enterprise II*; appellate court may not make factual findings justifying closure *post hoc*).

The remedy Petitioner-Appellants' request here is far more modest: an order mandating that the trial judge afford notice to

27

the public of any contemplated closures or sealing of documents,[8] allow opportunity for interested parties to be heard, and ultimately justify any restrictions on access by case-by-case specific findings of necessity after consideration of less-restrictive alternatives. Petitioner-Appellants also request that this Court make clear that these documents must be made available to the press and public contemporaneously with the proceedings in order for the right of public access to be meaningful. Finally, this Court should take this opportunity to state clearly and affirmatively that the right of public access to documents like these – judicial orders, filings, and transcripts – is protected by the First Amendment and therefore subject to the strict First Amendment standards described above.[9]

---

[8]   Although redacted defense filings have been made available to the public on the defense firm's website, that access is by the grace of defense counsel. (*See supra* note 2.) Any order from this Court should mandate that the trial Court make *both* government and defense filings available to the public going forward, subject to the First Amendment standards described herein.

[9]   It appears that Chief Judge Lind's decisionmaking was affected by the fact that she believes the military appeals courts (*e.g.* this Court and the A.C.C.A.) have only recognized a limited common law right of access to judicial documents, not a First Amendment right of access. *See* Kadidal Decl. ¶ 9 (JA-3–4); *see also* Lt. Col. Denise R. Lind, *Media Rights of Access to Proceedings, Information, and Participants in Military Criminal Cases*, 163 Mil. L. Rev. 1, 45–53 (2000).

Moreover, Judge Lind's article and her discussion in court indicate that she believes the FOIA statute provides an adequate alternative mode of access to the documents in question, an argument that was the government's sole response to our petition below. This argument compares apples to oranges. FOIA provides a lesser level of access to court-martial documents than the First

28

APPENDIX A-028

### III.  __The trial court's practice of deciding substantive issues within R.C.M. 802 conferences is inconsistent with the public's right of access to these proceedings__

A number of substantive matters, including the very issue of public access to documents, have been argued and decided by the trial court in Rule 802 conferences out of view of the public with no articulated justification for the lack of public access. Kadidal Decl. ¶ 13 (JA-4-5) & Ex. B (JA-16). There is, to Petitioner-Appellants' knowledge, no recording, transcript, or other record of any of those discussions. Because there is no other way

---

Amendment, as federal courts have noted. *See Dayton Newspapers, Inc. v. United States Dep't of the Navy*, 109 F. Supp. 2d 768, 772-73 (S.D. Ohio 1999) ("legal standards governing disclosure are not identical" under FOIA and First Amendment, in large part because FOIA allows numerous statutory exemptions). That court noted that the documents the Dayton Newspapers had requested – jury questionnaires from a court-martial – would largely have been available under the First Amendment but were properly withheld under FOIA. *Id.* at 775 n.5 ("Because the present case, unlike *Washington Post*, involves a FOIA request, rather than the First Amendment, the Court need not engage in strict-scrutiny review.") There can be no clearer demonstration of the fact that FOIA's built-in legal exemptions from disclosure will typically operate to produce far lesser access to records than the First Amendment demands – even putting to one side the fact that the FOIA statute permits delays in production that would not satisfy the contemporaneous access principles demanded by the First Amendment.

Accordingly, no federal court has ever held that FOIA trumps the constitutional right of public access to documents; indeed, quite the opposite: federal courts have held that FOIA allows withholding of documents already disclosed on the public record of courts-martial. *See, e.g.*, *Freedberg v. Department of Navy*, 581 F. Supp. 3 (D.D.C. 1982) (Gesell, J.) (allowing withholding of "NIS and JAG Manual investigations" of a murder despite the fact that "large portions" of the same "are already in the public record of the courts-martial" for two of the four murder suspects already tried); *see generally* ACCA Reply Br. at 10-18.

29

to vindicate the right of public access to those proceedings, this Court can only remedy the failure to make these past R.C.M. 802 conferences part of the public record by ordering that all conferences that have already been held be reconstituted in open court. *Cf. United States v. Ortiz*, 66 M.J. 334, 342 (C.A.A.F. 2008) ("an erroneous deprivation of the right to a public trial is a structural error, which requires" outcome of proceeding below to be voided "without [appellate court engaging in] a harmlessness analysis."). Moreover this Court should order that no further substantive matters be discussed in Rule 802 conferences without meeting the requirements of the First Amendment as set forth below.

Rule 802 by its terms contemplates allowing resolution of "routine or administrative matters" in conferences,[10] but allows that substantive matters may be resolved therein by "consent of the parties."[11] However, all "matters agreed upon at a conference shall be included on the record." R.C.M. 802(b) (JA-30-31). The trial court has decided substantive matters without promptly memorializing the discussion or the decisions on the record. The use of 802 conferences in this way violates the First Amendment, regardless of whether or not the parties consent, because the

---

[10]   Manual for Courts-Martial, Discussion, R.C.M. 802 (JA-30-31).

[11]   *Id.*

APPENDIX A-030

public is denied meaningful access to the proceedings. Recent events before the trial court (memorialized in the Declaration of Alexa O'Brien, a journalist attending the proceedings, JA–26–29) illustrate the problematic nature of that court's use of 802 conferences.

As Ms. O'Brien notes, during the 6 June 2012 Article 39 proceedings, the defense raised a number of objections to the court's R.C.M. 802 practice: (1) the government, it claimed, was relitigating already-decided motions during 802 conferences, (2) the public summary of issues decided in 802 conferences was generally not adequate, and (3) most importantly, the government had been taking positions in 802 conferences and then later taking contradictory positions in open court.[12] O'Brien Decl. ¶ 5 (JA–27). That latter problem, the defense contended, should be addressed by granting its motion that all 802 conferences in the case be recorded and transcribed. *Id*. ¶¶ 5, 4 (JA–26–27). Judge Lind denied the motion, noting that defense counsel had not objected to the lack of recording previously, and finding that while "matters agreed upon at the conference shall be included [in] the record orally or in writing" normally, "[f]ailure of a

_____

[12]     Eventually, the government approved for posting on the defense website the Defense Motion to Record and Transcribe All R.C.M. 802 Conferences (2 June 2012), appended as JA–32–34. The motion sets forth few examples of alleged government manipulation of the 802 process. *See id*. at ¶¶ 6–9 (JA–32–34); *see also id*. at ¶ 10 (JA–34).

APPENDIX A-031

party to object ... waives this requirement." *Id.* ¶ 7 (JA-28). Going forward, Judge Lind decided that "if either party objects to discussion of an issue in an R.C.M. 802 conference, the conference will be terminated" (rather than recording it), and the issue instead addressed at the next Art. 39 session on the court's calendar. *Id.* (JA-28-29).

Mandating that the substance of 802 conferences be memorialized on the record only when a party objects, as the trial court effectively has done here, is not enough to satisfy the right of public access. The parties cannot be allowed to control the right of the public to witness the substance of important aspects of the proceedings. The trial court's order would do nothing to prevent collusive attempts (by the parties acting together) to keep matters off the public record. And it does nothing to prevent the government from continuing to take contradictory positions from those it had taken in past conferences, as has been alleged here, O'Brien Decl. ¶ 5 (JA-26-27), relying only on the memory of the judge to provide a disincentive against such mischief.

Two R.C.M. rules are relevant here. On the one hand, R.C.M. 802(b) states that "conferences need not be made part of the record, but matters agreed on at a conference shall be included in the record orally or in writing. Failure of a party to object at trial to failure to comply with this subsection shall waive this requirement." (JA-30) On the other hand, R.C.M. 1103(b)(2)(B)

32

states that for general courts-martial, "the record of trial shall include a verbatim written transcript of all sessions" except deliberations, and the Discussion note to the rule states that this "verbatim transcript" requirement "includes ... all proceedings including sidebar conferences.... Conferences under R.C.M. 802 need not be recorded, but matters agreed upon at such conferences *must* be included on the record." (Emphasis added.) The verbatim transcript provision of R.C.M. 1103, which seems designed primarily to ensure the possibility of meaningful review by appellate courts, states the better rule, for it makes no reference to the potential for waiver by the parties of this mandate.[13]

Petitioner-Appellants submit that the trial court's finding that defense counsel had waived opposition to the court's failure to "include[e the substance of the 802s in] the record" by failing to object was erroneous, because case law establishes that 802 conferences must be recorded when important substantive mat-

---

[13]   Conflicts between two trial regulation provisions have been resolved by various interpretive canons. *Cf. United States v. Valente*, 6 C.M.R. 476, 477 (C.G.C.M.R. 1952) ("in such a case of conflict [between two provisions of Manual for Courts-Martial, the] paragraphs should be read together and, if possible, the conflict resolved in accord with the over-all intent of the Manual."), *with United States v. Morlan*, 24 C.M.R. 390, 392 (A.C.M.R. 1957) ("specific terminology controls and imparts meaning to general terminology"). Here, the conflict with the First Amendment means this Court need not sort out which interpretive canon(s) to apply to resolve the apparent conflict between R.C.M. rules 803(b) and 1103(b)(2)(B), as the 803(b) waiver rule cannot stand in the face of the First Amendment.

APPENDIX A-033

ters are addressed. *See United States v. Sadler*, 29 M.J. 370, 373
n.3 (C.M.A. 1990) (instructions not to be discussed at 802s);
*United States v. Garcia*, 24 M.J. 518, 519 (A.F.C.M.R. 1987) (802s
"not [for] central trial issues"; providency of guilty pleas may
not be discussed at 802 conference). Failure to do so violates
not only the verbatim transcript provisions of R.C.M. 1103 but
also the Fifth and Sixth Amendment right to public trial, and
First Amendment right of the public to be present. *United States
v. Walker*, 66 M.J. 721, 749-50, 753-54 (N-M.C.C.A. 2008) ("exten-
sive use" of 802s creates "deep[] concern" under R.C.M. 804,
U.C.M.J. Art. 39, and First, Fifth and Sixth Amendments; court
overturned death sentence on other grounds, mooting otherwise
serious 802 issues).

Several service courts of appeal have found this requirement
is jurisdictional and therefore cannot be waived by a party's
failure to object. *See Garcia*, 24 M.J. at 519-20 ("The require-
ment for a verbatim record, where it exists, is jurisdictional
and cannot be waived by counsel's failure to object. *United
States v. Whitney,* 23 U.S.C.M.A. 48, 48 C.M.R. 519 (1974); *United
States v. Desciscio*, 22 M.J. 684 (A.F.C.M.R. 1986). ... R.C.M.
802 conferences covering authorized subjects are ... an excep-
tion. ... However, when matters beyond the scope of the rule have
been discussed in an R.C.M. 802 conference, subsequent failure to
include them in the record may render it nonverbatim."); *Walker,*

34

APPENDIX A-034

66 M.J. at 754–55 ("extensive use" of 802s, including those where there was "a ruling by the judge affecting rights," "is jurisdictional and cannot be waived by failure to object at trial." (citing *United States v. Henry*, 53 M.J. 108, 110 (C.A.A.F. 2000))). Courts have presumed prejudice to a defendant from failure to record the substance of an 802 conference in the appellate record, *see United States v. Adriance*, 1988 CMR LEXIS 222, at *6 (A.F.C.M.R. Mar. 4, 1988); *Desciscio*, 22 M.J. at 686, and have found that the trial judge has an independent obligation to record. *See id.* at 688 ("trial judges must protect the accused's right to a complete record whenever they rule on objections or motions"); *United States v. Grey*, 1997 CCA LEXIS 198, at *18 (N-M.C.C.A. Jun. 20, 1997) ("the military judge and the trial counsel each had an independent obligation to ensure that the R.C.M. 802 session was summarized on-the-record"). Other service courts have strongly castigated a trial court's practice of frequent resort to 802 conferences, and noted that the use of the 802 process to "litigate issues" or decide contested issues is outside the intent of the drafters of the rules. *See Walker*, 66 M.J. at 756 ("we roundly condemn the [802] practice employed by the military judge in this case"); *see also id.* at 752 ("To litigate issues, or to decide issues not subject to agreement between the parties, 'would exceed, and hence be contrary to, the authority established under [UCMJ] Article 39(a)' for such conferences,"

35

citing "R.C.M. 802(a), Drafter's Analysis"); *Grey*, 1997 CCA LEXIS 198, at *16 ("military judge should have summarized ... the nature of the conference.... It was error not to").

The widespread practice of using 802 conferences to argue and pre-decide troublesome issues outside of public view, evidenced by these many cases, is troublesome. If current trends continue, nearly all important issues in high profile court-martial proceedings will be rehearsed, argued and decided behind closed doors, and afterwards presented in the most summary fashion – if at all – to the public. It is said that the ad hoc nature of military trial courts, each convened for the purpose of a single case, tends to sap participants (including military judges) of the confidence born of continuity of practice, which in turn fosters the practice of dress-rehearsing issues outside of public scrutiny in 802 conferences. While the aim of such a policy may be to enhance the appearance of professionalism of the military courts, it is a short-sighted means to that end, for by allowing decision-making to be withdrawn from public view, it will in the long run erode public confidence in their ability to deliver justice.

### Conclusion

As the Second Circuit explained in a high-profile terrorism case:

> Transparency is pivotal to public perception of the judiciary's legitimacy and independence. The political

36

APPENDIX A-036

> branches of government claim legitimacy by election,
> judges by reason. Any step that withdraws an element of
> the judicial process from public view makes the ensuing
> decision look more like fiat and requires rigorous jus-
> tification.

*United States v. Aref*, 533 F.3d 72, 83 (2d Cir. 2008) (quotation

and citation omitted). The legitimating function of openness is

as important as its role in making proceedings more likely to

arrive at accurate outcomes. Both considerations are vital in a

case with so high a public profile as this one, and the concerns

raised by the secrecy imposed thus far are magnified by the fact

that they are taking place in a military proceeding. *See* Eugene

R. Fidell, *Accountability, Transparency & Public Confidence in

the Administration of Military Justice*, 9 Green Bag 2d 361 (2006)

(openness is particularly vital in courts-martial because "mili-

tary trial courts in our country are not standing or permanent

courts," and may be convened by various commanding officers with-

out any centralized oversight at the trial stage).

On remand, the trial court should be clearly instructed that

the First Amendment right of public access applies to all R.C.M.

802 conferences and to the documents sought by Petitioner-

Appellants, that that right mandates timely access to the docu-

ments during (not after) the proceedings, and that any restric-

tions on public access that the Court finds to be consistent with

the First Amendment may only be imposed in a manner that allows

37

APPENDIX A-037

public participation in the decision-making as well as subsequent

review by appellate courts.[14]

Date: New York, New York
      26 June 2012

                              Respectfully submitted,


                              ___/s/sdk_____
                              Shayana D. Kadidal
                              J. Wells Dixon
                              Baher Azmy, Legal Director
                              Michael Ratner, President Emeritus
                              CENTER FOR CONSTITUTIONAL RIGHTS [15]
                              666 Broadway, 7th Floor
                              New York, New York 10012
                              Tel: (212) 614-6438
                              Fax: (212) 614-6499

                              Jonathan Hafetz
                              169 Hicks Street
                              Brooklyn, NY 11201
                              Tel: (917) 355-6896

                              *Counsel for Petitioner-Appellants*[16]

---

[14]   To the extent that access to portions of the proceedings or certain documents may be restricted to protect classified information, CCR requests that its attorneys who already hold top-secret security clearances (*cf*. Kadidal Decl. at ¶ 2 (JA-2)) be allowed access.

[15]   Counsel gratefully acknowledge the contributions of law students Madeline Porta and Carey Shenkman to this brief.

[16]   Petitioners' counsel are not admitted to practice before the Court and therefore request permission, pursuant to Rules 13(a-b) and 38(b) of this Court's Rules of Practice and Procedure, to appear pro hac vice for the limited purpose of litigating this Writ Appeal Petition. Good cause exists to grant this request given the emergency nature of the relief requested and the serious nature of the issues at stake in this case. Counsel are members in good standing of the bar in New York State, and are admitted to practice before various federal courts.
      This Court has already granted such a request in connection with its consideration of an earlier request for public access to the Art. 32 proceedings in the *Manning* case. *See Assange v. Unit-*

38

APPENDIX A-038

_ed States_, Misc. No. 12–8008/AR, 2012 CAAF LEXIS 42 (C.A.A.F. Jan. 11, 2012).

 Lead counsel, Mr. Kadidal, will file a motion for admission to the bar of this Court as soon as is practicable.

## **Respondents' Addresses, Telephone and Facsimile Numbers**

**For the United States:**

Capt. Judge Advocate Chad M. Fisher
Appellate Government Counsel
Lt. Col. Amber J. Loach
Acting Chief, Government Appellate Counsel
Attn: Government Appellate Division
Office of the Judge Advocate General
U.S. Army Legal Services Agency
9275 Gunston Rd.
Ft. Belvoir, VA 22060
Tel: (703) 693-0783

**For Judge Lind:**

Chief Judge Col. Denise Lind
U.S. Army Trial Judiciary, 1st Judicial Cir.
U.S. Army Military District of Washington
Office of the Staff Judge Advocate
103 Third Ave., SW, Ste 100.
Ft. McNair, DC 20319
Tel: c/o Ft. McNair SJA at (202) 685-3260 or -3025

## **Certification of Compliance with Rule 24(d)**

1.    This brief complies with the type-volume limitation of Rule 24(c) because it is a principal brief and contains 9056 words.

2.    This brief complies with the typeface and type style requirements of Rule 37 because it has been prepared in a mono-spaced typeface (Courier New) using Microsoft Word Versions 2003 and 2010 with 10 characters per inch in 12-point size.


_____
        /s/sdk
        Shayana Kadidal

## Certificate of Service

I hereby certify on this 26th day of June, 2012, I caused the foregoing Writ Appeal Petition to be filed with the Court and served on Respondents electronically via email (per this Court's Electronic Filing Order of 22 July 2010), and to be served on the trial and appellate courts below via overnight courier delivery (hardcopies arriving 27 June), at the following addresses and facsimile numbers, respectively:

```
Clerk of the Court
U.S. Court of Appeals for the Armed Forces
450 E Street, NW
Washington, DC 20442-0001
Tel: (202) 761-1448
efiling@armfor.uscourts.gov

- and -

U.S. Army Court of Criminal Appeals
Office of the Clerk of Court
9275 Gunston Road
Fort Belvoir, VA  22060-5546

- and -

Chief Judge Col. Denise Lind
U.S. Army Trial Judiciary, 1st Judicial Cir.
U.S. Army Military District of Washington
Office of the Staff Judge Advocate
103 Third Ave., SW, Ste 100.
Ft. McNair, DC 20319

- and -

David E. Coombs (counsel for Pfc. Manning)
Law Office of David E. Coombs
11 South Angell Street, #317
Providence, RI  02906
Tel: (508) 689-4616
(COURTESY COPY)

- and -
```

Capt. Judge Advocate Chad M. Fisher
Appellate Government Counsel
Office of the Judge Advocate General
U.S. Army Legal Services Agency
9275 Gunston Rd.
Ft. Belvoir, VA 22060
Tel: (703) 693-0783
chad.m.fisher.mil@mail.mil

Additionally the Joint Appendix hereto has been served in hard-copy on all parties and courts listed above except Capt. Fisher, who has consented to accept an electronic copy in lieu of a paper copy.


                          /s/sdk
                    Shayana Kadidal

43

```
              IN THE UNITED STATES COURT OF APPEALS
                    FOR THE ARMED FORCES

--------------------------------- x
                                  :
CENTER FOR CONSTITUTIONAL RIGHTS, :
GLENN GREENWALD, JEREMY SCAHILL,  : Crim. App. Misc.
THE NATION, AMY GOODMAN, DEMOCRACY : Dkt. No. 20120514
NOW!, CHASE MADAR, KEVIN GOSZTOLA, :
JULIAN ASSANGE, and WIKILEAKS,    :
                                  : General Court Martial
          Petitioner-Appellants,  : United States v. Manning,
                                  : Ft. Meade, Maryland
              v.                  :
                                  :
                                  : Dated: 26 June 2012
UNITED STATES OF AMERICA and CHIEF :
JUDGE COL. DENISE LIND,           :
                                  :
          Respondent-Appellees.   :
                                  :
--------------------------------- x
```

## **JOINT APPENDIX**

## TABLE OF CONTENTS

Order*, Center for Constitutional Rights v. United States*,
Army Misc. 20120514 (Army Ct. Crim. App. 21 June 2012).......JA-1

Declaration of Shayana Kadidal (18 May 2012)...............JA-2-9

   Ex. A: Letter from CCR to Judge Lind
   (21 Mar. 2012) .......................................JA-10-13

   Ex. B: Letter from CCR to David Coombs
   (23 Apr. 2012) .......................................JA-14-17

   Ex. C: Letter from Reporter's Committee for
   Freedom of the Press to Jeh Johnson,
   General Counsel for the Department of Defense
   (12 Mar. 2012) .......................................JA-18-22

Erratum to Declaration of Shayana Kadidal...................JA-23

Declaration of Kevin Gosztola (23 May 2012).............JA-24-25

Declaration of Alexa O'Brien (14 June 2012).............JA-26-29

Manual for Military Commissions (2010), R.C.M. 802.......JA-30-31

Defense Motion to Record and Transcribe All R.C.M. 802
Conferences (2 June 2012)................................JA-32-34

Charge Sheet, *United States v. Manning*
(rec'd 3 Feb 2012).......................................JA-35-43

APPENDIX A-045

# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
KERN, YOB, and COOK
Appellate Military Judges

## CENTER FOR CONSTITUTIONAL RIGHTS,
Petitioner
v.
## THE UNITED STATES OF AMERICA and
Colonel DENISE LIND,
Respondents

ARMY MISC 20120514

---------------
ORDER
---------------

On consideration of the Petition for Extraordinary Relief in the Nature of a Writ of Prohibition and Mandamus, the petition is DENIED.

DATE:  21 June 2012

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

CF:   JALS-DA
JALS-GA
Petitioner
Respondent
JALS-CR2

APPENDIX A-046

JA-001

## DECLARATION OF SHAYANA KADIDAL

I, Shayana Kadidal, hereby declare as follows:

1.      I am an attorney with the Center for Constitutional Rights ("CCR" or "the Center") and, along with others, represent the petitioners in this case. I make this declaration in support of Petitioners' application for a writ of mandamus.

2.      The Center for Constitutional Rights is a nonprofit public interest law firm in New York, where I have worked since 2001. I am a member of the bars of the State of New York and the District of Columbia, as well as several federal courts including the United States Supreme Court. I received my law degree in 1994 from Yale Law School, where I was a member of the law journal, and was afterwards a law clerk to Judge Kermit V. Lipez of the United States Court of Appeals for the First Circuit. I have worked on a large portion of CCR's post-9/11 litigation, including both cases successfully challenging the indefinite detention of foreign nationals at Guantánamo Bay Naval Station before the Supreme Court, *Rasul v. Bush,* 542 U.S. 466 (2004) and *Boumediene v. Bush*, 553 U.S. 723 (2008), and another case decided two terms ago at the Court, *Holder v. Humanitarian Law Project*, 561 U.S. ___, 130 S. Ct. 2705 (2010). I am currently managing attorney of CCR's Guantánamo litigation project, a position I have held since late 2006. In that capacity I hold a current Top Secret//SCI clearance from the Justice Department.

3.      CCR is counsel to the publisher of the WikiLeaks media group, Julian Assange, and Wikileaks. On behalf of Mr. Assange and Wikileaks the Center has sought to ensure public access to the proceedings in *United States v. Bradley Manning*, a Court Martial prosecution taking place in the Military District for Washington, D.C. and presided over by Chief Judge Col. Denise  Lind. Manning is charged with potentially capital offenses for allegedly providing

materials later published by WikiLeaks and a large number of other media outlets including the *New York Times*, *The Guardian*, *Der Speigel*, and others.

4.     Concerned by the lack of transparency surrounding the *Manning* proceedings in general and, in particular, the lack of access to critical – and presumptively public – documents and filings in the case, the Center sent two letters to the Court requesting broader public access to the proceedings and to documents related to the *Manning* case. The first such letter, dated March 21, 2012, was addressed to Chief Judge Lind and set forth the constitutional and common law standards requiring broad public access to court martial proceedings, including access to non-classified documents filed in the case. (The March 21, 2012 letter is attached hereto as Exhibit A).  On April 23, 2012, the Center sent a similar letter addressed to David Coombs, counsel to Bradley Manning, with a request that he deliver a copy to the Court and bring it to the attention of Chief Judge Lind. (The April 23, 2012 letter is attached as Exhibit B.) Both letters request public access to various documents in the *Manning* case including, *inter alia*, court orders, transcripts, and government filings, none of which have been made public to date. They also express concern about fact that many substantive matters are argued and decided in closed session during RCM 802 hearings, undermining this historic proceedings transparency and legitimacy.  The April 23 letter also requests, consistent with the presumption of public access to military commissions proceedings, that all 802 conferences be reconstituted in open court.[1]

---

[1]     A third letter from the Reporters' Committee for Freedom of the Press, dated March 12, 2012 and addressed to Defense Department General Counsel Jeh Johnson, requesting implementation of "the same measures provided for in the revised regulations governing trials by military commission" at Guantánamo to allow access to documents in the *Manning* proceedings, is appended as Exhibit C.

2

5.　　On April 23, 2012, I attended a pretrial hearing in *United States v. Manning* at the Magistrate's Court at Ft. Meade, Maryland. During that hearing one of the first issues addressed by the Court was CCR's April 23, 2012, letter demanding public access to the proceedings.

6.　　I took handwritten notes of the colloquy surrounding CCR's letter, which I relate in the following paragraphs, as no official transcript has been released to the public. (Indeed, there are no publicly-available transcripts of *any* proceedings before the Court Martial in *Manning*, including the RCM Article 32 hearings that took place beginning on December 16, 2011.). Quotations used in the following paragraphs are taken from my handwritten notes.

7.　　The Court stated that it had received CCR's letters, including the one addressed to David Coombs, and had entered both of them into the record in the case: "The Court has marked as appellate exhibit #66 a letter from the Center for Constitutional Rights. I received an earlier letter in March. Both are now [part of] appellate exhibit #66 in the record."

8.　　The Court then ruled on the requests. "The Court finds as follows: The letter asks that an attorney from the Center be allowed to address the Court. The letter is basically a request for intervention. That request is denied."

9.　　The Court went on to spell out some of its reasoning for denying CCR to access to critical documents in the case, including nonclassified portions the transcripts, court orders, and government filings. The Court stated that, "Documents are subject to a common law of access. That Common Law right of access is not absolute," citing *Nixon v. Warner Communications*, 435 U.S. 589 (1978). "This court also considers the Freedom of Information Act.... The common law right of access may be satisfied by FOIA.  *Id*. at 603-606." The Court went on to imply that it lacked control over release of documents that might otherwise be subject to FOIA: "The Court is not the custodian of the record at trial," citing RCM 501, 808, and 1103. "Neither is the Court

the release authority under FOIA." Chief Judge Lind gave no indication in her discussion that she believed the First Amendment right of public access applied to documents.

10.      In short, the Court denied CCR the relief requested in our letters.

11.      Prior to (and since) the hearing, a number of documents filed by the defense were publicly posted on defense counsel David Coombs' website, http://www.armycourtmartial defense.info/.[2] These include defense motions and replies in support of those defense motions, as well as defense responses to government motions. These defense filings were redacted by the government pursuant to a review procedure apparently agreed to by the parties.

12.      However, to this day, *none* of the corresponding government filings—either government motions or government responses to defense motions—have been made publicly available anywhere. Indeed, it appears from the redacted defense documents that are available on the defense website that the government is insisting that any quotation from its own filings be redacted from the public version of the defense document solely on the basis that it is part of a government filing. *See, e.g*., Defense Reply re. Motion to Compel Depositions (13 Mar. 2012), at ¶¶ 14-16;[3] Defense Reply re. Motion to Compel Discovery (13 Mar. 2012), at ¶¶ 2, 3, 3 n.1, 5.[4] This is so despite the fact that at the hearing the government attorney appeared to be quoting arguments from the briefs at the podium.

13.      At the April 23 hearing defense counsel stated that it had offered to post government filings (after redaction by the government) as well, but that the government objected to this proposed mode of making its filings available to the public.  At the hearing it was also stated that there was a RCM 802 conference on this very issue, and that a court order relevant to

---

[2]      It is not clear whether every document filed by the defense has yet been posted in redacted form.

[3]      Available at https://docs.google.com/file/d/0B_zC44SBaZPoQzFkT1ZtREtCbDg/edit

[4]      Available at https://docs.google.com/file/d/0B_zC44SBaZPoV1FNVDNDc3FueVU/edit

APPENDIX A-050

the subject was issued on March 28, 2012.  Yet, that order has not been publicly disclosed, nor have the original pleadings and arguments of the parties on the subject.

14.     The Court's own orders, including the protective order, case management order, and pretrial publicity order, are not publicly available in documentary form. During the hearing on April 23, the Chief Judge Lind read several orders into the record from the bench. Most of the first hour of the session consisted of her reading several orders in this manner—so rapidly that it appeared she was losing her voice, and asked an assistant for water, near the end of that hour. Yet significantly, because there are also no publicly-available transcripts of the proceedings on April 23, the notes of those few members of the press and public who were present at the hearing are the only records of those orders that any members of the public have access to. The court gave no indication that there is currently any schedule contemplated for publication of redacted transcripts.

15.     As a general matter, it was extremely difficult to follow what was being discussed and/or decided during the hearing without the having had an opportunity to read the Court's prior orders or the government's filings.

**Comparison With Guantanamo Military Commissions and Habeas Proceedings**

16.     CCR has had substantial experience litigating habeas petitions on behalf of Guantanamo detainees in federal court under strict rules of confidentiality.  CCR also has experience litigating cases in the Military Commission system established in Guantanamo by the President to adjudicate alleged war crimes.  Based on our experiences in habeas cases and Military Commissions proceedings, it is striking how much *less* public access the Manning proceedings provides than these forums.

APPENDIX A-051

17.     Many dozens of Guantanamo habeas cases have been consolidated in the district court for the District of Columbia.  In these cases, all of the various protective orders in place since 2004 have been made public upon issuance. The courts have at various times allowed the intervention of representatives of the press and public seeking to vindicate a right of public access to the proceedings and in particular to documents filed during the proceedings. *See, e.g.*, Press Applicants' Motion to Intervene for the Limited Purpose of Opposing Government's Motion to Confirm Designation of Unclassified Factual Returns as 'Protected,' Dkt. No. 1526, *In re Guantanamo Bay Detainee Litigation*, No. 08-mc-442 (D.D.C. Jan 14, 2009) (motion of *New York Times*, AP, and *USA Today*, opposing sealing of unclassified information in Guantánamo detainee habeas cases); Minute Order (April 2, 2009) (granting motion). The district and appellate courts have gone to pains to allow certain parts of the courtroom proceedings to take place in public. For the most part, redacted versions of all judicial opinions and the filings of the parties, have been produced and made available via PACER quickly.

18.     In the Military Commissions, far more openness also prevails than in the Manning proceeding.  For example, the protective order applicable to proceedings before the commissions is publicly available, and court orders and submissions by the parties are routinely posted in redacted form on the website for the Military Commissions, http://www.mc.mil/, within a maximum of fifteen days even where classification review and redaction occurs. Access to the courtroom by members of the press and public (including observers from human rights organizations) is facilitated by the use of a glass partition between the court and the audience and an audio delay that allows the authorities to cut off the sound feed whenever classified information is inadvertently discussed during the proceedings. A viewing location has been set up at Ft. Meade allowing spectators who are unable to travel to Guantánamo to see the

APPENDIX A-052

proceedings in real time over closed-circuit television. Transcripts of these public courtroom proceedings are also posted in a time frame comparable to that provided for high-profile criminal trials in the Article III courts; for instance, on Saturday May 5, 2012, during the thirteen hour arraignment proceedings for Khalid Sheikh Mohammed and other accused planners of the 9/11 attacks, transcripts from the morning sessions were already posted on the website several hours before the end of the evening sessions that night around 10:28pm.

19.    Written rules governing access to the proceedings and classification review are codified in Section 949d(c)(2) of the Military Commissions Act of 2009 (allowing closure only upon specific findings) and in the published *Regulation for Trial by Military Commission* (2011 Ed.).[5] Chapter 19 of that Regulation provides rules governing "Public Access to Commission Proceedings and Documents**,"** including provisions ensuring access for spectators **"**to the maximum extent practicable" (§ 19-6), allowing for "Public Release of transcripts, Filings, Rulings, Orders and Other Materials" within fixed, short time frames (one day for items requiring no classification review and 15 days for items requiring such review) (§ 19-4), and providing that the presiding military judge may resolve any dispute raised over public access to judicial materials (§ 19-3). Notably, the general section on public access (§ 19-1) notes the special importance of access to documents in conforming to the statutory requirement of transparency:

> Making military commissions accessible to the public includes providing access to military commission proceedings, transcripts, pleadings, filings, rulings, orders and other materials used at military commission proceedings, to the extent that these materials are not classified, covered by a protective order, or otherwise protected by law

---

[5]    Available at http://www.mc.mil/Portals/0/Reg_for_Trial_by_mcm.pdf

APPENDIX A-053

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 18th day of May, 2012.

Shayana Kadidal

8

**Exhibit A**

# centerforconstitutionalrights

*on the front lines for social justice*

March 21, 2012

**Via Federal Express**

Colonel Denise R. Lind
Chief Judge, 1st Judicial Circuit
U.S. Army Trial Judiciary
U.S. Army Military District of Washington
Office of the Staff Judge Advocate
103 Third Avenue, SW, Suite 100
Fort McNair, DC 20319

> **Re:    Access to Court-Martial Records in** *United States v. Bradley Manning*

Dear Chief Judge Lind:

The Center for Constitutional Rights (CCR) represents the Wikileaks media organization and its publisher Mr. Julian Assange regarding access to the court-martial proceedings in *United States v. Bradley Manning* at Fort Meade, Maryland. We write to request that the Court make available to the public and the media for inspection and copying all documents and information filed in the *Manning* case, including the docket sheet, all motions and responses thereto, all rulings and orders, and verbatim transcripts or other recordings of all conferences and hearings before the Court. We have been unable to obtain access to these important documents and have been told that they are not being made available to the public, media or interested parties. As the Manning court martial purports to be a public trial, we cannot understand why critical aspects of the proceedings are being withheld from public view. As Circuit Judge Damon Keith wrote in *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 683 (6th Cir. 2002): "Democracies die behind closed doors." We urge the Court to take the action required by military law and the Constitution and make these documents available.

First, there is no dispute that military law (including RCM 806) mandates a presumption of open, public court-martial trials, which may be overcome only in limited circumstances based on specific findings that closure is necessary. The public, including the media, have First Amendment and common law rights of access to criminal trials. There is also no dispute that the public has a compelling interest in obtaining access to all documents and information filed in Pfc. Manning's case given the nature of his alleged offenses. Access for media organizations, including groups such as Wikileaks which provide groundbreaking independent reporting on issues of great international significance, is especially important to ensure transparency, freedom of the press, and the integrity of these proceedings. The fairness of the proceedings have already been called into doubt by strong evidence and recent findings by United Nations Special Rapporteur on Torture, Juan Mendez, that Pfc. Manning suffered cruel, inhuman and degrading treatment – if not torture – during an 11-month period of solitary pretrial confinement in Kuwait and at Marine Corps Base Quantico.

666 broadway, 7 fl, new york, ny 10012
t 212 614 6464 f 212 614 6499 www.CCRjustice.org

Second, Wikileaks and Mr. Assange also have a unique and obvious interest in obtaining access to documents and information filed in this case. For more than a year, there has been intense worldwide speculation that hundreds of thousands of allegedly classified diplomatic cables published by Wikileaks – as well as *The New York Times*, *The Guardian*, and other international media organizations – were provided to Wikileaks and/or Mr. Assange by Pfc. Manning. Mr. Assange notably has a particular personal interest in this case because it appears that federal prosecutors in the Eastern District of Virginia have obtained a sealed indictment against him concerning matters that, based on prior official statements, will likely be addressed in Pfc. Manning's court-martial.

Notwithstanding these substantial interests, the *Manning* court-martial case thus far has not proceeded with the requisite openness. Instead, to date this court-martial reflects – and indeed compounds – the lack of openness experienced in Pfc. Manning's prior Article 32 hearing. Documents and information filed in the case are not available to the public anywhere, nor has the public received appropriate prior notice of issues to be litigated in the case. For example, undersigned counsel attended the motions hearing on March 15, 2012, and determined that it was not possible to understand fully or adequately the issues being litigated because the motions and response thereto were not available. Without access to these materials, the *Manning* hearings and trial cannot credibly be called open and public. We do not understand how a court-martial proceeding can be deemed to comply with the UCMJ or the Constitution unless its proceedings are accessible in a timely fashion. The public and our clients must be given access to the legal filings when filed and prior to arguments before the Court.

In addition, like the prior Article 32 hearing, it appears that a number of substantive issues are argued and decided in secret, in closed Rule 802 conferences. These important issues should be argued and decided in open court and on the record. This impedes the public's and media's right to a public trial. For example, when the undersigned was in court we were informed that the Court had signed a pre-trial publicity order apparently after a closed door 802 discussion with counsel. The argument regarding such an order, the decision and the order itself should have happened in public. This is particularly so because the order concerns what can and cannot be said to the public and press; an order of that sort should be dealt with in open court.

We therefore request that the Court order disclosure of all documents and information filed in the *Manning* case, and further implement procedures similar to those used in connection with military commission proceedings at Guantánamo Bay to ensure that information is accessible to the public in a timely and meaningful fashion. Specifically, we request that the Court enter an order requiring (a) immediate public access to all documents and information filed to date in this case, and (b) public disclosure of documents and information filed now or in the future, including disclosure of motions and responses thereto on a real-time basis, prior to argument and rulings on such motions.

We respectfully request that the Court enter such an order, or otherwise respond to this request, by Friday, March 30, 2012, in order to allow Wikileaks and Mr. Assange to seek any further judicial relief that may be necessary to protect their rights and the rights of the media and the general public.

APPENDIX A-057

If you have any questions, please do not hesitate to contact me.

Respectfully submitted,

Michael Ratner
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6429
Fax: (212) 614-6499
mratner@ccrjustice.org

*Counsel for Wikileaks and Julian Assange*

cc:   Jennifer Robinson

Jeh C. Johnson
General Counsel
Office of the General Counsel
United States Department of Defense
1600 Defense Pentagon
Room 3E788
Washington, D.C. 20301-1600

3

JA-013

**Exhibit B**

APPENDIX A-059

JA-014

center for constitutional rights

April 23, 2012

**Via Email (coombs@armycourtmartialdefense.com)**

David E. Coombs, Esq.
Law Office of David E. Coombs
11 South Angell Street, #317
Providence, RI 02906

      Re:   *United States v. Bradley Manning*

Dear Mr. Coombs:

The Center for Constitutional Rights (CCR) represents the Wikileaks media organization and its publisher Julian Assange regarding access to the court-martial proceedings in *United States v. Bradley Manning* at Fort Meade, Maryland. We are also making this request for access on behalf of the Center for Constitutional Rights, a non-profit legal and educational organization. We ask that you forward copies of this letter to Chief Judge Lind and counsel for the prosecution in advance of the hearings commencing April 24, 2012.

By letter to Chief Judge Lind dated March 21, 2012, CCR requested public access to documents and information filed in this case, including the docket sheet, all motions and responses thereto, all rulings and orders, and verbatim transcripts or other recordings of all conferences and hearings before the Court. We have received no response to our letter, and, with the exception of certain redacted defense motions recently published on your website, continue to be denied access to the requested materials without legal justification or other explanation.

Accordingly, in order to avoid any confusion and ensure that we have exhausted efforts to obtain meaningful, timely access to documents and information filed in this case without further litigation, we now renew our request for public access to these materials, including without limitation the following items referenced in open court during the arraignment and motions hearings on February 23, March 15, 16 2012:

- All orders issued by the Court, including the case management order, pretrial publicity order, protective order regarding classified information, and other protective orders;

- The government's motion papers and responses to the redacted defense motions; and

- Authenticated transcripts of all proceedings, including in particular transcripts of open court sessions, at the same time and in the same form they are provided to counsel for the parties.

This request includes timely public access to all documents and information filed subsequent to the March 16 hearing and all such documents and information filed in the future. These should be provided when filed.

We further request that the Court require all conferences held pursuant to R.C.M. 802 be held in open court and be made part of the record in this case, to the extent they involve substantive matters, and regardless of whether the parties agree to have those substantive matters discussed and decided off the record. Moreover, we request that all Rule 802 conferences which have already occurred be reconstituted in open court.

To the extent these requests are denied (or not decided) we request an explanation for the purported factual and legal basis for such result. We expect an immediate decision as the loss of First Amendment rights in this context "for even minimal periods of time" constitutes irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971)).

As you are aware, the First Amendment to the Constitution and the federal common law guarantee a right of public access to criminal proceedings, including courts-martial, except in limited circumstances. *See Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606 (1982); *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). In particular, "[t]he First Amendment guarantees the press and the public a general right of access to court proceedings and *court documents* unless there are compelling reasons demonstrating why it cannot be observed." *Washington Post Co. v. Robinson*, 935 F.2d 282, 287 (D.C. Cir. 1991) (emphasis added) (citing cases); *see also In re Washington Post Co.*, 807 F.2d 383, 390-91 (4th Cir. 1986) (same). Access may only be denied where the government establishes that closure is necessary to further a compelling government interest and narrowly tailored to serve that interest, and the court makes specific findings on the record supporting the closure to aid review. *See Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984). Any motion or request to seal a document or otherwise not disclose a document to the public must be "docketed reasonably in advance of [its] disposition so as to give the public and press an opportunity to intervene and present their objections to the court." *In re Washington Post Co.*, 807 F.2d 383, 390-91 (4th Cir. 1986) (quoting *In re Knight Publishing Co.*, 743 F2d 231, 234 (4th Cir. 1984)).

Indeed, it is reversible error for a court to withhold from the public each and every document filed, subject to further review and disclosure, because such procedures "impermissibly reverse the 'presumption of openness' that characterizes criminal proceedings 'under our system of justice." *Associated Press v. District Court*, 705 F.2d 1143, 1147 (9th Cir. 1983) (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980)). It is "irrelevant" that some of the pretrial documents might only be withheld for a short time. *Id.*

The Court's authority to grant CCR's requests for public access pursuant to the All Writs Act, 28 U.S.C. § 1651(a), is equally clear and indisputable. *See, e.g.*, *Denver Post Co. v. United States*, Army Misc. 20041215 (A.C.C.A. 2005), *available at* 2005 CCA LEXIS 550 (exercising jurisdiction and granting writ of mandamus to allow public access); *see also ABC, Inc. v. Powell*, 47 M.J. 363, 365 (C.A.A.F. 1997), *available at* 1997 CAAF LEXIS 74. This is particularly true given the Supreme Court's repeated conclusions that openness has a positive effect on the truth-determining function of proceedings and *can affect outcome. See Gannett Co. v. DePasquale*, 443 U.S. 368, 383 (1979)

APPENDIX A-061

("Openness in court proceedings may improve the quality of testimony, induce unknown witnesses to come forward with relevant testimony, cause all trial participants to perform their duties more conscientiously"); *Richmond Newspapers*, 448 U.S. at 596 (open trials promote "true and accurate fact-finding") (Brennan, J., concurring); *Globe Newspaper*, 457 U.S. at 606 ("[P]ublic scrutiny enhances the quality and safeguards the integrity of the factfinding process.").

Finally, senior CCR attorney Shayana Kadidal will attend the hearing in this case on April 24, 2012.  We request that he be afforded the opportunity to address the Court directly and present arguments concerning our requests for public access to documents and information filed in this case.

If you, the prosecution or the Court have any questions concerning request, please do not hesitate to contact Mr. Kadidal at (212) 614-6438, shanek@ccrjustice.org, or Michael Ratner at (917) 916-4554.

Very truly yours,

Michael Ratner
Wells Dixon
Shayana Kadidal

*Counsel for Wikileaks & Julian Assange*

3

APPENDIX A-062

JA-017

**Exhibit C**

**REPORTERS**
**COMMITTEE**
FOR FREEDOM OF THE PRESS

1101 Wilson Blvd., Suite 1100
Arlington, Va. 22209-2211
(703) 807-2100
www.rcfp.org

Lucy A. Dalglish
Executive Director

STEERING COMMITTEE

SCOTT APPLEWHITE
*The Associated Press*

WOLF BLITZER
*CNN*

DAVID BOARDMAN
*Seattle Times*

CHIP BOK
*Creators Syndicate*

ERIKA BOLSTAD
*McClatchy Newspapers*

JESS BRAVIN
*The Wall Street Journal*

MICHAEL DUFFY
*Time*

RICHARD S. DUNHAM
*Houston Chronicle*

ASHLEA EBELING
*Forbes Magazine*

FRED GRAHAM
*InSession*

JOHN C. HENRY
*Freelance*

NAT HENTOFF
*United Media Newspaper Syndicate*

DAHLIA LITHWICK
*Slate*

TONY MAURO
*National Law Journal*

DOYLE MCMANUS
*Los Angeles Times*

ANDREA MITCHELL
*NBC News*

MAGGIE MULVIHILL
*New England Center for Investigative Reporting*

BILL NICHOLS
*Politico*

SANDRA PEDDIE
*Newsday*

DANA PRIEST
*The Washington Post*

DAN RATHER
*HD Net*

JIM RUBIN
*Bloomberg News*

CRISTINE RUSSELL
*Freelance*

BOB SCHIEFFER
*CBS News*

ERIC SCHMITT
*The New York Times*

ALICIA SHEPARD
*National Public Radio*

PAUL STEIGER
*Pro Publica*

PIERRE THOMAS
*ABC News*

SAUNDRA TORRY
*USA Today*

JUDY WOODRUFF
*PBS/The NewsHour*

*Affiliations appear only
for purposes of identification.*

March 12, 2012

Mr. Jeh C. Johnson
General Counsel
U.S. Department of Defense
1400 Defense Pentagon
Washington, D.C. 20301-1400

*Re: Access to records in the court-martial of Pfc. Bradley Manning*

Dear Mr. Johnson:

The media coalition ("coalition") comprising the below-listed national and local news organizations and associations writes to express its concern about reports that journalists covering the court-martial of Pfc. Bradley Manning have been unable to view documents filed in the proceeding. *See, e.g.*, Josh Gerstein, *Bradley Manning Defers Plea in WikiLeaks Case*, POLITICO, Feb. 23, 2012, http://www.politico.com/news/stories/0212/73214.html (reporting that details of a proposed defense order aimed at limiting pretrial publicity in the case and other motions and orders filed therein and discussed during the first day of Manning's court-martial were not publicly available). In light of the upcoming hearing this week, we respectfully urge the U.S. Department of Defense to take swift action to implement measures that will enable members of the news media to view documents filed in connection with the proceeding beforehand.

You will recall a similar group comprising news organizations and those who advocate on their behalf last fall successfully appealed to the Defense Department for greater and easier access to important information about military commission proceedings held at Guantanamo Bay. *See, e.g.*, U.S. Dep't of Def., Regulation for Trial by Military Commission (2011 Edition). As such, the coalition respectfully urges the government to implement similar reforms in its regulations governing court-martial proceedings generally and that of Manning specifically to ensure that military personnel tried stateside have the same rights to a public trial as those afforded accused terrorists.

The prosecution of an American service member for the alleged leak of the largest amount of classified information in U.S. history is a matter of intense public interest, particularly where, as here, that person's liberty is at stake. Public oversight of the proceeding is of vital importance. Indeed, the interest in openness in this case is not mere curiosity but rather a concern about the very integrity of this nation's military courts — their ability to oversee the proceedings by which military personnel have their day in court to answer to and defend against allegations of serious offenses.

Despite the recognition that such access helps promote a perception of fairness and foster a more informed and well-educated public, the overwhelming majority of court records filed in Manning's court-martial have remained shielded from public view. *See* Gerstein, *supra*. This secrecy extends even to the court's docket, meaning that journalists covering the proceeding are often unaware of what is being discussed therein. *See id.* The U.S. Supreme Court and the nation's highest military courts have said the American press and public have a First Amendment right of access to criminal proceedings. But by refusing to provide reasonable and proper notice of such proceedings and the nature of the documents filed in connection therewith, the military justice system has severely undercut this foundational tenet of American democracy.

Perhaps more significantly, though, this policy belies the Defense Department's recent renewed commitment to transparency in the trials of accused terrorists at Guantanamo Bay, as reflected in its creation of a new Web site that contains documents filed in the proceedings, its establishment of a viewing location at Fort Meade that allows the press and public to watch a closed-circuit broadcast of the hearings and its adoption of updated regulations governing the commissions. These new guidelines attempt to address the complaints of journalists covering trials at Guantanamo Bay that the long classified review procedures and otherwise heightened secrecy are significant obstacles to their effective reporting on the offshore commissions. In response to these concerns, the government has committed to providing reporters contemporaneous access to court documents from each of the military commission's cases against accused terrorists and a new process whereby they may object to the designation of information as "protected" and thereby shielded from public view. Ironically, however, these journalists' stateside counterparts covering Manning's military trial face the same unnecessary degree of secrecy that makes reporting on military court proceedings incredibly difficult.

Accordingly, the coalition respectfully urges the Defense Department to implement in domestic court-martials the same measures provided for in the revised regulations governing trials by military commission, namely:

- posting online, on the military commission Web site or elsewhere, filings and decisions that do not require classification security review within one business day, posting filings that do require a security review within 15 business days (except in "exceptional circumstances") and posting unofficial transcripts of the proceedings "as soon as practicable after the conclusion of a hearing each day" (Regulation for Trial by Military Commission, *supra*, at 75–76);

- authorizing military judges overseeing court-martials to rule on any dispute raised by the parties or the public regarding filings, rulings, orders or transcripts over whether the document was appropriately designated as "protected" (*id.* at 69); and

- allowing the prosecution to take an interlocutory appeal on any order or ruling of a military judge that relates to the closure of proceedings to the public or the protection of classified or protected information; *id.* at 105.

APPENDIX A-065

Swiftly adopting these media access reforms will help ensure that the public's right of access to stateside military trials is at least as strong as its right to participate in and serve as a check upon the judicial process that oversees trials of accused terrorists. As in the past, we are happy to assist the government in the development of these reforms. Please do not hesitate to contact us if we can be of further assistance to you.

Sincerely,

---

Lucy A. Dalglish, Executive Director
Gregg P. Leslie, Legal Defense Director
Kristen Rasmussen, McCormick Legal Fellow

*On behalf of the following*:
**ABC News**
**Advance Publications, Inc.**
**A. H. Belo Corporation**
**Allbritton Communications Company**
**ALM Media, LLC**
**American Society of News Editors**
**The Associated Press**
**Association of Alternative Newsweeklies**
**Atlantic Media, Inc.**
**Bloomberg News**
**Cable News Network, Inc.**
**CBS News**
**Cox Media Group, Inc.**
**Digital First Media**
**Digital Media Law Project**
**Dow Jones & Company, Inc.**
**The E.W. Scripps Company**
**First Amendment Coalition**
**Gannett Co., Inc.**
**Hearst Corporation**
**Massachusetts Newspaper Publishers Association**
**The McClatchy Company**
**Meredith Corporation**
**Military Reporters & Editors**
**MPA – The Association of Magazine Media**
**The National Press Club**
**National Press Photographers Association**
**NBC News**
**New York *Daily News***
***The New York Times***
**Newspaper Association of America**

Case 1:13-cv-01504-ELH   Document 2-2   Filed 05/22/13   Page 70 of 357

**The Newspaper Guild – CWA**
**The Newsweek/Daily Beast Company LLC**
**North Jersey Media Group Inc.**
**NPR, Inc.**
**Online News Association**
**POLITICO LLC**
**Radio Television Digital News Association**
**The Reporters Committee for Freedom of the Press**
**Reuters News**
**Society of Professional Journalists**
**Stephens Media LLC**
**Time Inc.**
**Tribune Company**
*USA TODAY*
*The Washington Post*
**WNET**

cc: Col. Denise Lind, JAG Corps, U.S. Army
  David Coombs, Counsel for Pfc. Bradley Manning
  Capt. Ashden Fein, JAG Corps, Special Prosecutor, U.S. Army
  Douglas B. Wilson, Assistant Secretary of Defense for Public Affairs
    U.S. Department of Defense

### ERRATUM

Please take note that in the Declaration of Shayana Kadidal attached to the original Petition and made part of this Appendix, there is an incorrect internet link to the *current* (2011) version of the Regulation for Trial by Military Commission. The correct link at p.7 n.5 should be as follows:

http://www.fas.org/irp/doddir/dod/mcreg.pdf

Undersigned counsel apologizes for the error.

_____
Shayana Kadidal

**DECLARATION OF KEVIN GOSZTOLA**

I, Kevin Gosztola, declare as follows:

1.      I am a writer for Firedoglake ("Firedoglake.com"), a website engaged in news coverage with a specific emphasis on criminal trial issues. The site rose to fame with its award-winning coverage of the Valerie Plame affair and the Scooter Libby trial. Firedoglake has been covering the Bradley Manning case since his arrest in 2009. Because many of our writers have extensive expertise in criminal process, other journalists are frequent readers of Firedoglake;ABC news correspondent Jake Tapper referenced Firedoglake's coverage while questioning President Obama during a press conference recently.

2.      I cover issues related to civil liberties and digital freedom at a blog on the site titled "The Dissenter."I have been credentialed to cover Pfc. Bradley Manning's legal proceedings for Firedoglake. I have appeared on *Democracy Now!*, *The Young Turks* on Current TV, RT's *The Alyona Show*, Free Speech Radio News and Sirius XM Left's *The Mike Feder Show* to share updates on the proceedings.

3.      As a credentialed reporter, I would like access to court filings in the Manning proceedings to ensure that what I report is accurate and that quotes that I share with the public are not shared without proper context.

4.      I have to scramble to keep up with the judge when she reads court filings into the record because they are not being made available to the press or public. The judge often reads through the filing quickly to ensure the reading does not unnecessarily prolong the proceedings. The judge's rapid-fire reading is usually the only chance the media has to write down whatever important information is in the filing. This means reporters run the risk of not getting down a significant detail, hearing something incorrectly, transcribing a phrase that they will report without proper context, etc.

5.      From experience, reporters in the media pool for the Manning proceedings have on multiple occasions come together to compare notes. Reporters read what they were able to get down to each other. For example, they make sure they heard statements made by the prosecution or defense that are critical to coverage of the case. This has become a necessity because there is no access to court filings.

6.      Reporters ask the Army's legal matter expert (who is present at the hearings and available for briefings) to take notes and share them after the proceedings so what they heard

from the defense, prosecution and defense can be verified. This is an unfair burden to place on the legal matter expert. It is not his job to take notes for the press because they do not have access to court filings. The legal matter expert tries to keep up but he often is unable to get down key details. Therefore, he is unable to help the media.

7.     The Media Operations Center (MOC) at Fort Meade, a side room outside the courtroom where most reporters observe the proceedings via a video feed, frequently has technical glitches that disable its courtroom feed. In April, the feed went on and off at least 50 times. The technical issues made it nearly impossible for reporters in that room to cover the proceedings. Since press were unable to look at court filings after the day's proceedings, they had to ask the few media that were in the courtroom to share notes they wrote down on what the judge, defense and prosecution stated in court.

8.     I have readers who ask me why I have not been in the courtroom to report the proceedings. I do not go into the courtroom because I do not have access to court filings. I cannot scribble down notes by hand fast enough to keep up with the judge, defense and prosecution. I am much better at keeping up by typing up notes on a computer. However, computers are not allowed in the courtroom. Therefore, I have to choose: Either I can go into the courtroom and guarantee key details are missed or I can miss out on the scene in the courtroom and ensure that I am able to get down most of what is stated in court.

9.     I would have liked to have seen the pre-trial publicity order. It would have helped me understand what the prosecution, defense and judge want to protect in the proceedings and what they are willing to have disclosed to the public.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 23d day of May, 2012.

Kevin Gosztola

2

## DECLARATION OF ALEXA O'BRIEN

I, Alexa D. O'Brien, hereby declare as follows:

1.      I am credentialed press for the Article 39 proceedings in *United States v. Manning* and am located in the press pool during the proceedings. As a journalist, I have covered the WikiLeaks release of US State Department Cables, JTF memoranda known as the "GTMO files," and revolutions across Egypt, Bahrain, Iran, and Yemen, as well as the U.S. investigations and legal proceedings against WikiLeaks and Bradley Manning. I have interviewed preeminent U.S. foreign policy experts on the State Department cables, and published hours of interviews with former GTMO guards, detainees, defense lawyers, and human rights activists, as well as WikiLeaks media partners: Andy Worthington, a GTMO historian and author, and Atanas Tchobanov, the Balkanleaks' spokesman and co-editor of Bivol.bg. My coverage of Bahrain garnered in excess of 63,000 hits a day, and my stories have been picked up by Al Jazeera English, the BBC. My advocacy for free and fair elections, and freedom of speech and the press has been written about in Market Watch, Forbes, The Wall Street Journal, The Washington Post, Sydney Morning Herald, Australian Age, Fast Company, Wired, Nation, Harpers, The New York Times, The Los Angeles Times, and other news publications. I have also appeared on the BBC, RT News, French 24, and other news outlets.

2.      I attended pretrial hearings in *United States v. Manning* on June 6, 2012, and took extensive notes on the proceedings, typing them directly onto my notebook computer in the press pool (a separate room some distance from the courtroom to which the trial is broadcast by video link). What follows is summarized from my notes (with areas that were unclear indicated with brackets).

3.      During the June 6 session the court and counsel discussed the issue of off-the-record conferences under R.C.M. [Rules for Courts-Martial] 802.

4.      Judge Lind began by stating as follows:

        "R.C.M. 802 conferences are conferences where the parties for the Court to bring basically to the Court attention. Based on the last R.C.M. 802 conference the defense has filed a motion to record R.C.M. 802 conferences. That has been marked as Defense Motion to Record and Defense Trial all R.C.M. 802 Conferences. ... Appellate Exhibit 121. That motion is not part of the motions that were to be considered today in that R.C.M. 802 conferences are obviously provided by the Rule for Court-Martial are routine in criminal trials [but t]he Court believes that it is appropriate to address that motion at this hearing as they will continue to happen, and the defense has objected to participate in R.C.M. 802 conferences if they are not transcribed. [Addressing the defense:] Would you like to add anything the Court record?"

5.      David Coombs responded for the defense as follows:

"Your Honor, the defense's main position is that, even though we recognize 802 conferences are in fact a very common occurrence within Courts-Martial, usually the 802 conferences are limited to just scheduling issues, advisement to the Court of what may come up in future motion hearings, or any sort of logistical problems that may come up that either side may be having.

"Unfortunately, in this case the 802 conferences have become an opportunity to re-litigate a lot of the Court's rulings. And, so what happens is that we go into a great deal of substantive matters that the Court then considers from both sides. And, even though the Court correctly then does not make a ruling, we end up discussing the matter in such detail that we come back on the record, what happens is there is a very brief summary and the Court gives the parties to provide more detail, but then the Court makes its ruling.

"The defense believes that the way the 802 conferences are being used both as a matter of re-litigating issues, but also even just right now ... the Court recalls an 802 conference that the Government said that the "mitigation evidence would not be relevant." That is also the defense's recollection of the Government's assertion. But normally what happens is the Government takes a position in an 802 conference or later through its motion or its oral argument takes a contrary position.

"Because of the nature of the fact that things are not recorded, the defense is not in a position to say that the Government's belief is inaccurate based upon its statements.

"So, for the purposes of a substantive discussion, we would request that the 802 conferences be recorded. Understanding that the way our system works is that there is a last minute logistical issue and we need get the parties on the line for logistical stuff, that's normal, that's understandable. The defense will participate in those. Even this morning, in the 802 conference, that was perfectly acceptable.

"But, to the extent that we start talking about substantive matters we would request that those matters are on the record, so there is no doubt as to what one party said. If we are re-litigating something, then there is no doubt as to what has been advanced to the Court. And then when the Court makes its ruling, it's clear the matters which the Court considered."

6.      The prosecutor, Mr. Fein, responded for the government as follows:

"Your Honor, just briefly for purposes of the record, both the prosecution and the defense have petitioned the Court for 802(s) either over the telephone or even email on substantive matters.

"There is no prohibition for substantive matters to be discussed. In fact, 802 clearly contemplates that if parties agree it should that, it must be put on the record. It doesn't necessarily draw a line on substantive and procedural matters. The Government contends that there is nothing that the parties or the Court discussed in an 802 that can't be put on the record.

"Of course everything could be put on the record, and that is an option. However, the purpose of R.C.M. 802 according to the rule is to allow conferences for

the parties in order to consider matters to promote fairness, and efficiencies, and expeditious trial.

"Having to record an 802 is not going to help achieve the purpose of an 802, which is for an expeditious trial. So, the Government objects to the recording the 802s and if the issue [is] litigating substantive matters that don't go in favor of one party, and the parties don't agree then is making a part on the record is what 802..."

At the ellipsis at the end of the above colloquy, I missed a word.

7.      Judge Lind then issued a ruling as follows:

"As I discussed with counsel at this morning's 802, the Court is going to consider this issue at this session, because it does impact on the procedure for the remaining duration of this trial. And, the Court is actually prepared to rule on it. The ruling is as follows:"

[The Court noted this would be made an appellate exhibit titled "COURT RULING ON DEFENSE MOTION TO RECORD AND TRANSCRIBE ALL R.C.M. 802 CONFERENCES":]

"The defense moves the Court to order all R.C.M. [Rules for Courts-Martial] 802 conferences be recorded and transcribed for the record. The Government opposes. After considering the pleadings that have been presented, and argument of counsel, the Court finds and concludes the following:

'(1) The trial schedule developed by the Court and the parties provides for Article 39(a) Sessions to be held approximately every 5 to 6 weeks. To date there have been Article 39(a) Sessions held on 23 February, 15 and 16 March, 24 through 26 April, and the current session 4 to 6 June 2012.

'(2) R.C.M. 802 provides that after referral the military judge may upon request of either party or *sua sponte*, which means by myself, order one or more conferences with the parties to consider such matters as will promote a fair and expeditious trial. Conferences need not be made part of the record, but matters agreed upon at the conference shall be included [in] the record orally or in writing. Failure of a party to object at trial or failure to comply with R.C.M. 802 waives this requirement. No party may be prevented from any argument, objection, or motion at trial. The discussion to the rules states that the purpose of R.C.M. 802 conferences is to inform the military judge of anticipated issues and to expeditiously resolve matters in which the parties can agree, and not to litigate or decide contested issues.

'(3) The Court has been holding R.C.M. 802 conferences with counsel during and following the Article 39(a) Sessions and by telephone on 8 February 2012, 28 March 2012, and 30 May 2012. Each of these conferences has been synopsized on the record and the Court has invited the parties to add details to the Court synopsis.

'(4) Prior to the current motion dated 2 June 2012 the defense has not objected to conducting R.C.M. 802 conferences.

'(5) R.C.M. 802 does not require that such conferences be recorded or transcribed. The Court will continue to hold such conferences to address administrative, logistics, and scheduling issues. If either party objects to discussion of

an issue in an R.C.M. 802 conference, the conference will be terminated and the issue will be addressed at the next Article 39(a) Session.

'(6) The Court notes that the parties have raised substantive issues in the middle of the Article 39(a) scheduling periods that, if not addressed expeditiously, will delay the trial. Therefore, the Court in conjunction with the Parties will build in an additional Article 39(a) Session into the Court calendar. I anticipate it will be about a one day session midway between each scheduled Article 39(a) Session to address any such issues that arise. When additional substantive issues arise that require expeditious resolution the Court will schedule additional ad hoc Article 39(a) Sessions as necessary.

'Ruling:

'(1) The defense motion to record and transcribe R.C.M 802 conferences is denied.

'(2) R.C.M. 802 conferences will not be held over the objection of a party.

'(3) The Court will schedule an additional Article 39(a) Session in between the currently scheduled sessions to address on the record any additional issues that arise between our scheduled sessions.'"

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 14th day of June, 2012.

_____

Alexa D. O'Brien

(f) *Rulings on record*. All sessions involving rulings or instructions made or given by the military judge shall be made a part of the record. All rulings and instructions shall be made or given in open session in the presence of the parties and the members, except as otherwise may be determined in the discretion of the military judge.

## Discussion

*See* R.M.C. 808 and 1103 concerning preparation of the record of trial.

(g) *Effect of failure to raise defenses or objections*. Failure by a party to raise defenses or objections or to make requests or motions which must be made at the time set by this Manual or by the military judge under authority of this Manual, or prior to any extension thereof made by the military judge, shall constitute waiver thereof, but the military judge for good cause shown may grant relief from the waiver.

## Rule 802. Conferences

(a) *In general*. After referral, the military judge may, upon request of any party or sua sponte, order one or more conferences with the parties to consider such matters as will promote a fair and expeditious trial.

## Discussion

Conferences between the military judge and counsel may be held when necessary before or during trial. The purpose of such conference is to inform the military judge of anticipated issues and to expeditiously resolve matters on which the parties can agree, not to litigate or decide contested issues (*see* section (c) below). No party may be compelled to resolve any matter at a conference.

A conference may be appropriate in order to resolve scheduling difficulties, so that witnesses and members are not unnecessarily inconvenienced. Matters which will ultimately be in the military judge's discretion, such as conduct of voir dire, seating arrangements in the courtroom, or procedures when there are multiple accused may be resolved at a conference. Conferences may be used to advise the military judge of issues or problems, such as unusual motions or objections, which are likely to arise during trial.

Occasionally it may be appropriate to resolve certain issues, in addition to routine or administrative matters, if this can be done with the consent of the parties. For example, a request for a witness which, if litigated and approved at trial, would delay the proceedings and cause expense or inconvenience, might be resolved at a conference. Note, however, that this could only be done by an agreement of the parties and not by a binding ruling of the military judge. Such a resolution must be included in the record (*see* section (b) below).

A military judge may not participate in negotiations relating to pleas (*see* R.M.C. 705; *see* also Mil. Comm. R. Evid. 410).

No place or method is prescribed for conducting a conference. A conference may be conducted by radio or telephone.

(b) *Matters on record*. Conferences need not be made part of the record, but matters agreed upon at a conference shall be included in the record orally or in writing. Failure of a party to object at trial to failure to comply with this section shall waive this requirement.

(c) *Rights of parties*. No party may be prevented under this rule from presenting evidence or from making any argument, objection, or motion at trial.

APPENDIX A-075

(d) *Accused's presence*. The presence of the accused is neither required nor prohibited at a conference.

<div align="center">**Discussion**</div>

Normally the defense counsel may be presumed to speak for the accused.

(e) *Admission*. No admissions made by the accused or defense counsel at a conference shall be used against the accused unless the admissions are reduced to writing and signed by the accused and defense counsel.

(f) *Limitations*. This rule shall not be invoked in the case of an accused who is not represented by counsel.

## Rule 803. Military commission sessions without members

(a) A military judge who has been detailed to the military commission may, at any time after the service of charges which have been referred for trial by military commission under chapter 47A of title 10, United States Code, call the military commission into session without the presence of members for the purpose of:

     (1) hearing and determining motions raising defenses or objections which are capable of determination without trial of the issues raised by a plea of not guilty;

     (2) hearing and ruling upon any matter which may be ruled upon by the military judge under chapter 47A of title 10, United States Code, whether or not the matter is appropriate for later consideration or decision by the members;

     (3) receiving the pleas of the accused; and

     (4) performing any other procedural function which may be performed by the military judge under these rules and which does not require the presence of the members.

(b) Except as provided in subsections (c), (d), and (e), any proceedings under paragraph (a) shall be conducted in the presence of the accused, defense counsel, and trial counsel, and shall be made part of the record.

(c) *Deliberation or vote of members*. When the members of a military commission under chapter 47A of title 10, United States Code, deliberate or vote, only the members may be present.

<div align="center">**Discussion**</div>

The purpose of the sessions without members is "to give statutory sanction to pretrial and other hearings without the presence of the members concerning those matters which are amenable to disposition on either a tentative or final basis by the military judge." The military judge and members may, and ordinarily should, call the commission into session without members to ascertain the accused's understanding of the right to counsel, and the accused's choices with respect to these matters; dispose of interlocutory matters; hear objections and motions; rule upon other matters that may

<div align="center">II-69</div>

IN THE UNITED STATES ARMY
FIRST JUDICIAL CIRCUIT

| | | |
|---|---|---|
| U N I T E D   S T A T E S | ) | |
| | ) | **DEFENSE MOTION TO** |
| v. | ) | **RECORD AND TRANSCRIBE** |
| | ) | **ALL R.C.M. 802 CONFERENCES** |
| **MANNING**, Bradley E., PFC | ) | |
| U.S. Army,  xxx-xx-9504 | ) | |
| Headquarters and Headquarters Company, U.S. | ) | |
| Army Garrison, Joint Base Myer-Henderson Hall, | ) | 2 June 2012 |
| Fort Myer, VA  22211 | ) | |

RELIEF SOUGHT

1.  The Defense requests that this Court order that all future R.C.M. 802 conferences be recorded and transcribed for the record.

BURDEN OF PERSUASION AND BURDEN OF PROOF

2.  As the moving party, the Defense has the burden of persuasion.  R.C.M. 905(c)(2)(A).  The burden of proof is by a preponderance of the evidence.  R.C.M. 905(c)(1).

EVIDENCE

3.  The Defense does not request any witnesses or evidence be produced for this motion.

FACTS

4.  On several occasions the parties have held R.C.M. 802 conferences in order to discuss case related issues.  These conferences have mostly been held either in a conference room adjacent to the courtroom or by telephone when the parties are not centrally located.

5.  The Court has discussed the content of the various R.C.M. 802 conferences on the record at the following Article 39(a) session.  The Court has also invited the parties to add any detail either party desired to the Court's summary.

ARGUMENT

1

6. The Defense submits that this Court should order that all future 802 sessions be recorded and transcribed for the record for four reasons: (1) The Government often uses the 802 sessions to re-litigate matters already decided by the Military Judge under the auspices of "clarification"; (2) the Government often takes positions in 802 sessions which are inconsistent with its motions and what is says in open court; (3) the Government makes admissions in the 802 sessions which are relevant to the Defense's discovery requests; and (4) there is sometimes confusion as to exactly what was said at the 802 session.

7. First, the Government has used the opportunity that the 802 sessions provide to re-litigate issues already decided by the Military Judge under the guise that it was simply "clarifying" something. For instance, in its 23 March 2012 Ruling, the Court ordered that the Government produce the Department of State damage assessment. Appellate Exhibit XXXVI. The Government then sought "clarification" as to what it had to produce, given that the Department of State "had not completed a damage assessment." The Government then used that opportunity to argue that a draft damage assessment is not discoverable under *Giles* because it is speculative. Appellate Exhibit LXXI. Far from clarifying the Court's ruling, the Government was attempting to take issue with it. This happened again during the latest 802 session. The Court once again ordered the Government to provide a Department of State witness to testify as to what documents the department had that were responsive to the Defense's repeated discovery requests. The Government once again took this as an opportunity to re-litigate the issue, insisting that the Defense did not have the right to ask a Department of State witness questions about what they possess because this is a classic "fishing expedition." Again, when the Government disagrees with the Court's ruling, it simply asks for an 802 for "clarification."

8. Second, the Government will often say something in an 802 session that is inconsistent with what it says in its motions and what it says in open court. In one 802 session, the Defense asked what material from the FBI file the Government intended to produce since its motion was unclear in this respect (and the Court had not ruled on this issue, given that the Government represented that it was in the process of producing all discoverable material). In the 802 session, the Government explained that some portions of the FBI file do not deal with PFC Manning at all – accordingly, those would not be produced. Everything else would be. In its subsequent motions and in open court, it changed its position and said that only *Brady* was discoverable from the FBI file. Similarly, the issue regarding ONCIX and "damage assessments" vs. "investigative" files was dealt with during an 802 session. The Government claimed that the Defense was using the wrong terminology in its discovery requests and that's why it was not getting what it was looking for. Appellate Exhibit LXXII. Now, the Government is using the term "damage assessments" in the way that it told the Defense was incorrect. *See* Attachment. This Court and an appellate court should have the benefit of the Government's shifting litigation positions.

9. Third, the Government makes admissions or statements during these 802 sessions that it later denies – which is made easier by the fact that there is no transcript of exactly what the Government said during that session. For instance, the Government said during the latest 802 conference that the requested Department of State materials were simply not discoverable under R.C.M. 701(a)(2) or R.C.M. 701(a)(6). The Defense asked how the Government could make this statement, given that it had not even reviewed the files? Now, it its Response to the Defense

2

Motion to Compel Discovery #2, it states at p. 2, "The prosecution has never stated that the defense is not entitled to any information discoverable under RCM 701(a)(6), and has consistently stated that the prosecution intends to review all documents for <u>Brady</u> and RCM 701(a)(6) material that is provided by the DoS that are responsive."  Obviously, if the parties and the Court had a transcript of what was said, issues as to "who said what" could be easily resolved.

10.  Fourth, there is sometimes confusion about what exactly was decided during the 802 session.  At the latest 802 session, the Defense understood the Court to have ordered the Government to provide a list of all evidence is seeks to introduce in aggravation.  The Government does not believe it needs to compile a list, but simply to give the Court a sense of the type of information it plans on introducing in aggravation.  There was also some confusion on the dates when this needed to be produced.  With the benefit of a transcript, both parties can have access to exactly what was decided at the 802 session.

11.  As the Court is aware, there is a push for greater openness in this proceeding.  At present, too many issues are being said and litigated behind closed doors.  Accordingly, the Defense requests that this Court order a recording and transcript of all future 802 sessions.

<u>CONCLUSION</u>

12.  The Defense requests that this Court order that all future R.C.M. 802 conferences be recorded and transcribed for the record.

Respectfully submitted,

DAVID EDWARD COOMBS
Civilian Defense Counsel

3

APPENDIX A-079

# CHARGE SHEET

## I. PERSONAL DATA

| 1. NAME OF ACCUSED (Last, First, MI) | 2. SSN | 3. GRADE OR RANK | 4. PAY GRADE |
|---|---|---|---|
| MANNING, Bradley E. | ▮▮▮▮▮ | PFC | E-3 |

| 5. UNIT OR ORGANIZATION | 6. CURRENT SERVICE | |
|---|---|---|
| Headquarters and Headquarters Company, U.S. Army Garrison, Joint Base Myer-Henderson Hall Fort Myer, Virginia 22211 | a. INITIAL DATE ▮▮▮▮▮ | b. TERM 4 years |

| 7. PAY PER MONTH | | | 8. NATURE OF RESTRAINT OF ACCUSED | 9. DATE(S) IMPOSED |
|---|---|---|---|---|
| a. BASIC | b. SEA/FOREIGN DUTY | c. TOTAL | Pre-Trial Confinement | 29 May 10 - |
| $1,950.00 | None | $1,950.00 | | |

## II. CHARGES AND SPECIFICATIONS

10. ~~ADDITIONAL~~ *AF 23JAN12* CHARGE I:  VIOLATION OF THE UCMJ, ARTICLE 104.

THE SPECIFICATION:  In that Private First Class Bradley E. Manning, U.S. Army, did, at or near Contingency Operating Station Hammer, Iraq, between on or about 1 November 2009 and on or about 27 May 2010, without proper authority, knowingly give intelligence to the enemy, through indirect means.

~~ADDITIONAL~~ *AF 23JAN12* CHARGE II:  VIOLATION OF THE UCMJ, ARTICLE 134.

SPECIFICATION 1:  In that Private First Class Bradley E. Manning, U.S. Army, did, at or near Contingency Operating Station Hammer, Iraq, between on or about 1 November 2009 and on or about 27 May 2010, wrongfully and wantonly cause to be published on the internet intelligence belonging to the United States government, having knowledge that intelligence published on the internet is accessible to the enemy, such conduct being prejudicial to good order and discipline in the armed forces and being of a nature to bring discredit upon the armed forces.

(See Continuation Sheet)

## III. PREFERRAL

| 11a. NAME OF ACCUSER (Last, First, MI) | b. GRADE | c. ORGANIZATION OF ACCUSER |
|---|---|---|
| Leiker, Cameron A. | O-5 | HQ CMD BN, USA |

| d. SIGNATURE OF ACCUSER | e. DATE |
|---|---|
| ▮▮▮▮▮ | 1 MAR 2011 |

AFFIDAVIT: Before me, the undersigned, authorized by law to administer oaths in cases of this character, personally appeared the above named accuser this _1st_ day of _March_, 2011, and signed the foregoing charges and specifications under oath that he/she is a person subject to the Uniform Code of Military Justice and that he/she either has personal knowledge of or has investigated the matters set forth therein and that the same are true to the best of his/her knowledge and belief.

| ASHDEN FEIN | MDW, OSJA |
|---|---|
| Typed Name of Officer | Organization of Officer |
| O-3 | Trial Counsel |
| Grade | Official Capacity to Administer Oath |
| ▮▮▮▮▮ | (See R.C.M. 307(b) – must be a commissioned officer) |

**DD FORM 458, MAY 2000**       PREVIOUS EDITION IS OBSOLETE.

12.

On _Wed  02 March 2011_ @ 1545 HRS, 2011, the accused was informed of the charges against him/her and of the name(s) of
The accuser(s) known to me *(See R.C.M. 308 (a)).  (See R.C.M. 308 if notification cannot be made.)*

| CAMERON A. LEIKER | HQ CMD BN, USA |
|---|---|
| *Typed Name of Immediate Commander* | *Organization of Immediate Commander* |
| O-5 | |
| *Grade* | |
| *Signature* | |

### IV.  RECEIPT BY SUMMARY COURT-MARTIAL CONVENING AUTHORITY

13.

The sworn charges were received at _1055_ hours, _Tue, 08 March_ , 2011 at _HQ CMD BN, USA_
*Designation of Command or*

*Officer Exercising Summary Court-Martial Jurisdiction (See R.C.M. 403)*

*FOR THE[1]* _____

| CAMERON A. LEIKER | Commanding |
|---|---|
| *Typed Name of Officer* | *Official Capacity of Officer Signing* |
| O-5 | |
| *Grade* | |
| *Signature* | |

### V.  REFERRAL; SERVICE OF CHARGES

| 14a.  DESIGNATION OF COMMAND OF CONVENING AUTHORITY Headquarters, U.S. Army Military District of Washington | b.  PLACE Fort McNair, DC | c.  DATE 20120203 |
|---|---|---|

Referred for trial to the _General_ Court-martial convened by _Court-Martial Convening Order_

_Number 1, this headquarters, dated_

_2 February_ 2011 _, subject to the following instructions:[2]  None._

By _Command_ Of _MG MICHAEL S. LINNINGTON_
*Command or Order*

| | Chief, Military Justice |
|---|---|
| *Typed Name of Officer* | *Official Capacity of Officer Signing* |
| *Grade* | |
| *Signature* | |

15.

On _3 February_ , 2011 2012 , I (caused to be) served a copy hereof on ~~(each of)~~ the above named accused.

| ASHDEN FEIN | O-3 |
|---|---|
| *Typed Name of Trial Counsel* | *Grade or Rank of Trial Counsel* |
| *Signature* | |

FOOTNOTES:   1 — When an appropriate commander signs personally, inapplicable words are stricken.
2 — See R.C.M. 601(e) concerning instructions.  If none, so state.

DD FORM 458 (BACK), MAY 2000

CONTINUATION SHEET, DA FORM 458, MANNING, Bradley E., ███████████
Headquarters and Headquarters Company, U.S. Army Garrison, Joint Base
Myer-Henderson Hall, Fort Myer, Virginia  22211

Item 10 (Cont'd):

SPECIFICATION 2:  In that Private First Class Bradley E. Manning, U.S.
Army, did, at or near Contingency Operating Station Hammer, Iraq,
between on or about 15 February 2010 and on or about 5 April 2010,
having unauthorized possession of information relating to the national
defense, to wit:  a video file named "12 JUL 07 CZ ENGAGEMENT ZONE 30
GC Anyone.avi", with reason to believe such information could be used
to the injury of the United States or to the advantage of any foreign
nation, willfully communicate, deliver, transmit, or cause to be
communicated, delivered, or transmitted, the said information, to a
person not entitled to receive it, in violation of 18 U.S. Code
Section 793(e), such conduct being prejudicial to good order and
discipline in the armed forces and being of a nature to bring
discredit upon the armed forces.

SPECIFICATION 3:  In that Private First Class Bradley E. Manning, U.S.
Army, did, at or near Contingency Operating Station Hammer, Iraq,
between on or about 22 March 2010 and on or about 26 March 2010,
having unauthorized possession of information relating to the national
defense, to wit:  more than one classified memorandum produced by a
United States government intelligence agency, with reason to believe
such information could be used to the injury of the United States or
to the advantage of any foreign nation, willfully communicate,
deliver, transmit, or cause to be communicated, delivered, or
transmitted, the said information, to a person not entitled to receive
it, in violation of 18 U.S. Code Section 793(e), such conduct being
prejudicial to good order and discipline in the armed forces and being
of a nature to bring discredit upon the armed forces.

SPECIFICATION 4:  In that Private First Class Bradley E. Manning, U.S.
Army, did, at or near Contingency Operating Station Hammer, Iraq,
between on or about 31 December 2009 and on or about 5 January 2010,
steal, purloin, or knowingly convert to his use or the use of another,
a record or thing of value of the United States or of a department or
agency thereof, to wit:  the Combined Information Data Network
Exchange Iraq database containing more than 380,000 records belonging
to the United States government, of a value of more than $1,000, in
violation of 18 U.S. Code Section 641, such conduct being prejudicial
to good order and discipline in the armed forces and being of a nature
to bring discredit upon the armed forces.

APPENDIX A-082

JA-037

CONTINUATION SHEET, DA FORM 458, MANNING, Bradley E., ▉▉▉▉▉▉▉▉
Headquarters and Headquarters Company, U.S. Army Garrison, Joint Base
Myer-Henderson Hall, Fort Myer, Virginia  22211

SPECIFICATION 5:  In that Private First Class Bradley E. Manning, U.S.
Army, did, at or near Contingency Operating Station Hammer, Iraq,
between on or about 31 December 2009 and on or about 9 February 2010,
having unauthorized possession of information relating to the national
defense, to wit:  more than twenty classified records from the
Combined Information Data Network Exchange Iraq database, with reason
to believe such information could be used to the injury of the United
States or to the advantage of any foreign nation, willfully
communicate, deliver, transmit, or cause to be communicated,
delivered, or transmitted, the said information, to a person not
entitled to receive it, in violation of 18 U.S. Code Section 793(e),
such conduct being prejudicial to good order and discipline in the
armed forces and being of a nature to bring discredit upon the armed
forces.

SPECIFICATION 6:  In that Private First Class Bradley E. Manning, U.S.
Army, did, at or near Contingency Operating Station Hammer, Iraq,
between on or about 31 December 2009 and on or about 8 January 2010,
steal, purloin, or knowingly convert to his use or the use of another,
a record or thing of value of the United States or of a department or
agency thereof, to wit:  the Combined Information Data Network
Exchange Afghanistan database containing more than 90,000 records
belonging to the United States government, of a value of more than
$1,000, in violation of 18 U.S. Code Section 641, such conduct being
prejudicial to good order and discipline in the armed forces and being
of a nature to bring discredit upon the armed forces.

SPECIFICATION 7:  In that Private First Class Bradley E. Manning, U.S.
Army, did, at or near Contingency Operating Station Hammer, Iraq,
between on or about 31 December 2009 and on or about 9 February 2010,
having unauthorized possession of information relating to the national
defense, to wit:  more than twenty classified records from the
Combined Information Data Network Exchange Afghanistan database, with
reason to believe such information could be used to the injury of the
United States or to the advantage of any foreign nation, willfully
communicate, deliver, transmit, or cause to be communicated,
delivered, or transmitted, the said information, to a person not
entitled to receive it, in violation of 18 U.S. Code Section 793(e),
such conduct being prejudicial to good order and discipline in the
armed forces and being of a nature to bring discredit upon the armed
forces.

APPENDIX A-083

JA-038

CONTINUATION SHEET, DA FORM 458, MANNING, Bradley E., ████████████
Headquarters and Headquarters Company, U.S. Army Garrison, Joint Base
Myer-Henderson Hall, Fort Myer, Virginia  22211


SPECIFICATION 8:  In that Private First Class Bradley E. Manning, U.S.
Army, did, at or near Contingency Operating Station Hammer, Iraq, on
or about 8 March 2010, steal, purloin, or knowingly convert to his use
or the use of another, a record or thing of value of the United States
or of a department or agency thereof, to wit:  a United States
Southern Command database containing more than 700 records belonging
to the United States government, of a value of more than $1,000, in
violation of 18 U.S. Code Section 641, such conduct being prejudicial
to good order and discipline in the armed forces and being of a nature
to bring discredit upon the armed forces.

SPECIFICATION 9:  In that Private First Class Bradley E. Manning, U.S.
Army, did, at or near Contingency Operating Station Hammer, Iraq,
between on or about 8 March 2010 and on or about 27 May 2010, having
unauthorized possession of information relating to the national
defense, to wit:  more than three classified records from a United
States Southern Command database, with reason to believe such
information could be used to the injury of the United States or to the
advantage of any foreign nation, willfully communicate, deliver,
transmit, or cause to be communicated, delivered, or transmitted, the
said information, to a person not entitled to receive it, in violation
of 18 U.S. Code Section 793(e), such conduct being prejudicial to good
order and discipline in the armed forces and being of a nature to
bring discredit upon the armed forces.

SPECIFICATION 10:  In that Private First Class Bradley E. Manning,
U.S. Army, did, at or near Contingency Operating Station Hammer, Iraq,
between on or about 11 April 2010 and on or about 27 May 2010, having
unauthorized possession of information relating to the national
defense, to wit:  more than five classified records relating to a
military operation in Farah Province, Afghanistan occurring on or
about 4 May 2009, with reason to believe such information could be
used to the injury of the United States or to the advantage of any
foreign nation, willfully communicate, deliver, transmit, or cause to
be communicated, delivered, or transmitted, the said information, to a
person not entitled to receive it, in violation of 18 U.S. Code
Section 793(e), such conduct being prejudicial to good order and
discipline in the armed forces and being of a nature to bring
discredit upon the armed forces.

APPENDIX A-084

JA-039

CONTINUATION SHEET, DA FORM 458, MANNING, Bradley E., ▮▮▮▮▮▮▮▮
Headquarters and Headquarters Company, U.S. Army Garrison, Joint Base
Myer-Henderson Hall, Fort Myer, Virginia  22211

SPECIFICATION 11:  In that Private First Class Bradley E. Manning,
U.S. Army, did, at or near Contingency Operating Station Hammer, Iraq,
between on or about 1 November 2009 and on or about 8 January 2010,
having unauthorized possession of information relating to the national
defense, to wit:  a file named "BE22 PAX.zip" containing a video named
"BE22 PAX.wmv", with reason to believe such information could be used
to the injury of the United States or to the advantage of any foreign
nation, willfully communicate, deliver, transmit, or cause to be
communicated, delivered, or transmitted, the said information, to a
person not entitled to receive it, in violation of 18 U.S. Code
Section 793(e), such conduct being prejudicial to good order and
discipline in the armed forces and being of a nature to bring
discredit upon the armed forces.

SPECIFICATION 12:  In that Private First Class Bradley E. Manning,
U.S. Army, did, at or near Contingency Operating Station Hammer, Iraq,
between on or about 28 March 2010 and on or about 4 May 2010, steal,
purloin, or knowingly convert to his use or the use of another, a
record or thing of value of the United States or of a department or
agency thereof, to wit:  the Department of State Net-Centric Diplomacy
database containing more than 250,000 records belonging to the United
States government, of a value of more than $1,000, in violation of 18
U.S. Code Section 641, such conduct being prejudicial to good order
and discipline in the armed forces and being of a nature to bring
discredit upon the armed forces.

SPECIFICATION 13:  In that Private First Class Bradley E. Manning,
U.S. Army, did, at or near Contingency Operating Station Hammer, Iraq,
between on or about 28 March 2010 and on or about 27 May 2010, having
knowingly exceeded authorized access on a Secret Internet Protocol
Router Network computer, and by means of such conduct having obtained
information that has been determined by the United States government
pursuant to an Executive Order or statute to require protection
against unauthorized disclosure for reasons of national defense or
foreign relations, to wit:  more than seventy-five classified United
States Department of State cables, willfully communicate, deliver,
transmit, or cause to be communicated, delivered, or transmitted the
said information, to a person not entitled to receive it, with reason
to believe that such information so obtained could be used to the
injury of the United States, or to the advantage of any foreign
nation, in violation of 18 U.S. Code Section 1030(a)(1), such conduct
being prejudicial to good order and discipline in the armed forces and
being of a nature to bring discredit upon the armed forces.

APPENDIX A-085

JA-040

CONTINUATION SHEET, DA FORM 458, MANNING, Bradley E., ████████
Headquarters and Headquarters Company, U.S. Army Garrison, Joint Base
Myer-Henderson Hall, Fort Myer, Virginia  22211


SPECIFICATION 14:  In that Private First Class Bradley E. Manning,
U.S. Army, did, at or near Contingency Operating Station Hammer, Iraq,
between on or about 15 February 2010 and on or about 18 February 2010,
having knowingly exceeded authorized access on a Secret Internet
Protocol Router Network computer, and by means of such conduct having
obtained information that has been determined by the United States
government pursuant to an Executive Order or statute to require
protection against unauthorized disclosure for reasons of national
defense or foreign relations, to wit:  a classified Department of
State cable titled "Reykjavik-13", willfully communicate, deliver,
transmit, or cause to be communicated, delivered, or transmitted the
said information, to a person not entitled to receive it, with reason
to believe that such information so obtained could be used to the
injury of the United States, or to the advantage of any foreign
nation, in violation of 18 U.S. Code Section 1030(a)(1), such conduct
being prejudicial to good order and discipline in the armed forces and
being of a nature to bring discredit upon the armed forces.

SPECIFICATION 15:  In that Private First Class Bradley E. Manning,
U.S. Army, did, at or near Contingency Operating Station Hammer, Iraq,
between on or about 15 February 2010 and on or about 15 March 2010,
having unauthorized possession of information relating to the national
defense, to wit:  a classified record produced by a United States Army
intelligence organization, dated 18 March 2008, with reason to believe
such information could be used to the injury of the United States or
to the advantage of any foreign nation, willfully communicate,
deliver, transmit, or cause to be communicated, delivered, or
transmitted, the said information, to a person not entitled to receive
it, in violation of 18 U.S. Code Section 793(e), such conduct being
prejudicial to good order and discipline in the armed forces and being
of a nature to bring discredit upon the armed forces.

SPECIFICATION 16:  In that Private First Class Bradley E. Manning,
U.S. Army, did, at or near Contingency Operating Station Hammer, Iraq,
between on or about 11 May 2010 and on or about 27 May 2010, steal,
purloin, or knowingly convert to his use or the use of another, a
record or thing of value of the United States or of a department or
agency thereof, to wit:  the United States Forces - Iraq Microsoft
Outlook / SharePoint Exchange Server global address list belonging to
the United States government, of a value of more than $1,000, in
violation of 18 U.S. Code Section 641, such conduct being prejudicial
to good order and discipline in the armed forces and being of a nature
to bring discredit upon the armed forces.

APPENDIX A-086

JA-041

CONTINUATION SHEET, DA FORM 458, MANNING, Bradley E., ███████████
Headquarters and Headquarters Company, U.S. Army Garrison, Joint Base
Myer-Henderson Hall, Fort Myer, Virginia  22211

~~ADDITIONAL~~ AF 23JAN12 CHARGE III:  VIOLATION OF THE UCMJ, ARTICLE 92.

SPECIFICATION 1:  In that Private First Class Bradley E. Manning, U.S.
Army, did, at or near Contingency Operating Station Hammer, Iraq,
between on or about 1 November 2009 and on or about 8 March 2010,
violate a lawful general regulation, to wit:  paragraph 4-5(a)(4),
Army Regulation 25-2, dated 24 October 2007, by attempting to bypass
network or information system security mechanisms.

SPECIFICATION 2:  In that Private First Class Bradley E. Manning, U.S.
Army, did, at or near Contingency Operating Station Hammer, Iraq,
between on or about 11 February 2010 and on or about 3 April 2010,
violate a lawful general regulation, to wit:  paragraph 4-5(a)(3),
Army Regulation 25-2, dated 24 October 2007, by adding unauthorized
software to a Secret Internet Protocol Router Network computer.

SPECIFICATION 3:  In that Private First Class Bradley E. Manning, U.S.
Army, did, at or near Contingency Operating Station Hammer, Iraq, on
or about 4 May 2010, violate a lawful general regulation, to wit:
paragraph 4-5(a)(3), Army Regulation 25-2, dated 24 October 2007, by
adding unauthorized software to a Secret Internet Protocol Router
Network computer.

SPECIFICATION 4:  In that Private First Class Bradley E. Manning, U.S.
Army, did, at or near Contingency Operating Station Hammer, Iraq,
between on or about 11 May 2010 and on or about 27 May 2010, violate a
lawful general regulation, to wit:  paragraph 4-5(a)(3), Army
Regulation 25-2, dated 24 October 2007, by using an information system
in a manner other than its intended purpose.

SPECIFICATION 5:  In that Private First Class Bradley E. Manning, U.S.
Army, did, at or near Contingency Operating Station Hammer, Iraq, on
divers occasions between on or about 1 November 2009 and on or about
27 May 2010, violate a lawful general regulation, to wit:  paragraph
7-4, Army Regulation 380-5, dated 29 September 2000, by wrongfully
storing classified information.

APPENDIX A-087

JA-042

MEMORANDUM FOR RECORD

SUBJECT:  Receipt of Referred Charge Sheet

I acknowledge receipt of the charges referred against me, to a General Court-Martial, by
Major General Michael S. Linnington, dated 3 February 2012.

BRADLEY E. MANNING
PFC, U.S. Army
Accused

DATE:  03   FEB   2012

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ARMED FORCES**

| | |
|---|---|
| **Center for Constitutional Rights, et al.,**<br>        Petitioners-Appellants<br><br>                v.<br><br>**UNITED STATES OF AMERICA**<br><br>**and**<br><br>**Colonel DENISE LIND**<br>Military Judge,<br>        Respondents-Appellees. | ) APPELLEE'S ANSWER TO APPELLANT'S<br>) PETITION FOR EXTRAORDINARY RELIEF<br>) IN THE NATURE OF WRITS OF MANDAMUS<br>) AND PROHIBITION<br>)<br>) **Crim. App. Dkt. No. Misc. 20120514**<br>)<br>) **USCA Misc. Dkt. No. 12-8027/AR**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**TO THE HONORABLE JUDGES OF THE UNITED STATES
COURT OF APPEALS FOR THE ARMED FORCES**

**Statement of Statutory Jurisdiction**

The United States Army Court of Criminal Appeals (Army Court) denied appellant's request for extraordinary relief, pursuant to the All Writs Act.[1]  This Court reviews decisions of a service court on a petition for extraordinary relief as a writ-appeal, under Rules 4(b)(2) and 18(a)(4) of this Court's Rules of Practice and Procedure (Rules).[2]  This answer is filed pursuant to Rules 27(b) and 28(b)(2).

---

[1] 28 U.S.C. 1651 (1992); Joint Appendix (JA) 1.
[2] *Ellis v. Jacob*, 26 M.J. 90, 91 (C.M.A. 1988).

1

APPENDIX A-089

### Statement of the Case and Facts

Private First Class (PFC) Bradley Manning is charged with five specifications of violating a lawful general regulation, one specification of aiding the enemy, one specification of conduct prejudicial to good order and discipline and service discrediting, eight specifications of communicating classified information, five specifications of stealing or knowingly converting government property, and two specifications of knowingly exceeding authorized access to a government computer, in violation of Articles 92, 104, and 134, Uniform Code of Military Justice (UCMJ).[3]  The convening authority referred the charges to a general court-martial on February 3, 2012, and PFC Manning was arraigned on February 23, 2012.  The military judge held Article 39(a), UCMJ, sessions on March 15-16, April 24-26, and June 6-8, 2012.

On March 21, appellants, who are not parties to the court-martial, sent a letter to the military judge requesting the Court:

> make available to the public and the media for
> inspection and copying all documents and information
> filed in the *Manning* case, including the docket sheet,
> all motions and responses thereto, all rulings and
> orders, and verbatim transcripts or other recordings of
> all conferences and hearings before the Court.[4]

---

[3] JA 35-42 (Charge Sheet).
[4] JA 3 (Declaration of Shayana Kadidal); JA 11-13.

2

APPENDIX A-090

At the 39(a) session on April 24, the military judge marked appellant's letter as Appellate Exhibit 66, treated it as a request to intervene, and denied the request.[5]

On May 23, 2012, appellant filed a writ-petition at the Army Court seeking similar relief.  Appellant asked the Army Court to compel the military judge to grant public access to all documents pertaining to the case and to require conferences held under Rule for Courts-Martial (R.C.M.) 802 to be made part of the record in their entirety.  On May 30, 2012, the Army Court ordered the Government to respond to the Petition, and on June 21, 2012, the Army Court denied the Petition.  Five days later, on June 26, 2012, appellant timely filed this writ-appeal petition ("writ-appeal") at this Court.

## Relief Requested

Appellant asks this Court to grant a petition for a writ-appeal of the Army Court's denial of his petition for extraordinary relief.  The Government asks this Honorable Court to deny the petition because appellant fails to meet the threshold criteria for extraordinary relief.

---

[5] JA 4.

3

APPENDIX A-091

## Appellant's Statement of the Issues

### I.

WHETHER THE FIRST AMENDMENT RIGHT OF PUBLIC
ACCESS (OR OTHER PUBLIC-ACCESS RIGHTS)
APPLIES AND GUARANTEES ACCESS TO THE
DOCUMENTS PETITIONER-APPELLANTS SEEK
(JUDICIAL ORDERS, FILINGS, AND TRANSCRIPTS)
IN A TIMELY FASHION, CONTEMPORANEOUS WITH
THE PROCEEDINGS TO WHICH THEY RELATE.

### II.

WHETHER FIRST AMENDMENT PRINCIPLES APPLY TO
FUTURE DOCUMENT SEALINGS GOING FORWARD,
INCLUDING (A) THE RIGHT TO PUBLIC NOTICE OF
A REQUEST FOR SEALING, (B) OPPORTUNITY FOR
INTERESTED PARTIES TO BE HEARD, AND (C) THAT
THE TRIAL COURT BE REQUIRED TO ULTIMATELY
JUSTIFY ANY RESTRICTIONS ON PUBLIC ACCESS
WITH CASE-BY-CASE SPECIFIC FINDINGS OF
NECESSITY AFTER CONSIDERATION OF LESS-
RESTRICTIVE ALTERNATIVES.

### III.

WHETHER PAST R.C.M. 802 CONFERENCES SHOULD
BE RECONSTITUTED ON THE PUBLIC RECORD.

### IV.

WHETHER PUBLIC ACCESS TO FUTURE R.C.M. 802
CONFERENCES SHOULD BE GOVERNED BY FIRST
AMENDMENT PRINCIPLES.

## Summary of Argument

The Army Court properly denied the petition for
extraordinary relief because appellant failed to meet the first
two conditions for extraordinary relief.  First, a writ of
mandamus or prohibition is appropriate only when no other
adequate remedy is available.  Here, appellants have an adequate

4

APPENDIX A-092

remedy under the Freedom of Information Act (FOIA) to request access to these court-martial documents.[6]

Second, appellant failed to show that his right to the requested relief is clear and indisputable.  At the very least, federal courts have divided over whether the press is *constitutionally* entitled to *contemporaneous* access to judicial documents.

### Law and Standard of Review

A writ of mandamus or prohibition is a "drastic remedy... [which] should be invoked only in truly extraordinary situations."[7]  Therefore, appellant has an "extremely heavy burden" to justify the granting of a writ.[8]

> As the writ is one of the most potent weapons in the judicial arsenal, three conditions must be satisfied before it may issue.  First, the party seeking issuance of the writ must have no other adequate means to attain the relief he desires-a condition designed to ensure that the writ will not be used as a substitute for the regular appeals process.  Second, the petitioner must satisfy the burden of showing that his right to issuance of the writ is clear and indisputable. Third, even if the first two prerequisites have been met, the issuing court, in the exercise of

---

[6] *See* 5 U.S.C. § 552.

[7] *Murray v. Haldeman*, 16 M.J. 74, 76 (C.M.A. 1983) (citing *United States v. LaBella*, 15 M.J. 228, 229 (C.M.A. 1983); and *United States v. Thomas*, 33 M.J. 768 (N.M.C.M.R. 1991)).

[8] *Dew v. United States*, 48 M.J. 639, 648 (Army Ct. Crim. App. 1997) (citing *McKinney v. Jarvis*, 46 M.J. 870, 873 (Army Ct. Crim. App. 1997) and *Bankers Life and Casualty Co.*, 346 U.S. at 384).

APPENDIX A-093

its discretion, must be satisfied that the writ is appropriate under the circumstances.[9]

## Argument

### I.  Appellants have adequate means, aside from a writ, to attain the relief they seek.

Utilizing the Supreme Court's standards for granting extraordinary relief, appellants fail to meet the first criteria because they can obtain their requested relief, public access to court-martial documents, through the FOIA.

The FOIA generally provides that any person has the right to obtain access to federal agency records except to the extent those records are protected from disclosure by the FOIA.[10] Indeed, the "thrust of the FOIA since its initial enactment has been to provide for disclosure of governmental files unless an exemption is established."[11] Specifically, in 5 U.S.C. § 552(a)(3)(A), Congress requires each agency, upon proper request, to "make the [requested] records promptly available to any person" unless subject to certain limited exemption.  Under

---

[9] *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 381 (2004) (internal quotation marks and brackets omitted) (quoting *Kerr v. United States Dist. Court for Northern Dist. of Cal.*, 426 U.S. 394, 403 (1976); *Bankers Life & Casualty Co. v. Holland*, 346 U.S. 379, 384 (1953); and *Ex parte Fahey*, 332 U.S. 258, 260, (1947)).

[10] *See* 5 U.S.C. § 552; Pub. L. No. 104-231, § 2 (1996) (Congressional Statement of Findings and Purposes); *see also Brown v. Federal Trade Commission*, 710 F.2d 1165, 1177 (6th Cir. 1983).

[11] *Title Guarantee Co. v. N.L.R.B.*, 534 F.2d 484, 488 (2d Cir. 1976).

APPENDIX A-094

this statute, Congress *specifically* included courts-martial within the definition of an "agency" and subjected them to the FOIA disclosure requirements.[12]

The Department of the Army promulgated Army Regulation (AR) 25-55, The Department of the Army Freedom of Information Act Program (November 1, 1997), to comply with its disclosure obligations under the FOIA.  Specifically, The Judge Advocate General (TJAG) is authorized to act on any request for records relating to courts-martial.[13]  Appellants, who bear the burden of justifying extraordinary relief, provided no evidence of any FOIA request for the documents they seek.

Even assuming that appellants made a proper FOIA request, and that FOIA request was denied by both the initial and appellate denial authorities (AR 25-55, para. 5-3), then appellants still are not entitled to mandamus at this Court because the proper remedy is to challenge the denial in federal district court.[14]  As provided in AR 25-55 and the FOIA statute itself, a requester "may seek an order from a United States

---

[12] 5 U.S.C. § 551(1)(F) (definitions).
[13] AR 25-55, para. 5-200(d)(14).  *See also* "A Citizen's Guide To Request Army Records Under the Freedom of Information Act (FOIA)", Department of the Army Freedom of Information Act Guide, March 2006, p. 16, available at http://www.armyg1.army.mil/foia/docs/Citizensguide_2006.pdf (listing specific point of contact for FOIA requests at the Office of The Judge Advocate General).
[14] *See* 5 U.S.C. § 552(a)(4)(B).

7

District Court to compel release of a record after administrative remedies have been exhausted."[15]

Where access to agency documents is otherwise available under the FOIA, federal courts routinely deny requests for mandamus.[16]  While these cases do not specifically address requests for court-martial documents, they do stand for the proposition that the availability of FOIA can preclude extraordinary relief.  This Court should likewise deny appellants' request for extraordinary relief because FOIA is the proper vehicle for obtaining records from United States agencies.[17]

Appellants, relying on *Dayton Newspapers, Inc. v. United States Dep't of the Navy*,[18] argue that FOIA is not an adequate remedy because FOIA provides a lesser right of access than the First Amendment.[19]  But *Dayton*'s discussion of the comparative scope of the First Amendment and FOIA is pure dicta, given that

---

[15] AR 25-55, para. 5-400(b); 5 U.S.C. § 552(a)(4)(B).  *See also Dep't of Air Force v. Rose*, 425 U.S. 352, 360 (1976) (the FOIA created a judicially enforceable public right to secure such information from "possibly unwilling official hands.").
[16] *See McLeod v. U.S. Dep't of Justice*, 2011 WL 2112477, *1 (D.D.C. 2011) (unpublished) (denying mandamus where petitioner sought Department of Justice records because relief available under FOIA); *Housley v. United States*, 978 F.2d 715 (9th Cir. 1992) (unpublished) (same); *Strunk v. U.S. Dep't of State*, 693 F.Supp.2d 112, 113 n.1 (D.D.C. 2010) (same for State Department records); *Pickering-George v. Registration Unit, DEA/DOJ*, 553 F.Supp.2d 3, 4 n.1 (same for DEA records).
[17] *See McLeod*, 2011 WL 2112477 at *1.
[18] 109 F.Supp.2d 768 (S.D. Ohio 1999).
[19] Writ-Appeal at 28-29, fn. 9.

APPENDIX A-096

the plaintiffs in *Dayton* did not assert a First Amendment claim.[20]  Moreover, appellants have no legal basis to claim that FOIA is inadequate if they have yet to properly request the documents they seek.

There is no question that "[t]he public has a right to information concerning the activities of its Government."[21]  But the mechanism for enforcing that right is the FOIA, not mandamus or prohibition.  This Court should not permit appellants to use the extraordinary writ process to circumvent the procedures established by FOIA.[22]

For appellants' second issue presented, regarding notice and an opportunity to be heard prior to closure, it is important to note that there is a difference between public access to sealed documents (and closed hearings), and public access to documents admitted and discussed in open court without restriction.  Appellants frequently conflate the two.[23]

---

[20] 109 F.Supp.2d at 773.  The Government also notes that the *Dayton* court did not cite to any case standing for the proposition that the First Amendment was broader than FOIA.
[21] Department of Defense Regulation 5400.7-R, DOD Freedom of Information Act Program, para. C1.3.1.1.
[22] *See, e.g., Housley*, 978 F.2d at 715 (noting that mandamus under these circumstances would permit petitioner to circumvent FOIA procedures).
[23] *Compare* Writ-Appeal at 6 ("[T]he public has largely been denied access to even non-classified documents filed in Pfc. Manning's court-martial....[T]he government's motion papers have not been disclosed in any form....The court's own orders...have not been published.") with Writ-Appeal at 9 ("The First Amendment requires public access unless the government

APPENDIX A-097

To the extent appellants seek access to motions, pleadings, and orders admitted and discussed in open court (i.e., never sealed), appellants have never been "denied" access to these documents because they have yet to request them from the proper release authority.[24]   Appellants' citation to case law concerning actual closure or sealing of documents is not applicable here[25] because neither the government, nor the military judge, denied, withheld, or restricted anything.[26]   Logically, appellants cannot claim they have been denied access to these documents until they request access from the person or entity empowered to grant it.

This would be a different question if appellants were appealing an order actually sealing a document, or closing portions of the court-martial to the public.  In such a situation, a writ may be appropriate.[27]   However, appellants

---

demonstrates that closure is necessary to further a compelling government interest....) and Writ-Appeal at 18 ("[T]he First Amendment demands that '[d]ocuments to which the public has a qualified right of access  may be sealed only if....)."
[24] Either the Office of The Judge Advocate General or the Fort McNair Office of the Staff Judge Advocate (see AR 25-55, App. B., para. 5(b)(5) addressing requests for court-martial documents post-action by the convening authority.).
[25] Writ-Appeal at 14.
[26] For example, appellants' cite to *United States v. Scott*, 48 M.J. 663 (Army Ct. Crim. App. 1998) at pages 21-22 of the writ-appeal, is inapposite.  In *Scott*, the military judge sealed (that is, indefinitely prevented public access) a stipulation of fact used during the appellant's providence inquiry.  Appellants presented no evidence to this Court that any of the documents they seek were sealed by protective order of the military judge.
[27] The Government is referring only to the process of filing a writ and is not suggesting that any writ would be meritorious.

APPENDIX A-098

presented no evidence that the military judge ever sealed any documents or closed the courtroom.  The military judge's ruling - that she was not the custodian of the record of trial, or the release authority under FOIA[28] - is not a "closure" of the court or the sealing of a document.  It is merely a recognition that appellants have failed to request these documents through the proper channels.  This renders appellants' second issue presented unripe for review.

In sum, appellants have a statutory remedy available to them under FOIA, which they have decided to forego in favor of seeking extraordinary relief.  The procedure for accessing court-martial documents is different than in federal court.  A request for judicial documents in federal court may appropriately be made to the judge since FOIA does not apply to judicial documents in Article III courts.[29]  But such is not the case for access to court-martial documents.  Congress provided a specific statutory process for the public to access court-martial records, and this Court should not allow appellants to bypass the *procedures* and *protections* of that system through an extraordinary writ.

---

[28] JA 4.
[29] *See Brown*, 710 F.2d 1165, 1177 (citing 5 U.S.C. § 551(1)(B)).

11

APPENDIX A-099

**II.   Appellants also failed to show that the First Amendment indisputably requires contemporaneous access to court-martial documents.[30]**

In addition to failing the first condition, appellants do not satisfy the second condition for extraordinary relief because they cannot show that their right to relief is indisputable.   Appellants cite to a group of cases suggesting that the First Amendment to the Constitution requires *contemporaneous* access to judicial documents.[31]   That view, however, is hardly unanimous among the federal circuits.   The Sixth Circuit has held, and the Supreme Court has indicated, that the First Amendment right to public access is satisfied by one's unencumbered presence at the trial.[32]   The Constitution only requires "that members of the public and the media have the opportunity to attend criminal trials and to report what they have observed."[33]   Accordingly, "when the media and public are given unfettered access to attend all proceedings and members of

---

[30] The Government submits that this argument regarding the scope of the First Amendment right of public access can fit under either the second prong of mandamus, or the ultimate question of whether the writ should issue.

[31] *See* Writ-Appeal at 15–17.

[32] *United States v. Beckham*, 789 F.2d 401, 403 (6th Cir. 1986) (stating that the members of the media appealed the district court's denial of permission to copy, among other things, documentary exhibits).

[33] *Beckham*, 789 F.2d at 409 (citing *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 610 (1978)).

12

APPENDIX A-100

the media are permitted to publish what they have heard and seen in the courtroom, there is no constitutional violation."[34]

This view of the scope of First Amendment public access is supported by the Supreme Court's decision in *Nixon v. Warner Communications*.[35]   The *Beckham* court ably summarized the facts in *Nixon*:

> [*Nixon*] involved the criminal trial of several of President Nixon's former advisers in connection with the Watergate investigation.   Portions of tape-recordings were played for the jury and the public in the courtroom, and the reels of tape were admitted into evidence.   The district court furnished the jurors, reporters, and members of the public in attendance with transcripts, which were not admitted as evidence.   Members of the media attempted to obtain immediate access to the tapes as well, which the district court denied.[36]

The media argued in *Nixon*, as appellants argue here, that the publics' understanding of the trial was incomplete without access to the tapes themselves.[37]   The Supreme Court rejected that argument, and found that the constitutional requirement of a public trial is satisfied "by the opportunity of members of the public and the press to attend the trial and report what

---

[34] *United States v. Boyd*, 2008 WL 2437725 (E.D. Tenn. 2008) (unpublished); *see also In re NBC Universal, Inc.,* 426 F.Supp.2d 49, (E.D.N.Y. 2006) (When a court has placed "no restrictions upon press access to, or publication of any information in the public domain," the Constitution is not implicated.).
[35] 435 U.S. 589 (1978).
[36] *Beckham*, 789 F.2d at 408 (citing *Nixon*, 435 U.S. 589).
[37] 435 U.S. at 610; Writ-Appeal at 17; JA 6.

APPENDIX A-101

they have observed."[38]   That opportunity existed in *Nixon*, and it certainly exists in *Manning* given the word-for-word detail contained in appellants' sworn declarations.[39]

In addition to the First Amendment, appellants also claim the common law entitles them to contemporaneously access these documents.[40]   But here, to the extent the common law applies to courts-martial,[41] any common law right is obviated by the FOIA. Again, *Nixon* is instructive.   In *Nixon*, the press also asserted that the common law guaranteed them access to the Presidential tapes at issue.[42]   But the Supreme Court found that the common law did not authorize release of the tapes because Congress had created a statutory and administrative scheme for the public to access the Presidential tapes (The Presidential Recordings Act).[43]   The Act provided for "legislative and executive appraisal of the most appropriate means of assuring public

---

[38] *Nixon*, 435 U.S. at 610 (appearing to address both First Amendment and Sixth Amendment arguments regarding the public trial right).
[39] JA 26-28.
[40] Writ-Appeal at 9, fn. 4.
[41] The Government does not concede that the history of the public's access to courts-martial is the same as in Article III courts.   *See, e.g.*, William Winthrop, *Military Law and Precedents* 161-62 (2d ed., Government Printing Office 1920) (1895).
[42] *Nixon*, 435 U.S. at 607.
[43] *Nixon*, 435 U.S. at 608 ("[W]e hold that the common-law right of access to judicial records does not authorize release of the tapes in question....").

14

APPENDIX A-102

access to the material, subject to prescribed safeguards."[44] Congress and the Executive have done the same with access to court-martial records through the FOIA and its implementing regulations.

In short, appellants failed the second condition for extraordinary relief because they cannot show that the *Constitution*, or the common law, requires *contemporaneous* access to court-martial documents.  This Court should grant no relief.

### III.  The parties and the military judge have complied with the requirements of R.C.M. 802, and no action by this Court is required.

Based on the evidence provided to this Court, neither the parties nor the military judge have violated the requirements of R.C.M. 802.  Appellants allege in their pleading that "[t]he trial court has decided substantive matters without promptly memorializing the discussion or the decisions in the record."[45] But they provided no evidence to that effect.  None of the declarations appellants provide identify any issue that was decided by the court without being made part of the record at the next Article 39(a) session.[46]  Indeed, precisely the opposite

---

[44] *Nixon*, 435 U.S. at 605-606.

[45] Writ-Appeal at 30.

[46] Although not part of a declaration, Mr. Ratner's March 21, 2012, letter to the military judge (JA 11-12) does mention the issuance of a pretrial publicity order.  However, this order was obviously captured on the record since Mr. Ratner begins his discussion of this issue by stating, "[W]hen the undersigned *was*

15

is true.  The military judge found that the parties have held
R.C.M. 802 conferences, and appropriately summarized the
substance of each conference on the record.[47]  No party has been
prevented from making any argument, motion, or objection at
trial.

   The thrust of appellants' argument concerning R.C.M. 802
conferences amounts to a constitutional challenge to 802
conferences as a whole.[48]  And this argument is also without
merit.  The First Amendment public trial right is not absolute,
and does not extend to all parts of a trial.[49]  Assuming an
R.C.M. 802 conference can be considered part of the
"proceedings,"[50] R.C.M. 802 conferences, like bench conferences
in federal court, are not open to the public and do not infringe
on the public trial right.[51]  Public access and the statutory

---

in court, we were informed that the Court had signed a pretrial
publicity order." (emphasis added).
[47] JA 28.
[48] Writ-Appeal at 30-31.
[49] In re Associated Press, 172 Fed.Appx. 1, 2006 WL 752044 (4th
Cir. 2006)(citing Richmond Newspapers, Inc. v. Virginia, 448
U.S. 555, 581 n.18 (1980)).
[50] See Richmond Newspapers, Inc., 448 U.S. at 598, n.23 ("[W]hen
engaging in interchanges at the bench, the trial judge is not
required to allow public or press intrusion upon the huddle.
Nor does this opinion intimate that judges are restricted in
their ability to conduct conferences in chambers, inasmuch as
such conferences are distinct from trial proceedings.").
[51] In re Associated Press, 2006 WL 752044 (citing United States
v. Valenti, 987 F.2d 708, 713-14 (11th Cir. 1993) and United
States v. Edwards, 823 F.2d 111, 116-17 (5th Cir. 1987).  See
also United States v. Gurney, 558 F.2d 1202, 1210 (5th Cir.
1977) (holding that "bench conferences between judge and counsel

APPENDIX A-104

requirement for a verbatim transcript[52] are satisfied by the parties' and the military judge's on the record synopses of any substantive matters actually decided in conference.

---

outside of public hearing are an established practice...and the protection of their privacy is generally within the court's discretion....Such conferences are an integral part of the internal management of a trial, and screening them from access by the press is well within a trial judge's broad discretion.").
[52] UCMJ, Art. 54.

17

APPENDIX A-105

## Conclusion

Wherefore, the Government respectfully requests this

Honorable Court deny the petition for a writ-appeal.


CHAD M. FISHER
Captain, JA
Office of the Judge Advocate
   General, United States Army
Appellate Government Counsel
9275 Gunston Road
Fort Belvoir, VA 22060
(703) 693-0783
Chad.m.fisher.mil@mail.mil
**Lead Counsel**
C.A.A.F. Bar Number 34883

AMBER J. ROACH
Lieutenant Colonel, JA
Acting Chief, Government
   Appellate Division
U.S.C.A.A.F. Bar No. 35224

18

## CERTIFICATE OF FILING AND SERVICE

I certify that the original was electronically filed to efiling@armfor.uscourts.gov on 5 July 2012, and contemporaneously served electronically on appellate defense counsel, Mr. Shayana D. Kadidal at shanek@ccrjustice.org and via hard copy at CENTER FOR CONSTITUTIONAL RIGHTS, 666 Broadway, 7th Floor, New York, New York, 10012.

ANGELA R. RIDDICK
Paralegal Specialist
Government Appellate
   Division

19

IN THE UNITED STATES COURT OF APPEALS
FOR THE ARMED FORCES

```
--------------------------------- x
                                  :
CENTER FOR CONSTITUTIONAL RIGHTS, :
GLENN GREENWALD, JEREMY SCAHILL,  : Crim. App. Misc.
THE NATION, AMY GOODMAN, DEMOCRACY : Dkt. No. 20120514
NOW!, CHASE MADAR, KEVIN GOSZTOLA, :
JULIAN ASSANGE, and WIKILEAKS,    : USCA Misc.
                                  : Dkt. No. 12-8027/AR
          Appellants,             :
                                  : General Court Martial
          v.                      : United States v. Manning,
                                  : Ft. Meade, Maryland
                                  :
UNITED STATES OF AMERICA and CHIEF :
JUDGE COL. DENISE LIND,           : Dated: 13 July 2012
                                  :
          Appellees.              :
                                  :
--------------------------------- x
```

### REPLY BRIEF IN SUPPORT OF
### WRIT-APPEAL PETITION FOR REVIEW OF ARMY COURT OF CRIMINAL APPEALS
### DECISION ON APPLICATION FOR EXTRAORDINARY RELIEF

Petitioner-Appellants have asked this Court to grant extraordinary relief enforcing the First Amendment right of timely public access to documents in the court-martial of Pfc. Bradley Manning (including the parties' filings, transcripts and court orders), as well as an order that any future restrictions on public access in the proceedings be imposed consistent with the First Amendment in a manner that allows for public participation in that decision-making process and subsequent appellate review. Petitioner-Appellants also seek application of First Amendment public access principles to the closed R.C.M. 802 conferences during which most of the substantive pretrial arguments and deci-

sions are taking place in the *Manning* proceedings – including de-liberations over the protective order itself.

The government's brief, filed on 5 July 2012, does not seri-ously contest that the First Amendment right of public access ap-plies to documents in courts-martial, and does not dispute that there has been no access to any written court orders, party fil-ings, or transcripts below. Instead, it makes essentially one ar-gument as to the claims for documents: extraordinary relief is inappropriate because the Freedom of Information Act (FOIA) al-lows for access (albeit non-contemporaneous access) to the docu-ments at issue. As the government recognizes, this argument can only be sustained if (1) the right of public access applicable here does not mandate access to the documents at issue *contempo-raneous with* the actual proceedings, *and* (2) if access under the FOIA statute can, as a legal matter, fulfill the mandates of the First Amendment and other rights of public access asserted by Pe-titioners. Neither is the case.

As to Petitioner-Appellants' demand to apply First Amendment access principles to R.C.M. 802 conferences, the government's alarmist response claims that 802 conferences would no longer be possible under our proposed standard. That confuses what we are proposing (application of strict scrutiny to closed conferences) with something no party is proposing (an absolute bar on their use). Where a trial court makes specific findings of a compelling

2

interest in arguing substantive issues in closed session, nar-rowly-tailored closures are permissible. But the routine use of off-the-record conferences to argue and decide nearly every sig-nificant issue in a case, as observed below, is not – even where both parties consent to it.

**ARGUMENT**

**I.   Precedent requires a right of *contemporaneous* public access**

In describing the First Amendment right of access to judi-cial documents that has been recognized in eleven federal Court of Appeals circuits, Petitioner-Appellants' opening brief ex-plained that that right of public access exists not only to pro-mote public confidence in judicial proceedings and assure public accountability of government officials involved in those proceed-ings, but also because transparency and public scrutiny have a tangible effect on the ability of judicial proceedings to produce accurate results. *See* Pet. Br. at 14 (citing cases). It should be quite obvious, as Petitioners' opening brief notes,[1] that if pub-lic access is not contemporaneous with the actual proceedings, this error-correcting function of openness, especially with re-spect to factual matters, will be irretrievably lost.

More than sixty years of caselaw reinforce this point in the Due Process, Sixth Amendment, and First Amendment public ac-cess/open trial contexts. As Plaintiff-Appellants noted in their

---

[1]   *See* Pet. Br. at 15–16.

3

opening brief, the Supreme Court noted that "contemporaneous review" was required as a "restraint on ... abuse of judicial power" as early as *In re Oliver*, 333 U.S. 257, 270 (1948). In that case the Court held that a defendant's Fourteenth Amendment Due Process Clause rights mandated reversal of a criminal contempt proceeding that took place behind closed doors.[2] No less than the Due Process Clause, the Sixth Amendment right to public trial also mandates contemporaneous access to proceedings — for the same logical reasons as the First Amendment cases describe: legitimacy, protection from official abuses, and error correction. The numerous Sixth Amendment cases cited in the opening brief make this abundantly clear. *See* Pet. Br. at 15–16 (citing cases).

These Sixth Amendment rights to "immediate and contemporaneous" public access apply no less to pretrial proceedings (such as the ones currently underway for Pfc. Manning) than to trials themselves. *See Waller v. Georgia*, 467 U.S. 39, 46 (1984) (Sixth Amendment right to public trial applies to pretrial (suppression) proceedings; "presence" of spectators necessary to ensure public legitimacy of trial, good conduct of government officials, and

---

[2]     Notably, the habeas petitioner (and contempt defendant) complained that a full transcript of his supposedly-perjurious statements that were the basis of the contempt finding had not been made part of the record of his conviction or presented to his appellate court — adding to the problematic secrecy in his trial. *See Oliver*, 333 U.S. at 264.

because such real-time access "encourages witnesses to come forward and discourages perjury" (citing *Oliver*)).

There is no logical reason why the principle of contemporaneous access should not carry over from the Due Process and Sixth Amendment cases to First Amendment cases. This Court has several times opined that Sixth Amendment and First Amendment open trial principles in this regard are interchangeable. *See United States v. Ortiz*, 66 M.J. 334, 338, 339-40 (C.A.A.F. 2008); *United States v. Hershey*, 20 M.J. 433, 436 (C.M.A. 1985). Indeed, the tendency of public access to improve errors in factfinding – the traditional purview of trial courts – argues forcefully for a contemporaneous right of public access to documents.

The common logic of the Due Process, Sixth Amendment and First Amendment policies favoring open trial is reflected in the frequent citation to *Oliver* in the Supreme Court cases recognizing a specifically First Amendment right of public access:

> *Oliver* recognized that open trials are bulwarks of our free and democratic government: public access to court proceedings is one of the numerous "checks and balances" of our system, because "contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power," [333 U.S.] at 270.

*Richmond Newspapers*, 448 U.S. at 592 (Brennan, J., concurring, with Marshall, J.); *id.* at 597 n.22 ("the [later] availability of a trial transcript is no substitute for a public presence ... the 'cold' record is a very imperfect reproduction of events that

transpire in the courtroom."); *id*. at 573 n.9 (citing *Oliver*) (Op. of Berger, C.J., joined by White, Stevens, JJ.).

As Petitioner-Appellants' declarations and opening brief make clear, restrictions on contemporaneous access have perhaps their sharpest impact on the media. *See* Pet. Br. at 17; Gosztola Decl. at ¶¶ 3-9 (JA-24-25). The Supreme Court and some of our finest legal scholars have recognized as much. *See, e.g., Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 572-73 (1976) (Brennan, J., concurring) ("discussion of public affairs in a free society cannot depend on the preliminary grace of judicial censors"); *id*. at 609 ("Indeed it is the hypothesis of the First Amendment that injury is inflicted on our society when we stifle the immediacy of speech." (quoting Alexander Bickel, The Morality of Consent 61 (1975))). Unsurprisingly, most of the First Amendment cases mandating contemporaneous access to documents involve media petitioners. *See* Pet. Br. at 16-17 (citing three such cases: *Chicago Tribune Co.*; *Associated Press*; and *United States v. Smalley* (involving the *Dallas Morning News* and *Forth Worth Star Telegram*)).

Mandamus and Prohibition are, as the government notes, appropriately termed "extraordinary" writs. But the First Amendment demands the immediate relief that only the writs can provide. As noted in our opening brief, Pet. Br. at 18, this is reflected in numerous federal cases where extraordinary forms of relief – pre-

6

liminary injunctions, or appeals under the collateral order doc-
trine – are allowed to vindicate public access rights. *See, e.g.*,
*Wecht*, 537 F.3d at 229-30 ("the value of contemporaneous disclo-
sure, as opposed to post-trial disclosure, is significant enough
to justify our immediate review of the matter under the collat-
eral order doctrine [on the media-petitioner's appeal].); *In re
Applications of NBC*, 828 F.2d 340, 343 (6th Cir. 1987) (collat-
eral order appeal); *Grove Fresh Distributors, Inc.*, 24 F.3d at
897 ("'[E]ach passing day may constitute a separate and cogniza-
ble infringement of the First Amendment.'").

## II.  <u>Cases involving audio and video records are not the equiva-<br>lent of cases seeking documents</u>

The government cites to two cases in support of the idea
that federal courts have in fact not been unanimous in the re-
quiring contemporaneous access to judicial documents – a single
Supreme Court case decided on common law grounds prior to the
*Richmond Newspapers* line of cases establishing the First Amend-
ment right of public access (*Nixon v. Warner Communications*, 435
U.S. 589 (1978)), and a single Sixth Circuit case from 1986
(*United States v. Beckham*, 789 F.2d 401 (6th Cir. 1986)). Gov't
Br. at 12. The government argues that, standing against all the
cases and well-established legal principles cited above, the ex-
istence of these two singular cases means that Petitioner-

7

Appellants' "right to relief is [not] indisputable" and therefore extraordinary relief is inappropriate.

That argument would be extraordinary enough by itself. It is more extraordinary because *Beckham*, the Sixth Circuit case, is clearly no longer good law. The two-judge majority in *Beckham* based its ruling on a reading of a common law right of access to judicial records (informed by *Nixon*), finding the First Amendment did not apply.[3] The following year the Sixth Circuit ruled that the First Amendment did guarantee a right of access to judicial records. *See In re Applications of NBC*, 828 F.2d 340 (6th Cir. 1987) (cited in Pet. Br. at 11 n.5).[4]

Moreover, the *Beckham* majority, despite holding that the First Amendment did not govern access to judicial documents, ruled that under the common-law standard the trial court erred "in refusing to grant permission to copy the documentary exhibits" sought by the media in mandamus. 789 F.2d at 403, 412. The majority held that the trial court was only correct in withhold-

---

[3]  *See Beckham*, 789 F.2d at 409 ("If a right to copy the tapes and transcripts in this case exists, it must come from a source other than the Constitution."); 409-10, 413 (noting common-law basis of analysis for access to tapes, citing *Nixon* frequently).

[4]  The *NBC* panel came to this conclusion notwithstanding the *Beckham* panel opinion. *Cf.* 828 F.2d at 351 (Ryan, J., dissenting).

8

ing (again, under a common law analysis) the right to copy audio tapes[5] sought by the media.

*Beckham* and *Nixon*, then, are both narrow cases rejecting only a common law claim of access to audio tapes. Both cases illustrate why tapes are special: they have a potential to sensationalize judicial proceedings, in much the same way that televising court sessions might.[6]

The *Beckham* court, for instance, noted that release of the actual tapes could impart a carnival feeling into the court room, increasing tensions in the community (where the mayor and the media were engaged in conflict over what he asserted was racially-charged negative coverage) and importing them into the courtroom, and could also contaminate the jury pool because of the "misleading aura of accuracy to a tape recording." *Id*. at 410. *Nixon* involved similar concerns over commercially-motivated media sensationalism,[7] but primarily turned on the fact that Congress had re-

---

[5]    The *Beckham* court also denied the right to copy transcripts of those tapes. But the particular transcripts at issue were not admitted into evidence. The transcripts were used at trial only as "visual aids," with warnings to the jury to not consider them authoritative. The court refused to introduce them to evidence because they were acknowledged to be riven with errors. *See* 789 F.2d at 411. The same concerns the trial court had that the tapes would convey a misleading sense of accuracy seemed to apply to the transcripts as well. *See id*. at 411 n.4.

[6]    For this reason R.C.M. § 806(c) contains a flat ban on audio and video recording of courts-martial.

[7]    *See Nixon*, 435 U.S. at 598 (noting interest of courts in ensuring their records were not used to "promote ... scandal" or

cently legislated in the field the common law right otherwise oc-
cupied.[8]

The *Beckham* court noted that the question of access to the
actual tapes might have come out differently if the First Amend-
ment had applied to the actual tapes (as it now ought to, post-
*NBC*). *Id*. at 411. However, application of First Amendment strict
scrutiny analysis by trial courts will not always result in re-
lease of judicial records. Where a compelling interest (e.g., as
in *Nixon*, a high risk of irreparable jury taint[9]) exists, nar-
rowly-tailored measures taken to restrict public access (e.g. al-
lowing public release of carefully-limited parts of the materials

---

"serve as reservoirs of libel[]"); *id*. at 595 (noting risk of
jury taint for Watergate defendants if tapes were released). Jury
taint may at times constitute a compelling interest justifying
restrictions on public access under strict scrutiny. *See infra*,
pages 10–11 and n.9.

[8]    *Id*. at 607 n.18 ("existence of Act...obviates...common-law
right"). As the First Circuit noted a decade later, "[t]he Court
in [*Nixon v.*] *Warner Communications* was dealing with a most idio-
syncratic situation involving a Presidential privacy interest, a
[Presidential Records] statute [created by Congress] specifically
governing access in a limited number of unique cases, prior dis-
tribution of complete transcripts, and a motive to copy the tapes
for sale. In light of *Richmond Newspapers*, decided two years
later, we cannot read *Warner Communications* as laying down a gen-
eral rule for all criminal cases that once the substance of tes-
timony and evidence has been exposed to public view, there is no
right of access to visual and aural means of preserving it."
*Globe Newspaper Co. v. Pokaski*, 868 F.2d 497, 504 (1st Cir. 1989)
(Coffin, J.); *see also United States v. Berger*, 990 F. Supp.
1054, 1056–57 (C.D. Ill. 1998) (noting circuit splits re. video-
tapes).

[9]    *See Nixon*, 435 U.S. at 595 (Judge Sirica felt Watergate de-
fendants might suffer jury taint if tapes were released and they
eventually faced retrial).

only after the jury verdict) may satisfy strict scrutiny. But even under the common law, the *Beckham* court noted that where the conduct of public officials is at issue, release of materials would advance public knowledge of a case, or the substance of the material was available to the public already,[10] these factors would weigh in favor of release. *Id.* at 412.

These latter factors are present in the instant case. Nothing in the materials Petitioner-Appellants have requested has the potential to exacerbate jury taint or turn the *Manning* proceedings into a circus (though application of strict scrutiny is typically for the trial court in the first instance). Petitioner-Appellants are merely seeking access to the most sober elements of the documentary record. Far from turning this trial into a circus, public access to the briefs, orders and transcripts

---

[10]     The government claims that "when the media and public are given unfettered access [and allowed] to publish what they have heard and seen," Gov't Br. at 12-13, that is all that is required – especially "given the word-for-word detail contained in appellants' sworn declarations," Gov't Br. at 14 and 14 n.39. (In other words, the fact that Ms. O'Brien took such excellent notes on one given section of the proceedings on one day (JA-26-29) should overcome the First Amendment right of access.) But their own best case contradicts this – the *Beckham* court, applying a common law standard, would have found the *Manning* transcripts releasable simply because their substance was already available to members of the public attending the proceedings. (Moreover, Ms. O'Brien was recently denied access to the media room where she managed to use her computer to type the notes used in her declaration. *See* http://www.alexaobrien.com/secondsight/wikileaks/ bradley_manning/miltary_distri/military_district_of_washington_ threatens_journalist_with_arrest.html.)

should increase the amount of respect and legitimacy accorded to the proceedings below. *Cf*. Pet. Br. at 36-37.

III. **FOIA is no substitute for access under the First Amendment**

The second component of the government's argument is that because Petitioners "can obtain their requested relief" through FOIA, Gov't Br. at 6, they must exhaust FOIA before they can be entitled to extraordinary relief. *Id*. at 7-8, 4. In effect, the government argues that the FOIA statute somehow provides all the relief Petitioners would be entitled to under the First Amendment and common law rights of access.[11] In fact, FOIA provides neither the full extent of disclosure mandated by the First Amendment, nor the contemporaneous disclosure it demands.

"Even though the FOIA and the First Amendment both foster an atmosphere of governmental openness, ... the legal standards governing disclosure are not identical under the two provisions. [T]he government may overcome the FOIA's presumption of openness (i.e., disclosure) by demonstrating the applicability of an ex-

---

[11]    The government also seems to argue – their brief is not entirely coherent on this point – that because there has been no order sealing documents from disclosure, there is no action of the trial court for us to challenge. Gov't Br. at 9-11. Of course, since neither the protective order nor any sealing orders have been released, the public has no way to know whether this is true, but the government's argument misses the more basic point that under the First Amendment, public access to judicial documents is presumptive; any deviation from the presumption of access not comporting with strict scrutiny is a violation of the public's right of access. Put another way, release should be automatic; the failure to release violates the First Amendment.

emption [provided for in the FOIA statute.]" *Dayton Newspapers, Inc. v. United States Dep't of the Navy*, 109 F. Supp. 2d 768, 772–73 (S.D. Ohio 1999). Under the terms of the FOIA statute, the government may withhold, for example, records relating to "internal personnel rules and practices"; most "inter-agency or intra-agency memoranda" including those subject to the deliberative process privilege; "personnel and medical files" implicating privacy interests; and various subcategories of "records or information compiled for law enforcement purposes" including those that "would disclose techniques and procedures for law enforcement investigations or prosecutions." 5 U.S.C. § 552(b)(2), (4)–(7).

In *Dayton Newspapers*, the plaintiffs requested certain court-martial records, including the questionnaires filled out by the members (the military rough-equivalent of jurors), under FOIA and not under the First Amendment. The *Dayton Newspapers* court, citing the A.C.C.A.'s decision in *Scott*, 48 M.J. at 665, 666, implied that Army courts had recognized such a First Amendment right of access. 109 F. Supp. 2d at 773. The court noted that under the First Amendment, juror questionnaires in civilian criminal courts would generally be available to the media. *Id*. at 772 (citing *Application of Washington Post*, No. 92-301, 1992 U.S. Dist. LEXIS 16882, 1992 WL 233354, at *4 (D.D.C. 1992)). However, because the plaintiff newspapers had only made their request under the FOIA, the court applied the "lesser" right to obtain in-

formation pursuant to FOIA "rather than the constitutional [First Amendment] strict-scrutiny analysis set forth in *Press-Enterprise* and *Washington Post*," *id.* at 773, and found that FOIA's exemption (b)(7)(C) (for records that if produced "could reasonably be expected to constitute an unwarranted invasion of personal privacy") applied to exempt the court-martial members' questionnaires from disclosure under FOIA. *Id.* at 776.

The district judge in *Dayton Newspapers* noted that in dicta in previous opinions he had opined that the First Amendment would have mandated "public release" of all but the most "intensely personal" information on the questionnaires. However, plaintiffs made their claims exclusively under FOIA; accordingly, he had come to the conclusion that because of the statutory exemptions built into FOIA, the documents could be withheld in their entirety. 109 F. Supp. 2d at 775 n.5 ("Because the present case, unlike *Washington Post*, involves a FOIA request, rather than the First Amendment, the Court need not engage in strict-scrutiny review.") This and other cases[12] make clear that FOIA's built-in legal exemptions from disclosure will typically operate to produce far lesser access to records than the First Amendment demands.

---

[12]    *See, e.g., Freedberg v. Department of Navy*, 581 F. Supp. 3, 4 (D.D.C. 1982) (Gesell, J.) (allowing withholding in FOIA of "NIS and JAG Manual investigations" of a murder despite the fact that "large portions" of the same "are already in the public record of the courts-martial" for two of the four murder suspects already tried).

14

APPENDIX A-121

In the Manning proceedings, the "internal personnel rules" FOIA exemption might operate to exclude evidence of computer security policies at the intelligence facility where Manning worked; the "inter-agency or intra-agency memoranda" exemption might operate to exclude the damage assessments that have of late been the subject of intense discovery litigation; "personnel and medical files" arguably implicating Manning's privacy might be withheld even though admitted into evidence; and untold amounts of evidence might be withheld under the (7)(E) exemption for law enforcement techniques and procedures.

Indeed, prior media FOIA requests for documents in the Manning case – including defense filings relating to speedy trial – were denied by the Army in their entirety on the grounds that they might interfere with law enforcement proceedings and deny the defendant fair trial under Exemption 7(A) and (B) of FOIA. That is a truly astonishing ruling given that many of the documents requested *were filed by the defense*. *See* Appendix A (FOIA request and appeal documents of Josh Gerstein of POLITICO).

<p align="center">*     *     *</p>

Moreover, access to documents under FOIA is too slow to be "contemporaneous" with the proceedings in the manner required by the First Amendment. This is true both as a practical matter and

<p align="center">15</p>

a matter of law.[13] Notwithstanding any practical delays engendered by agency backlogs and the like,[14] the statute itself has delays built into it: Under 5 U.S.C. § 552(a)(6)(A)(i) agencies are allowed 20 business days to determine whether to comply with FOIA requests, a deadline that can be and often is extended as pro-

---

[13]    The government appears to believe that only after a trial is over can FOIA provide access to the documentary record of trial. *See* Gov't Br. at 10 n.24 ("post-action requests" to JAG, SJA offices are proper means to seek release under Army FOIA regulation AR 25-55). Judge Lind's law review article on public access likewise claims that FOIA production of court-martial records can occur only after a trial is over, at which point the records are turned over from the court-martial to military authorities. *See* Lt. Col. Denise R. Lind, *Media Rights of Access to Proceedings, Information, and Participants in Military Criminal Cases*, 163 Mil. L. Rev. 1, 57 (2000) (finding, based on what may be a misreading of 5 U.S.C. § 551(a)(1)(F), that the records of courts-martial only become "agency" records when they are transferred at the conclusion of trial to the convening authority).

If accurate, this would render FOIA even more problematic as an alternative public access scheme – for the production of documentary records would by definition not be contemporaneous with the proceedings, instead only coming after the trial was over.

[14]    The long delays endemic to processing FOIA requests are the stuff of legend. The New York Times recently reported that on 4 January 2012 it received a twelve-page document in response to a request it made (via Federal Express priority overnight courier) on 1 June 1997. The story also documented two 20-year-old unprocessed requests, both of which related to documents from 1961 or before, and quoted officials stating the system was "slower than any of us would like" and refusing to agree that "a delay of 10 years or more constituted a de facto denial." Matthew L. Wald, *Slow Responses Cloud a Window into Washington*, N.Y. Times (Jan. 28, 2012), *available at* http://www.nytimes.com/2012/01/29/us/slow-freedom-of-information-responses-cloud-a-window-into-washington.htm?pagewanted=all.

APPENDIX A-123

vided for in the statute.[15] Although the government would surely like to continue to avoid the entire issue of public access by claiming the lack of a pending FOIA request by Petitioners renders any appeal to the burden of real-world FOIA processing delays here premature, as it did below, it has no answer for the systematic delays and exemptions built into the statute. Finally, agencies may charge search and production fees in many circumstances under FOIA, a burden on the representatives of the press and public that is unheard of in First Amendment access cases.

The few cases cited by Respondents for the idea that FOIA forecloses extraordinary relief in mandamus, Gov't Br. at 8–9, all of which appear to involve pro se petitioners, are entirely inapposite. All four of them involve requests aimed at agency records (*Strunk*,[16] *Pickering-George*[17]) or prosecutorial files

---

[15]    *See* 5 U.S.C. § 552(a)(6)(A)(i) (twenty business day deadline); *id*. § 552(a)(6)(B)(ii) (allowing extensions without fixed time limit in "unusual circumstances").

[16]    In *Strunk v. United States Dep't of State*, 693 F. Supp. 2d 112 (D.D.C. 2010), petitioner, a Birther, sought Department of State records relating to the President's travel, birth, and passport records simultaneously in both mandamus and FOIA. The court summarily dismissed the mandamus request in a footnote. *Id*. at 113 n.1. There is no mention of the First Amendment in the opinion.

[17]    Respondents have cited to a footnote in *Pickering-George v. Registration Unit*, 553 F. Supp. 2d 3, 4 (D.D.C. 2008), wherein the court indicates that the pro se plaintiff attempted to amend his complaint seeking mandamus relief in addition to his FOIA claims seeking access to DEA records. The court denied that request as futile, finding plaintiff had not actually sent any FOIA

APPENDIX A-124

(*McLeod*,[18] *Housley*[19]). In neither situation would a First Amendment right of access to such documents exist in the first place, so it makes no sense to argue that the availability of FOIA to access such documents somehow has been held to displace a First Amendment right of access in mandamus in these otherwise rather trivial cases.

In sum, because FOIA is not a plausibly adequate alternative to the contemporaneous access required by the First Amendment,[20] Petitioner-Appellants need not exhaust any available FOIA remedy before seeking the relief they seek presently.

---

request to the correct address for the agency. Again, there is no mention of the First Amendment in the opinion.

[18]   In *McLeod v. DOJ*, 2011 WL 2112477 (D.D.C. May 24, 2011) (unpublished), a pro se petitioner sought access to files documenting a DOJ corruption investigation of a state prosecutor.

[19]   In *Housley v. United States*, 1992 U.S. App. LEXIS 26368 (9th Cir. 1992) (unpublished mem. dec., table report at 978 F.2d 715), petitioner, a federal prisoner, sought "to disclose documents, files and records obtained through the alleged illegal use of electronic surveillance devices" via mandamus, and had simultaneously filed a FOIA request for the same. The Court dismissed. The case contains no mention of the First Amendment.

[20]   *Cf. Doe v. Gonzales*, 500 F. Supp. 2d 379, 416 (S.D.N.Y. 2007) ("Plaintiffs' 'desire here is to exercise their First Amendment rights, which distinguishes this case from those in which an individual seeks disclosure of information ... pursuant to FOIA. Here, [Plaintiffs] seek to vindicate a constitutionally guaranteed right; they do not seek to vindicate a right created, and limited, by statute.'"), *aff'd in part, rev'd in part on diff. grounds*, 549 F.3d 861 (2d Cir. 2008).

18

APPENDIX A-125

## IV.  **The history of public access is irrelevant here**

The government did not contest below that the First Amendment right of public access identified in *Richmond Newspapers* applied in courts-martial.[21] For the first time on appeal, and in a footnote,[22] Gov't Br. at 14 n.41, the government claims that it "does not concede that the history of the public's access to courts-martial is the same as in Article III courts." The government offers no support other than a pincite to Winthrop (with no quotation attached[23]), nor does it elaborate as to in what sense the history of access has or has not been "the same as" in Article III courts, or why that is legally relevant. On any of these

------

[21]   Nor, in fairness, could it, given the overwhelming weight of federal caselaw cited by Petitioners, *see* Pet. Br. at 10-21, and the fact that the A.C.C.A. in *United States v. Scott*, 48 M.J. 663 (Army Ct. Crim. App. 1998), *pet'n for rev. denied*, 1998 CAAF LEXIS 1459 (C.A.A.F. 1998), applied First Amendment standards in analyzing a claim for public access to documents, *see* Pet. Br. at 21-22.

[22]   Remarkably, the text this footnote is attached to discusses the *common law* right of access.

[23]   The Winthrop treatise states of courts-martial that at the court's discretion, "proceedings shall not be reported except officially" and "other reporters may be required not to take notes," though "in general" open access is permitted. Winthrop's Military Law and Precedents 162 (2d ed. 1896) (reprinted 1920). However, the same section states "[o]riginally, (under the Carlovingian Kings,) courts-martial ... were held *in the open air,* and in the Code of Gustavus Adolphus ... criminal cases before such courts were required to be tried '*under the blue skies.'* The modern practice has inherited a similar publicity." *Id.* at 161 (original emphasis). And there is no reference to the treatment of judicial documents anywhere in this section (or that we can find in the rest of the treatise). In short, Winthrop provides no guidance for the present inquiry.

APPENDIX A-126

grounds – failure to raise argument in the lower court, failure to elaborate it with sufficient detail to allow a coherent response, failure to offer support, and placement in a footnote – this Court should consider any such argument waived.[24]

Even presuming that the government intended to allude to the Supreme Court's "experience and logic"[25] test for application of the First Amendment right of public access to proceedings, this Court has repeatedly applied that line of decisions to courts–martial.[26] In doing so this Court both found a past tradition of

---

[24]   *Hernandez v. Cook Cnty. Sheriff's Off.*, 634 F.3d 906, 913 (7th Cir. 2011) ("'skeletal' arguments may be properly treated as waived.... The underlying concern is to ensure that the opposing party is denied sufficient notice to respond to an argument."); *Long-Gang Lin v. Holder*, 630 F.3d 536, 543 (7th Cir. 2010) (party "must identify the legal issue, raise it in the argument section of her brief, and support her argument with pertinent authority"); *Draper v. Martin*, 664 F.3d 1110 (7th Cir. 2011) ("Plaintiffs fail to offer any record citations or analysis ... we deem their undeveloped argument waived"); *United States v. Torres-Aguilar,* 352 F.3d 934, 936 n.2 (5th Cir. 2003) (argument deemed abandoned by appellant "only briefly mentioning it in a footnote of his opening brief without providing any legal citation or analysis").

[25]   *Press-Enterprise-II*, 478 U.S. 1, 9 (1986). The historical prong of this test has been widely criticized by commentators, and was never entirely dispositive as applied by the Supreme Court in any event, *see, e.g.*, *Globe Newspaper Co. v. Superior Ct.*, 457 U.S. 596, 605 n.13 (1982) (Brennan, J. concurring) (noting there was a *general* tradition of openness of criminal trials, and the Court thus ignored the *specific* tradition of closure for minor sex victims given that the "logic" portion of the test demanded it); *North Jersey Media Group v. Ashcroft*, 308 F.3d 198, 225 (3d Cir. 2002) (citing cases applying same analysis); *see also infra* note 27.

[26]   *See, e.g.*, *United States v. Travers,* 25 M.J. 61, 62–63 (C.M.A. 1987) (First Amendment right of public access extends to

APPENDIX A-127

open access ("experience") and established such a practice going forward. Similarly, the *Scott* case established precedent for public access to judicial documents in Army courts-martial 14 years ago. *See* Pet. Br. at 21–22 (citing *United States v. Scott*, 48 M.J. 663 (A.C.C.A. 1998).

Perhaps the government means to imply that the relevant history is the 19th century environment of Winthrop's day – that is, that the history of access to documents need be ancient and unbroken for the First Amendment right to apply.[27] If so, that argument is a non-sequitur, for traditional courts-martial lacked any documentary records comparable to today's U.C.M.J. trials.[28] Historically, courts-martial were oral proceedings, without written

---

courts-martial, citing *Richmond Newspapers* and *Press-Enterprise I* and *II*).

[27]  Though the government has made similar arguments in civilian cases, the federal courts have not agreed that ancient history is relevant to this inquiry. *See Detroit Free Press v. Ashcroft*, 303 F.3d 681, 700 (6th Cir. 2002) (rejecting argument that history of access must stretch to ancient times, and also finding relevant "current ... statutes" providing open access (*cf*. U.C.M.J. § 836; current R.C.M. 806(b)(2))); *id*. at 701 ("brief historical tradition might be sufficient to establish a First Amendment right of access where the beneficial effects of access to that process are overwhelming and uncontradicted" (citing Justice Brennan's *Richmond Newspapers* concurrence)); *NYCLU v. NYCTA*, 652 F.3d 247, 259 (2d Cir. 2011) (same; cases "focus not on formalistic descriptions of the government proceeding but on the kind of work the proceeding actually does and on the First Amendment principles at stake").

[28]  Moreover, as footnote 25, *supra*, notes, it is the *general* tradition of access to the *type of proceeding* in question that is significant under the Supreme Court's test – not whether access typically ran to documents, various portions of that proceeding, etc.

APPENDIX A-128

filings, adjudicated by a superior officer. The entire process was conducted without judges and typically without even any requirement for involvement by lawyers. A record of trial was only required to be produced if there was a conviction.[29]

Congress changed that radically in 1968, creating military judges to administer courts-martial,[30] and again in 1979, specifically extending the U.C.M.J. § 836 mandate that those tribunals apply "principles of law ... generally recognized in the trial of criminal cases in the United States district courts" to "[p]retrial ... procedures" (that is, the provision's coverage expanded from "cases" to all aspects of cases, including "[p]retrial, trial, and post-trial procedures").[31] Recent history is thus the only "experience" that is even possibly relevant here.[32] In any event, resolving historical questions is not necessary to resolve the present dispute, because by statute Congress has made clear that it intended that the U.C.M.J. system be open

---

[29]   However, the records of cases attracting significant public attention, dating back to the Revolution (such as Joshua Hett Smith (acquitted of aiding Benedict's Arnold treason), the Lincoln assassination conspirators, etc.) were often privately printed and sold to the public soon after the fact.

[30]   *See* Statement of President Johnson on signing Military Justice Act of 1968, P.L. 90-632 (Oct. 24, 1968) ("It creates an independent court system within the military, free from command pressures and control.").

[31]   *See* Defense Authorization Act 1980, P.L. 96-107, 93 Stat. 811, § 801(b) (Nov. 9, 1979) (specifically extending § 836 to pretrial proceedings).

[32]   *See supra* note 27 (citing *Detroit Free Press*).

APPENDIX A-129

and be alike to federal courts procedurally. *See* Pet. Br. 12–13 (citing § 836). That procedural conformity should extend to access to judicial documents, as recognized (or presumed to exist) in every relevant federal Court of Appeals under the First Amendment.[33]

## V.   R.C.M. 802 conferences are subject to the First Amendment right of public access

The government claims the trial court has "appropriately summarized the substance of each [R.C.M. 802] conference on the record." Gov't Br. at 16. In open court on June 6, the trial court noted that three specific conferences "ha[ve] been synopsized" on the record and the parties invited to supplement the synopsis. JA–28. Without full transcripts of all public sessions (and full knowledge of all occasions on which R.C.M. 802 conferences have been held) it is impossible for Petitioner-Appellants to know whether the government's claim is accurate, but the language of the trial court's statement again implies that if the parties fail to object to an inadequate synopsis, the court has no further duty to provide public access. That cannot be adequate to satisfy the right of public access – which, it bears repeat-

---

[33]   *See* Pet. Br. 11–12 n.5. Common law standards are much the same. *Id*. 20–21.

ing, is a right that belongs to the public and not the parties, and therefore cannot be waived away by the parties.[34]

The government is correct to say that the "First Amendment public trial right is not absolute" but is wrong to imply that that means certain areas of adversary proceedings and judicial decision-making – such as bench conferences in federal courts or substantive R.C.M. 802 conferences in courts-martial – may be placed entirely outside the scope of the First Amendment. Gov't Br. at 16. The First Amendment demands only that any restrictions on public access satisfy strict scrutiny (and, procedurally, that interested parties have meaningful notice and opportunity to object to such restrictions). If, for instance, the court finds that there is a compelling interest in keeping prejudicial material out of the view of the jury, the court may impose restrictions that meet the narrow tailoring test – meaning, they are the least restrictive means that can still satisfy the compelling interest. Occasionally, bench conferences are used in federal courts to discuss matters that must be kept out of earshot of the jury, and public dissemination is prohibited until after the verdict so as not to reach (non-sequestered) jurors via the media. In such cases, the First Amendment is satisfied so long as the

---

[34]   Compare Manual for Courts Martial (2012), R.C.M. 806(b)(2), Discussion, stating "that the prosecution and defense jointly seek to have a session closed does not, however, automatically justify closure, for the public has a right in attending courts-martial."

24

restriction on contemporaneous public access is necessary to

serve a compelling interest and is the least restrictive measure

available to meet the need.[35]

The government claims that Petitioner-Appellants have failed

to "identify any issue" decided "without being made part of the

record" at the next public session. That is simply wrong: despite

not having transcripts of the public sessions for comparison, our

---

[35]   *See, e.g.*, *United States v. Smith*, 787 F.2d 111, 114-15 (3d
Cir. 1986) (approving press access to transcript of sidebar con-
ference by applying common-law principles, 787 F.2d at 113 n.1,
without reaching First Amendment: "Although the public and press
may be justifiably excluded from sidebar and chambers conferences
even when substantive rulings are made, the public interest in
the ruling is not diminished. ... the public interest in observa-
tion and comment must be effectuated in the next best possible
manner.").

Even *United States v. Valenti*, 987 F.2d 708 (11th Cir.
1993), cited by the government, acknowledged that courts had to
"accommodate the public's right of access" to bench conferences,
but that government interests might outweigh that right of access
– in other words, strict scrutiny is not "fatal in fact" to all
restrictions on public access. *Cf. In re Associated Press*, 172
Fed. Appx. 1, 5, 2006 WL 752044 (2006) ("prompt post-trial re-
lease of transcripts" of bench conferences satisfies public ac-
cess right).

The government's brief cites to language in the *Richmond
Newspapers* concurrence of Justice Brennan without correctly iden-
tifying that language as coming from a concurrence. *See* Gov't Br.
at 16 n.50 (quoting *Richmond Newspapers*, 448 U.S. at 598 n.23
(Brennan, J., concurring) ("[W]hen engaging in interchanges at
the bench, the trial judge is not required to allow public or
press intrusion upon the huddle. Nor [are] judges restricted
in their ability to conduct conferences in chambers, inasmuch as
such conferences are distinct from trial proceedings.")). In any
event, the language in question is logically read (a) as a con-
cession that strict scrutiny would ordinarily allow the sort of
exchanges traditionally held at trial in sidebar out of jury ear-
shot, and (b) to distinguish administrative matters (which are
"distinct from trial proceedings") from contested matters (which
are not).

exhibits note that several orders were not disclosed on the record even though their existence was alluded to (e.g. a pretrial order, JA-11-12, and an order on posting of defense briefs, JA-6). Moreover, the *Defense Motion to Record and Transcribe All R.C.M. 802 Conferences*, JA-32-34, notes that there has "sometimes [been] confusion about what exactly was decided during [an] 802 session." JA-34, ¶ 10. In any event, it is sufficient at this point for this Court to order that the trial court ensure that its past and future R.C.M. 802 practices conform to First Amendment principles, *see* Pet. Br. at 4, Relief Sought, ¶ 2,[36] leaving specific implementation of the remedy to the trial court in the first instance.

## Conclusion

As Petitioner-Appellants noted in our opening brief, it seems likely that the only reason Judge Lind did not find in favor of public access to the documents and proceedings at issue here is that she believed this Court and the A.C.C.A. have not yet held that the First Amendment applies to guarantee public access to anything other than the courtroom itself. *See* Pet. Br. at 28 n.9 (citing Kadidal Decl. ¶ 9 (JA-4-5) and Lt. Col. Denise R. Lind, *Media Rights of Access to Proceedings, Information, and Participants in Military Criminal Cases*, 163 Mil. L. Rev. 1, 45-

---

[36]   This section in our opening brief contains a typographic error, repeated twice: "in a matter not inconsistent with the First Amendment" should read "in a manner not inconsistent...."

APPENDIX A-133

53 (2000)). (The government, in contrast, does not seriously con-
test that the First Amendment right of public access applies to
documents in courts-martial.) Judge Lind concludes her article
with a plea to the military authorities to amend the Rules for
Courts-Martial to comply with the First Amendment's public access
standards:

> The current Rules for Courts-Martial governing access
> to Article 32 investigations and courts-martial pro-
> ceedings provide standards for closure that violate the
> media First Amendment right of access. ... Both R.C.M.
> 405(h)(3) and R.C.M. 806 should be amended to incorpo-
> rate the compelling interest/individualized find-
> ings/narrowly tailored means test to justify closing
> proceedings or sealing records to which the First
> Amendment right of access attaches.[37] This test should
> be the rule for closure with or without defense objec-
> tion. Rule for Courts-Martial 801(a)(3) should be
> amended to authorize military judges to control and re-
> lease judicial records filed in connection with courts-
> martial. Finally, [the Rules] should provide for media
> notice and opportunity to be heard with respect to clo-
> sure/sealing.

163 Mil. L. Rev. at 86. We could not agree more with the ultimate
policy goals Judge Lind advocates for in her article: improved
access (and opportunity to object to restrictions on access) for
the media and the public. Petitioners would only add that this
Court should make clear that the First Amendment *mandates* such a
result, regardless of whether the R.C.M. specifies the same. Do-
ing so is vital if the military justice system is to be taken se-

---

[37]   After Judge Lind's article was published, current R.C.M.
806(b)(2) was added to address some of the concerns in the quoted
sentence. *See* E.O. 13,365, 69 Fed. Reg. at 71334 (Dec. 3, 2004).

APPENDIX A-134

riously as the equivalent of the civilian criminal justice system

in terms of fairness, accuracy and transparency.

Date: New York, New York
      13 July 2012

                      Respectfully submitted,


                          /s/sdk
                      Shayana D. Kadidal
                      J. Wells Dixon
                      Baher Azmy, Legal Director
                      Michael Ratner, President Emeritus
                      CENTER FOR CONSTITUTIONAL RIGHTS [38]
                      666 Broadway, 7th Floor
                      New York, New York 10012
                      Tel: (212) 614-6438
                      Fax: (212) 614-6499

                      Jonathan Hafetz
                      169 Hicks Street
                      Brooklyn, NY 11201
                      Tel: (917) 355-6896

                      *Counsel for Petitioner-Appellants* [39]

---

[38]   Counsel gratefully acknowledge the contributions of law students Madeline Porta and Carey Shenkman to this brief.

[39]   Lead counsel, Mr. Kadidal, mailed a motion for admission to the bar of this Court to the Clerk of Court on July 2, 2012.

APPENDIX A-135

## **Certification of Compliance with Rule 24(d)**

    1.   This brief complies with the type-volume limitation of Rule 24(c) because it is a principal brief and contains 6995 words.

    2.   This brief complies with the typeface and type style requirements of Rule 37 because it has been prepared in a mono-spaced typeface (Courier New) using Microsoft Word Versions 2003 and 2010 with 10 characters per inch in 12-point size.


                          /s/sdk
                      Shayana Kadidal

## <u>Certificate of Service</u>

I hereby certify on this 13th day of July, 2012, I caused the foregoing Reply Brief to be filed with the Court and served on Respondents electronically via email (per this Court's Electronic Filing Order of 22 July 2010), and to be served on the trial and appellate courts below via overnight courier delivery (hardcopies arriving 16 July), at the following addresses and facsimile numbers, respectively:

Clerk of the Court
U.S. Court of Appeals for the Armed Forces
450 E Street, NW
Washington, DC 20442-0001
Tel: (202) 761-1448
efiling@armfor.uscourts.gov

– and –

U.S. Army Court of Criminal Appeals
Office of the Clerk of Court
9275 Gunston Road
Fort Belvoir, VA  22060-5546

– and –

Chief Judge Col. Denise Lind
U.S. Army Trial Judiciary, 1st Judicial Cir.
U.S. Army Military District of Washington
Office of the Staff Judge Advocate
103 Third Ave., SW, Ste 100.
Ft. McNair, DC 20319

– and –

David E. Coombs (counsel for Pfc. Manning)
Law Office of David E. Coombs
11 South Angell Street, #317
Providence, RI  02906
Tel: (508) 689-4616
(COURTESY COPY)

30

– and –

Capt. Judge Advocate Chad M. Fisher
Appellate Government Counsel
Office of the Judge Advocate General
U.S. Army Legal Services Agency
9275 Gunston Rd.
Ft. Belvoir, VA 22060
Tel: (703) 693-0783
chad.m.fisher.mil@mail.mil

<div align="right">

_____/s/sdk_____
Shayana Kadidal

</div>

APPENDIX A-138

**APPENDIX A**

(listed in reverse order)

FOIA request of Josh Gerstein, a journalist with POLITICO (March 3, 2011)

Administrative appeal of denial of request filed by Josh Gerstein (April 12, 2011)

Army General Counsel letter denying FOIA appeal (May 23, 2011)



**DEPARTMENT OF THE ARMY**
OFFICE OF THE GENERAL COUNSEL
104 ARMY PENTAGON
WASHINGTON DC 20310-0104

May 23, 2011

Mr. Josh Gerstein
1100 Wilson Boulevard, 6th Floor
Arlington, VA 22209

Dear Mr. Gerstein:

This letter responds to your Freedom of Information Act (FOIA) appeal, dated
April 11, 2011. You appealed a denial by the U.S. Army Criminal Investigation
Command (USACIDC) for records concerning PFC Bradley Manning.

We apologize for our delayed response to your appeal. The Army must address
a large volume of FOIA demands and cannot always respond to appeals as quickly as
we would like. We make it our practice to respond to appeals in the order received.
The courts have sanctioned this method of handling FOIA cases. *Open America v.
Watergate Special Prosecution Force*, 547 F.2d 605, 614-16 (D.C. Cir. 1976).

You requested records "of all motions or written requests filed by defense
counsel for PFC Bradley E. Manning or by the Staff Judge Advocate in connection with
the preferred charges pending against him or his conditions of confinement." You also
requested "copies of any responses the opposing party, the commander, or convening
authority submitted or issues in response to such motions or written requests." You
specified that your request included, but was not limited to:

   1. Any request to convene a Rule 706 board regarding PFC Manning;

   2. Complaint(s) filed about PFC Manning's conditions of confinement on or
      about 5 January 2011; and,

   3. A defense demand for a speedy trial filed on or about 19 January 2011.

USACIDC withheld the responsive documents pursuant to Exemptions 2, 6, 7(A),
and 7(C) of the FOIA. 5 U.S.C. § 552(b)(2), (b)(6), (b)(7)(A), and (b)(7)(C). After
carefully reviewing your appeal, this office has determined that, at this time, the
responsive documents must be withheld in their entirety pursuant to Exemptions 7(A)
and 7(B) of the FOIA. Accordingly, your appeal is denied.

*Exemption 7(A)*

Exemption 7(A) permits the Government to withhold information compiled for law
enforcement purposes when disclosure "could reasonably be expected to interfere with
enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). This exemption protects the

Government's ability to control and shape law enforcement proceedings and prevents the premature revelation of the government's evidence and trial strategy. *Alyeska Pipeline Serv. Co. v. EPA*, 856 F.2d 309, 312 (D.C. Cir. 1988). Exemption 7(A) requires a two-part test. Records can be withheld only if they relate to a pending or prospective law enforcement proceeding, and their release could reasonably be expected to cause some harm. *See e.g., NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224 (1978).

After coordinating with the United States Army Criminal Investigation Command, we have determined that the records you have requested are part of an active law enforcement proceeding. Thus, they meet the first part of the Exemption 7(A). The second part of the analysis is also met, as releasing the records could hinder the Government's ability to shape its enforcement proceedings.

*Exemption 7(B)*

Additionally, the records are subject to Exemption 7(B) of the FOIA.

Exemption 7(B) protects records whose disclosure could lead to prejudicial pretrial publicity that would impair a court proceeding. Specifically, Exemption 7(B) protects "records or information compiled for law enforcement purposes [when] disclosure would deprive a person of a right to a fair trial or an impartial adjudication."

The leading case applying Exemption 7(B) is *Washington Post Co. v. DOJ*. 863 F.2d 96 (D.C. Cir. 1988). That case set forth a two-part test for applying Exemption 7(B): a trial or adjudication must be pending or truly imminent and it must be more probable than not that disclosure of the information would seriously interfere with the fairness of the proceedings. In this case, both requirements are met. Adjudication is pending and release of these documents, given the circumstances of the accusations against PFC Manning, would seriously interfere with the fairness of the proceedings.

This office notes, however, that both Exemption 7(A) and 7(B) are temporally-limited, and do not apply indefinitely. Rather, they apply only to the extent that enforcement proceedings are pending or ongoing. When the proceedings have closed, neither Exemption will apply to these records. At that time, however, other Exemptions, such as Exemptions 6 and 7(C) may continue to apply to limited portions of the responsive records. At such time, USACIDC will entertain a new request for this information.

This letter constitutes final action on behalf of the General Counsel, who has been designated by the Secretary of the Army to consider appeals under the FOIA. You may, if you so desire, seek judicial review of this determination through the federal court system in accordance with the provisions of the FOIA, 5 U.S.C. § 552(a)(4)(B).

Sincerely,

Ronald J. Buchholz
Associate Deputy General Counsel

# POLITICO

April 12, 2011

Director
U.S. Army Crime Records Center
6010 6th Street
Fort Belvoir, VA 22060-5585

Via Fax No. (703) 806 0462

Re: Freedom of Information Act Appeal, FA11-1904

Expedited Processing Requested

Dear Sir or Madam:

This is an administrative appeal of denial of a request for agency records brought pursuant to the
Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

By an e-mail dated March 3, 2011, I requested certain records from the Army's Northern Command and
Military District Washington relating to the prosecution and detention of PFC Bradley Manning. (Copies
of the relevant correspondence accompany this appeal.)

By a letter dated March 17, 2011, the Army's Joint Base Myer, Henderson Hall, responded to my
request, indicating that "redactions are being recommended" and it was being referred for action to the
U.S. Army Crime Records Center.

By a letter dated March 30, 2011, the U.S. Army Crime Records Center ("USACRC") responded to my
request. It was not entirely clear whether the records addressed in the response were solely those
located by Joint Base Myer or others. In any event, the request was denied in its entirety.

I hereby appeal from that decision.

I believe that some of the FOIA exemptions cited by USACRC are not applicable to the requested
records. In addition, I believe others may be applicable to portions of the responsive records but are not
a lawful basis to withhold the records in their entirety.

Exemption (b)(7)(A) is not an appropriate basis for withholding the records sought in my request. My
request seeks primarily defense filings or requests which are commonly made public in connection with
proceedings in civilian courts, including local, state and federal courts. The disclosure of such records is
not viewed as interfering with ongoing investigations and there is no basis for expecting that they would
do so in this instance.

Director, U.S. Army Crime Records Center
April 12, 2011
Page 2

To be clear, I am not seeking investigative records that would detail the strategies and techniques of criminal investigators, but rather adversarial legal filings. These are obviously known to the defendant and, in some instances, have been publicly discussed by or released by his counsel. Again, there is no reasonable basis to expect that disclosure of this sort of information would prejudice any ongoing investigation.

As a result of the Supreme Court's recent ruling in Milner v. Department of the Navy, exemption (b)(2) is inapplicable to substantive information responsive to this request. That exemption it could apply to certain strictly internal administrative data but the response to my request does not describe the records withheld in sufficient detail for me to assess that.

Exemptions (b)(6) and (b)(7)(C) could apply to some of the requested data but also do not justify withholding the requested records in their entirety. There is no reasonable expectation of privacy in adversarial legal filings. The significant public interest in PFC Manning's case and his conditions of confinement weighs in favor of disclosure. And public statements by his attorney, posted online at www.armycourtmartialdefense.info, diminish PFC Manning's reasonable expectation of privacy.

It is possible that some sensitive medical information could be contained in the requested records. If that is the case, such data could be redacted while releasing the remainder of the records.

I note that the Army has, on at least two occasions, publicly released so-called "charge sheets" in connection with Pvt. Manning's case. In addition, the Army has issued press releases about the case and made a series of public statements about the conditions of his confinement. If the "charge sheet," press releases, and information about conditions of confinement can be disclosed without interfering with an ongoing investigation or violating Pvt. Manning's privacy, it seems clear that at least some of the information I have requested can also be released while accommodating those concerns.

To the extent any of the claimed exemptions may be applicable to the requested records, I ask that the Army exercise its discretion to release the information in compliance with Obama Administration policy favoring transparency in government.

I ask that this appeal be expedited for the reasons cited in my March 3, 2011 request. I certify by my signature below that the statements in this appeal and the prior request are true and accurate to the best of my knowledge and belief.

If there are any questions about this appeal, please do not hesitate to contact me at (703) 647-7684.

Many thanks for your attention to this appeal.

Sincerely,

Josh Gerstein

**From:** Josh Gerstein
**Sent:** Thursday, March 03, 2011 4:02 PM
**To:** Tracy.mendez@jfhqncr.northcom.mil; FOIA@northcom.mil; MCBQuanticoFOIA@usmc.mil
**Subject:** FOIA Request - Expedited Processing Requested

Dear Sir or Madam:

This is a request for agency records brought pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

This request is being directed simultaneously to the entities I consider most likely to maintain the requested records: the Army's Northern Command, the Military District Washington Staff Judge Advocate, and the Marine Corps Base Quantico. If your entity does not maintain such records or you are not the proper point of contact for FOIA requests, I ask that you forward this request to the appropriate contact or entity.

I hereby request one copy of all motions or written requests filed by defense counsel for PFC Bradley E. Manning or by the Staff Judge Advocate in connection with the preferred charges pending against him or his conditions of confinement. In addition, I request copies of any responses the opposing party the commander or convening authority submitted or issued in response to such motions or written requests.

My request includes, but is not limited to:

any request to convene a Rule 706 board regarding PFC Manning;

complaint(s) filed about PFC Manning's conditions of confinement on or about 5 January 2011;

a defense demand for speedy trial filed on or about 9 January 2011;

an Article 138 complaint filed on or about 19 January 2011.

I ask that this request be expedited under the provisions of FOIA and applicable Department of Defense regulations. I am employed full-time as a journalist for POLITICO, a web site and newspaper of general circulation. I am seeking these records for use in time-sensitive news stories and contend there is a compelling need for their disclosure.

The prosecution of PFC Manning by the Army and his treatment at the brig by the Marine Corps are of widespread and exceptional media interest. They have generated stories in hundreds if not thousands of news outlets across the country and around the globe. The federal government's actual and alleged actions with respect to Manning are clearly of current interest to the public. DoD regulations specifically contemplate expedited processing in cases involving breaking news stories. See DoD Directive 5400.7 Paragraph C 1.5.4.3.2.

In addition, as a result of an apparent  contradiction between public statements by the Army and counsel for PFC Manning, there is now considerable public confusion about the speedy trial and excludable time issues pertaining to PFC Manning. Release of these records should help resolve that conflict.

I seek a fee waiver for the reasons described above. However, I am willing to pay any fee of up to $250 while reserving my right to appeal any denial of a waiver.

I also note that some or all of the records I am seeking would routinely be available to the public if Manning was being prosecuted in state or federal courts. A similar presumption of public access should be applied to court filings and similar records in the military justice system.

I ask that these records be released to me in readily-viewable electronic form by e-mailing them to me at jgerstein@politico.com. If there are any questions about this request, please do not hesitate to contact me by email or by phone at (703) 647-7684.

If you would kindly send a short e-mail acknowledging receipt of this request, I would appreciate it.

I certify under penalty of perjury that the statements in this request are true and accurate to the best of my knowledge and belief.

Sincerely,
Josh Gerstein
Reporter
POLITICO
1100 Wilson Blvd, 6th Floor
Arlington, VA 22209
703-647-7684

IN THE UNITED STATES COURT OF APPEALS
FOR THE ARMED FORCES

| | |
|---|---|
| **Center for Constitutional Rights, et al.,** | ) MOTION TO ATTACH TRIAL TRANSCRIPT |
| Petitioners-Appellants | ) IN RESPONSE TO COURT ORDER |
| | ) |
| | ) **Crim. App. Dkt. No. Misc. 20120514** |
| v. | ) |
| | ) **USCA Misc. Dkt. No. 12-8027/AR** |
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **and** | ) |
| | ) |
| **Colonel DENISE LIND** | ) |
| Military Judge, | ) |
| Respondents-Appellees. | ) |
| | ) |

**TO THE HONORABLE JUDGES OF THE UNITED STATES
COURT OF APPEALS FOR THE ARMED FORCES**

COME NOW the United States Government, by and through its undersigned attorneys of record, and hereby submits its Motion to Attach Trial Transcript in Response to Court Order in the above captioned case.

On July 24, 2012, this Honorable Court issued an interlocutory order to the Government to file the ruling and analysis of the military judge regarding Petitioner's requested order for public access to all documents and information filed in the case of United States v. Private First Class Bradley Manning. The Government hereby attaches an excerpt of the authenticated transcript from the April 24, 2012, Article 39(a), UCMJ, session, wherein the military judge ruled on Petitioner's

1

APPENDIX A-147

request.   No other motions or filings were submitted with regard to Petitioner's claims.

The Government will provide a copy of this filing and its attachment to counsel for the accused, Private First Class Bradley Manning.

WHEREFORE, the Government respectfully requests that its motion be granted.

CHAD M. FISHER
Captain, JA
Office of the Judge Advocate
    General, United States Army
Appellate Government Counsel
9275 Gunston Road
Fort Belvoir, VA 22060
(703) 693-0783
Chad.m.fisher.mil@mail.mil
**Lead Counsel**
C.A.A.F. Bar Number 34883

AMBER J. ROACH
Lieutenant Colonel, JA
Acting Chief, Government
    Appellate Division
U.S.C.A.A.F. Bar No. 35224

2

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I certify that the original was electronically filed to efiling@armfor.uscourts.gov on *3 August 2012*, and contemporaneously served electronically on appellate defense counsel, Mr. Shayana D. Kadidal at shanek@ccrjustice.org.


ANGELA R. RIDDICK
Paralegal Specialist
Government Appellate
   Division

3

APPENDIX A-149

Original

VERBATIM [1]

# EXCERPT OF TRIAL TRANSCRIPT
# BY ORDER OF C.A.A.F [2]

### (and accompanying papers)

of

| MANNING, Bradley E. | 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 | PFC/E3 |
|---|---|---|
| (Name, Last, First, Middle Initial) | (Social Security Number) | (Rank) |

Headquarters and
Headquarters Company,

| United States Army Garrison | U.S. Army | Fort Myer, Virginia 22211 |
|---|---|---|
| (Unit/Command Name) | (Branch of Service) | (Station or Ship) |

by

## GENERAL COURT-MARTIAL

### Convened by Commander
#### (Title of Convening Authority)

UNITED STATES ARMY MILITARY DISTRICT OF WASHINGTON
#### (Unit/Command of Convening Authority)

### Tried at

| Fort Meade, Maryland | on | 24 April 2012 |
|---|---|---|
| (Place or Places of Trial) | | (Date or Hearing) |

Companion Case(s): None

---

1 Insert "verbatim" or "summarized" as appropriate. (This form will be used by the Army and Navy for verbatim records of trial only.)
2 See inside back cover for instructions as to preparation and arrangement.

DD FORM 490, MAY 2000          Previous editions are obsolete                    Front Cover

# MILITARY JUDGE'S ERRATA (CCR FILING RULING)
# UNITED STATES V. MANNING, BRADLEY E.

| Military Judge: | Trial Counsel: | Defense Counsel: | Court Reporter: |
|---|---|---|---|
| COLONEL LIND | CPT WHYTE MAJ FEIN | MAJ HURLEY MR. COOMBS, ESQ. | TRISHA WILLIAMS-BUTLER |

| LOCATION | | CHANGE | | INITIALS |
|---|---|---|---|---|
| PAGE # | LINE # | FROM | TO | Court Reporter |
| 5 | 19 | Rules | Rule | D2 |
| 7 | 7 | determination | determinations | D2 |
| 11 | 2 | is | are | D2 |
| 12 | 2 | delete "of what" | | D2 |
| 13 | 8 | is | are | D2 |
| 14 | 22 | delete "not" | | D2 |
| 16 | 15 | delete "filing" | | D2 |
| 19 | 6 | request | requests | D2 |
| 20 | 11 | delete "a" | | D2 |
| 20 | 11 | finding | findings | D2 |
| 20 | 20 | Constitutionally | Congressionally | D2 |
| 21 | 5 | change "a" to "of" | | D2 |
| 21 | 11 | case. Whether | case, whether | D2 |
| 21 | 12 | exhibit | exhibits | D2 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

DENISE R. LIND, COL, JA, Military Judge          DATE

## TRIAL COUNSEL ERRATA (CCR FILING RULING)
## UNITED STATES V. MANNING, BRADLEY E.

| Military Judge:<br>COLONEL LIND | | Trial Counsel:<br>CPT WHYTE<br>MAJ FEIN | Defense Counsel:<br>MR. COOMBS, ESQ. | Court Reporter:<br>TRISHA WILLIAMS-BUTLER |
|---|---|---|---|---|
| LOCATION | | CHANGE | | INITIALS |
| PAGE # | LINE # | FROM | TO | Court Reporter |
| 7 | 2 | documents | document | on audio |
| 7 | 16 | by other approved means | other approved means | |
| 8 | 1 | pleading, and | pleading, or | |
| 9 | 17 | Any communications | Any communication | |
| 11 | 4 | *Amicus Curie* | *Amicus Curiae* | Gaw-B |
| 21 | 12 | exhibit | exhibits | on audio |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

ALEXANDER S. von ELTEN, CPT, JA, Assistant Trial Counsel         30 July 2012   DATE

# DEFENSE COUNSEL ERRATA (CCR FILING RULING)
## UNITED STATES V. MANNING, BRADLEY E.

| Military Judge:<br><br>COLONEL LIND | Trial Counsel<br>CPT WHYTE<br>MAJ FEIN | Defense Counsel:<br><br>MR. COOMBS, ESQ. | Court Reporter:<br><br>TRISHA WILLIAMS-BUTLER |
|---|---|---|---|
| **LOCATION** | **CHANGE** | | **INITIALS** |
| PAGE # | LINE # | FROM | TO | Court Reporter |

| PAGE # | LINE # | FROM | TO | Court Reporter |
|---|---|---|---|---|
| NC | NC | No Changes to Document | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

_____          _____
DAVID E. COOMBS, ESQ. Civilian Defense Counsel          DATE

# DEFENSE COUNSEL ERRATA (CCR FILING RULING)
# UNITED STATES V. MANNING, BRADLEY E.

| Military Judge: | Trial Counsel | Defense Counsel: | Court Reporter: |
|---|---|---|---|
| COLONEL LIND | CPT WHYTE MAJ FEIN | MAJ Thomas F. Hurley | TRISHA WILLIAMS-BUTLER |

| LOCATION | | CHANGE | | INITIALS |
|---|---|---|---|---|
| PAGE # | LINE # | FROM | TO | Court Reporter |
| | | No changes | requested | (Jau) -B |
| | | | | |

*Thomas F. Hurley*

THOMAS F. HURLEY, MAJ, JA, DEFENSE COUNSEL

2 August 2012

DATE

1   [The Article 39(a) session was called to order at 1007, 24 April

2   2012.]

3        MJ:   Please be seated.

4              This Article 39(a) session is called to order.

5              Trial counsel, please account for parties?

6        TC:   Your Honor, all present, all previous parties are present

7   with the following exceptions:

8              Captain Overgaard is no longer sitting at the prosecution

9   table.  Captain Whyte is and his credentials already have been

10  previously put on the record.

11             For the defense also, also Captain Tooman is present and

12  Captain Bouchard is no longer present.

13       MJ:   Now was Major Kemkes at the last session?

14       TC:   He was not, ma'am.

15       MJ:   Okay.

16             Let us begin with the defense counsel issue.

17             Now, PFC Manning, do you remember at the arraignment I

18  advised you of your rights to counsel?

19       ACC:  Yes, Your Honor.

20       MJ:   All right.  At that time I advised you that you have the

21  right to be represented by your then detailed defense counsel, who

22  were Major Kemkes and Captain Bouchard.

23

24

1

1      MJ:  They were lawyers certified by the Judge Advocate General

2   as qualified to act as your defense counsel and that they were

3   members of the United States Army's Trial Defense Service.  Their

4   services were provided at no expense to you.  I also advised you

5   that you have the right to be represented by military counsel of

6   your own selection provided that the counsel you request is

7   reasonably available.  If you're represented by military counsel of

8   your own selection then your detailed defense counsel would

9   normally be excused.  However, you could request that your detailed

10  defense counsel continue to represent you, but that request would

11  not have to be granted.

12      In addition to your military defense counsel, you have

13  the right to be represented by civilian counsel at no expense to

14  the government.  Civilian counsel may represent you along with your

15  military defense counsel; or you could excuse your military defense

16  counsel and be represented solely by your civilian counsel.  At the

17  arraignment you advised me that you wish to be represent by Mr.

18  Coombs, and by Major Kemkes, and Captain Bouchard.

19      Do you remember that discussion?

20      ACC: Yes, Your Honor.

21      MJ:  All right.  I'm looking at Appellate Exhibit LXI, which

22  is a Memorandum for Record, dated 13 April 2012 signed by you, PFC

23  Manning.

24

2

1      MJ:   It states:

2            One, I've thoroughly discussed my options regarding my

3      detailed military counsel with Mr. Coombs.  We have spoken about

4      the advantages and disadvantages of retaining my detailed counsel,

5      Major Matthew Kemkes and Captain Paul Bouchard, on my case.  I

6      elect to excuse my detailed counsel, Major Kemkes and Captain

7      Bouchard; and I request that Major Joshua Tooman be detailed to my

8      case at my military counsel.  I do not request any other defense

9      counsel be detailed to my case at this time.

10           Now did you write this memorandum?

11     ACC: I did.  Yes, Your Honor.  Yes.

12     MJ:   And did you sign it?

13     ACC: Yes, Your Honor.

14     MJ:   So do you consent then to having, basically, Major Kemkes

15     and Captain Bouchard being replaced as detailed defense counsel by

16     Captain Tooman?

17     ACC: That is correct, Your Honor.

18     MJ:   All right.  Mr. Coombs, do you also agree that you've

19     advised PFC Manning and that you concur in this decision?

20     CDC: Yes, Your Honor.

21     MJ:   All right.  The Court then finds that this is an

22     appropriate change in defense counsel under Rule for Courts-Martial

23     505(d)(2)(b)(2) and R.C.M. 506(c).

24

APPENDIX A-157

1      MJ:   Captain Tooman, please announce your detailing

2   qualifications for the record.

3      DC:   Your Honor, I have been detailed to the court-martial by

4   Lieutenant Colonel Douglas Watkins, the Regional Defense Counsel of

5   the Great Plains Region, United States Army Trial Defense Service.

6   I am qualified and certified under the Article 27(b) and sworn

7   under Article 42(a) of the Uniform Code of Military Justice.   I

8   have not acted in any manner which might tend to disqualify me in

9   this court-martial.

10      MJ:   All right. Thank you.

11         All right, I would like to begin by going over some

12   issues that have arisen since our last session.   Today we will be

13   going over basically those housekeeping issues; as well as

14   addressing discovery issues that have been raised by the parties.

15         May I see the Security Officer Order, please?

16   [The court reporter handed the Military Judge AE XXXIV.]

17      MJ:   All right.  After the last session the government

18   proposed an order to Court Security Officers and detailed security

19   experts.   The defense had no objections to it.   So the Court has

20   signed the order to the security experts.

21                     [END OF PAGE.]

4

```
 1       MJ:   It basically states:

 2            The matter comes before the Court upon Protective Order

 3   on 16 March 2012 to prevent the unauthorized disclosure or

 4   dissemination of classified national security information which

 5   will be reviewed by, or made available to, or is otherwise in the

 6   possession of the accused and the parties to this case.  The Court

 7   finds that this case will involve information that has been

 8   classified in the interest of national security.  The storage,

 9   handling, and control of this information will require special

10   security procedures mandated by statute, Executive Order, and

11   regulation, and access to which requires the appropriate security

12   clearances and "need to know".  Under Executive Order 13526, "need

13   to know" means a determination within the executive branch in

14   accordance with the directives issued pursuant to this order that a

15   prospective recipient requires access to specified classified

16   information in order to perform or assist in a lawful and

17   authorized governmental function.

18            Three, pursuant to the authority granted under the

19   Military Rule of Evidence 505, the general supervisory authority of

20   the Court, and in order to protect the national security, it is

21   hereby ordered that:

22            A - Definitions.  All definitions in the Protective Order

23   that was already entered shall apply;

24
```

<div align="center">5</div>

1    MJ:   B - Court Security Officer.  Mr. Jay Prather, shall serve

2    as the Court's Security Officer for supervising security

3    arrangements necessary to protect from authorized disclosure any

4    classified documents or information submitted or made available to

5    the Court in connection with the above referenced court-martial.

6         One, the defense may request to disclose classified

7    information to recipients not authorized pursuant to the Protective

8    Order, subject to the approval of the United States or the Court.

9    If such request is approved, the Court Security Officer shall

10   verify that the intended recipients of the classified information

11   hold the required security clearance, signed a Memorandum of

12   Understanding at Appendix 'A' of the Protective Order, and have a

13   need to know.  The Court Security Officer may request the

14   assistance of trial counsel to verify whether the intended

15   recipients hold the required security clearance.  The Court

16   Security Officer shall promptly notify the United States and the

17   Court whether such intended recipients of classified information

18   satisfy these three requirements.

19        Two, the Court Security Officer shall accept receipt of

20   any pleading, document, or other substantive communication filed by

21   either party that contains classified information or information

22   reasonably believed to be classified, if required.

23

                                  6

1    MJ:   Three, the Court Security Officer shall promptly examine

2    any proceeding or other documents filed by either party that

3    contains classified information or information reasonably believed

4    to be classified to determine any question of derivative

5    classification or any other matter that could be reasonably be

6    believed to relate to classified information, but is not authorized

7    to make classification determinations; that is, whether information

8    is properly classified and verify whether the proceeding or

9    document contains classified information and is properly marked.

10    Four, the Court Security Officer shall promptly deliver

11    to the Court and opposing party any filing by either party that

12    contains classified information, except for any *ex-parte* filing

13    which shall be delivered only to the Court, absent Court approval.

14    Five, the Court Security Officer shall promptly notify

15    the prosecution, as the command's representative, over SIPRNET or

16    by other approved means under Army Regulation 380-5 of any spillage

17    of classified information.

18    C - Security Experts.   Detailed security experts shall

19    provide advice to their respective party concerning procedures

20    governing the appropriate storage, handling, and transmittal of

21    classified documents and information, pursuant to the Protective

22    Order and applicable regulations and federal law.

23

7

1    MJ:   Detailed security experts shall also provide their

2    respective party with procedures for preparing any document,

3    pleading, and substantive communication that contains classified

4    information or information reasonably believed to be classified.

5         Detailed security experts should be consulted by the

6    defense and prosecution regarding any question of derivative

7    classification or any other matter that could reasonably be

8    believed to relate to classified information, but are not

9    authorized to make classification determinations; that is, whether

10   information is properly classified.

11        One, a detailed security expert shall review, in-person

12   or over SIPRNET, while in a government facility approved for

13   classified information processing, any pleading, document or

14   subject of communication, including all attachments and enclosures

15   thereto, which contains classified information or information

16   reasonably believed to be classified, whether by original,

17   derivative, or compilation, and verify whether the pleading or

18   document contains classified information and is properly marked.

19        Two, a security expert detailed to the defense shall be

20   present at all times that the defense intends to disclose or elicit

21   classified information under paragraph 3(L)(6) of the Protective

22   Order and shall promptly terminate any conversation whenever the

23   defense elicits or attempts to elicit classified information not

24   previously approved for disclosure by the United States or the

8

1    Court, or whenever the intended recipient discloses classified

2    information for which the defense has no need to know.

3        MJ:   Three, if requested by the defense, a security expert

4    detailed to the defense shall promptly and properly deliver any

5    pleading or document filed by the defense to the Court Security

6    Officer and the prosecution, except for any *ex-parte* filing which

7    shall be delivered only to the Court or to the Court Security

8    Officer.

9            Four, detailed security experts to the defense shall

10   properly destroy, by means approved for classified information

11   destruction, any documents requested by the defense, in the

12   presence of the defense.

13           Five, detailed security experts to the defense shall

14   promptly notify the Court Security Officer, over SIPRNET, or by

15   other approved means under Army Regulation 380-5 of any spillage of

16   classified information.

17           D - Communications.  Any communications related to this

18   case, including internal communications between members of the

19   prosecution or defense; and communications between the parties, the

20   Court, and the Court Security Officer that contains classified

21   information or information reasonably believed to be classified

22   shall not be transmitted over any standard commercial telephone

23   instrument or office intercommunication system, including but not

24   limited to the internet.

9

1      MJ:   Any communication related to this case, including

2   internal communications between members of the prosecution or the

3   defense and communications between the parties, the Court, and the

4   Court Security Officer that contains classified information or

5   information reasonably believed to be classified shall be

6   transmitted over SIPRNET or by other approved means under Army

7   Regulation 380-5.

8           Further ordered, the procedures set forth in this order

9   may be modified by further order of the Court acting under Military

10  Rule of Evidence 505 and the Court's inherent supervisory authority

11  to ensure fair and expeditious trial.

12          Five, Army Regulation 380-5, no procedure in this order

13  shall operate to supersede, or cause a violation of any provision

14  of Army Regulation 380-5.

15          So ordered this 22nd day of March 2012.

16          Does either side have anything further to address with

17  respect to the Court's Security Order?

18      TC:   No, Your Honor.

19      CDC: No, Your Honor.

20      MJ:   All right.   I was also advised after the proceedings

21  yesterday that the--may I see the *Amicus* Order, please?

22  [The court reporter handed AE XXXV to the Military Judge.]

23


10

1    MJ:  That there may be non-parties who wish to file *Amicus*

2    Briefs, which are called 'Friend of the Court Briefs' with the

3    Court.  Based on that information, the Court has made the following

4    ruling with respect to *Amicus Curiae* filings, dated 23 March 2012.

5         The Court has been advised that there may be non-parties

6    who will move the Court for leave to file an *Amicus Curiae* brief.

7         The Court will not grant leave for a non-party to file an

8    *Amicus* brief.  The government or the defense may attach such a

9    filing by a non-party as part of the brief filed within the

10   suspense dates set by the Court.

11   MJ:  Does either side have anything to address further with

12   respect to *Amicus* filings?

13   CDC: No, Your Honor.

14   TC:  No, Your Honor.

15   MJ:  Okay.

16        May I see the Interim Order, please.

17   [The court reporter handed AE XXXIX to the Military Judge.]

18   MJ:  All right.  After the last session the defense advised

19   the Court--apparently I understand the defense has a website of

20   some kind?

21   CDC: Yes, ma'am.

22   MJ:  All right.  The defense advised the Court that the

23   defense wishes to file its motions on the website that the defense

24   has.

11

1      MJ:   Would you like to describe for the record what you

2    advised the Court you wanted to do?

3      CDC: Yes, ma'am.

4           The defense simply requested to be allowed to present

5    redacted portions of their motions on our blog.  Basically, the

6    *Army Court-Martial Defense Blog* in order for the public to have

7    access to this information. One of the common criticisms that has

8    been launched so far against this case is that it has not been

9    sufficiently public and that the public has not had the access to

10   the court filings by both of the parties.  Both the Center for

11   Constitutional Rights and also the Reporters Committee on Freedom

12   of the Press has requested to have access to the court filings.

13   The defense does not see any need to deny that request.  So we have

14   asked both from the Court and basically with negotiations with the

15   government to allow us to have our defense motions posted.  We've

16   offered to post also the government's response motions and their

17   motions and they declined that offer.  However, with their

18   redactions, the government, now under our agreement, can look at

19   our motions and indicate what areas of the motions need to be

20   redacted.  The defense will comply with that request and only until

21   the government is satisfied, will the defense then post its motions

22   on our webpage.

23     MJ:   All right.

24

12

1      MJ:  Government, you initially objected to that procedure.

2           Is that correct?

3      TC:  Yes, Your Honor.

4      MJ:  Okay.  Now what is the government's current position?

5      TC:  Your Honor, the government's current position is we still

6  object overall to the procedure but as the defense submits their

7  proposed redactions we will review them and we will comply with the

8  Court's order on having the information reviewed; and if there are

9  any additional Protective Orders to request then ultimately the

10  government needs to ensure it protects essential witnesses,

11  individuals, and any information that is subject to the Court's

12  Protective Orders.

13     MJ:  All right.  The parties and I had a telephonic R.C.M. 802

14  conference on this issue.  Once again, what an R.C.M. 802

15  conference is where I talk to the parties about logistics and other

16  issues that arise in cases; and then at the next session the

17  parties and I put what was discussed on the record.  In this case,

18  the Court heard both sides and arrived at an Interim Order which

19  was signed on 28 March 2012.  What that order says is:

20          One, at an R.C.M. 802 conference after the Article 39(a)

21  session on 16 March 2012, the defense advised the government and

22  the Court of its intent to publish without enclosures, defense

23  filings and proposed filings with the Court on the internet.

13

APPENDIX A-167

1     MJ:   The government, via email dated 23 March 2012, 1733

2     [hours], advised the Court that the government opposes internet

3     publication of such defense filings.

4           The government further requested that prior to any

5     internet publication of a Court filing or proposed filing by the

6     defense, the government have:

7           One, an opportunity to file a motion for a Protective

8     Order or multiple Protective Orders under Rule for Courts-Martial

9     701(g) and Rule for Courts-Martial 806(d); and

10          Two, 30 days to receive input from all different federal

11    entities on what discovery information such agencies did not intend

12    to be publicly available.

13          Two, the defense, via email dated 23 March 2012 at 1745

14    and 1803 [hours] advised the government of its intent to publish on

15    the internet all previous defense filings with the Court without

16    enclosures and proposed defense filings for the next Article 39(a)

17    session; 24 through 26 April 2012, unless subject to a Protective

18    Order by the Court.  The emails are attached as Attachment 'A'.

19          Three, a pleading is "filed" with the Court when it is

20    identified as an exhibit on the record at an Article 39(a) session.

21    Pleadings served on the opposing party that have not been

22    identified on the record at an Article 39(a) session are "proposed

23    filings".

14

1    MJ:   Four, the Interim Order is issued in accordance with

2    Military Rule of Evidence 505(g) and (h); Military Rule of Evidence

3    506(g) and (h); Rule for Courts-Martial 701(g); and Rule for

4    Courts-Martial 806(d); and *Seattle Times v. Rhinehart*, *104 Supreme*

5    *Court 2199 (1984)*.  This Interim Order provides procedures for the

6    government to request Protective Orders prior to any public release

7    of defense Court filings or proposed filings.

8         The Court finds this Interim Order necessary under the

9    above authorities.  The government has provided the defense both

10   classified information and government information subject to

11   Protective Order under Military Rule of Evidence 505(g)(1) and

12   Military Rule of Evidence 506(g).

13        This Court has issued a Protective Order for classified

14   information provided to the defense in discovery.  The defense has

15   accepted such discovery and agreed to comply with the Protective

16   Orders.  There have been two classified information spillage

17   incidents to date in this case.

18        Five, this Interim Order applies to all previous Court

19   filings and any pleadings proposed for Court filing during the

20   Article 39(a) session currently scheduled to be held on 24 through

21   26 April 2012.

22

APPENDIX A-169

1       MJ:    Interim Order.

2              One, the government's request to file a motion for a

3       Protective Order or multiple Protective Orders prior to public

4       release of defense Court filings or proposed Court filings is

5       granted as provided below.

6              Two, the defense will notify the government of each

7       defense Court filing or proposed filing intended for public

8       release.   The defense will provide the government with the original

9       filing and the redacted filing intended for public release.

10             Three, government motions for Protective Order will:

11             A - Address each defense Court filing or proposed Court

12      filing individually and identify, with particularity, each portion

13      of the filing to which the government objects to public release and

14      the legal basis for each objection to public release.

15             B - Provide proposed findings of fact for the Court with

16      respect to each portion of each filing to which the government

17      objects to public release.

18             Four, suspense dates for defense filings and proposed

19      filings the defense intends to publicly release; and the Court in

20      the order sets suspense dates that have already passed.

21                          [END OF PAGE.]

16

1     MJ:   Five, the defense will not publicly release any defense

2     appellate exhibit or proposed filing with the Court to which the

3     government objects until after the government motions for

4     Protective Order are addressed at the Article 39(a) session 24

5     through 26 April 2012.

6          Six, the defense will not disclose any information known

7     or believed to be subject to a claim of privilege under Military

8     Rule of Evidence 505 or Military Rule of Evidence 506 without

9     specific Court authorization.   Prior to any disclosure of

10    classified information, the defense will provide notice under

11    Military Rule of Evidence 505(h) and follow the procedures under

12    that Rule.

13         Seven, personal identifying information, P-I-I, will be

14    redacted from all defense filings publicly released.   P-I-I

15    includes personal addresses, telephone numbers, email addresses,

16    first five digits of social security numbers, dates of birth,

17    financial account numbers, and the names of minors.

18         Eight, to protect the safety of potential witnesses all

19    persons who are not parties to the trial shall be referenced by

20    initials of first and last name in any defense filing publicly

21    released.

22

17

1    MJ:   Nine, for future defense filings with the Court where the

2    government moves for a Protective Order preventing public release,

3    the Court proposes the procedures in the draft Protective Order at

4    Attachment 'C'.  Objections to the proposed procedures will be

5    addressed at the Article 39(a) session.

6         Counsel and I met in chambers briefly before coming on

7    the record today.  I had asked the counsel if they had any

8    objections to the draft Protective Order, which in essence just

9    sets future time lines and is, in substance, pretty much the same

10   as the Interim Order that I just read.

11        Do the parties have any objections to the draft----

12   TC:   No, Your Honor.

13   MJ:   ----Protective Order?

14   CDC:  No, Your Honor.

15   MJ:   All right.  So the Court will go ahead and sign that; and

16   that will apply to future postings.

17   [The Military Judge signed AE XXXIX.]

18   MJ:   Let me see the letter.

19   [The court reporter handed AE LVI to the Military Judge.]

20   MJ:   All right.  The Court has marked as an exhibit; Appellate

21   Exhibit LXVI.  Last night, Mr. Coombs forwarded me a letter from

22   the Center for Constitutional Rights; and I received an earlier

23   such letter on the 21st of March 2012.

24

18

APPENDIX A-172

```
 1        MJ:   Those are both marked as Appellate Exhibit LXVI,

 2   requesting access to documents in this case.   The Court finds as

 3   follows:

 4             The letter that I received last night requested that an

 5   attorney will attend the hearing on April 24th and that the Center

 6   for Constitutional Rights requests that he be afforded an

 7   opportunity to address the Court directly and present arguments

 8   concerning the request for public access to documents and

 9   information filed in the case.   It's basically a request for

10   intervention.

11             That request is denied.

12             The Court notes as follows:

13             The Court has received several requests for copies of

14   exhibits from this case from entities who are not parties to the

15   trial.   Now, this Court's duty is to ensure that the 1st Amendment

16   Right to a public trial; and the accused's 6th Amendment Right to a

17   public trial are guaranteed.   That Rule is also codified in Rule

18   for Courts-Martial 806.   These proceedings have been open and will

19   remain open to the maximum extent.   There may potentially be some

20   closed proceedings for classified information, if justified by the

21   government and findings of the Court.

22

23

24
```

19

1    MJ:   The standard for closure of trials in the military is

2  under Rule for Court-Martial 806(c), which says that courts-martial

3  shall be open to the public unless:

4          One, there is a substantial probability that an

5  overriding interest would be prejudiced if the proceedings remained

6  open;

7          Two, closure is no broader than necessary to protect the

8  overriding interest;

9          Three, reasonable alternatives to closures were

10  considered and found inadequate; and

11          Four, the Military Judge makes case specific findings on

12  the record justifying closure.  As I said earlier, these

13  proceedings have remained open thus far.

14          The Court has received several requests for copies of the

15  exhibits in this case from entities who are not parties to the

16  trial.  While the Court acknowledges the existence of a common law

17  right of access to public records, including judicial documents,

18  that right is not absolute; *Nixon versus Warner Communications*

19  *Inc.*, *435 U.S. 589 at 599, (1978)*.

20          The Court also notes the existence of a Congressionally

21  devised system of access to government documents, the Freedom of

22  Information Act or FOIA.

23

24

20

1    MJ:   When Congress has created an administrative procedure for

2    processing and releasing to the public on terms meeting with

3    Congressional approval the common-law right of access may be

4    satisfied under the terms of that Congressionally devised system of

5    access.  *Id.* at *603* to *606*.  Nor does the 1st Amendment guarantee

6    of freedom of the press or the 6th Amendment guarantee of a public

7    trial mandate access to or copying by non-parties of exhibits

8    admitted during a court-martial.  Constitutional interpretation

9    aside, the Court notes that under the military justice system, the

10   Court does not call a court-martial into existence, nor is the

11   Court the custodian of exhibits in the case; whether appellate,

12   prosecution, or defense exhibits, which become part of a record of

13   trial.  See for example, Rules for Courts-Martial 503(a) and (c);

14   601(a); 808 and 1103(b)(1)(a) and (d)(5).

15        Neither is the Court the release authority for such

16   documents if requested under FOIA.  Requests for access to exhibits

17   in this case should be directed to the appropriate records

18   custodian.

19                           **[END OF PAGE.]**

21

AUTHENTICATION OF EXCERPT OF TRANSCRIPT

in the case of

PRIVATE FIRST CLASS MANNING, BRADLEY E., 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, HEADQUARTERS AND

HEADQUARTERS COMPANY, UNITED STATES ARMY GARRISON, FORT MYER, VIRGINIA

22211

I received for review and authentication the transcript excerpt from
the 24 April 2012 Article 39(a) session pertaining to the Court's
ruling on the Center for Constitutional Rights' application for
documents and any sort of written findings on _2 August 2012_

DENISE R. LIND
COL, JA
Military Judge

DATE: _2 August 2012_

## INSTRUCTIONS FOR PREPARING AND ARRANGING RECORD OF TRIAL

**USE OF FORM** – Use this form and MCM, 1984, Appendix 14, will be used by the trial counsel and the reporter as a guide to the preparation of the record of trial in general and special court-martial cases in which a verbatim record is prepared. Air Force uses this form and departmental instructions as a guide to the preparation of the record of trial in general and special court-martial cases in which a summarized record is authorized. Inapplicable words of the printed text will be deleted.

**COPIES** – See MCM, 1984, RCM 1103(g). The convening authority may direct the preparation of additional copies.

**ARRANGEMENT** – When forwarded to the appropriate Judge Advocate General or for the judge advocate review pursuant to Article 64(a), the record will be arranged and bound with allied papers in the sequence indicated below. Trial counsel is responsible for arranging the record as indicated, except that items 6, 7, and 15e will be inserted by the convening or reviewing authority, as appropriate, and items 10 and 14 will be inserted by either trial counsel or the convening or reviewing authority, whichever has custody of them.

1. Front cover and inside front cover (chronology sheet) of DROP-DOWN Form 490.

2. Judge advocate's review pursuant to Article 64(a), if any.

3. Request of accused for appellate defense counsel, or waiver/withdrawal of appellate rights, if applicable.

4. Briefs of counsel submitted after trial, if any (Article 38(c)).

5. DD Form 494, "Court-Martial Data Sheet."

6. Court-martial orders promulgating the result of trial as to each accused, in 10 copies when the record is verbatim and in 4 copies when it is summarized.

7. When required, signed recommendation of staff judge advocate or legal officer, in duplicate, together with all clemency papers, including clemency recommendations by court members.

8. Matters submitted by the accused pursuant to Article 60 (MCM, 1984, RCM 1105).

9. DROP-DOWN Form 458, "Charge Sheet" (unless included at the point of arraignment in the record).

10. Congressional inquiries and replies, if any.

11. DD Form 457, "Investigating Officer's Report," pursuant to Article 32, if such investigation was conducted, followed by any other papers which accompanied the charges when referred for trial, unless included in the record of trial proper.

12. Advice of staff judge advocate or legal officer, when prepared pursuant to Article 34 or otherwise.

13. Requests by counsel and action of the convening authority taken thereon (e.g., requests concerning delay, witnesses and depositions).

14. Records of former trials.

15. Record of trial in the following order:
    a. Errata sheet, if any.

    b. Index sheet with reverse side containing receipt of accused or defense counsel for copy of record or certificate in lieu of receipt.

    c. Record of proceedings in court, including Article 39(a) sessions, if any.

    d. Authentication sheet, followed by certificate of correction, if any.

    e. Action of convening authority and, if appropriate, action of officer exercising general court-martial jurisdiction.

    f. Exhibits admitted in evidence.

    g. Exhibits not received in evidence. The page of the record of trial where each exhibit was offered and rejected will be noted on the front of each exhibit.

    h. Appellate exhibits, such as proposed instructions, written offers of proof or preliminary evidence (real or documentary), and briefs of counsel submitted at trial.

---

**DD FORM 490, MAY 2000**                                    **Inside of Back Cover**

IN THE UNITED STATES COURT OF APPEALS
FOR THE ARMED FORCES

```
--------------------------------- x
                                  :
CENTER FOR CONSTITUTIONAL RIGHTS, :
GLENN GREENWALD, JEREMY SCAHILL,  : Crim. App. Misc.
THE NATION, AMY GOODMAN, DEMOCRACY : Dkt. No. 20120514
NOW!, CHASE MADAR, KEVIN GOSZTOLA, :
JULIAN ASSANGE, and WIKILEAKS,    : USCA Misc.
                                  : Dkt. No. 12-8027/AR
               Appellants,        :
                                  : General Court Martial
          v.                      : United States v. Manning,
                                  : Ft. Meade, Maryland
                                  :
UNITED STATES OF AMERICA and CHIEF :
JUDGE COL. DENISE LIND,           : Dated: 24 August 2012
                                  :
               Appellees.         :
                                  :
--------------------------------- x
```

## PETITIONER–APPELLANTS' RESPONSE
## PURSUANT TO INTERLOCUTORY ORDER OF 24 JULY 2012

On 24 July 2012, this Court "ordered that the Government file with this Court the ruling and analysis of the military judge regarding [Petitioner-Appellants'] request" for "public access to all documents and information filed in the case of *United States v. Private First Class Bradley Manning*, including the docket sheet, all motions and responses thereto, all rulings and orders, and verbatim transcripts or other recordings of all conferences and hearings before the court-martial." In response to this order, on 3 August 2012 the government filed an excerpt of the authenticated transcript from the Article 39(a) session of

April 24, 2012 in which Judge Lind announced a decision on Petitioners' motion for relief.

While a word-for-word comparison of the transcript to the account given in the Kadidal Declaration (*cf*. Kadidal Decl. ¶¶ 7-9, JA-4-5, with Tr. 18-21) demonstrates some of the difficulty in taking precise notes during a live courtroom proceeding,[1] the substance of the account given in our declaration was entirely accurate: Judge Lind held that neither the First Amendment (nor the Sixth) "mandated access to ... exhibits admitted during a court-martial" and nowhere indicated that she believed the First Amendment guaranteed access to transcripts, orders, and briefs. In the absence of any First Amendment right, she noted (somewhat ambivalently) that the FOIA statute "may" supersede any common law right of public access to the judicial documents in Pfc. Manning's case that might otherwise have been available (see Tr. at 21), and therefore denied the relief Petitioner-Appellants requested.[2]

---

[1]     Compare Gov't Br. at 14 n.39 (implying that because Petitioners' declarations related open-court discussions in such detail, release of transcripts would be superfluous and unnecessary); Pet. Reply at 11 n.10 (responding to same).

[2]     Needless to say, in so ruling Judge Lind made no "document-specific finding of justification for restricting all access to each of these documents, after careful consideration of less-restrictive alternatives," Pet. Br. at 24, as required by First Amendment strict scrutiny.

2

That holding neatly tracks Judge Lind's conclusions in the law review article on public access to courts-martial she published twelve years ago,[3] and is further confirmation of what we posited in our briefs: "it seems likely that the only reason Judge Lind did not find in favor of public access to the documents and proceedings at issue here is that she believed this Court and the A.C.C.A. have not yet held that the First Amendment applies to guarantee public access to anything other than the courtroom itself." Pet. Reply at 26; *see also* Pet. Br. at 28 n.9. Given the extraordinarily high profile of these proceedings, Judge Lind's statements make it imperative for this Court to make it absolutely explicit that the First Amendment applies to mandate release of judicial documents in courts-martial (as should already be clear from the *Scott* case[4] (for Army proceedings at the least), and from U.C.M.J. Article 36 and the tenor of R.C.M. 806 as well). Moreover, this Court should make it clear that the First Amendment mandates contemporaneous release of judicial documents. *See* Pet. Br. at 15–18; Pet. Reply at 3–7.

The government's filing also demonstrates what really needed no further proof: that there can be no justification for failure

---

[3]    Lt. Col. Denise R. Lind, *Media Rights of Access to Proceedings, Information, and Participants in Military Criminal Cases*, 163 Mil. L. Rev. 1, 45–53 (2000).

[4]    *United States v. Scott*, 48 M.J. 663 (A.C.C.A. 1998); *see also* Pet. Br. at 21–22, Pet. Reply at 13, 21.

APPENDIX A-180

to release transcripts of open court proceedings. The twenty-one pages of transcript the government has filed on the public record in this Court were filed without a single redaction. Nor can there be any justification for failing to publish the trial court's many orders, most obviously those that were read into the record during open court proceedings. *See, e.g.*, Tr. at 5–10 (trial court reciting into the record the full text of its Security Order); Tr. at 11 (full text of court's order with respect to amicus briefs); Tr. at 13–18 (full text of court's Interim Protective Order). Indeed, the government was not required by this Court's Interlocutory Order to file the portions of the transcript that disclose any of these three orders.[5] That it did so, without filing them under seal or redacting any portion of them, is simply another indication that most of the trial court's orders can be filed publicly with no harm to the government or the integrity of the trial.

The brief excerpt of the transcript filed with this Court also contains at least one indication that the failure to publish transcripts and orders may prejudice third parties seeking to assert their interests in the proceedings. At page 11 of the transcript, the trial court notes that it "has been advised that there may be non-parties who will move the Court for leave to

---

[5]   This Court's 24 July 2012 Order required only that the government file "the ruling and analysis of the military judge" regarding "public access to all documents."

file an *Amicus Curiae* brief. The Court will not grant leave for a non-party to file an *Amicus* brief. The government or the defense may attach such a filing by a non-party as part of the brief filed within the suspense dates set by the Court." Absent publication of this order or of the transcript of the session in which it was announced, only those potential amici actually present in the courtroom would be aware that they were subject to this order. Of course, the rule announced gives the parties control over which amici may present their arguments to the court, so it is hardly surprising that neither party objected to this procedure. But any other potential amici not firmly aligned with the interests of the government or Pfc. Manning would likely have no knowledge of this rule and the deadlines mandated by the rule, and might end up investing huge amounts of effort in drafting briefs that end up yielding no benefit to the court or the public good. It is hard to imagine how this lack of transparency about basic ground rules will operate to aid the trial court in coming to proper resolutions of the many complex issues of first impression that will be presented during the course of the proceedings. And this is just one example of hidden lawmaking, contained in just fifteen lines of transcript on just one day of the pretrial proceedings. There may be many others.

The relief Petitioner-Appellants request here is not burdensome. Documents should ordinarily be made accessible to the pub-

lic in the normal course of events, just as courtroom sessions are. Publication of the documents should be made contemporaneous with the judicial proceedings to which they are relevant. Should the government assert a need to alter the First Amendment's default presumption of openness, the press and public are entitled to advance notice, an opportunity to participate in the judicial decisionmaking, and an adequate record of decision sufficient to facilitate later appellate review. As part of this process, the government must articulate with specificity a compelling interest in closure. The trial court must then engage in strict scrutiny analysis: it must carefully and skeptically review the asserted interest to ensure that it in fact rises to the level of a "compelling" interest in closure; make specific, on the record findings demonstrating that closure is essential to serve that compelling government interest; and assure itself that whatever restrictions on public access it orders are narrowly tailored to serve that interest by considering less drastic alternatives, again providing specific reasons and factual findings that support rejecting those alternatives. *See* Pet. Br. at 18–19 (setting forth standard and quoting cases for each point above), *id*. at 37–38 (summarizing same).

Application of First Amendment strict scrutiny does not mean that every filing in the trial court will be released in unexpurgated form to the public, or that every private conference at the

APPENDIX A-183

bench will be thrown open. Under strict scrutiny the government could still argue that national security interests are compelling enough to require redaction of specific items of information from certain documents prior to publication,[6] or require closure of the courtroom for certain arguments that touch on sensitive factual information or for certain presentations of evidence. Trivial administrative matters with no implications for third parties may be hashed out outside of public hearing in R.C.M. 802 conferences, so long as the requirement of a later public-record summary is complied with. There may be grounds to keep matters discussed in sidebars hidden from the public during trial when that is necessary to keep the discussion from the ears of the sitting military jury. But in every hypothetical noted above, the denial of public access will easily meet the requirements of strict scrutiny (so long as the facts support the government's assertions of necessity).

It is perhaps understandable that the trial court, fearful in light of what it (mistakenly) perceives as a lack of clear precedent for application of the First Amendment, has chosen to blanket the Manning trial in secrecy. But its default presumption

---

[6]    Again, classification review and other redaction processing of documents should not become an excuse for non-contemporaneous publication: the military commissions at Guantanamo mandate production of public versions of even classified-information containing documents within 15 days of filing. *See* Pet. Br. at 26–27 (citing Kadidal Decl. ¶¶ 18–19 (JA–7–9)).

against transparency serves no one's interests – least of all the interests of the government, which will see the legitimacy of any conviction questioned if the current status quo prevails. We urge this Court to speedily alter that status quo. As we have stated previously, "[d]oing so is vital if the military justice system is to be taken seriously as the equivalent of the civilian criminal justice system in terms of fairness, accuracy and transparency."[7]

New York, New York
Dated: 24 August 2012

Respectfully submitted,

_____/s/sdk_____
Shayana D. Kadidal [8]
[C.A.A.F. Bar No. 35713]
J. Wells Dixon
Baher Azmy, Legal Director
Michael Ratner, President Emeritus
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6438
Fax: (212) 614-6499

Jonathan Hafetz
169 Hicks Street
Brooklyn, NY 11201
Tel: (917) 355-6896

*Counsel for Petitioner-Appellants*

_____

[7]    Pet. Reply at 27–28.

[8]    Petitioner-Appellants' lead counsel, Mr. Kadidal, has since our last filing been admitted to the Bar of this Court. He will be resident at the University of Michigan Law School for the majority of the 2012-2013 academic year but is available, should the Court schedule oral argument, for most of the next two months.

8

APPENDIX A-185

## <u>Certificate of Service</u>

I hereby certify on this 24th day of August, 2012, I caused the foregoing Supplemental Brief to be filed with the Court and served on Respondents electronically via email (per this Court's Electronic Filing Order of 22 July 2010), and to be served on the trial and appellate courts below via mail or courier delivery, at the following addresses and facsimile numbers, respectively:

```
Clerk of the Court
U.S. Court of Appeals for the Armed Forces
450 E Street, NW
Washington, DC 20442-0001
Tel: (202) 761-1448
efiling@armfor.uscourts.gov

- and -

U.S. Army Court of Criminal Appeals
Office of the Clerk of Court
9275 Gunston Road
Fort Belvoir, VA  22060-5546

- and -

Chief Judge Col. Denise Lind
U.S. Army Trial Judiciary, 1st Judicial Cir.
U.S. Army Military District of Washington
Office of the Staff Judge Advocate
103 Third Ave., SW, Ste 100.
Ft. McNair, DC 20319

- and -

David E. Coombs (counsel for Pfc. Manning)
Law Office of David E. Coombs
11 South Angell Street, #317
Providence, RI  02906
Tel: (508) 689-4616
(COURTESY COPY)
```

9

APPENDIX A-186

– and –

Capt. Judge Advocate Chad M. Fisher
Appellate Government Counsel
Office of the Judge Advocate General
U.S. Army Legal Services Agency
9275 Gunston Rd.
Ft. Belvoir, VA 22060
Tel: (703) 693-0783
chad.m.fisher.mil@mail.mil


      /s/sdk
    Shayana Kadidal

10

United States Court of Appeals
for the Armed Forces
Washington, D.C.

Center for Constitutional          )  USCA Dkt. No. 12-8027/AR
Rights, et al,                     )  Crim.App. Dkt. No. 20120514
                   Appellants      )
                                   )
          v.                       )          O R D E R
                                   )
United States,                     )
                                   )
and                                )
                                   )
Colonel Denise Lind,               )
Military Judge,                    )
                   Appellees       )

     On consideration of the pleadings of the parties, and oral

argument, held on October 10, 2012, it is, by the Court, this

12th day of October, 2012,

     ORDERED:

     That the parties file supplemental briefs on the following

additional issues:

     I.        WHETHER, IN LIGHT OF DENEDO v. UNITED STATES, 556
               U.S. 904 (2009), CLINTON v. GOLDSMITH, 526 U.S.
               529 (1999), UNITED STATES v. LOPEZ de VICTORIA, 66
               M.J. 67 (C.A.A.F. 2008), ABC, INC. v. POWELL, 47
               M.J. 363 (C.A.A.F. 1997), UNITED STATES v.
               HERSHEY, 20 M.J. 433 (C.M.A. 1985), ARTICLES 36,
               66, AND 67, UCMJ, AND RULE FOR COURTS-MARTIAL 806,
               THIS COURT AND THE UNITED STATES ARMY COURT OF
               CRIMINAL APPEALS HAVE SUBJECT-MATTER JURISDICTION
               OVER APPELLANTS' REQUEST FOR EXTRAORDINARY RELIEF.

     II.       WHETHER APPELLANTS, NON-PARTIES TO THE COURT-
               MARTIAL, HAVE STANDING IN THIS COURT OR THE UNITED
               STATES ARMY COURT OF CRIMINAL APPEALS TO FILE A
               REQUEST FOR EXTRAORDINARY RELIEF IN THIS MATTER.

III.    ASSUMING JURISDICTION, (1) IN THE CONTEXT OF THE
        RECORDS NOW AT ISSUE, WHICH OFFICIALS ARE LAWFULLY
        AUTHORIZED TO DIRECT PUBLIC RELEASE OF SUCH
        RECORDS, AND (2) TO WHAT EXTENT MUST APPELLANTS
        FIRST DEMONSTRATE THAT THEY HAVE MADE THEIR
        INITIAL REQUEST TO AN APPROPRIATE RECORDS
        CUSTODIAN AND HAD SUCH REQUEST DENIED.

Appellants' brief on these issues shall be filed within ten days of the date of this Order.  Appellees' brief shall be filed within five days of the filing of Appellants' brief.  Counsel for Private Bradley Manning, the accused at the pending court-martial, may also file a brief on the above issues within ten days of the date of this Order.

For the Court,

William A. DeCicco
Clerk of the Court

cc:  The Judge Advocate General of the Army
     Counsel for Appellant (KADIDAL, Esq.)
     Counsel for the Government (FISHER)
     Counsel for the Accused (COOMBS, Esq.)
     Amicus Curiae (LESLIE, Esq.)

2

APPENDIX A-189

IN THE UNITED STATES COURT OF APPEALS
FOR THE ARMED FORCES

```
-------------------------------- x
                                  :
CENTER FOR CONSTITUTIONAL RIGHTS, :
GLENN GREENWALD, JEREMY SCAHILL,  : Crim. App. Misc.
THE NATION, AMY GOODMAN, DEMOCRACY : Dkt. No. 20120514
NOW!, CHASE MADAR, KEVIN GOSZTOLA, :
JULIAN ASSANGE, and WIKILEAKS,    : USCA Misc.
                                  : Dkt. No. 12-8027/AR
                  Appellants,     :
                                  : General Court Martial
          v.                      : United States v. Manning,
                                  : Ft. Meade, Maryland
                                  :
UNITED STATES OF AMERICA and CHIEF :
JUDGE COL. DENISE LIND,           : Dated: 22 October 2012
                                  :
                  Appellees.      :
                                  :
-------------------------------- x
```

### PETITIONER-APPELLANTS' POST-ARGUMENT SUPPLEMENTAL BRIEF

Shayana D. Kadidal
[C.A.A.F. Bar No. 35713]
J. Wells Dixon
Baher Azmy, Legal Director
Michael Ratner, President Emeritus
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (646) 498-8498
Fax: (212) 614-6499

Jonathan Hafetz
169 Hicks Street
Brooklyn, NY 11201
Tel: (917) 355-6896

*Counsel for Petitioner-Appellants*

## TABLE OF CONTENTS

I. Jurisdiction...................................................1

II. Standing....................................................14

III. The military judge has the authority to direct public
release of judicial records....................................21

IV. Excluding records of R.C.M. 802 conferences,
the records at issue are already in existence..................31

V. Relief......................................................33

CONCLUSION.....................................................35

## INDEX (TABLE OF AUTHORITIES)

*ABC v. Powell*, 47 M.J. 363 (C.A.A.F. 1997).....................8

*Associated Press v. United States Dist. Court*,
705 F.2d 1143 (9th Cir. 1983)...................................7

*Arizona v. Fulminante*, 499 U.S. 279 (1991)..................5, 9

*Arrow Transp. Co. v. Southern R. Co.*, 372 U.S. 658 (1963).......3

*Branzburg v. Hayes*,  408 U.S. 665 (1972)......................18

*Carrelli v. Ginsburg*, 956 F.2d 598 (6th Cir. 1992)............26

*Conway v. United States*, 852 F.2d 187 (6th Cir. 1988).........26

*Clinton v. Goldsmith*, 526 U.S. 529 (1999)...............8, 11–12

*Denedo v. United States*, 66 M.J. 114 (2008)...................12

*Dobzynski v. Green*, 16 M.J. 84 (C.M.A. 1983)..................2

*Ex parte Bradstreet*, 7 Pet. 634 (1833)........................2

*FEC v. Akins*, 524 U.S. 11 (1998)..................15–16, 19, 20

*FTC v. Dean Foods Co.*, 384 U.S. 597 (1966)..................2–3

*Frothingham v. Mellon*, 262 U.S. 447 (1923)...................19

i

*Gambale v. Deutsche Bank AG*, 377 F.3d 133 (2d Cir. 2004).......22

*Gannett v. DePascuale*, 443 U.S. 368 (1978)....................33

*Globe Newspaper Co. v. Pokaski*,
868 F.2d 497 (1st Cir. 1989) (Coffin, J.)..................31-32

*Globe Newspaper Co. v. Superior Court*,
457 U.S. 596 (1982)....................................7, 17, 19

*Haddad v. Ashcroft*,
221 F. Supp. 2d 799 (E.D. Mich. 2002),
*vacated as moot after deportation*,
76 Fed. Appx. 672 (6th Cir. 2002)..............................5

*In re Globe Newspaper Co.*,
729 F.2d 47 (1st Cir. 1984) (Coffin, J.).......................7

*In re Petition to Inspect & Copy Grand Jury Materials*,
735 F.2d 1261 (11th Cir. 1984)................................22

*In re Washington Post Co.*, 807 F.2d 383 (4th Cir. 1986)........7

*Indianapolis Star v. United States*,
2012 U.S. App. LEXIS 18627 (6th Cir. Sep. 5, 2012).............26

*La Buy v. Howes Leather Company*, 352 U.S. 249 (1957)...........7

*Ex parte Levitt*, 302 U.S. 633 (1937)..........................19

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)...........16

*Meese v. Keene*, 481 U.S. 465 (1987)...........................18

*McClellan v. Carland*, 217 U.S. 268 (1910).....................3

*Morrison v. Olson*, 487 U.S. 654 (1988)........................16

*Murray v. Haldeman*, 16 M.J. 74 (C.M.A. 1983)..................6

*Nixon v. Warner Communications*, 435 U.S. 589 (1978).......21, 31

*Noyd v. Bond*, 395 U.S. 683 (1969).............................14

*Oregonian Publ'g Co. v. United States Dist. Court*,
920 F.2d 1462 (9th Cir. 1990)...................................7

APPENDIX A-192

*Press-Enterprise Co. v. Superior Court*,
478 U.S. 1 (1986)......................................7, 17, 19

*Press-Enterprise Co. v. Superior Court of California*,
464 U.S. 501 (1984)...................................7, 17, 19

*Public Citizen v. United States Dep't of Justice*,
491 U.S. 440 (1989)...........................................21

*Resnick v. Patton*, 258 Fed. Appx. 789 (6th Cir. 2007).........26

*Richmond Newspapers v. Virginia*,
448 U.S. 555 (1980)...............................7, 17, 19, 32

*Roche v. Evaporated Milk Assn.*, 319 U.S. 21 (1943)..........3, 6

*Rosen v. Sugarman*,
357 F.2d 794 (2d Cir. 1966) (Friendly, J.)......................7

*Schlesinger v. Reservists Committee to Stop the War*,
418 U.S. 208 (1974)......................................19, 20

*Schmidt v. Boone*, 59 M.J. 841 (A.F.C.C.A. 2004)..............6, 9

*Shaw v. Hunt*, 517 U.S. 899 (1996).............................16

*United States v. Beckham*, 789 F.2d 401 (6th Cir. 1986)......25-26

*United States v. Chagra*, 701 F.2d 354 (5th Cir. 1983)..........6

*United States v. Chisholm*,
58 M.J. 733 (Army Ct. Crim. App. 2003)........................22

*United States v. Denedo*, 556 U.S. 904 (2009).............2, 12-14

*United States v. Flowers*, 389 F.3d 737 (7th Cir. 2004)........22

*United States v. Hershey*, 20 M.J. 433 (C.M.A. 1985)............5

*United States v. Lopez de Victoria*,
66 M.J. 67 (C.A.A.F. 2008)..................................8-10

*United States v. Ortiz*, 66 M.J. 334 (C.A.A.F. 2008)............4

*United States v. Peters*, 754 F.2d 753 (7th Cir. 1985)..........7

*United States v. Richardson*, 418 U.S. 166 (1974)..............19

iii

APPENDIX A-193

*United States v. Reinert*, 2008 WL 8105416 (A.C.C.A. 2008).......8

*United States v. Schmidt*,
60 M.J. 1 (C.A.A.F. 2004) (per curiam).......................8-9

*United States v. SCRAP*, 412 U.S. 669 (1973)...................21

*United States v. United States District Court for
Southern Dist. of W. Va.*, 238 F.2d 713 (4th Cir. 1956).........2

*Waller v. Georgia*, 467 U.S. 39 (1984).......................4-5

*Warth v. Seldin*, 422 U.S. 490 (1975).......................19-20

**STATUTES AND RULES**

18 U.S.C. § 3731...............................................10

U.C.M.J. Article 36..............................14, 22, 25, 30

U.C.M.J. Article 62............................................10

U.C.M.J. Article 66...............................2, 12, 14

U.C.M.J. Article 67...............................2, 10, 13, 14

Fed. R. Crim. P. 6(e)..........................................22

R.C.M. 503....................................................24

R.C.M. 601....................................................24

R.C.M. 801....................................................25

R.C.M. 802.................................................32-34

R.C.M. 806...........................................22-23, 25, 30

R.C.M. 808.................................................24-25

R.C.M. 1103..........................................24-25, 27, 31

R.C.M. 1104....................................................26

R.C.M. 1201.....................................................6

APPENDIX A-194

Army Judiciary Rules of Court (2012)...........................23

Rules of Practice before Army Courts-Martial (2009)...........23

**TREATISES**

16 Wright, Miller & Cooper,
Federal Practice & Procedure § 3932......................2, 3, 7

**MISCELLANEOUS**

Gosztola Declaration.........................................15

Gosztola FOIA request........................................29

APPENDIX A-195

IN THE UNITED STATES COURT OF APPEALS
FOR THE ARMED FORCES

```
-------------------------------- x
                                 :
CENTER FOR CONSTITUTIONAL RIGHTS, :
GLENN GREENWALD, JEREMY SCAHILL,  : Crim. App. Misc.
THE NATION, AMY GOODMAN, DEMOCRACY : Dkt. No. 20120514
NOW!, CHASE MADAR, KEVIN GOSZTOLA, :
JULIAN ASSANGE, and WIKILEAKS,    : USCA Misc.
                                 : Dkt. No. 12-8027/AR
            Appellants,          :
                                 : General Court Martial
            v.                   : United States v. Manning,
                                 : Ft. Meade, Maryland
                                 :
UNITED STATES OF AMERICA and CHIEF :
JUDGE COL. DENISE LIND,          : Dated: 22 October 2012
                                 :
            Appellees.           :
                                 :
-------------------------------- x
```

## PETITIONER-APPELLANTS' POST-ARGUMENT SUPPLEMENTAL BRIEF

Petitioner-Appellants submit this supplemental brief in response to the Court's order of October 12, 2012, setting forth three additional issues for briefing in the wake of the oral argument held on October 10, 2012.

## I. Jurisdiction

In actions seeking extraordinary relief under the All Writs Act, the jurisdiction of the military appellate courts may properly be premised on a theory of "potential jurisdiction" (sometimes dubbed "anticipatory jurisdiction") over issues that arise prior to the court-martial's findings and sentence, where "necessary or appropriate" to preserve appellate jurisdiction that would otherwise exist in the future when actual findings and

a sentence have issued.[1] In the instant case, (1) the trial court clearly had jurisdiction to consider — and did consider — our claims; (2) the A.C.C.A. had potential appellate jurisdiction, since a conviction and sentence sufficiently grave to bring the case below within Article 66 may ensue,[2] and that potential jurisdiction gave the A.C.C.A. authority to issue extraordinary relief under the All Writs Act; and (3) this Court, in turn, has potential jurisdiction under Article 67 to review any such Article 66 appeal from the A.C.C.A., and that Article 67 potential jurisdiction gives this Court authority to issue extraordinary relief under the All Writs Act.[3]

The Supreme Court has recognized such potential or anticipatory jurisdiction in too many All Writs Act cases to count:

> [The power to issue writs in aid of jurisdiction under the All Writs Act] extends to the potential jurisdiction of the appellate court where an appeal is not then pending but may be later perfected. *Cf. Ex parte Bradstreet*, 7 Pet. 634 (1833) (Marshall, C.J.). These holdings by Chief Justice Marshall are elaborated in a long

---

[1]   As this Court noted at argument, the All Writs Act is not an independent source of jurisdiction. *See United States v. Denedo*, 556 U.S. 904, 913-14 (2009). Rather, it empowers the court to issue injunctive orders to preserve potential jurisdiction founded in other provisions.

[2]   It is well-established at law that the possibility of acquittal is not enough to defeat jurisdiction in such circumstances. See, among many examples, *United States v. United States District Court for Southern Dist of W. Va.*, 238 F.2d 713, 718-19 (4th Cir. 1956); 16 Wright, Miller & Cooper, Federal Practice & Procedure § 3932 n.30 (citing cases and further references).

[3]   *Cf. Dobzynski v. Green*, 16 M.J. 84, 90 (C.M.A. 1983) (Everett, C.J., dissenting) (explaining potential jurisdiction in All Writs Act context in same terms).

APPENDIX A-197

line of cases, including *McClellan v. Carland*, 217 U.S. 268 (1910), where Mr. Justice Day held: "we think it the true rule that where a case is within the appellate jurisdiction of the higher court a writ ... may issue in aid of the appellate jurisdiction which might otherwise be defeated ...." At 280. And in *Roche v. Evaporated Milk Assn.*, 319 U.S. 21 (1943), Chief Justice Stone stated that the authority of the appellate court "is not confined to the issuance of writs in aid of a jurisdiction already acquired by appeal but extends to those cases which are within its appellate jurisdiction although no appeal has been perfected." At 25. Likewise, decisions of this Court "have recognized limited judicial power to preserve the court's jurisdiction or maintain the status quo by injunction pending review of an agency's action through the prescribed statutory channels. At 25. Such power has been deemed merely incidental to the courts' jurisdiction to review final agency action...." *Arrow Transp. Co. v. Southern R. Co.*, 372 U.S. 658, 671, n. 22 (1963).

*FTC v. Dean Foods Co.*, 384 U.S. 597, 603-04 (1966).[4] In *Dean Foods*, the FTC sought an injunction under the All Writs Act to preserve the status quo against what it viewed as a potentially anticompetitive purchase and planned breakup of a company. The Court of Appeals denied relief but the Supreme Court reversed, holding that because the purchasers planned to split up the target company and scatter its businesses and assets, an All Writs

---

[4]    On potential jurisdiction, *see generally* 16 Wright, Miller & Cooper, Federal Practice & Procedure § 3932 ("[I]t has been established since the decision in *McClellan v. Carland*[, 217 U.S. 268 (1910)] that writs might issue in aid of appellate jurisdiction yet to be acquired, as well as jurisdiction actually acquired. This rule has allowed the Supreme Court to issue writs under the All Writs Act to the courts of appeals in cases in which it relied solely on the prospect of possible future jurisdiction, and even to issue writs directly to district courts on the ground that it ultimately would have jurisdiction to review a court of appeals judgment on appeal from the district court.").

APPENDIX A-198

Act injunction preserving the status quo pending a final agency ruling on the merger was the only way to preserve the Court of Appeals' statutory appellate jurisdiction over any future appeal from a decision of the FTC barring the merger. *See id.* at 605, 604 (All Writs Act relief necessary and appropriate "upon a showing that an effective remedial order, once the merger was implemented, would otherwise be virtually impossible, thus rendering the enforcement of any final decree of divestiture futile," which would thus create an "impairment of the effective exercise of appellate jurisdiction" in the Court of Appeals).

Jurisdiction clearly exists here on the same theory. *Whether* to exercise it, as this Court and others have done in any number of media access cases, is a separate prudential question under the All Writs Act, but just as easy to answer. Here, the integrity of the trial will be irreparably damaged by failure to grant the relief sought here, because denial of a public trial is a structural error that requires invalidation of the trial court proceedings. *United States v. Ortiz*, 66 M.J. 334, 342 (C.A.A.F. 2008) ("an erroneous deprivation of the right to a public trial is a structural error, which requires" outcome of proceeding below to be voided "without [appellate court engaging in] a harmlessness analysis."); *Waller v. Georgia*, 467 U.S. 39, 49-50 (1984) (voiding outcome of suppression hearing improperly closed to the public, and ordering new suppression hearing, and new tri-

4

al as well if result of new suppression hearing was materially different); *Haddad v. Ashcroft*, 221 F. Supp. 2d 799, 805 (E.D. Mich. 2002) (even in civil administrative context, remedy for im-properly-closed immigration detention hearing was to "either release [detainee] or hold a new detention hearing that is open to the press and public), *subsequently vacated as moot after depor-tation*, 76 Fed. Appx. 672 (6th Cir. 2002); Audio at 48:57 (Judge Ryan: "ultimately [openness or lack thereof] impacts the findings and sentence ... the validity [thereof]").[5] That is justifiably so given the Supreme Court's frequent warnings that openness tangi-bly enhances accuracy. *See Arizona v. Fulminante*, 499 U.S. 279, 310 (1991) (Rehnquist, C.J., stating opinion of the Court as to this section) (citing list of basic structural trial protections mandated by constitution, including open trial, and concluding that "[w]ithout these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair"; such violations are therefore not subject to harmless error analysis). Moreover, damage to the public's First Amendment interest in transparent criminal process occurs every day that the challenged secrecy is allowed to continue, and this

---

[5]     *But see United States v. Hershey*, 20 M.J. 433, 437-38 (C.M.A. 1985) (holding error harmless in "unique circumstances" where, *inter alia*, no one attended proceedings and there was no evidence that anyone was actually barred from entry during the improperly-closed portion of the hearing).

harm is of the sort ordinarily cognized as irreparable harm. *See* Pet. Br. at 9-10, 18, 26. It is therefore "appropriate" under the All Writs Act for this Court to intervene in order to preserve jurisdiction and "compel [the trial court] to exercise its authority when it is its duty to do so,"[6] especially given that issuance of the writ in such circumstances would be "consistent with judicial economy," *Murray v. Haldeman*, 16 M.J. 74 (C.M.A. 1983), by preventing reversal of any ultimate conviction below.

The surest proof of the appropriateness of All Writs Act relief is the fact that it has been exercised so often in similar cases where third-party members of the public and news media have asked the Courts of Appeals to grant access to judicial documents in proceedings taking place in courts of first instance.[7] *See,*

---

[6]    *Schmidt v. Boone*, 59 M.J. 841, 843 (A.F.C.C.A. 2004); *see also Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 30 (1943) ("function of mandamus [is] to correct" "abuse of judicial power, or refusal to exercise it").

[7]    The trial court's refusal to allow Petitioner-Appellants to intervene below, *see* JA-4 ¶ 8, Tr. at 19 (holding that CCR's letter "is a request for intervention. That request is denied."), denied us the opportunity to participate directly in any direct appeal that might eventually be brought by the parties. Many federal Courts of Appeal only allow for mandamus, not direct appeal, in like circumstances. *See United States v. Chagra*, 701 F.2d 354, 360 (5th Cir. 1983) (noting many Circuits do not permit third-party appeals in federal system, and that "the great majority of cases involving challenges to closure and similar orders have been reviewed pursuant to some sort of extraordinary writ."); *cf*. R.C.M. 1201 (containing no mention of third-party appeal procedure). As we have argued, the trial court's failure to allow Petitioners *to be heard* on the matter of closures is *itself* a violation of the First Amendment that can justify this Court's

APPENDIX A-201

*e.g.*, *In re Globe Newspaper Co.,* 729 F.2d 47 (1st Cir. 1984)
(Coffin, J.); *In re Washington Post Co.*, 807 F.2d 383 (4th Cir.
1986); *United States v. Peters*, 754 F.2d 753, 763 (7th Cir.
1985); *Oregonian Publ'g Co. v. United States Dist. Court*, 920
F.2d 1462 (9th Cir. 1990); *Associated Press v. United States
Dist. Court*, 705 F.2d 1143 (9th Cir. 1983), among many others.[8]

---

invocation of potential jurisdiction. All this strongly militates
in favor of extraordinary relief here.

Even assuming the availability of some hypothetical form of
*direct* appeal by third parties like Petitioner-Appellants, manda-
mus would still be available. The Supreme Court has recognized
that issuance of the writ will often be appropriate even for is-
sues addressable via direct appeal. *See* 16 Wright, Miller &
Cooper, Federal Practice & Procedure § 3932 ("*La Buy* [*v. Howes
Leather Company*, 352 U.S. 249 (1957),] is most famous for declar-
ing that the writs may be used for 'supervisory control of the
District Courts by the Court of Appeals.' This standard for
properly exercising the writ power has led to other cases in
which orders were reviewed that plainly could have been reviewed
on appeal from a final judgment [citing cases, including *Rosen v.
Sugarman*, 357 F.2d 794, 797 (2d Cir. 1966) (Friendly, J.)]. Su-
pervisory mandamus, in short, establishes that a writ may be in
aid of court of appeals jurisdiction, and thus within the power
conferred by [the All Writs Act], simply because it is the most
efficient method of reviewing an order that could effectively be
reviewed, and if need be reversed, on a subsequent appeal.").

[8]   The majority of the landmark Supreme Court First Amendment
decisions granting access to courtrooms came up on extraordinary
relief (in state appellate courts) as well. *Press-Enterprise Co*.
*v. Superior Court of California*, 464 U.S. 501, 504-05 (1984)
("Petitioner then sought in the California Court of Appeal a writ
of mandate to compel the Superior Court to release the tran-
script"); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596,
600 & 600 n.4 (1982) (media sought extraordinary relief from a
justice of the Massachusetts Supreme Judicial Court, the highest
state court of appeals); *Press-Enterprise Co. v. Superior Court*,
478 U.S. 1, 5 (1986) (media sought mandamus in court of appeal
and then California Supreme Court); *see also Richmond Newspapers
v. Virginia*, 448 U.S. 555 (1980) (newspapers sought mandamus as
well as direct appeal).

7

Indeed, "potential" or "anticipatory" jurisdiction has been tacitly recognized by this Court in its previous All Writs Act cases. *ABC v. Powell*, 47 M.J. 363 (C.A.A.F. 1997), was a case where media petitioners successfully sought extraordinary relief to gain access to Article 32 proceedings for SMA Gene McKinney. The opinion says next to nothing about extraordinary writ jurisdiction, other than making a passing citation to the All Writs Act, *id*. at 364, and noting that media petitioners sought access to the Article 32 proceedings via petition for extraordinary relief (mandamus) filed *directly* in the CAAF. But it clearly falls into the "potential jurisdiction" ambit of *Dean Foods* and the numerous similar Supreme Court decisions cited therein. *ABC* has been found by the A.C.C.A. to "remain good law" in the wake of *Goldsmith* and *Lopez de Victoria*. *United States v. Reinert*, 2008 WL 8105416 at *8 (A.C.C.A. 2008) ("Not only do the facts of [*ABC*] differ significantly from those of Goldsmith, but our superior court continues to cite to [it] without suggesting [the] decision[ has] any infirmity." (citing *Lopez de Victoria*)). Its procedural posture bears a great deal of similarity to the instant case; if anything, Petitioner-Appellants here have a stronger claim because they did not circumvent the A.C.C.A as the *ABC* petitioners did.

More recently, in *United States v. Schmidt*, 60 M.J. 1 (C.A.A.F. 2004) (per curiam), defendant sought extraordinary re-

APPENDIX A-203

lief from a ruling of the trial court that before his security-cleared civilian defense counsel could access classified information, the defendant needed to inform the prosecutor of "the exact materials to which you think the civilian counsel needs access" and include a justification for the same. This Court reversed the CCA decision denying extraordinary relief on the merits. The CCA decision said nothing about the basis for jurisdiction, *Schmidt v. Boone*, 59 M.J. 841, 842 (A.F.C.C.A. 2004), but clearly the only possible basis was anticipatory jurisdiction – again based on a structural defect (denial of counsel in violation of the Fifth and Sixth Amendments) that threatened the validity of any ultimate finding and sentence the trial court might arrive at. *Cf. Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991) ("The entire conduct of the trial from beginning to end is obviously affected by the absence of counsel for a criminal defendant"). Because the CCA and this Court clearly would have had jurisdiction over any such future finding, extraordinary relief was permissible under the All Writs Act "in aid of" that jurisdiction where defendant had no other means to pursue timely relief, and delay would prejudice the interests of justice and waste judicial resources.

<center>*     *     *</center>

None of the other cases cited by this Court in its October 12, 2012 supplemental briefing order is to the contrary. *United*

<center>9</center>

APPENDIX A-204

*States v. Lopez de Victoria*, 66 M.J. 67 (C.A.A.F. 2008) held that either party may take an appeal to the C.A.A.F. under Article 67 from the ruling of a service court of criminal appeals on a government interlocutory appeal under Article 62. This Court held that it had jurisdiction to hear an appeal from an Article 62 appeal to the CCA despite the fact that text of Article 62 did not explicitly mention further appeals from the CCAs to the C.A.A.F. The decision was premised on Congress' intent to promote uniformity of decision among the service courts (which would be advanced by allowing the C.A.A.F. to sort out splits between the CCAs) (*id.* at 71), Congress' intent in creating Article 62 to parallel the rights of appeal federal prosecutors have under 18 U.S.C. § 3731 (*id.* at 70, 71), and relied on a directly-on-point piece of legislative history from the Senate Armed Services Committee (*id.* at 70). Because the case involved a direct appeal to this Court, neither the opinion nor the dissent dealt with the scope of the power to preserve appellate jurisdiction under the All Writs Act. It should be noted, however, that there is no controversy over this Court's power to hear Article 67 appeals from Article 66 cases in the CCAs. Therefore, even if the dissenting position in *Lopez de Victoria* had been adopted by this Court, this Court would still have potential jurisdiction over the claims now before it.

10

APPENDIX A-205

Nor does *Clinton v. Goldsmith*, 526 U.S. 529 (1999) counsel a different result here. Goldsmith was convicted by court-martial and sentenced; a year after his conviction became final, Congress expanded the President's power to drop certain convicted officers from the rolls of the military, and the Air Force sought to use this expanded power to drop Goldsmith from the rolls. Goldsmith obtained extraordinary relief from this Court to block what he characterized as a retroactive expansion of his sentence. The Supreme Court disagreed with this characterization, stating that "Goldsmith's court-martial sentence has not been changed; another military agency simply has taken independent action" dropping him from the rolls. *Id.* at 536. Thus the claims fell outside this Court's All Writs Act authority: "Simply stated, there is no source of continuing jurisdiction for the CAAF over all actions administering sentences that the CAAF at one time had the power to review." *Id.* As an executive action independent of the court-martial proceedings, this Court had no power to intervene in Goldsmith's separation from service, especially given that there existed alternative administrative routes for appeal available by statute: Goldsmith could have presented his claim that dropping him from the rolls violated the *ex post facto* clause to an administrative board, *see id.* at 538, 538 n.12, among other venues for relief, *id.* at 539. Petitioner-Appellants here are challenging a *still-ongoing* proceeding where a legal violation (of the First

Amendment right of public access) threatens the *fundamental integrity* of the outcome. Conduct of the court-martial and public access to judicial records are core aspects of the trial process, making the instant case utterly unlike *Clinton v. Goldsmith*.

In contrast to Maj. Goldsmith, the petitioner in *United States v. Denedo*, 556 U.S. 904 (2009), sought a writ of *coram nobis* seeking to vacate his conviction by court-martial (which had at the time been final for six years) on the basis of ineffective assistance of counsel. The CCA summarily rejected the petition,[9] but this Court found that there was jurisdiction "to conduct collateral review under the All Writs Act" to "modify an action that was taken within the subject matter jurisdiction of the military justice system" and remanded. *Denedo v. United States*, 66 M.J. 114, 119, 120 (2008). The Supreme Court granted certiorari and affirmed. The Court found that the CCA's "jurisdiction to issue the writ" of *coram nobis* — which it said was "properly viewed as a belated extension of the original proceeding in which the error allegedly transpired" — "derives from the earlier jurisdiction it exercised to hear and determine the validity of the conviction on direct review" under Article 66. 556 U.S. at 914, 913, 914. Because the CCA had jurisdiction, "the CAAF had jurisdiction to entertain [an] appeal" from the CCA's

---

[9]    The Supreme Court took note of the fact that the CCA decision (as in the instant case) included no discussion or analysis. 556 U.S. at 908.

APPENDIX A-207

judgment under Article 67. *Id*. at 915. The Court stated that "[o]ur holding allows military courts to protect the integrity of their dispositions and processes" via the All Writs Act "when it is shown that there are fundamental flaws in the proceedings leading to their issuance." 556 U.S. at 916. The Court concluded:

> The military justice system relies upon courts that must take all appropriate means, consistent with their statutory jurisdiction, to ensure the neutrality and integrity of their judgments. ... [T]he jurisdiction and the responsibility of military courts to reexamine judgments in rare cases where a fundamental flaw is alleged and other judicial processes for correction are unavailable are consistent with the powers Congress has granted those courts under Article I and with the system Congress has designed.

*Id*. at 917. Even the four dissenting Justices in *Denedo* were primarily concerned with granting military appellate courts with "*continuing* jurisdiction" over otherwise "final court-martial judgments" in *coram nobis*, *Id*. at 923, 921 (Roberts, C.J., dissenting), which they presumably viewed as outside even the potential jurisdiction conferred by statute and recognized in cases like *Dean Foods*. This, the dissenters feared, risked "conferring ... perpetual authority" on the CCA and this Court to "extend[] jurisdiction" even past the date of separation from the military when the government might lack jurisdiction to retry. *Id*. at 923, 923 n.2. That is the opposite of the situation here, where petitioners have intervened to preserve the "integrity of [any] judgment" that comes from the trial court by correcting the "funda-

13

mental flaw" *while the proceedings below are taking place*, not afterwards, when the only remedy may be the far more extreme one of vacatur and retrial. *Id.* (majority op.) at 917.

<p style="text-align:center">*    *    *</p>

Nothing Congress has done in the intervening years since *ABC v. Powell* precludes the availability of the sort of relief requested here. (Indeed, there may well have been Congressional reliance on the availability of this sort of relief in the wake of high-profile public-access cases such as *Hershey* and *Powell*.) Recognizing All Writs Act relief here would be consistent with the Congressional policy that courts-martial follow processes similar to those used in ordinary federal criminal courts. That policy is embodied in Article 36 and in the simple fact that Congress has denominated this Court a "court." Courts have contempt power, jurisdiction to review their own jurisdiction, and various other powers that are not spelled out in the text of U.C.M.J. Articles 66 and 67 but that this Court and the service courts have recognized and exercised over the years.[10]

## II. Standing

Petitioner-Appellants requested relief[11] from the trial court and were denied; they then exhausted their remedies in the Army

---

[10]    *Cf. Noyd v. Bond*, 395 U.S. 683, 695 (1969) (All Writs Act "'mak[es] explicit the right to exercise powers implied from the creation of … courts'" by statute, including military courts) (quoting statutory revision notes to All Writs Act).

<p style="text-align:center">14</p>

Court of Criminal Appeals.[12] They clearly have standing under existing Supreme Court precedents.

The Supreme Court recognized citizen-plaintiffs' standing in *FEC v. Akins*, 524 U.S. 11 (1998). In *Akins*, plaintiffs, six individual members of the voting public, claimed that a federal statute (the reporting requirements for political action committees) created a right to information (to the information the lobbying group AIPAC needed to file, on plaintiffs' view), and denial of this right created concrete injury:

> The 'injury in fact' that respondents have suffered consists of their inability to obtain information … that, on respondents' view of the law, the statute requires that AIPAC make public. There is no reason to doubt their claim that the information would help them (and others to whom they would communicate it) to evaluate candidates for public office, especially candidates who received assistance from AIPAC, and to evaluate the role that AIPAC's financial assistance might play in a specific election. Respondents' injury consequently seems concrete and particular. Indeed, this Court has previously held that a plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain in-

---

[11]   Several current Petitioners did not request relief in CCR's original missive to the trial court on April 23, 2012, but as to their standing, it obviously would have been futile for them to make the same request after CCR and the other media parties mentioned in the letter (see JA-15) had been denied relief. Moreover, as Chief Judge Baker noted at argument, Audio at 49:02, anyone actually present in the courtroom during the pretrial proceedings would have had extraordinary difficulty understanding the proceedings given the failure to provide access to the documents. (*See* Gosztola Decl., JA-24-25 at ¶¶ 4-8.) That itself is a further basis for recognizing standing of the media petitioners who have sought to cover the proceedings in open court.

[12]   This Court's order asked whether standing existed in the A.C.C.A.; we believe it did there as well for the same reasons it exists in this Court, as described herein.

APPENDIX A-210

> formation which must be publicly disclosed pursuant to
> a statute.

*Akins*, 524 U.S. at 21 (citing cases).[13] Similarly, Petitioners here have suffered injury because they requested and were denied access to information that must be publicly disclosed by operation of the First Amendment. That sort of injury is no different, as the *Akins* court noted, from mass-tort or voting rights cases where a common injury is shared by many. *See, e.g.*, *Shaw v. Hunt*, 517 U.S. 899, 904 (1996) ("a plaintiff who resides in a district which is the subject of a racial gerrymander claim has standing to challenge the legislation which created that district").

*Akins* is consistent with the unquestioned standing, recognized by the Supreme Court, of the various media plaintiffs in the *Richmond Newspapers* line of cases. In all four of those cases, media petitioners requested access in the trial court and

---

[13]   *Akins* was decided after *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), which held that bars on citizen standing were not prudential but of constitutional dimension. So clearly the Supreme Court believes that standing premised on a violation of the public's right to information does not fall afoul of the requirement of individualized injury-in-fact otherwise mandated by Article III's case-or-controversy requirement. *See Akins*, 524 U.S. at 24-25 ("We conclude that similarly, the informational injury at issue here, directly related to voting, the most basic of political rights, is sufficiently concrete and specific such that the fact that it is widely shared does not deprive Congress of *constitutional* power to authorize its vindication in the federal courts.") (emphasis added). (The First Amendment rights at issue here are, like those in *Akins*, directly related to electoral accountability of the executive, which is in our system the primary check on the behavior of prosecutors. *Cf. Morrison v. Olson*, 487 U.S. 654, 706 (1988) (Scalia, J., dissenting).)

APPENDIX A-211

were denied; they then sought extraordinary relief from superior courts. The Supreme Court never questioned the standing of petitioners in any of these cases, despite the fact that standing is jurisdictional and any federal court is obliged to assure itself that it exists. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 560, 562-63 (1980) (not questioning standing, despite fact that media petitioners did not object to exclusion at very outset of dispute; issue not moot despite release of transcripts after end of trial, because "capable of repetition, yet evading review")[14]; *Globe Newspapers Co. v. Sup. Ct.*, 457 U.S. 596, 599 n.4 (1982) (not questioning standing of media petitioners, who had initially moved to revoke closure order in trial court, and subsequently sought extraordinary relief in state courts, and similarly finding case not moot); *Press-Enterprise Co. v. Sup. Ct. of Cal. [Press-Enterprise I]*, 464 U.S. 501, 504-05 (1984) (not questioning standing of media petitioners who had initially moved trial court for access, been denied, and sought writ of mandate); *Press-Enterprise Co. v. Sup. Ct. [Press-Enterprise II]*, 478 U.S. 1, 3-6 (1986) (not questioning standing of media petitioners requested release of transcripts at close of pretrial hearing and were denied, then sought extraordinary relief). Equally relevant are the many, many cases in the Courts of Ap-

---

[14]    The media sought relief both on direct appeal and mandamus, 448 U.S. at 562.

APPENDIX A-212

peals recognizing standing for plaintiffs in the access-to-documents cases we have cited. *See* Pet. Br. at 11-12 n.5.

At oral argument on October 10, Judge Stuckey asked whether, if such First Amendment claims could be equally well asserted by members of the general public,[15] standing should be denied because the injury is too widely-shared. Essentially, Judge Stuckey's question speculates as to whether standing should be rejected here on an analogy to the citizen- and taxpayer-standing or "generalized grievance" cases decided by the Supreme Court over the

---

[15]   In response to Judge Stuckey's question as to whether the media petitioners here stood exactly on par with any member of the general public, undersigned counsel noted at oral argument that *Branzburg v. Hayes*, 408 U.S. 665 (1972), did evince a desire on the part of the Supreme Court not to distinguish between classes of journalists -- but that case concerned applicability of *generally-applicable legal obligations* to journalists. Drawing distinctions between citizen journalists and professional journalists would effectively invalidate many statutes as to their applicability to whatever group of professional journalists the court drew a line around. *See id*. at 703-06. *Branzburg* did not involve attempts by journalists to *enforce a right* that arguably benefits them more tangibly than other citizens. Professional journalists may well have a more substantial, concrete injury – the cost to their professional interests -- than ordinary observers not seeking to earn income or enhance their professional reputations by covering the Manning trial. Moreover, the attorney petitioners here – CCR itself and as representative of its legal staff – have a professional interest in accessing information that will likely be useful in their representation of other clients. *See* JA-12 (specifically noting this interest for CCR). The injury from denial is thus a professional injury to them. *Cf. Meese v. Keene*, 481 U.S. 465, 473 (1987).

That said, Petitioners do still believe that any member of the general public denied access ought to be able to assert standing on par with the professional media petitioners here, based on the logic of the *Richmond Newspapers* line of cases above.

APPENDIX A-213

last several decades. *Cf. Warth v. Seldin*, 422 U.S. 490 (1975); *Frothingham v. Mellon*, 262 U.S. 447 (1923); *Ex parte Levitt*, 302 U.S. 633 (1937). Of course, those lines of standing cases were well-established long before *Richmond Newspapers*, but proved no bar to the Burger Court finding that the petitioners in *Richmond Newspapers*, *Globe*, and *Press-Enterprise-I* and *-II* had standing to assert claims like those now before this Court. Most cases rejecting standing on grounds that the injury constituted a "generalized grievance" involved claims under *structural* provisions of the Constitution (*see, e.g.*, *United States v. Richardson*, 418 U.S. 166 (1974) (challenging CIA budget under Statements and Accounts clause); *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208 (1974) (seeking injunction against members of Congress serving in reserves under Incompatibility Clause); *Ex parte Levitt* (Incompatibility Clause claim seeking to bar Hugo Black's appointment to Supreme Court because he had voted in Senate to increase pension of Justices)), or under theories of taxpayer-based standing to challenge federal expenditures. The First Amendment claims here are neither.[16] In *Akins*, the government made

---

[16]  Taxpayer standing assertions in cases like *Richardson* (a case which did involve some nexus to information, *see Akins*, 524 U.S. at 21-22) were rejected because there is no "logical nexus between the status asserted and the claim sought to be adjudicated" under the provision of the constitution the claims were based on — the Statements and Accounts Clause. To put it in terms the Supreme Court has used in APA challenges brought by individuals not directly controlled by a regulation they seek to challenge,

APPENDIX A-214

the same argument suggested by Judge Stuckey at oral argument, and the Supreme Court rejected it clearly and in emphatic terms.[17]

As the Supreme Court has repeatedly noted over the years, that an injury is widely shared does not mean it cannot underlie standing. *See Akins*, 524 U.S. at 24 ("where a harm is concrete, though widely shared, the Court has found injury in fact.");

---

the taxpayer-plaintiffs were not within the "zone of interests" the constitutional provision was designed to protect. *See, e.g.*, *United States v. Richardson*, 418 U.S. 166, 178 n.11 (1974) ("It is ... open to serious question whether the Framers of the Constitution ever imagined that general directives to the Congress or the Executive would be subject to enforcement by an individual citizen. While the available evidence is neither qualitatively nor quantitatively conclusive, historical analysis of the genesis of cl. 7 [the Statements and Accounts Clause] suggests that it was intended to permit some degree of secrecy of governmental operations."). That is not so for the open-court rights protected by the First Amendment here: Petitioner-Appellants, like all members of the public who might request the relief sought here and be denied, are firmly within the zone of interests the First Amendment seeks to protect.

[17]  *Akins*, 524 U.S. at 23 ("The Solicitor General points out that respondents' asserted harm (their failure to obtain information) is one which is ''shared in substantially equal measure by all or a large class of citizens.'' Brief for Petitioner 28 (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). ... The kind of judicial language to which the FEC points, however, invariably appears in cases where the harm at issue is not only widely shared, but is also of an abstract and indefinite nature -- for example, harm to the 'common concern for obedience to law.' [citing *Schlesinger*, *inter alia*]. The abstract nature of the harm -- for example, injury to the interest in seeing that the law is obeyed -- deprives the case of the concrete specificity that characterized those controversies which were 'the traditional concern of the courts at Westminster,' *Coleman*, 307 U.S. at 460 (Frankfurter, J., dissenting); and which today prevents a plaintiff from obtaining what would, in effect, amount to an advisory opinion.").

Of course, the bar on rendering "advisory opinions" is even weaker in an Article I court like this Court, where it is only a prudential, not a Constitutional, bar.

APPENDIX A-215

*United States v. SCRAP*, 412 U.S. 669, 686-88 (1973) ("all persons who utilize the scenic resources of the country, and indeed all who breathe its air, could claim harm similar to that alleged by the environmental groups here. But we have already made it clear that standing is not to be denied simply because many people suffer the same injury."); *see also Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 449-50 (1989) ("The fact that other citizens or groups of citizens might make the same complaint after unsuccessfully demanding disclosure under FACA [the Federal Advisory Committee Act] does not lessen appellants' asserted injury, any more than the fact that numerous citizens might request the same information under the Freedom of Information Act entails that those who have been denied access do not possess a sufficient basis to sue."). Petitioner-Appellants here have made their request and been denied; they clearly have standing.

## III. The military judge has the authority to direct public release of judicial records

The military judge in this case has the inherent authority to direct public release of the records at issue here. "Every court has supervisory power over its own records and files." *Nixon v. Warner Communications*, 435 U.S. 589, 598 (1978).[18] The

---

[18]   To answer a question raised during a colloquy with government counsel, Audio at 38:16-38:27, Petitioner-Appellants believe that courts-martial are *both* courts for purposes of the law of

APPENDIX A-216

A.C.C.A. has held that Army courts have inherent authority over their records. *United States v. Chisholm*, 58 M.J. 733, 738 (Army Ct. Crim. App. 2003) ("How a particular military judge 'directs' the completion of a given record is a matter within his or her broad discretion and inherent authority."). Federal courts have frequently relied on their inherent powers over their own records to expunge judicial records, to unseal records even after dismissal or final resolution of an action, or to unseal records of grand juries even outside the parameters of Fed. R. Crim. P. 6(e). *See, e.g., United States v. Flowers*, 389 F.3d 737, 739 (7th Cir. 2004) (describing power over expungement of judicial records, though rejecting claim); *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 142 (2d Cir. 2004) (unsealing after dismissal); *In re Petition to Inspect & Copy Grand Jury Materials*, 735 F.2d 1261, 1267-72 (11th Cir. 1984) (grand jury). Ordering release pursuant to the public's First Amendment rights is equally within the inherent powers of any court, military or federal.

Moreover, the military judge controls access pursuant to R.C.M. 806. As we have consistently argued,[19] R.C.M. 806 should be interpreted in light of U.C.M.J. Article 36 to reach judicial documents. No one doubts that Judge Lind has authority over clo-

---

public access to criminal trials (under the Sixth and the First Amendments and the due process clause) and an executive agency for FOIA purposes (as we noted at argument, Audio at 55:04).

[19]   *See, e.g.*, Pet. Br. at 12-13.

APPENDIX A-217

sure of physical access to the courtroom under R.C.M. 806; in light of the fact that the uniform rule in district court criminal trials mandates public access to judicial documents, she must have authority under that same rule to make the records sought here available to the public. A military judge no more has authority to throw up her hands and disavow any power to enforce the First Amendment rights of the public than she has to disclaim power to enforce the open trial demands of the Sixth Amendment.

The current Army Judiciary Rules of Court (26 March 2012),[20] attached to the appended declaration of undersigned counsel, are fully consistent with the view that the trial judge has custody over the relevant documents. Rule 3 makes clear that the judge should receive copies of motions prior to the pre-trial session at which they are heard, and 3.1 makes clear that the judge receives copies of such motions along with the clerk and opposing counsel. And Rule 28.1 makes it clear that the documents held by the Court Reporter are held subject to the "express permission of the judge"; that is, that the Judge has ultimate control over their disposition. (Even actual *trial* documents must be copied to the judge in advance, Rule 2.1.9, witness lists to the judge and Court Reporter, Rules 2.1.8, 2.2.5, and trial exhibits to the

---

[20]  The 2009 version, in effect for certain earlier pretrial sessions below, is effectively identical in all cited respects. *See* Rules of Practice before Army Courts-Martial (2009), Rules 2.1.6, 2.1.7, 2.25, 3, 3.1, 28.1 (mirroring cited provisions in 2012 version).

APPENDIX A-218

Court Reporter, Rules 2.1.9, 2.2.5, who again holds records subject to control of the judge.)

In fact Judge Lind has asserted control over the documents at issue here to at least this extent: as to the defense briefs, she has ordered that they may be published. So she clearly has already exercised control over whether to allow those documents to be released. The audio recording of each session is turned over to defense counsel, so she has also exercised control over distribution of the verbatim record. Moreover, Respondents complied with this Court's July 24, 2012 order, by publicly producing the transcript of the April 23, 2012 pretrial session.

In her ruling set forth in that transcript, Judge Lind claimed that "under the military justice system, the Court does not call a court-martial into existence, nor is the Court the custodian of exhibits in the case; whether appellate, prosecution, or defense exhibits, which become a part of the record of trial. See for example, [R.C.M.] 503(a) and (c); 601(a); 808 and 1103(b)(1)(a) and (d)(5)." (Tr. at 21.) None of the R.C.M. provisions cited, however, indicate that the trial judge is not a custodian of the records, or that some other party is a custodian, or that the trial court is not empowered to order publication or release of records of the court-marital in furtherance of the

24

APPENDIX A-219

open trial mandate of the First Amendment and R.C.M. 806.[21] In contrast, R.C.M. 801(a) states that "The military judge is the presiding officer in a court-martial," with the discussion note indicating that "[t]he military judge is responsible for ensuring that court-martial proceedings are conducted in a fair and orderly manner"; 801(b)(1) states that she may "promulgate and enforce rules of court"; and 801(f) instructs that her rulings "*shall* be made a part of the record" (emphasis added). All of these are consistent with the notion that the trial judge is empowered, under the First Amendment, Article 36, and R.C.M. 806, to publish the orders, transcripts, and pleadings sought here.

Given that the First Amendment mandates contemporaneous access[22] to judicial documents, *see* Pet. Br. at 15-18; Reply at 3-7,

---

[21]    Most of the provisions Judge Lind cited say nothing to the trial judge's power to make public records of courts-martial. R.C.M. 503(a) merely describes appointment of members, and 503(c) detailing of trial and defense counsel. R.C.M. 601(a) merely states that the charges are referred by the Convening Authority. R.C.M. 1103(d)(5) appears not to exist. Of the cited provisions, that leaves only R.C.M. 1103(b)(1)(A), which states that, post-trial, trial counsel,"[u]nder the direction of the military judge, [shall] cause the record of trial to be prepared,," and R.C.M. 808, which states that "trial counsel ... shall take such action as may be necessary to ensure that a record which will meet the requirements of R.C.M. 1103 can be prepared."

[22]    While it is a trivial point given the overwhelming weight of authority in favor of contemporaneous access from the other circuits, *see* Pet. Br. at 15-18, there is no "split" in the Sixth Circuit, as counsel for the government insisted at oral argument, Audio at 33:45. *See* Reply Br. at 8, 8 n.4. Indeed the best proof of this is that *Beckham* has not since been cited as good law by the Sixth Circuit except in an assortment of situations where the Sixth Circuit has found that no First Amendment right of access

APPENDIX A-220

this Court's third question might usefully be refined to ask whether *any other entity besides the trial judge* has the ability to release documents from a court-martial *during the pendency of* the pre-trial and trial proceedings. The answer is no: The Convening Authority does not have actual custody of the records. Neither does the Convening Authority authenticate the record. *See* R.C.M. 1104(a)(2) ("the military judge present at the end of the proceedings shall authenticate the record of trial" except in emergency cases involving disability or prolonged absence). And there is no specific indication that trial counsel has custody — exclusive or otherwise — of the records *during* the trial. R.C.M. 1103(b)(1)(A), part of the chapter on post-trial procedures, states that trial counsel shall, "[u]nder the direction of the military judge, cause the record of trial to be prepared," but that clearly refers to a post-trial obligation, and says nothing

---

applies, leaving only claims for common-law access of the type analyzed in *Beckham. See Indianapolis Star v. United States*, 2012 U.S. App. LEXIS 18627 (6th Cir. Sep. 5, 2012) (no First Amendment right of access to search warrant proceedings); *Resnick v. Patton*, 258 Fed. Appx. 789 (6th Cir. 2007) (common law right recognized in *Beckham* would not apply to documents not admitted to evidence (dictum)); *Carrelli v. Ginsburg*, 956 F.2d 598 (6th Cir. 1992) (applying common law access to minutes of Ohio State [horse] Racing Commission). These are the only Sixth Circuit cases ever to rely on *Beckham*, with the exception of a case citing it as authority for the constitutionality of bans on televising criminal proceedings, *Conway v. United States*, 852 F.2d 187 (6th Cir. 1988).

APPENDIX A-221

to who retains custody and authority over the documents during the trial.[23]

In her ruling, Judge Lind also stated that "[n]either is the Court the release authority for such documents if requested under FOIA." (Tr. at 21.) But the question of whether the trial judge is empowered to release judicial documents should not be confused with the *separate* question of whether she is also the proper release authority *under FOIA*. As we noted in our Reply, both Judge Lind and the government seem to believe that FOIA is only applicable to records of a court-martial *after the trial is over*:

> The government appears to believe that only after a trial is over can FOIA provide access to the documentary record of trial. *See* Gov't Br. at 10 n.24 ("post-action requests" to JAG, SJA offices are proper means to seek release under Army FOIA regulation AR 25-55). Judge Lind's law review article on public access likewise claims that FOIA production of court-martial records can occur only after a trial is over, at which point the records are turned over from the court-martial to military authorities. *See* Lt. Col. Denise R. Lind, *Media Rights of Access to Proceedings, Information, and Participants in Military Criminal Cases*, 163 Mil. L. Rev. 1, 57 (2000) (finding, based on what may be a misreading of 5 U.S.C. § 551(a)(1)(F), that the records of courts-martial only become "agency" records when they are transferred at the conclusion of trial to the convening authority).
>
> If accurate, this would render FOIA even more problematic as an alternative public access scheme – for the production of documentary records would by def-

---

[23]   R.C.M. 1103(b)(1)(B) mandates that trial counsel shall, as prescribed by regulation, "cause to be retained" the original components of the record — but it clearly means that trial counsel should, after the post-trial assembly of the official record, retain the raw notes and materials from which that record was prepared.

APPENDIX A-222

inition not be contemporaneous with the proceedings, instead only coming after the trial was over.

Reply Br. at 16 n.13. At oral argument, the government stated as follows:

> Judge Stuckey: They can go through FOIA while a court martial's goin' on?

> Capt. Fisher: Absolutely. The Army regulation specifically says that. It says: if you want court-martial documents, here is the office that you direct that request to. And I think the temporal nature of it, your honor, is really... I think the temporal nature... [answer cut off by question from the bench]

Audio at 39:08 to 39:30. The response skirts the question (it only states that the Army regulation specifies *a party to whom* FOIA requests should be directed, without taking a position on *when* the obligation to produce the records begins), and was unfortunately cut off before the key question — when can such a request be made, and at what point in time is the government obligated to act upon it? — was complete. (The government will, hopefully, clarify this in its response to this brief.) What is clear is that the government believes that, notwithstanding FOIA, the trial judge is empowered to release the documents requested here. Audio at 40:22 (Capt. Fisher, responding to question from Judge Cox as to whether FOIA creates any prohibition on trial judge, convening authority or JAG deciding to release documents contem-

28

APPENDIX A-223

poraneously: "I don't think that there is, Your Honor. I think that that could be done.").[24] We agree.

<div align="center">*     *     *</div>

At oral argument, we noted the fact that one of the Petitioners — Kevin Gosztola — requested from the OJAG on August 3d thru FOIA the very order of the trial judge publicly produced to this Court on that same date by the government. The request is included with the supplemental declaration of undersigned counsel attached to this brief. As noted at oral argument, the document has not been produced thru FOIA, nearly three months later. Indeed, the request has not been responded to other than to notify Mr. Gosztola that the request was forwarded from the Office of Judge Advocate General (which the government insisted at argument was the FOIA custodian and the "only entity authorized" to control release of documents via FOIA in this case, Audio at 32:00, 48:01) to the Convening Authority (the Military District of Washington) and OTJAG Criminal Law Division. Whether this reflects a game of hide-the-custodian or whether there is genuine uncertain-

---

[24]   In fairness, *earlier* in the argument the government *seemed* (with considerable hesitation) to take the opposite position: *see* Audio at 37:50 (Capt. Fisher, in response to Chief Judge Baker's question whether FOIA is exclusive means for access to briefs: "I think that's what it says…"); *id*. at 38:02 (in response to Judge Stuckey's question "Does FOIA purport to be exclusive — on its face?": "I'd have to double-check the statute"); *id*. at 38:11 (Judge Stuckey: "It is *a* mechanism." Capt. Fisher: "No, Your Honor, I think it is *the* mechanism.").

<div align="center">29</div>

ty over who has release authority under FOIA, the episode simply illustrates the endemic delays that make FOIA unsuitable to satisfy the error-correcting function of contemporaneous access to judicial documents.

*     *     *

This Court has also asked: "To what extent must appellants first demonstrate that they have made their request to an appropriate records custodian and had such request denied?" As noted above, Petitioner-Appellants have made their request to the appropriate party — the trial judge, who has the power to mandate release (under R.C.M. 806, Article 36, the First Amendment and her inherent powers as a military judge) and who has already exercised that power in making many other decisions about open access in this case. But to some extent the question itself ignores the fact that the First Amendment mandates that the default presumption is one of public access to the documents at issue here. A failure by the trial judge to conform the proceedings to that mandated default position empowers, at a minimum, parties who have been injured by the failure to challenge the defect. Petitioners need not exhaust a process that is inadequate on its face (FOIA) before challenging that ongoing, irreparable harm to their First Amendment interests. (This dispute is obviously ripe for resolution by this Court for all the reasons given above.)

30

## IV. Excluding records of R.C.M. 802 conferences, the records at issue are already in existence

At argument, during discussion of our request for release of transcripts (or their equivalent), Judge Ryan questioned whether Petitioner-Appellants had a right to demand that records be created which did not already exist.[25] That issue is moot here, as

---

[25]   In any given case there are two alternatives: some form of audio recording, notes, or transcripts exist or, no such record exists. If no such record exists, as Judge Stuckey noted at argument, there has been a violation of the verbatim transcript requirement of R.C.M. 1103. If audio files or written notes or transcripts exist, they constitute judicial documents, and all such records that exist are subject to the First Amendment right of access.

We do not suggest that if only audio files exist, transcripts *must* be created. Access to the audio files, while not always ideal, should suffice to meet the demands of the First Amendment, as members of the media or sufficiently interested members of the public could independently contract with private stenographers to produce transcripts from the audio files. *Cf.* R.C.M. 1103(j) (permitting audio or video recording in lieu of "recording by a qualified court reporter," but mandating that transcripts be produced prior to forwarding of record, except in cases of military exigency (in which event it must be prepared before further review)); R.C.M. 1103(b)(2)(B) (2012 version) (striking from prior version the word "written": "the record of trial shall include a verbatim ~~written~~ transcript of all sessions.").

There is authority for the position (advanced by Petitioner-Appellants at oral argument) that a failure to create *any* record of otherwise open court proceedings is constitutionally problematic (that is, that even if there were no R.C.M. 1103, there would be a right to have a tape or other record created), and also for the position that audio *must* be made available *if* transcripts are not available. *See Globe Newspaper Co. v. Pokaski*, 868 F.2d 497, 504-05 (1st Cir. 1989) (Coffin, J.) ("In light of *Richmond Newspapers*, decided two years later, we cannot read [*Nixon v.*] *Warner Communications* as laying down a general rule for all criminal cases that once the substance of testimony and evidence has been exposed to public view, there is no right of access to visual and aural means of preserving it. For such an

complete audio records and some stenographic records do exist for the pretrial sessions at issue here, as the attached declaration of undersigned counsel indicates, at ¶ 2.[26]

(As to the 802 conferences, Petitioner-Appellants *are* demanding that some form of record of the arguments, factual representations, and decisions therein be created for the benefit of the public. Again, as we summarized it at oral argument, we believe that the parties ought not be able to argue substantive issues behind closed doors, and then by consent waive away the public's right to know the substance of the legal arguments made and the factual positions taken.[27] In short, the waiver provision of R.C.M. 802(b) is inconsistent with the First Amendment.)

---

extension arguably would mean that once an open trial is held, a permanent barrier can be erected against inspection of exhibits, audiotapes, videotapes, and any papers to which the public had no 'physical access.' Proceedings that were recorded only on tape — as many are — would be forever insulated from inspectors. Moreover, there would be no opportunity to check whether, in light of a tape, a paper record or transcript had been altered. / We therefore conclude that, after *Richmond Newspapers*, a blanket prohibition on the disclosure of records of closed criminal cases of the types at issue here implicates the First Amendment. This threshold decision does not leave the state helpless. The Commonwealth simply has the burden to demonstrate why more access is not better than less."").

[26]   Rather than clutter the docket by submitting the declaration as a supplemental authority, Petitioner-Appellants have appended it to this brief.

[27]   Again, while we have no reason to suspect specific collusion on the limited record before us, the potential for collusion does exist under the trial court's current practice, and defense and prosecution frequently have a mutual interest in secrecy that diverges from the interest of the public in transparency (and the corresponding interest of the courts in ensuring that proceedings

APPENDIX A-227

**V. Relief**

Finally, to summarize and reiterate our claims for relief (previously set forth at Pet. Br. at 3-4, 27-28, 30, and 37-38), as to our documents claims, this Court should follow the example of the twelve federal circuit courts that hear criminal appeals and clearly instruct the lower courts that the First Amendment applies to judicial documents in courts-martial; that the First Amendment demands a default presumption of public release of judicial documents, contemporaneous with the proceedings to which the documents are relevant; and that prior to any closure, the trial court must give the public notice and opportunity to respond, and apply strict scrutiny, justifying any restrictions on access with item-by-item, specific findings of necessity after ensuring itself that no less-restrictive alternatives exist that would adequately serve the compelling interest justifying closure. Finally, the record created must be sufficient to permit subsequent appellate review.

---

are subjected to public scrutiny to ensure their accuracy). This was recognized by the four dissenting Justices of the Supreme Court in *Gannett v. DePascuale*, 443 U.S. 368, 418-33 (1978) (Brennan, J., dissenting) (suggesting Due Process clause forbids defendant from seeking a closed trial). This divergence between the defendant's interests (protected by the Sixth Amendment) and the public interest led to the creation of the First Amendment right recognized in the *Richmond Newspapers* line of cases, several of which involved charges of sexual abuse of minors that both prosecutors and defendants shared an interest in shielding from public view.

APPENDIX A-228

The practical and logistical details of access to the records sought here may be left to be worked out before the trial court in the first instance: we have every reason to believe Judge Lind will be receptive to these claims once this Court makes clear the First Amendment applies here, the costs of electronic publication should be trivial (and we have no reason to expect the media will be unwilling to collectively assume whatever costs comport with ordinary practice in federal court), and, as the government noted at oral argument, there is "absolutely nothing" wrong with allowing public access to much of the material requested here, Audio at 49:42 (subject, of course, to limitations of access to sensitive materials consistent with strict scrutiny that can be worked out before the trial court consistent with the procedures set forth in the preceding paragraph).

As to the R.C.M. 802 issue, as we noted in our Reply at page 26, "it is sufficient at this point for this Court to order that the trial court ensure that its past and future R.C.M. 802 practices conform to First Amendment principles ... leaving specific implementation of the remedy to the trial court in the first instance." In so doing, we believe it would be beneficial for this Court to specifically note that the waiver provision of R.C.M. 802(b) is inconsistent with the First Amendment (to the extent it allows the parties to waive rights that also belong to the general public). Moreover, in order to facilitate a review by peti-

34

tioners and the rest of the public as to whether the requirement for an adequate public summary of past 802 conferences was complied with, it would be beneficial for this Court to specify that the trial court should arrange for the speedy public release of audio files of the public pretrial proceedings and whatever transcripts (uncorrected or otherwise) such as exist.

The sky will not fall if this Court mandates this relief. In fact, quite the opposite is likely to result: an enhancement of public confidence in the military justice system which, as always with high profile criminal trials, will to some extent be on trial itself in the *Manning* proceedings.

<div align="center">

**CONCLUSION**

</div>

For the reasons stated above, this Court should grant the relief Petitioner-Appellants seek.

Date: Ann Arbor, Michigan
      22 October 2012

                          Respectfully submitted,

                          _____/s/sdk_____
                          Shayana D. Kadidal
                          [C.A.A.F. Bar No. 35713]
                          J. Wells Dixon
                          Baher Azmy, Legal Director
                          Michael Ratner, President Emeritus
                          CENTER FOR CONSTITUTIONAL RIGHTS
                          666 Broadway, 7th Floor
                          New York, New York 10012
                          Tel: (646) 498-8498
                          Fax: (212) 614-6499

                          Jonathan Hafetz
                          169 Hicks Street

APPENDIX A-230

Brooklyn, NY 11201
Tel: (917) 355-6896

*Counsel for Petitioner-Appellants* [28]

---

[28] Counsel gratefully acknowledge the contributions of former interns and current law students Madeline Porta and Carey Shenkman to this supplemental brief.

36

APPENDIX A-231

## <u>Certificate of Service</u>

I hereby certify on this 22d day of October, 2012, I caused the foregoing Post-Argument Supplemental Brief to be filed with the Court and served on Respondents and Amici electronically via email (per this Court's Electronic Filing Order of 22 July 2010), and to be served on the trial and appellate courts below via mail, at the following addresses and facsimile numbers, re-spectively:

> Clerk of the Court
> U.S. Court of Appeals for the Armed Forces
> 450 E Street, NW
> Washington, DC 20442-0001
> Tel: (202) 761-1448
> efiling@armfor.uscourts.gov
>
> - and -
>
> U.S. Army Court of Criminal Appeals
> Office of the Clerk of Court
> 9275 Gunston Road
> Fort Belvoir, VA  22060-5546
>
> - and -
>
> Chief Judge Col. Denise Lind
> U.S. Army Trial Judiciary, 1st Judicial Cir.
> U.S. Army Military District of Washington
> Office of the Staff Judge Advocate
> 103 Third Ave., SW, Ste 100.
> Ft. McNair, DC 20319
>
> - and -
>
> David E. Coombs (counsel for Pfc. Manning)
> Law Office of David E. Coombs
> 11 South Angell Street, #317
> Providence, RI  02906
> Tel: (508) 689-4616

APPENDIX A-232

```
(COURTESY COPY)

- and -

Capt. Judge Advocate Chad M. Fisher
Appellate Government Counsel
Office of the Judge Advocate General
U.S. Army Legal Services Agency
9275 Gunston Rd.
Ft. Belvoir, VA 22060
Tel: (703) 693-0783
chad.m.fisher.mil@mail.mil

- and -

Gregg P. Leslie
Robert Tricchinelli[29]
The Reporters Committee for
Freedom of the Press
1101 Wilson Blvd., Suite 1100
Arlington, VA 22209-2100
gleslie@rcfp.org
Tel: (703) 807-2100
```

                                  _____/s/sdk_____
                                  Shayana Kadidal

---

[29]    Previous amici counsel, Ms. Kristen Rasmussen, has recently
left Reporters' Committee.

APPENDIX A-233

## SUPPLEMENTAL DECLARATION OF SHAYANA KADIDAL

I, Shayana Kadidal, hereby declare as follows:

1.      I am an attorney with the Center for Constitutional Rights and, along with others, represent the petitioners in this case, *Center for Constitutional Rights et al. v. United States et al.*, USCA Misc. Dkt. No. 12-8027/AR. I make this supplemental declaration in connection with the Post-Argument Supplemental Brief of Petitioner-Appellants' in support of their application for a writ of mandamus.

2.      After the oral argument in this case on October 10, I corresponded with David Coombs, counsel for the defense in the proceedings below. Mr. Coombs informs me that all the courtroom proceedings (excluding, of course, the R.C.M. 802 Conferences) are being recorded on audio. At the end of each session, Mr. Coombs receives a CD with the audio file(s) from the proceedings. Under the trial court's direction, Mr. Coombs is only permitted to use the CD as support for his motions. On occasions, in addition to the audio recording, he reports that there is a court reporter present, who uses either a Dictaphone or stenography to record the proceedings. On those occasions, however, as always, the proceedings are also audio recorded.

3.      As described at oral argument (Audio at 59:00), one of the Petitioner-Appellants here, journalist Kevin Gosztola, requested from the OJAG on August 3d thru FOIA the order of the trial judge publicly produced to this Court on that same date by the government. The request is attached hereto. The document has not been produced thru FOIA, some two months later, despite the fact that it has been released to the public through the proceedings before this Court. Indeed, the request has not been responded to, other than to notify Mr. Gosztola that his request was forwarded from the Office of Judge Advocate General (which the government insisted at argument was the FOIA custodian and the "only entity authorized" to control release of docu-

<center>1</center>

ments in this case, Audio at 32:00, 48:01) to the Convening Authority (the Military District of Washington) and OTJAG Criminal Law Division. *See* https://www.muckrock.com/foi/united-states-of-america-10/request-for-april-24-bradley-manning-decision-1646/ (attached).

4.     Also attached hereto is the current version of the Army Judiciary Rules of Court (26 March 2012), cited in our brief.

5.     Finally, at oral argument, Judge Cox stated that if a member of the public wanted to access the court-martial records of the William Calley (My Lai) case, that request would have to go to military authorities under FOIA (Audio at 56:16). As it turns out, the full records of the Calley court-martial and the various appeals therefrom (including to President Nixon) are freely available to the public at the National Archives repository located at College Park, Maryland. *See* http://research.archives.gov/description/562118.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 22d day of October, 2012.


_____/s/sdk_____
Shayana Kadidal

APPENDIX A-235

Monday, October 22, 2012

- Log in
- Register

# MuckRock / FOI

- News
- Submit Request
- FOI Requests
- Account
- About
- Blog

- All Requests

# FOI Request

## Request for April 24 Bradley Manning Decision

Requested by KevinGosztola on Aug. 3, 2012 for the Office of the Judge Advocate General of United States of America

Status: Awaiting Response, past due by 1 month, 3 weeks

Tags: bradley manning, military, military justice, wikileaks

**From FireDogLake.com on Aug. 3, 2012:**
FOIA REQUEST
Expedited processing requested

Dear FOIA Officer:

Pursuant to the federal Freedom of Information Act, 5 USC § 552, I request access to and copies of an April

APPENDIX A-236

24 decision and/or ruling issued by Judge Army Col. Denise Lind in the court martial proceedings for PFC. Bradley Manning. This decision directly addressed a motion for access to decisions, rulings, orders or any transcripts in the court martial of Manning. Lind denied an attorney with the Center for Constitutional Rights (CCR) the opportunity to address the court. She read the decision on this motion in front of the public and credentialed media. Therefore, it should have no information in the decision or ruling that would be considered classified or necessary to withhold from the public. The contents could also not be said to violate the privacy of Manning if disclosed to the public because all the material was read while credentialed media and the public were present.

I would like to receive the information in the following format: electronic.

As a representative of the news media I am only required to pay for the direct cost of duplication after the first 100 pages. Through this request, I am gathering information on the court martial proceedings against PFC. Bradley Manning that is of current interest to the public because the government alleges he is responsible for possibly the largest security breach in American history.

I have a right to access records in the court martial of Manning but thus far have been denied. I am a plaintiff who, as of August 2, has signed on to a lawsuit filed by CCR that is before the United States Court of Appeals of the Armed Forces (CAAF) and seeks to force the judge to grant the press and public access to court martial records. It has been suggested that the Freedom of Information Act (FOIA) is available to journalists like myself and, as members of the press, we should use it if we want to gain access. That is a patently absurd argument for the government to make. I do not believe the government has any intention of filling any FOIA requests before Manning's court martial is over, which is why I have signed on to the lawsuit that is before CAAF.

Since the government insists the press has FOIA available as some kind of substitute for access to court martial records, the Judge Advocate General's Office should at least be able to release the judge's decision that lays out why the press and public should have no access to records. Furthermore, the government has informed attorneys with CCR that they plan to make the judge's decision or ruling on the motion a matter of public record on August 10, 2012. If the Judge Advocate General's Office does not release a copy of the judge's decision or ruling on this April 24 motion for access, it will be showing just how spectacularly ridiculous the government's position is in defending secrecy in the court martial of Manning.

This information is being sought on behalf of Firedoglake for dissemination to the general public. Over 8,500 people have shown interest in the disclosure of this decision by signing on to the request.

Please waive any applicable fees. Release of the information is in the public interest because it will contribute significantly to public understanding of government operations and activities.

If my request is denied in whole or part, I ask that you justify all deletions by reference to specific exemptions of the act. I will also expect you to release all segregable portions of otherwise exempt material. I, of course, reserve the right to appeal your decision to withhold any information or to deny a waiver of fees.

As I am making this request as a journalist and this information is of timely value, I would appreciate your communicating with me by email, rather than by mail, if you have questions regarding this request. My email is [redacted].

I am requesting expedited processing of this request Pursuant to 5 U.S.C section 552(a)(6)(E) based on

APPENDIX A-237

compelling need and "urgency to inform the public concerning actual or alleged Federal Government activity." I certify, as required by regulation, that the compelling need for expedited processing is true and correct to the best of my knowledge and belief. This request is central to the transparency that is required for there to be an accurate recounting of the activities of the United States government in regard to the transparency of court martial proceedings currently taking place in the case of Pfc. Bradley Manning, currently on trial for his life. The prompt release of information as a means of informing the public about this case is crucial.

I look forward to your reply within 20 business days, as the statute requires.

Thank you for your assistance.

Sincerely,

Kevin Gosztola

Co-Filed with the following individuals:

(Paul) Spencer Dawkins

a logan

a harper

A Longley

A Goodman

A Lynn Raiser

A. Waldschmidt

A. Dragun

A. Raclare Kanal

A.B. Kovats

"A.K., Anka & Chloe" Jhangiani

Aaron Todd

Aaron Kunkle

aaron urbanski

Aaron Walters

Aaron Molloy

Aaron Ucko

APPENDIX A-238

Aaron Dailey

Aaron Gayken

Click here to show all co-filers

**From Kevin Gosztola to Office of the Judge Advocate General on Aug. 29, 2012:**

Hi,

I wanted to follow up on the following public records request. No acknowledgement letter has been received yet.

Thanks for your assistance.

**From Patoir, Maanvi M CIV (US) to Kevin Gosztola on Aug. 29, 2012:**

Classification: UNCLASSIFIED
Caveats: NONE

Mr. Gosztola,

Our office does not have record of having received this FOIA request. Do you know to whom it was originally sent? It is not within our purview to maintain documents related to criminal trials. We will refer this request to the Office of the Judge Advocate General, Criminal Law Division and to Office of the Staff Judge Advocate for the Military District of Washington for their direct response to you.

v/r,
Maanvi

**From MuckRock to Office of the Judge Advocate General on Aug. 29, 2012:**

Thanks for your help. This request was originally mailed to:

Office of the Judge Advocate General
ATTN: DAJA-AL
2200 ARMY PENTAGON, RM 1E739
WASHINGTON, DC 20310-2200

Any help you can provide in helping get it to the correct office for processing is appreciated.

**From Thomas, Lisa CIV (US) to Kevin Gosztola on Sept. 11, 2012:**

Classification: UNCLASSIFIED
Caveats: NONE

APPENDIX A-239

Case 1:13-cv-01504-ELH   Document 2-2   Filed 05/22/13   Page 243 of 357

Sir,

Your FOIA request was referred to the OTJAG Criminal Law Division. The
contact information for OTJAG Criminal Law Division is below:

Mr. Allan Pfautsch
Paralegal Specialist
Office of The Judge Advocate General
Criminal Law Division
2200 Army Pentagon
Washington, DC 20310
[redacted]@mail.mil

Please contact Mr. Pfautsch directly regarding the status of your case.
Thank you.

***************************

Your request was also referred to the Military District of Washington. The
contact information is below:

Deputy Chief of Staff for Personnel
Military District of Washington
ATTN: Toni Jelks
103 Third Avenue, SW
Washington, DC 20319
[redacted]@us.army.mil

Please contact Ms. Jelks directly regarding the status of your case. Thank
you.

v/r,


**From MuckRock.com to Office of the Judge Advocate General on Oct. 11, 2012:**

To Whom It May Concern:

I wanted to follow up on the following Freedom of Information request, copied below, and originally submitted
on Aug. 3, 2012. Please let me know when I can expect to receive a response, or if further clarification is
needed.

Thank you for your help.

APPENDIX A-240

# Newsletter

Want to be notified about interesting government documents like this one? Sign up for our mailing list. We only send it out when we have something interesting to say, and we'll never sell or spam your address. You can unsubscribe easily any time you want.

**Email Address**

Subscribe

Add a comment...

Comment

Posting as Shayana Kadidal (Not you?)

☑ Post to Facebook

Facebook social plugin

About MuckRock

We make tools to keep our government transparent and accountable.

Follow Us

- Latest News
- Recently Submitted Requests
- Recently Completed Requests
- @MuckRockNews
- Like Us

Want to Learn More?

Read our blog and join our mailing list.

Get in Touch

Email: info@muckrock.com

© 2012 MuckRock → Home |Blog

APPENDIX A-241



# Rules
# Of Practice Before
# Army Courts-Martial

26 March 2012

APPENDIX A-242

**UNITED STATES ARMY TRIAL JUDICIARY**

**RULES OF PRACTICE BEFORE ARMY COURTS-MARTIAL**

## PREAMBLE

These Rules of Practice before Army Courts-Martial (Rules of Court) supplement the Rules for Courts-Martial (RCM) and, together with the RCM, govern trials by courts-martial presided over by judges assigned to or affiliated with the United States Army Trial Judiciary.  These Rules of Court are applicable to all cases tried in and all counsel practicing before Army courts-martial, including accused who choose to proceed *pro se* pursuant to RCM 506(d).  They are effective upon approval by the Chief Trial Judge and supersede all rules previously published as Rules of Practice Before Army Courts-Martial.  A copy of these rules will be maintained by each military judge, by each military trial and defense counsel and court reporter, and in every Army courtroom.  Detailed defense counsel will provide a copy of these rules to civilian counsel and/or individual military counsel immediately after such counsel is retained or made available.

Adherence to these rules will promote an orderly, expeditious, and just disposition of court-martial cases, and provide for more efficient application of judicial and legal resources.  Counsel, as officers of the court, are ethically obligated and expected to be familiar with and follow these rules, as well as Army Regulation 27-26, *Rules of Professional Conduct for Lawyers* (RPCL), and current American Bar Association Standards for Criminal Justice, to the extent that the latter apply at courts-martial.

These rules are but a means to the orderly administration of justice and are promulgated under RCM 108 and 801(b), and Chapter 7, Army Regulation 27-10.  Counsel will adhere to these rules; however, noncompliance does not give rise to any rights or remedies for an accused and the rules will be interpreted and applied in that light.  Counsel may be required to explain the failure to comply with these rules and the military judge is empowered to take appropriate action pursuant to applicable law and regulation.  (*See* Rules 3.3 and 3.4, RPCL.  *See also* RCM 109 regarding suspension of counsel from practice in courts-martial and RCM 809 regarding contempt procedures pursuant to Article 48, UCMJ.)  A trial judge may modify, amend, revoke, or set aside any rule contained herein only with the approval of the Chief Trial Judge.


*Michael J. Hargis*

MICHAEL J. HARGIS
COL, JA
Chief Trial Judge

**Table of Contents**

**SECTION I.  Docketing Procedures and Continuances** ................................................................ 1

   RULE 1:  Docketing ..................................................................................................................... 1

**SECTION II.  Pretrial Practice and Notice Requirements** ........................................................ 2

   RULE 2:  Counsel Requirements ............................................................................................... 2

   RULE 3:  Motions Practice ......................................................................................................... 4

   RULE 4:  Pretrial Sessions ......................................................................................................... 5

**SECTION III.  Decorum and Conduct** ........................................................................................ 5

   RULE 5:  Punctuality ................................................................................................................... 5

   RULE 6:  Decorum ...................................................................................................................... 5

   RULE 7:  Addressing the Judge ................................................................................................. 6

   RULE 8:  *Ex Parte* Communications ......................................................................................... 6

   RULE 9:  Uniform Requirements ............................................................................................... 6

   RULE 10:  Spectators ................................................................................................................. 7

**SECTION IV.  Trial Procedure** .................................................................................................... 7

   RULE 11:  Pleas .......................................................................................................................... 7

   RULE 12:  Stipulations ............................................................................................................... 7

   RULE 13:  Voir Dire .................................................................................................................... 8

   RULE 14:  Opening Statements ................................................................................................ 8

   RULE 15:  Exhibits ...................................................................................................................... 8

   RULE 16:  Witnesses ................................................................................................................ 10

   RULE 17:  Conduct of Counsel ................................................................................................ 10

   RULE 18:  Court Reporter ........................................................................................................ 11

   RULE 19:  Objections ............................................................................................................... 11

   RULE 20:  Closing Arguments ................................................................................................. 11

   RULE 21:  Instructions ............................................................................................................. 12

   RULE 22:  Findings and Sentencing Worksheets .................................................................. 12

   RULE 23:  Presentation of the Accused ................................................................................. 12

   RULE 24:  Trial Procedure Guide ............................................................................................ 12

   RULE 25:  Restraint of the Accused and Witnesses .............................................................. 12

   RULE 26:  Withdrawal by Counsel .......................................................................................... 12

i

**SECTION V.  Post-Trial Matters** ............................................................................................. **13**

RULE 27:  Post-trial and Appellate Rights ......................................................................... 13

RULE 28:  Records of Trial ................................................................................................. 13

**SECTION VI.  Supporting Trial Personnel** ............................................................................ **14**

RULE 29:  Bailiff ................................................................................................................. 14

RULE 30:  Guards .............................................................................................................. 14

RULE 31:  Courtroom Security .......................................................................................... 14

**SECTION VII.  Effective Date** ................................................................................................. **14**

RULE 32:  Effective Date ................................................................................................... 14

**APPENDIX A  Sample Docket Notification** ........................................................................... **16**

**APPENDIX B  Sample Docketing Order** ................................................................................ **19**

**APPENDIX C  Motion and Response Format** ......................................................................... **21**

**APPENDIX D  Bailiff's Duties** ................................................................................................ **23**

**APPENDIX E  Court Member Questionnaire** .......................................................................... **25**

**APPENDIX F  Witness Identification Form** ............................................................................ **27**

**APPENDIX G  Authentication of the Record of Trial** ............................................................ **28**

**INDEX** .................................................................................................................................... **29**

ii

APPENDIX A-245

## RULES OF COURT

**Section I.  Docketing Procedures and Continuances.**

**RULE 1:  Docketing.**  The military judge (judge) responsible for a case will establish docketing and calendar management for that case to ensure compliance with these rules.  Each judge, or the judge's clerk of court (clerk) (unless that judge is co-located with the Chief Circuit Judge) will maintain a current master docket on the Army Courts-Martial Internet Docket (ACMID) posted on the Army Trial Judiciary homepage ([www.jagcnet.army.mil/usatj](www.jagcnet.army.mil/usatj)) and update it at least weekly.

    **RULE 1.1:  Procedures.**  In addition to the RCM 308 requirement for commanders to immediately inform the accused of preferred charges, trial counsel will deliver, or cause to be delivered, a copy of preferred charges to the appropriate Trial Defense Service (TDS) field office at the earliest possible date so that military defense counsel can be appointed and begin case preparation.  Absent extraordinary circumstances, within 24 hours of referral, the trial counsel will cause the charges to be served on the accused and defense counsel and simultaneously provide a copy of the charge sheet(s), all applicable convening order(s), and a complete copy of the accused's Enlisted or Officer Record Brief to the judge or, at the judge's discretion, his/her clerk.  The charge sheet must indicate the date on which the charges were served on the accused, IAW RCM 602.  If such service has not been completed within 24 hours of referral, upon completion of such service the trial counsel will immediately provide the judge with another copy of the charge sheet(s) showing such service.  Additionally, the trial counsel will ensure the copy of the accused's Enlisted or Officer Record Brief provided to the judge contains the following correct and complete information:

- The accused's date of birth
- The accused's MOS or Branch Code
- The accused's marital status
- The accused's GT score
- The accused's Basic Active Service Date
- The accused's sex / redcat
- The accused's complete civilian education

(If accused's Enlisted or Officer Record Brief is incomplete, the trial counsel shall provide this information to the judge by separate memorandum.)  These documents may be provided in hardcopy or by e-mail.  Also within 24 hours of referral, the the trial counsel will initiate an Electronic Docket Request (EDR) (Appendix A) and send it to the detailed defense counsel, who will complete Section B and, within three duty days of receipt from the trial counsel, return it to the trial counsel, who will complete Section C and forward it to the judge within one duty day of receipt from the defense counsel.  The EDR must contain specific, factual support for all requested dates.  The trial counsel must inform the judge in the docketing request if the accused is in pretrial confinement.  Normally within one duty day of receipt of the completed EDR, the judge will set an arraignment and/or trial date, if the judge has not already set such dates.  The judge will ordinarily, within 20 days of service of charges and consistent with Chapter 5, AR 27-10, set a trial date.  Any period of delay from the judge's receipt of the referred charges until arraignment is considered pretrial delay approved by the judge per RCM 707(c), unless the judge specifies to the contrary.  If counsel are unavailable to proceed on the scheduled date, they must move for a continuance (see Rule 1.2 below).  The judge may use a pretrial order (PTO) to direct dates for compliance regarding discovery and notice.  See Appendix B for a sample PTO.

    **RULE 1.2:  Continuances.**  Motions for a continuance will be in writing unless made verbally on the record.  Counsel will promptly send the motion to opposing counsel and the judge and may use email. The motion shall include: (1) a statement of the specific facts supporting the requested delay; and (2) a statement of the duration of the delay.  Unless a different time is set by the judge, opposing counsel will indicate in writing his/her position regarding the delay within 48 hours of receipt of the motion. The judge may act on the motion without an Art. 39(a) session or RCM 802 conference.  The judge has sole

1

responsibility to set or change trial dates; only the judge may grant a continuance.  Requests for continuance are not granted until affirmatively acted upon by the judge.

**RULE 1.3:  Duty Days.**  For purposes of these rules, a "duty day" is Monday through Friday, unless formally designated as a federal holiday or training holiday approved by the appropriate GCMCA-level senior operational commander.  Unless otherwise prescribed by appropriate authority, a "duty day" does not include Saturday and Sunday.  In deployed areas, a "duty day" is determined by the GCMCA-level senior operational commander.

**Section II.  Pretrial Practice and Notice Requirements.**

**RULE 2:  Counsel Requirements.**

**RULE 2.1:  Trial counsel requirements.**

**RULE 2.1.1:  Pretrial agreement.**  When the Convening Authority accepts an accused's offer to plead guilty pursuant to a pretrial agreement, the trial counsel will immediately provide a signed copy of the offer portion only to the judge, at least two duty days prior to trial.  If the pretrial agreement includes a signed stipulation of fact, it must also be provided to the judge (including all enclosures) with the offer portion of the pretrial agreement.  Otherwise, stipulations of fact must be provided to the judge immediately after signature by all parties, but at least two duty days prior to trial.

**RULE 2.1.2:  Notice of Pretrial Agreements, Alternate Disposition and Not Going Forward.**  After referral, the trial counsel will immediately notify the judge and defense counsel if an alternate disposition of the charges is likely.  To facilitate docket management and trial preparation after referral of charges, trial and defense counsel will notify the judge immediately when an offer to plead guilty or a request for discharge/resignation in lieu of court-martial has been submitted.  Additionally, trial counsel will notify the judge when the offer to plead guilty or request for discharge/resignation will be presented to the GCMCA for decision and whether the SJA is supporting the request.  Immediately when such a decision is made but at least two duty days prior to trial, trial counsel will notify the judge and defense counsel of any charges or specifications upon which the Government will not present evidence.

**RULE 2.1.3:  Witnesses.**  Trial counsel is responsible for notifying all requested witnesses of the time, place, and uniform for the trial.  Witnesses will be instructed to be present at a time so that the court will not have to recess awaiting their presence; however, the court will cooperate with witnesses whose absence from duty or job is especially disruptive or who provide essential services or missions to the extent that a fair, orderly, and expeditious trial is not sacrificed.  Counsel will notify the judge when such witnesses are to be called so that appropriate coordination can be accomplished.  Requests for delay to obtain or await arrival of witnesses normally will not be favorably considered in the absence of prior coordination with the judge.  The timing of witnesses is crucial to the orderly presentation of a case. Unless otherwise ordered by the judge, before beginning their case in chief, counsel will provide the bailiff with a list of witnesses, in the order to be called, so the bailiff can have witnesses standing by to present their testimony.

**RULE 2.1.4:  Court members.**  Trial counsel is responsible for notifying the members of the time, place, and uniform for the trial.  Members will not be informed of the projected pleas or any other information about the court-martial, to include the accused's name or the nature of the charges.  Trial counsel is responsible for confirming that each panel member has personally acknowledged the notification.

**RULE 2.1.5:  RCM 802 Sessions.**  Unless a different time is set by the judge, trial and defense counsel will arrive at the judge's chambers for an RCM 802 session fifteen (15) minutes in advance of the time set for any proceedings on the record.  Should the judge publish standard questions

2

for discussion during this RCM 802 session, trial and defense counsel must be prepared with answers to those standard questions.

**RULE 2.1.6:  Article 39(a) Sessions**.  Trial and defense counsel will discuss what matters, if any, need to be addressed at an Art. 39(a) session immediately before trial begins, and its likely duration. Trial and defense counsel should request an Art. 39(a) session for an earlier date if it is anticipated that substantial time will be required to resolve the matters, so as not to have the members standing by unnecessarily.  The judge will decide whether such matters will be resolved on the day of trial or on a day prior to trial.  If such matters will be resolved on the trial date, trial and defense counsel will consult the judge so the Art. 39(a) session can begin as early as possible on that date.  Trial counsel will consult  the judge for a decision as to the time court members should be present and ready to proceed so as to avoid needless waiting by court members and others.  Reporting times for court members will be scheduled to minimize waiting times for members; unless otherwise indicated by the judge, that time will be the time listed on the docket for the members to be called.  With the judge's approval, members may be placed on call if a lengthy Art. 39(a) session is expected or when the judge otherwise deems it appropriate.

**RULE 2.1.7:  Section III Disclosures.**  Unless otherwise ordered by the judge, prior to arraignment or not later than two duty days after the trial date is set if arraignment is the day of trial, the government will disclose to the defense that information required to be disclosed under MRE Section III.

**RULE 2.1.8:  Witness lists.**  Unless otherwise ordered by the judge, no later than seven duty days prior to trial, the trial counsel will provide the judge, opposing counsel and court reporter a written list containing each witness' full name (correctly spelled), and unit/duty station or city and state of residence (as applicable) for each witness to be called, indicating whether the witness will be called during the merits and/or during the sentencing phases of trial.  Unless otherwise ordered by the judge, no later than seven duty days prior to any scheduled Art. 39(a) session to resolve pretrial motions, the trial counsel will provide the judge, opposing counsel, and court reporter a written list containing each witness' full name (correctly spelled), and unit/duty station or residence (as applicable) for each witness to be called during the Art. 39(a) session.  These lists should ordinarily be typed or computer generated, but must always be legible.

**RULE 2.1.9:  Trial documents.**  No later than two duty days before trial, the trial counsel will provide the judge and defense counsel the following documents, as applicable, by hardcopy or e-mail:  all amending court-martial convening orders; and, in trials with members, a seating chart, flyer, and draft findings and sentence worksheets (*see* Rule 22).  The judge may also require copies of proposed voir dire questions in writing and completed court member questionnaires.  No later than one duty day before trial on the merits, trial counsel will provide to the detailed court reporter for marking all exhibits which may be used during the merits or sentencing phase of the trial (*see* Rule 15).

**RULE 2.1.10:  Court Reporters.**  Trial counsel is responsible for notifying the detailed court reporter of the date/time, or changed date/time, of any Art. 39(a) sessions and trial.  Trial counsel will ensure the court reporter is sworn.

**RULE 2.2:  Defense counsel requirements.**

**RULE 2.2.1:  General.**  Unless the judge sets a different deadline, defense counsel will notify the trial counsel and judge, in writing, at least ten duty days before an Art. 39(a) session to resolve motions or the date of trial (whichever is earlier), of the forum and pleas and will file all motions.  This is a minimum notice requirement.  Defense counsel will, whenever possible, provide such notice and file all motions as far in advance as possible to ensure the orderly administration of justice.  If the plea or forum changes after notification, defense counsel will immediately inform the judge and trial counsel of the change.

**RULE 2.2.2:  Pleas.**  If the accused intends any plea other than "to the specification(s) of (the) (all) charge(s), (guilty) (not guilty)", the defense counsel will specify in the notice in 2.2.1, above, the actual pleas to be entered, unless such pleas were provided to the judge previously in the offer portion of a

pretrial agreement.  If the pleas will be to a named lesser included offense, defense counsel will also provide a copy of the re-written specification which accurately represents the plea, which will be attached to the record of trial as an appellate exhibit.

RULE 2.2.3:  Evidence and discovery issues.  Defense counsel will notify trial counsel of any witnesses or evidence the defense wants the Government to produce.  Such requests will comply with applicable RCMs and orders.  Unless the judge sets a different deadline, absent extraordinary circumstances, such requests will be made not less than ten duty days prior to the scheduled Art. 39(a) session and/or the trial date for all witnesses, whether local, active-duty military or other witnesses.  (Earlier notice may be required for some witnesses, *e.g.*, laboratory experts, chain-of-custody witnesses or out-of-country witnesses.)  Further, it is not unreasonable to require an accused to exercise his or her rights under the Compulsory Process and Confrontation Clauses of the Sixth Amendment in advance of trial, and to be compelled to announce his or her intent to call certain witnesses.  Therefore, the judge may require the Government to provide notice to the accused of its intent to use an analyst's report as evidence at trial, after which the accused may be given a reasonable period of time in which he or she may object to admission of the evidence absent the analyst's live appearance at trial.  *See Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527 (2009).  When the prosecution denies production of defense-requested witnesses or evidence, such denials will be furnished to the defense counsel in writing and reasons for the denial will be stated.  If the defense still desires the witness or evidence, the defense counsel will immediately file a motion for appropriate relief, in the form of a motion to compel, with the judge, serving a copy on the trial counsel.  If the defense counsel undertakes to obtain a witness on his or her own and such witness does not appear, absent extraordinary circumstances, a continuance will not normally be granted to obtain the presence of such witness.  Counsel for both sides are required to bring any discovery problem immediately to the judge's attention.

RULE 2.2.4:  Notice of certain defenses.  Unless the judge sets a different deadline, defense counsel will notify the trial counsel in writing at least ten duty days before the scheduled Art. 39(a) session and/or the trial date (whichever is earlier) of the intent to offer the defense of alibi, innocent ingestion, or lack of mental responsibility, or the intent to introduce expert testimony as to the accused's mental condition, and of all other notices required by RCM 701(b)(2).

RULE 2.2.5:  Witness lists and marking of exhibits.  Same requirement as in Rule 2.1.8 above. The accused need not be listed as a witness in this notice requirement.  Defense counsel will comply with the requirement to provide exhibits to the court reporter for marking as in Rule 2.1.9 above.

RULE 3:  Motions practice.  Absent unusual circumstances, such as a particularly complex case, counsel should be prepared to dispose of all motions at one preliminary session.  This requires counsel to conduct all reasonable investigation to identify and perfect motions in advance of that one preliminary session.  Requests to file motions beyond the deadline set by the judge from counsel who do not comply with this requirement may not be favorably considered.  Motions will consist of a written pleadings containing:  (1) the relief sought; (2) the burden of persuasion and burden of proof; (3) the facts in issue as believed by counsel and supported by the evidence; (4) a list of evidence and witnesses to be produced; (5) argument and the legal authority upon which the argument is based and contrary legal authority of which counsel is aware; and (6) a conclusion that restates the relief sought.  A format for motions is at Appendix C.  Unless the judge directs otherwise, both parties will submit all motions in this format.  The motion will also state whether the moving party desires to present evidence or oral argument, or both, on the motion.  Unless the judge sets a different schedule, the nonmoving party, if opposing the motion, will file a response with opposing counsel and the judge within three duty days after the motion is received or two duty days before any scheduled hearing on the motion, whichever is earlier.  The response should follow the format for motions and must include that party's desire whether to present evidence or oral argument, or both, on the motion.  The judge may consider failure to file a timely reponse as conceding the merits of the motion.  If neither party desires a hearing and the motion does not involve disputed issues of fact, the judge may rule on the basis of the matters filed.  Motions requiring findings of fact must be supported by evidence presented by the parties or by a written stipulation of fact.

4

**RULE 3.1:  Filing of Motions.**  Motions are considered filed with the court when the moving party has provided the signed original, including any enclosures, to the clerk (in person or by confirmed email), as well as a copy, including all enclosures, (also in person or by  confirmed email), to both opposing counsel and the judge.  Motions sent by mail, courier or other carrier are not considered filed until physically received.  In extraordinary circumstances, the judge may allow filing to consist of a copy, including all enclosures, to the clerk, opposing counsel and to the judge and may authorize providing the original motion, including any enclosures, to the court reporter before the motions hearing.  Should a motion submitted to the the judge be altered or amended in any way from the motion provided to the clerk, the heading of the motion must identify it as a "corrected copy" and reflect the date of correction.  The corrected copy of the motion is considered filed under the same circumstances as above.

**RULE 3.2:  Speedy trial motions.**  Speedy trial motions will contain a stipulated chronology of dates and events to which the parties agree and, if needed, a separate chronology from each party for those dates and events as to which there is no agreement.

**RULE 3.3:  Stipulations in motions hearings.**  If a motion or objection does not involve a factual dispute, counsel will, to the extent possible, endeavor to enter into a written stipulation of fact or expected testimony concerning undisputed matters for the limited purpose of obtaining a ruling on a motion or objection.

**RULE 3.4:  Counsel Certification.**  Every motion, pleading, or other document submitted to the court by a party will be signed by at least one counsel of record.  Counsel's signature constitutes a certification that he or she has read the motion, pleading, or other document; that, to the best of the signer's knowledge, or upon information and belief formed after reasonable inquiry, it is well grounded in fact and warranted by existing law or is a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose, such as to harass or cause undue delay.

**RULE 4:  Pretrial sessions.**

**RULE 4.1:  Requests.**  If counsel desires an RCM 802 conference or Art. 39(a) session before the scheduled trial date beyond those set forth above, he or she may request it.  The request should include:  (1) the purpose of the proposed session; (2) the estimated duration of the session, including, as to Art. 39(a) sessions, the number of witnesses to be called; (3) a proposed date and time of the session; and (4) whether opposing counsel concurs in or objects to the proposed session.  Such pretrial sessions are desirable, and the judge may direct such sessions when litigation or resolution of such motions is expected to be lengthy or when disposition of the motion is likely to affect proceeding with trial on the scheduled trial date.

**RULE 4.2:  Arraignments.**  Either party may request, or the judge may direct *sua sponte*, an Art. 39(a) session solely for arraignment.  Counsel should be prepared for arraignments shortly following service on the judge of the documents set forth in Rule 1.1 above.

<div align="center">

**Section III.  Decorum and Conduct.**

</div>

**RULE 5:  Punctuality.**  Punctuality in all matters affecting the court is required of all parties and reflects preparation and professionalism.  When a party unavoidably is or will be late, or the proceedings will be delayed, the judge will be notified as soon as possible and provided an explanation.

**RULE 6:  Decorum.**

**RULE 6.1:  General.**  Counsel for both sides shall assist the judge with maintaining a solemn and dignified atmosphere throughout the trial.  Generally speaking, counsel are responsible for the conduct of the witnesses they call during court proceedings.  As a traditional mark of respect for the judicial system,

<div align="center">5</div>

all persons in the courtroom, regardless of rank or grade, except the court reporter, will rise when the judge enters or leaves the courtroom.  All persons, except the judge and court reporter, will rise when the entire court member panel enters and leaves the courtroom.  The trial counsel is responsible for saying (or having the bailiff say), "All rise," whenever the judge or entire court member panel enters or leaves the courtroom.  All parties should remain in place until the judge indicates that all may be seated, or upon the full departure of the judge and members.

**RULE 6.2:  Bar of the courtroom.**  No one other than a trial participant is allowed inside the bar of the courtroom without the judge's permission when court is in session.  When court is not in session, supervisory attorneys and paralegals are allowed inside the bar.

**RULE 6.3:  Prohibitions.**  Eating and drinking are not permitted in the courtroom during open sessions (except water or other non-alcoholic beverage in an unmarked opaque container for the trial participants).  Chewing gum and tobacco products are not permitted in the courtroom at any time.  Absent prior approval by the judge, passing notes or whispering over the bar between trial participants and the gallery is prohibited.  Photographs, video and sound recordings (except those by the detailed court reporter or otherwise authorized by the military judge), and radio and television broadcasts shall not be made in or from the courtroom during any trial proceedings.  Cell phones, radios, pagers, iPods, BlackBerrys, and similar devices are not allowed in the courtroom unless they are completely turned off.  No explosives, flammable liquids, caustic materials, or other hazardous materials will be brought into the courtroom without the judge's prior approval.  Firearms or weapons, except when used as exhibits or otherwise explicitly authorized by the judge (*e.g.*, civilian law enforcement personnel or courtroom security officers), are not permitted in the courtroom (*see also* Rules 15.6, 30 and 31).  A copy of Rule 6.3 will be posted near the entry of the courtroom and inside the courtroom.

**RULE 6.4:  Facility cleanliness.**  Trial counsel is responsible for ensuring that the courtroom, deliberation room, waiting rooms, and latrines are clean and in proper order before and after each trial.  This includes emptying trash containers in all areas.  This responsibility also applies to counsel who serve as U.S. Magistrate Court prosecutors in a courtroom used for Magistrate Court; the courtroom and other areas will be in proper order for courts-martial after each session of Magistrate's Court.

**RULE 7:  Addressing the judge.**  Counsel and other persons connected with the trial, including court members, witnesses, court reporters, accused, and spectators, will address the judge as "Judge," "Your Honor," or "Sir" or "Ma'am" in the courtroom.  Elsewhere, counsel should bear in mind the circumstances and presence of others when addressing the judge.

**RULE 8:  *Ex parte* communications.**  *Ex parte* communications between counsel and the judge concerning any case, except as to docketing and other routine or purely administrative matters, are prohibited.  Where counsel desire to inform the judge of unusual problems or issues that are likely to affect the duration, progress, or orderly disposition of the case, counsel may confer with the judge in the presence of opposing counsel (either in person, via telephone conference, or via email with copies furnished to opposing counsel), as provided in RCM 802, or request an Art. 39(a) session.  Counsel may also file a brief or memorandum with the judge and opposing counsel, to be made an appellate exhibit, advising the court of the matter in question.  In the unusual circumstances when a communication must be made *ex parte*, it should normally be made in writing.  Such writing may, upon good cause, be sealed by the judge.

**RULE 9:  Uniform requirements.**  Army courts-martial are Federal courts, under Article I of the United States Constitution, and are due the same deference as any other Federal court.  Army courts-martial are formal, dignified proceedings charged with determining significant and weighty issues.  Accordingly, the appearance and demeanor of all participants in Army courts-martial – civilian or military, counsel or witness -- should reflect the gravity and solemnity of those proceedings.

**RULE 9.1:  Civilian counsel and civilian court reporters.**  Male civilian counsel and male civilian court reporters will wear a conservative coat and tie, shirt, slacks, and shoes.  Female civilian

counsel and female civilian court reporters will wear appropriate conservative business clothing.  Civilian clothing for males and females generally should be such as they would wear to a place of worship or job interview.

**RULE 9.2:  Military trial participants.**  Unless the judge orders otherwise, the uniform for military trial participants in Army trials is a Class A uniform (the judge may authorize the court reporter to wear a Class B uniform).  Unless the judge orders a uniform other than a Class A or B uniform for trial, judges must wear a Class B uniform under a required black judicial robe while presiding at Army trials.  In forward deployed areas, judges should wear the locally prescribed field uniform or ACUs under a required black judicial robe while presiding at Army trials; the judge also may authorize military trial participants to wear the locally prescribed field uniform or ACUs.

**RULE 9.3:  Civilian witnesses/military witnesses in civilian clothing.**  To the extent that counsel have control over civilian witnesses' attire, their clothing should be of the type that they would wear to a place of worship or job interview.  As an exception to Rule 9.2 above, military witnesses permitted to testify in civilian clothing (*e.g.,* CID agents and MPI investigators) also will wear civilian clothing they would wear to a place of worship or job interview.

**RULE 9.4:  Exceptions.**  The judge may grant individual exceptions to the above uniform requirements for good cause shown (for example, an accused returning from an extended absence without ready access to a Class A uniform).

**RULE 10:  Spectators.**

**RULE 10.1:  General.**  Spectators are encouraged to attend courts-martial and shall be permitted to observe all trial proceedings, unless otherwise determined by the judge.  While no age restrictions apply as to who may be a spectator, no one will be permitted to disrupt the dignified, formal atmosphere of the court-martial.  The bailiff will advise parents to consider the nature of expected testimony before bringing young children into the courtroom as spectators, as testimony in some cases may unavoidably be graphic, vulgar, and/or obscene.

**RULE 10.2:  Restrictions.**  Spectators may enter and leave the courtroom during open sessions but will not be permitted to disturb or interrupt court proceedings by their conduct.  Spectators will not indicate or demonstrate in any manner agreement or disagreement with testimony, procedures or results at a trial, nor will their appearance or attire be permitted to detract from the dignity of the proceedings or to create a disruption.  Spectators will not sleep or engage in loud whispering.

**RULE 10.3:  Sanctions.**  Spectators who violate these rules may be excluded from the courtroom, held in contempt, or both.  A copy of Rule 10 will be posted near the entry to the courtroom and inside the courtroom to place spectators on notice of these rules.

<div align="center">

**Section IV.  Trial Procedure.**

</div>

**RULE 11:  Pleas.**  The accused and counsel will stand and face the judge when entering pleas, and defense counsel will enter the accused's plea.  Should the accused's plea be particularly complex, defense counsel may mark the accused's written plea, submitted IAW Rule 2.2.2 above, as an appellate exhibit and when called upon to enter a plea, may announce that the accused pleads as set forth in that appellate exhibit.

**RULE 12:  Stipulations.**  Similar to Rule 3.3, if an issue arising during trial does not involve a factual dispute, counsel shall endeavor, to the extent possible, to enter into a stipulation of fact or expected testimony prior to trial concerning the undisputed facts.  Counsel may enter stipulations for the limited purpose of obtaining a ruling on a motion or objection.

<div align="center">7</div>

**RULE 12.1:  General.**  Absent extraordinary circumstances, all stipulations shall be in writing.

**RULE 12.2:  Marking.**  Stipulations will be marked as Prosecution, Defense, or Appellate Exhibits, as appropriate.  Stipulations of expected testimony will be read to the trier of fact but not taken into the deliberation room.  Stipulations are not to be mentioned to court members unless previously received into evidence at an Art. 39(a) session.

**RULE 13:  Voir dire**.

**RULE 13.1:  Conduct.**  The judge will ordinarily initiate voir dire examination by asking preliminary questions.  The judge will then permit such additional questions by counsel in *en banc* or general voir dire as are deemed reasonable and proper by the judge.  The judge may require counsel to to submit voir dire questions to the judge in advance of trial.

**RULE 13.2:  Individual voir dire.**  Counsel must state specific reasons for any desired voir dire of individual members.  Subsequent individual voir dire will be limited to those specific reasons and any reasonable follow-up questions.

**RULE 13.3:  Questionnaires.**  To expedite voir dire, the trial counsel should provide new members with questionnaires before trial under RCM 912, using the format at Appendix E, and provide those to the judge and, upon request, the defense counsel.  No post-trial questionnaires or surveys will be sent to any member nor will any post-trial assessment be requested from any court member except upon approval of the judge.

**RULE 13.4:  Challenges.**  Counsel will not state challenges, or lack thereof, in the presence of court members.

**RULE 14:  Opening statements.**  Counsel shall confine their opening statements to what they expect the evidence to prove and to issues in the case.  Counsel will not use opening statements to argue or instruct as to the law.  Counsel will not show to the members during opening statements evidence that has not previously been admitted.

**RULE 15:  Exhibits.**

**RULE 15.1:  Marking.**  To save time prior to trial, counsel shall have the court reporter mark any exhibit "for identification," including objects and documents, intended to be used or introduced at trial.  See Rules 2.1.9 and 2.2.5.  This includes demonstrative exhibits.  Prosecution exhibits will be numbered consecutively with Arabic numbers, defense exhibits with capital letters, and appellate exhibits with Roman numerals.  Generally, those exhibits that are to be considered on either the merits of the case or in sentencing will be marked as prosecution or defense exhibits; all others should be marked as appellate exhibits (such as those used during motions hearings).  To the extent possible, counsel should consider the order in which the exhibits are to be referenced and make every effort to have those exhibits marked sequentially consistent with their use during the trial or hearing.  Counsel shall consult in advance with the court reporter on the means to mark exhibits not readily amenable to marking which may require tagging, stickers, or other atypical marking for identification.  When questioning a witness or addressing the court about an exhibit, counsel shall specify the exhibit number or letter.  Any exhibit shown to a witness must be marked and previously shown to opposing counsel before being used with that witness.  Prosecution and defense exhibits will be referred to as "for identification" until the judge admits the exhibit into evidence.  Once counsel has concluded examination on or use of an exhibit, it shall immediately be returned to the court reporter's custody.  Under no circumstances may a counsel or witness maintain control of an original exhibit after it has been marked as an exhibit without the express permission of the judge.  Likewise, neither a counsel nor a witness may mark or in any way alter an exhibit after it has been admitted into evidence without the express permission of the judge.

8

**RULE 15.2:  Copies.**  When a counsel requests to publish a document admitted in evidence to the members, that counsel will have previously made copies for each member and opposing counsel will have previously confirmed those copies are accurate reflections of the original.  When counsel are offering an exhibit for which they wish a copy/reproduction substituted in the record (*e.g.,* original personal records of an accused or original family photographs; original checks or other negotiable instruments) the counsel should be prepared with an exact copy/reproduction or accurate representation when offering the exhibit.  The copy/reproduction should mirror the actual exhibit as closely as possible, to include the use of color copies (for photographs) or standard 8 1/2 x 11 paper copies (charts, PowerPoint slides) as appropriate.

**RULE 15.3:  Demonstrative evidence.**  Photographs, charts, maps, diagrams, and similar testimonial aids should be large enough and positioned for all parties to see.  Copies of photographs or other aids (including electronically presented exhibits) may be furnished to each trial participant, in the sole discretion of the judge, when appropriate.

**RULE 15.4:  Presentation before trial.**  The trial counsel will show prosecution exhibits to defense counsel before trial.  Defense counsel will similarly show defense exhibits to trial counsel before trial, unless otherwise granted an exception by the judge.

**RULE 15.5:  Substitution.**  If an item of evidence is inappropriate for inclusion in the record, counsel offering the item shall arrange for and request that a suitable substitute (*e.g.*, a photograph) be inserted in the record.  This request should be made when the exhibit is offered into evidence or before the court-martial is adjourned.  If the judge approves the request, the trial counsel will ensure that a suitable substitute is included.  If a copy of a document must be substituted in the record of trial, only a legible, permanent-type photocopy, not a fax copy, may be used.  If an exhibit is in color, the copy must be in color.  If photographs are substituted for an exhibit, the photgraph must clearly and accurately reflect the evidentiary value of the exhibit (e.g. signatures on a urine bottle or the serial number on a weapon).

**RULE 15.6:  Safeguarding evidence and firearms.**  The counsel offering a piece of evidence is responsible for safeguarding that evidence until it is released to the court reporter or to an evidence custodian at the end of trial.  Evidence that has not been admitted or has been rejected shall remain out of the members' sight.  For safety reasons, if firearms are marked as exhibits, the trial counsel will ensure that before they are brought into the courtroom, they are rendered inoperable in a manner that does not change their evidentiary value, *e.g.*, a locking device or plastic flexi-cuff through the magazine well and chamber while the slide is locked to the rear.  Exhibits which could be used as a weapon, such as a knife or pair of scissors, will be attached to an evidence board.

**RULE 15.7:  Sealed Exhibits.**  When the judge orally orders any portion of the record sealed, including, but not limited to, matters reviewed *ex parte*, classified materials, medical or mental health records (whether or not reviewed in chambers and/or admitted as evidence), autopsies, MRE 412 sessions (to include motions and responses relating to MRE 412 and regardless whether the matters litigated UP MRE 412 are admitted or not), and child and adult pornographic materials, the trial counsel will ensure the judge prepares a written order detailing the limitations on access to the sealed matters. *See generally* RCM 1103A.  This includes exhibits actually admitted into evidence.  The trial counsel will ensure the sealed matters are not further reproduced or copied and will remain only in the original record of trial.  One suggestion is to place the pages of the record or exhibit ordered sealed in a large envelope, then two-hole punch the envelope on the bottom for placement in the appropriate place in the original record of trial, with the opening of the envelope at the bottom of the record of trial.  The Staff Judge Advocate's Office is responsible for reviewing the allied papers and ensuring all required documents are sealed before reproducing the record and mailing the accused or the accused's defense counsel his or her copy.  The trial counsel will ensure a copy of the judge's written order sealing the page(s) or exhibit(s) is attached to the outside of the envelope and placed in the other copies of the record of trial.  All exhibits and documents ordered sealed, to include videos and images of child pornography, will be appended to the record of trial as set forth above, will not be removed unless ordered by a judge, and will be sent to the Clerk of Court for the Army Court of Criminal Appeals for inspection in accordance with that court's rules.

APPENDIX A-254

**RULE 16:  Witnesses.**

**RULE 16.1:  Presence in the courtroom.**  Witnesses generally should not sit in the courtroom prior to their testimony.  Unless the judge excludes them pursuant to MRE 615, witnesses who will testify only on sentencing may observe the trial on the merits or guilty plea providence inquiry.  After witnesses have been permanently excused, they may remain as spectators.  The judge will consider MRE 615 and applicable law in deciding whether victims should be excluded from proceedings.

**RULE 16.2:  Preparation.**  Trial counsel will ensure that all witnesses understand the physical layout of the courtroom, where they should go, and what they should do upon entering the courtroom.  Counsel should arrange before a trial session for witnesses to be immediately available when called to testify.  Military witnesses must not salute the judge or president of the court in the courtroom.

**RULE 16.3:  Oaths and identification.**  Trial counsel will swear all witnesses testifying on the merits in the presence of the members and fully identify them even if they have been previously sworn and identified at an Art. 39(a) session.  If a witness is later permanently excused and recalled, the witness will be resworn.  If a witness is later temporarily excused and recalled, the witness will be asked if they are the same person who previously testified in the court-martial and will be reminded he/she is still under oath.  Trial counsel will not announce the witness' social security number or require the witness to do so.  The trial counsel should identify the witness in his initial leading question, as in the following examples:

(1)  Are you Staff Sergeant Will E. Peters, of Battery A, 2d Battalion, 7th Air Defense Artillery, 11th Air Defense Artillery Brigade, Fort Bliss, Texas?

(2)  Are you Mrs. June A. Cleaver, of Smithville, Georgia?

Witnesses who do not wish to disclose their home town in open court are not required to do so.  In such cases, trial counsel will state, after the witness has given his or her name, that the other identifying information has already been provided to the reporter for inclusion in the record, if the identification does not otherwise appear in the record.  The form at Appendix F may be used to provide such information to the court reporter.

**RULE 16.4:  Gestures or Actions by Witnesses.**  If, during testimony, witnesses make gestures having evidentiary value or engage in other nonverbal conduct, the counsel examining the witness is responsible to concisely and accurately describe the witnesses' actions for the record.  If not done contemporaneous with counsel examination, counsel should request the military judge's permission to describe such gestures or actions for the record.

**RULE 17:  Conduct of Counsel.**

**RULE 17.1:  Standing.**  Unless otherwise authorized, counsel will stand when addressing the judge (to include when making objections) and court members or examining witnesses.

**RULE 17.2:  Demeanor.**  Counsel will not indicate, in any manner inconsistent with the dignified nature of a court-martial, agreement or disagreement with testimony, argument by opposing counsel, a court ruling, or other procedures at trial, except by proper objection or motion.

**RULE 17.3:  Undue familiarity.**  Counsel shall refrain from any familiarity among themselves, with the judge, with court members, or with witnesses, in the presence of the accused or other trial participants, or while court is in session or during any recess.  Colloquy between multiple defense counsel or between multiple trial counsel will not be permitted during trial without the judge's prior approval and then should be infrequent and of short duration.  Opposing counsel will not confer while court is in session without the judge's prior approval.

**RULE 17.4:  Treatment of witnesses and positioning.**  Counsel will conduct questioning of witnesses and arguments to the court at a reasonable distance from the witness or court.  This reasonable distance will be from a relatively fixed location (*e.g.*, from counsel table, a lectern, or the end of the court-member box).  Counsel will not roam, pace, or aimlessly wander throughout the courtroom nor take a position that blocks the view between a witness and other trial participants.  Counsel will not first approach a witness without asking prior permission of the judge.  Witnesses will be treated with fairness and consideration – they will not be crowded, shouted at, ridiculed, humiliated, or otherwise abused.  All witnesses, except children, will be referred to by their surnames and titles, as applicable.

**RULE 17.5:  Double-teaming.**  Except with prior permission of the judge, only one counsel per side may examine any one witness or rise to address the court on any particular issue, motion, argument, or objection.

**RULE 17.6:  Conduct of opposing counsel.**  During argument of counsel or examination of a witness, opposing counsel shall remain seated at counsel table, except when rising to state an objection.  Opposing counsel shall not talk to others or otherwise engage in conduct that diverts attention from counsel's argument or examination.  (The foregoing does not prohibit counsel whispering or passing notes to a co-counsel or the accused, and vice-versa, if attention is not otherwise diverted from opposing counsel's presentation.)

**RULE 17.7:  Sidebar conferences.**  Sidebar conferences will not be used.  If matters must be discussed out of the presence of the court members, counsel will request an Art. 39(a) session.

**RULE 17.8:  Offers of proof**.  Offers of proof are not evidence.  A judge's essential findings will not be based on offers of proof.  Offers of proof will be used only in those rare circumstances set forth in MRE 103(a)(2).

**RULE 17.9:  Judicial Notice.**  Counsel will advise the judge and opposing counsel in writing, as soon as possible and preferably before trial, of any requests for judicial notice.  Counsel will provide a copy of the applicable law, regulation, order or other source to be used in determining whether to take judicial notice, which will be appended to the record of trial as an appellate exhibit, unless it can be reasonably anticpated to be readily available to any possible reviewing authority.  This is especially important in Article 92 and Assimilative Crimes Act cases where local regulations and state statutes may not be readily available to the appellate courts.

**RULE 18:  Court Reporter.**  Each time the court convenes or reconvenes, the court reporter shall note in the record the presence or absence of the trial participants and the time at which the court convenes or reconvenes.  The court reporter shall also note the time at which recesses are taken and the time of closing and of adjournment.  Court reporters shall ensure that the name and rank of all military parties to the trial and the name and address of civilian counsel are properly noted in the record.

**RULE 19:  Objections.**  When counsel initially enters an objection, he or she will state only "Objection, Your Honor."  Counsel will not provide a specific basis for it unless asked by the judge.  Opposing counsel will immediately cease examination and await the judge's resolution of the objection.  Before making any argument on an objection, counsel will request permission from the judge.  Any argument will be direct and succinct.  Motions *in limine* are encouraged regarding evidentiary issues counsel believe are likely to be contested at trial.  After the judge rules on an objection or makes any other ruling, counsel shall not make further argument or comment, except with the express permission of the judge.  After a ruling, counsel may, however, make offers of proof to preserve an objection or issue for appellate purposes or request reconsideration.  In trials with members, such offers of proof should normally be made in an Art. 39(a) session.  *See* MRE 103(c).

**RULE 20:  Closing arguments.**  In closing argument, counsel may make reasonable comment on the evidence, challenge the veracity of a particular witness, and draw such inferences from the testimony as will support the party's theory of the case, but shall not assert a personal belief in the justness of a

particular cause, the guilt or innocence of the accused, or the credibility of a witness, including the accused.

**RULE 21:  Instructions.**  If either counsel desires any specialized instructions (those not contained in DA Pamphlet 27-9, *Military Judges' Benchbook* or any approved interim change to the *Benchbook*), such instruction shall be submitted in writing with supporting authority, if any, to the judge and opposing counsel at least two duty days prior to the date set for trial, unless the judge directs a different deadline.

**RULE 22:  Findings and sentence worksheets.**  In trials with members, trial counsel will prepare tailored findings and sentence worksheets, using the formats in DA Pamphlet 27-9, *Military Judges' Benchbook*, and submit them to the judge and opposing counsel at least two duty days prior to trial, unless the judge directs a different deadline.  Any lesser included offenses likely to be in issue will be reflected on the findings worksheet to reflect a proper finding as to the lesser included offense.

**RULE 23:  Presentation of the accused.**  In trials with members, the accused and his or her counsel will stand and face the president of the court prior to announcement of the findings, and, if necessary, the sentence.  In a trial before military judge alone, the accused and defense counsel will stand and face the judge prior to such announcement(s).

**RULE 24:  Trial procedure guide.**  Unless otherwise modified by the judge, the trial guide in DA Pamphlet 27-9, *Military Judges' Benchbook*  with approved interim changes will be used.  An unofficial DA Pamphlet 27-9, *Military Judges' Benchbook* containing all approved interim changes is available at www.jagcnet.army.mil/usatj.

**RULE 25:  Restraint of the accused and witnesses.**

    **RULE 25.1:  Accused.**  The accused will not be physically restrained in a manner observable by the court members unless the judge approves the restraint in advance.  If defense counsel have a concern with regard to the nature of restraint of the accused, it shall be brought to the attention of the judge immediately and outside the presence of members.

    **RULE 25.2:  Witnesses.**  Because of special security needs at Fort Leavenworth and other installations with confinement facilities and the frequency of trials involving inmate witnesses, and considering the familiarity of those assigned to such installations with inmates wearing restraints and prison uniforms, trials at those installations involving inmate witnesses may necessitate that such witnesses testify in the uniform and restraints compatible with their custody status.  Whenever possible, inmate witnesses will not wear restraints other than hand irons.  Counsel should coordinate with the judge well in advance of trial if they need any special security precautions or exceptions.  All parties will take every precaution to prevent witnesses from being seen by members in any form of restraint or prison clothing, unless the witness is scheduled to testify in those restraints or clothing.  In all cases, the judge will rule on the uniform and restraint, if any, of all witnesses and state such rationale on the record.

**RULE 26:  Withdrawal by counsel.**

    **RULE 26.1:  Trial counsel.**  After referral, trial counsel shall not be permitted to withdraw unless substitute qualified counsel is detailed prior to or simultaneously with the relief of the withdrawing counsel.

    **RULE 26.2:  Detailed defense counsel.**  After referral, detailed military defense counsel may not withdraw from representation of the accused without the judge's approval, whether or not the accused wishes to release the detailed military counsel.  Approval will take into consideration compliance with RCM 505(d)(2), RCM 506(b)(3) and RCM 506(c), as applicable.

    **RULE 26.3:  Individual counsel.**  Once individual military or civilian counsel enters an appearance (to include a written appearance), such counsel may not withdraw from representation of the accused without the judge's approval, whether or not the accused wishes to release the counsel.

APPENDIX A-257

Approval will take into consideration compliance with RCM 506(c), as applicable.  Willful failure of a fee-paying client to comply with the terms of the contract for representation may provide grounds for counsel to request to withdraw.  The mere failure, however, to pay the fee does not terminate the attorney's obligations as an officer of the court.  Approval of the request to withdraw will take into consideration whether:  (1) counsel has taken reasonable steps to avoid foreseeable, material prejudice to any substantial right of the accused; (2) adequate time exists to employ other counsel without undue prejudice to the accused or the Government; and (3) the interests of justice and orderly administration of justice are advanced.

**Section V.  Post-Trial Matters.**

**RULE 27:  Post-trial and appellate rights.**  The defense counsel will explain to the accused his or her post-trial and appellate rights prior to trial with the aid of an applicable form tailored to the level of court-martial; however, the defense counsel and accused should ordinarily not sign or date the form until the date the sentencing phase begins.  The defense counsel will submit the completed and signed form to the judge at the start of sentencing proceedings, after the court reporter has marked it as an appellate exhibit.

**RULE 28:  Records of trial.**

   **RULE 28.1:  Original Documents Related to the Case.**  After referral and service of the charges on the accused and before arraignment, trial counsel shall submit original signed documents pertaining to the case to the court reporter.  This includes, but is not limited to, the DA Form 5112 and magistrate's memorandum approving or disproving pretrial confinement, charge sheet, forwarding recommendations, Article 32 report of investigation (if applicable), pretrial advice, and convening authority referral documents.  Trial counsel should make a working copy of all documents, but should ensure all work product and matters which may not be admissible (*e.g.*, counseling statements) and matters not related to offenses charged are not placed in the original files.  If and when additional documents pertaining to the case are created after referral (*e.g.*, discharge/resignation in lieu of court-martial, withdrawal of charges, motions, judicial orders or requests for deferment) counsel are obligated to deliver the original of these documents to the court reporter for inclusion of the record as soon as possible.  The assigned court reporter will maintain all original documents until the record of trial is assembled.  Once delivered to the court reporter, no one may remove original documents from the original file without the express permission of the judge.  Likewise, after delivery to the court reporter original documents and exhibits may not be altered, amended, removed or marked on in any way without the express permission of the judge.

   **RULE 28.2:  Errata.**  Changes in the record of trial due to errors will be made by trial and defense counsel by recording the necessary changes on an errata sheet.  Substantive changes should first be coordinated by counsel with the court reporter.  If there is disagreement, the matter shall be presented to the judge for resolution.

   **RULE 28.3:  Trial counsel review.**  Before forwarding any record of trial to the judge for authentication, trial counsel present for trial must personally review it for accuracy and completeness and initiate corrective action, as required.  Trial counsel should ensure that the record is free of transcription errors when it is forwarded to the judge for authentication.

   **RULE 28.4:  Defense counsel review.**  Trial counsel will ensure that a photocopy of the record is provided to the defense counsel present for trial concurrently with the original record being provided to trial counsel for review.  Defense Counsel will note on the authentication sheet the date they received the record for review.  Court reporters preparing the record of trial may use the modified DD Form 490 at Appendix G to facilitate record of receipt.  The purpose of defense counsel being provided the record is to provide an opportunity to submit necessary corrections, if any, prior to authentication, not to prepare and complete post-trial submissions on behalf of the accused.

APPENDIX A-258

**RULE 28.5:  Time for review.**  When providing the record of trial to counsel for errata, the court reporter will set a due date based on the counsel reviewing 150 pages per day.  Counsel will expeditiously review records of trial  and comply with that due date (except as noted below).  Except in extraordinary circumstances, counsel should be able to review at least 150 pages of double-spaced typing per calendar day while they are at home station and not on leave or pass, or in trial or conducting an Article 32 investigation.  If counsel are not at home station, are on leave or pass, or are in trial or conducting an Article 32 investigation during the period before the due date, counsel should contact the court reporter for adjustment of the due date.  If trial counsel or others responsible for post-trial processing experiences inordinate delay awaiting defense counsel review, after reasonable efforts they may consult the judge and forward the record for the judge's authentication.

**RULE 28.6:  Court reporter responsibility after authentication.**  Following the judge's authentication of the original record, the reporter will ensure that all changes are made to other copies of the record, which then shall be distributed as required.  To facilitate this, trial counsel must ensure the court reporter receives the record after the judge has authenticated it.

**RULE 28.7:  Electronic Review**.  At the direction of the judge, when the judge deems it feasible to ensure the presence of all exhibits by means other than personal observation, the transcript may be forwarded by e-mail and the judge will correct the transcript by editing the Microsoft Word document itself.  The original and all copies of the authenticated transcript shall be produced from the judge's edited Word document.  The judge will e-mail his/her errata sheet and authentication page to the court reporter, followed by mailing the hard copy of both documents to the court reporter.

### Section VI.  Supporting Trial Personnel.

**RULE 29:  Bailiff.**  Unless the judge directs otherwise, the court requires a bailiff at every Art. 39(a) session at which witnesses will be called and at every trial.  The bailiff will obtain witnesses as they are called to testify, call everyone to rise when the judge or the entire panel enters or leaves the courtroom, and take care of administrative errands during trial.  The bailiff will neither be a witness, nor the unit escort, nor a guard for the accused.  Likewise, a bailiff should neither have an interest in the case nor a close association with the accused or a victim of a charged offense.   In cases of an enlisted accused, the bailiff will ordinarily be a noncommissioned officer senior to the accused.  In cases of an officer accused, the bailiff will ordinarily be an officer senior to the accused, if reasonably available.  If not reasonably available, the bailiff will be a noncommissioned officer in the rank of SFC or above.  Trial counsel is responsible for obtaining and briefing the bailiff as to the bailiff's duties (*see* Appendix D) and providing the bailiff a copy of Appendix D.  If a bailiff is not present, trial counsel will perform the bailiff's duties.

**RULE 30:  Guards.**  Unless otherwise directed by the judge, guards, if necessary, will not be permitted inside the bar of the courtroom.  Firearms or weapons, except when such are to be exhibits or when otherwise explicitly authorized by the judge (*e.g.*, civilian law enforcement personnel and courtroom security officers), are not permitted in the courtroom.  (*See* Rule 15.6 regarding firearms as exhibits; Rule 25.1 regarding restraint of the accused; Rule 31 regarding courtroom security.)  In forward deployed areas where Soldiers normally carry firearms / weapons, the judge may set special rules for firearms or weapons in the courtroom.

**RULE 31:  Courtroom security.**  The judge may require that courtroom security officers attend selected trials or hearings.  If so, the trial counsel is responsible for ensuring this requirement is satisfied.  When used, courtroom security officers will be military law enforcement personnel or United States Marshals attired as the judge directs (which may include their regular uniform, carrying a loaded sidearm and other equipment designated by the Provost Marshal where the trial is held).  Use of a courtroom security officer is not an indicator that the accused presents a security or flight risk.  An instruction to members to that effect may be appropriate in the judge's discretion.

APPENDIX A-259

**Section VII.  Effective Date.**

**RULE 32:  Effective date.**  The foregoing Rules of Practice Before Army Courts-Martial are approved and effective on the 26th day of March 2012.


*Michael J. Hargis*

MICHAEL J. HARGIS
COL, JA
Chief Trial Judge

15

APPENDIX A-260

**APPENDIX A**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | DOCKET REQUEST |
| v. | ) | |
| | ) | |
| NAME | ) | (AR 27-10) |
| RANK, U.S. ARMY | ) | |
| UNIT | ) | |

<u>SECTION A</u>

(To be completed by trial counsel and delivered to defense counsel not later than the first duty day after referral of charges to trial.)

1.  Type of court-martial: _____ GCM _____ SPCM

2.  Date charges referred to trial: _____.

3.  Date referred charges served upon the accused: _____.

4.  Accused (has been) (is not) in pretrial confinement (since _____).

5.  Name of detailed defense counsel: _____.

6.  Date referred charges provided to defense counsel: _____.

7.  The prosecution will be ready for trial on and after: _____.  The military

judge should consider the following matters when setting a trial date:  [ANY pretrial restraint other than

pretrial confinement should be noted]

_____

_____.

8.  Companion case(s): _____

_____          _____
Printed Name/Telephone Number                         (CPT)(MAJ)(LTC), JA
                                                                     Trial Counsel

_____          _____
Email Address                                               Date

16

<u>SECTION B</u>

(To be completed and delivered by defense counsel to trial counsel not later than the third duty day after receipt.)

1.  The defense:

      [  ] requests an earlier trial date of _____

      [  ] does not oppose a trial date as indicated in Section A.

      [  ] requests a delay until _____ for the following

reason(s): _____

_____.

2.  Anticipated forum: _____ MJ alone ____ Officer Panel ____ Enlisted Panel

3.  Anticipated pleas: _____ Guilty ____ Not Guilty ____ Mixed

4.  Anticipated motions:

_____

_____.

5.  Estimated number of days for trial: _____.

6.  Civilian counsel: _____  _____
                                              (Name)                    (Telephone Number)

                _____
                                    Email Address

_____  _____
Printed Name/Telephone Number                     (CPT)(MAJ)(LTC), JA
                                          Defense Counsel

_____  _____
Email Address                                    Date

APPENDIX A-262

SECTION C

(To be completed by trial counsel and delivered to the military judge not later than the first duty day after return from the defense counsel.)

1.  Contents of Section B are noted. The prosecution:

[  ] does not oppose the trial date requested by the defense.

[  ] opposes the earlier trial date or delay requested by the defense for the following reasons:

_____

_____.

2.  Estimated number of days for trial: _____

_____          _____
Printed Name/Telephone Number                        (CPT)(MAJ)(LTC), JA
                                                                      Trial Counsel

                                                      _____
                                                                      Date

**NOTE:  Charge Sheet(s), Convening Order(s), and ERB or ORB must be delivered, e-mailed, scanned or faxed to the military judge within 24 hours of referral.**

18

APPENDIX A-263

**APPENDIX B**

UNITED STATES OF AMERICA         )
                                   )
                 v.            )           Docketing Order
NAME                          )
RANK   U.S. Army          )           (Date)
UNIT                           )

1.  I am the docketing judge in this case.  (_____ is the trial judge assigned to the case.)  Trial is scheduled to convene at _____ hours on _____ 20__.  Pursuant to RCM 701 and 801, the following orders are issued to ensure a fair, orderly, and expeditious trial of this court-martial:

    a.  Counsel for each side will notify each other, as well as the Court, of the substance of any anticipated motions, including motions *in limine*, not later than 1200 hours local time, (*15 duty days prior to trial)* 20__.  The following issues, if relevant, will be addressed in your notice to each other and the Court.

      (1)  Objections based on defects in the preferral, forwarding, investigation or referral of charges (RCM 905(b)(1)).

      (2)  Objections based on corrections or defects in the Article 32 investigation or pretrial advice (RCM 906(b)(3)).

      (3)  A request for a bill of particulars (RCM 906(b)(6)).

      (4)  Whether a sanity board will be requested, or whether there is any good faith basis to question the mental capacity or responsibility of the accused (RCM 906(b)(14)).

      (5)  Any motions for discovery, production of evidence or witnesses, including patient records or communications (MRE 513(e)(1)(A)), any consultants or experts (RCM 701, 703, 905(b)(4), and 906(b)(7)), and, if applicable, whether a hearing is requested.

      (6)  Any request for continuance (RCM 906(b)(1)).

      (7)  Any request for investigative support.

      (8)  Any request for change of venue (RCM 906(b)(11)).

      (9)  Any evidentiary issues, the resolution of which may cause a delay in the scheduled proceedings of this case.

      (10) Any motions for severance of charge or accused (RCM 905(b)(5), (9)).

      (11) Any objections based on denial of individual counsel (RCM 906(b)(6)).

      (12) Any motions to suppress evidence (RCM 905(b)(3)).  The provisions of MRE 304(d), 311(d), and 321(c) shall be strictly adhered to.  Notice of intent to admit statements of the accused, evidence seized from the person or property of the accused, or prior identification of the accused, shall be provided to counsel for the accused at the earliest possible time.

    b.  The trial counsel shall submit in writing to the defense counsel a complete list of witnesses the government anticipates calling in all phases of the trial by 1200 hours local time, (ten  duty days before date inserted in para 1a) 20__.

<div align="center">19</div>

c.  The defense counsel shall submit in writing to the trial counsel:  a complete list of witnesses whose production by the government is requested by the defense by 1200 hours local time, (ten duty days before  date inserted in para 1a) 20__ (RCM 703(c)(2)(A)); and by 1200 hours local time, (ten duty days before date inserted in para 1a) 20__, a complete list of the names and addresses of all witnesses, other than the accused, whom the defense intends to call during the defense case in chief and provide all sworn or signed statements known by the defense to have been made by such witnesses in connection with the case (RCM 701(b)(1)(A)).  (Counsel are reminded of RCM 703(b) and (c) concerning what must be contained in the request and potential penalties for failure to submit the name of a witness in a timely manner.  If any witnesses requested by counsel are represented by their own defense counsel, counsel shall contact their counsel and determine if the witness is a suspect, and if the witness will invoke his or her Article 31, UCMJ, rights.)

2.  Each motion will be in writing (RCM 905(a)).  Counsel will state the grounds or basis of each motion, and the specific ruling or relief sought.  Counsel will cite the legal authority supporting each motion. Motions are due to the opposing party and the Court by 1200 hours local time, (ten duty days prior to trial), 20 __.

3.  Each response to a motion submitted is due to the opposing party and the Court by 1200 hours local time, (seven duty days prior to trial), 20__.  Any issues regarding the production of witnesses will be addressed as promptly as possible in an RCM 802 session with counsel for each side and the military judge.  This may be done in a conference call.

4.  Notice of any defenses described in RCM 701(b)(2) shall be provided in writing to the trial counsel no later than 1200 local time, (insert date in Para 1b) 20__.  In accordance with Court rules, the defense counsel will notify the Court and trial counsel of trial forum and anticipated pleas in writing at least five duty days before trial.

5.  Trial counsel shall provide the military judge with any pretrial agreement (less quantum) and, stipulation of fact as soon as signed by all the parties.  If the case is resolved by alternatives to court-martial, trial counsel shall notify the military judge immediately.

(Signature block of military judge)

APPENDIX A-265

**APPENDIX C**

**MOTION AND RESPONSE FORMAT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | (Prosecution)(Defense) Motion |
| v. | ) | (for Appropriate Relief) |
| | ) | (to Dismiss) |
| (Last Name), (First Name)(MI) | ) | (*in Limine*) |
| (Rank), U.S. Army, | ) | |
| (Company) | ) | |
| (BN), (BDE) | ) | (Date) |
| 10th Mountain Division | ) | |
| Fort Drum, New York  13603 | ) | |

RELIEF SOUGHT

The (Prosecution)(Defense) in the above case requests that the Court (compel the Government to produce Defense requested witnesses)(dismiss Specification 1 of Charge II for failure to state an offense)(prevent the Defense from admitting inadmissible hearsay testimony).  The (Prosecution)(Defense) (does)(does not) request oral argument.  [These are examples only.  Counsel should list in the introductory paragraph a specific summary of what they are requesting the court to do.]

BURDEN OF PERSUASION AND BURDEN OF PROOF

[Here state which side has the burden and the applicable standard].  [Note:  The moving party generally has the burden of persuasion (*see* RCM 905(c)(2)), except that the Prosecution has the burden of persuasion on motions based on lack of jurisdiction (RCM 905(c)(2)(B), denial of speedy trial (same), running of the statute of limitations (same), suppression (MRE 304(e), 311(e)(1) and 321(d)), and unlawful command influence (*United States v. Biagase*, 50 M.J. 143 (1999)).

The burden of proof is generally preponderance of the evidence (RCM 905(c)(1)).  Clear and convincing evidence is the standard for consent searches (MRE 314(e)(5)), subterfuge suppression motions (MRE 313(b)), and MRE 321(d)(2) to show a subsequent identification is untainted.  The above is NOT an exhaustive list, but only provides examples of the burdens for the more frequently used motions.]

FACTS

[(Note:  If the parties can agree to undisputed facts, include, "The Prosecution and Defense, with the express consent of the accused, agree to stipulate to the following facts for the purposes of this motion...."]

WITNESSES/EVIDENCE

The (Prosecution will have)(the Defense requests) the following witnesses/evidence produced and present for this motion: [Facts and offers of proof are not evidence for purposes of the motion unless the opposing counsel agress to stipulate.  Otherwise, the parties should be prepared to call witnesses, request the court take judicial notice, or offer documentary evidence or some other form of proof.]

LEGAL AUTHORITY AND ARGUMENT

[Separate multiple arguments into separate paragraphs with bold headings so the court can follow. Include analysis of the application of the facts to the law.  Cite the legal authority upon which you rely

within the body of the argument.  Incude contrary legal authority, if aware.  Do not merely list statutes and cases. For example:]

A soldier may be ordered to provide a urinalysis sample if the order is based upon probable cause (cite authority here).   The urinalysis test in this case was not, however, based on probable cause.  The company Commander, CPT X, admits to getting an anonymous phone call saying that SPC Y (the accused in this case) had been seen, three weeks ago, with a person the anonymous caller "knew" used marijuana.  The caller did not describe how he "knew" the other person used marijuana.  Based solely on that information, CPT X ordered SPC Y to take a urinalysis test.  Therefore, the results of the urinalysis test are not admissible as evidence against the accused (cite legal authority here).

Or

While the urinalysis in this case was ordered by the Commander, CPT X, he did so at the request of Mr. A, a counselor at ADAPCP, as part of SPC Y's enrollment in ADAPCP. Evidence protected by the Limited Use policy is not admissible in a court-martial (cite authority here).  Because the urinalysis test results in this case are protected by this policy, they are inadmissible.

Or

The accused told his friend, SPC Y, two days after the alleged rape occurred that "she (the victim) wanted me."  The Defense wants to call SPC Y to testify to this statement.  The Government moves *in limine* to prevent that testimony as inadmissible hearsay (cite authority here).

<u>CONCLUSION</u>

Based on the above, the (Prosecution)(Defense) requests that the Court (compel the Government to produce Defense requested witnesses)(dismiss Specification 1 of Charge II for failure to state an offense)(prevent the Defense from presenting inadmissible hearsay testimony).  [Be specific.]


(Name of Counsel)
(Rank), JA
(Trial)(Defense) Counsel


[A CERTIFICATE OF SERVICE IS NOT REQUIRED.]

I certify that I have served or caused to be served a true copy of the above on the (Trial)(Defense) Counsel on _____ 20__.


(Name of Counsel)
(Rank), JA
(Trial)(Defense) Counsel


22

APPENDIX A-267

**APPENDIX D**

**BAILIFF'S DUTIES**

1.      Uniform for Bailiff.

    a. Court member trials:  Class A (Green or ASU), Class B or ACU, as designated by the judge.

    b. Judge alone trials:  Class A (Green or ASU), Class B or ACU, as designated by the judge.

2.      Duties.

    a. The bailiff will report to the trial counsel in the courtroom 30 minutes before the court start time to help the trial counsel set up the courtroom.

    b. The bailiff is the only link between the parties (judge, counsel, accused, court reporter, and court members) and anyone else when the court is in session.  The bailiff will deliver any necessary messages to the parties during trial.

    c. The bailiff will ensure that the court members remain sequestered during deliberations.  The bailiff will post himself or herself outside the door of the deliberation room and will let the parties know when the court members are ready to have the court reconvene.

    d. The bailiff will remain alert at all times.

    e. During trial, the bailiff will position himself or herself so that he or she not only observes the parties, but also any spectators.  The bailiff will ensure a quiet and orderly atmosphere exists in the waiting room area and spectator gallery at all times.  The bailiff will politely escort loud, disruptive, or sleeping spectators from the courtroom.  Children may observe trials, but if they become disruptive, the bailiff will ensure that they leave the courtroom.

    f. Food, chewing gum, beverages (other than water), cameras, tape recorders, videocameras, and weapons (unless authorized by the judge) are not permitted in the courtroom.  The judge may permit parties (counsel and the accused) and court members to have a beverage (*e.g.*, a cup of coffee or water) in the courtroom.  Photographs, video and sound recordings (except those by the detailed court reporter or otherwise authorized by the military judge), and radio and television broadcasts shall not be made in or from the courtroom during any trial proceedings.  Cell phones, radios, iPods, BlackBerrys, pagers, and similar devices that make noise are not allowed in the courtroom, unless they are disengaged (completely turned off).  The bailiff will assist the court in enforcing these prohibitions in a dignified, professional fashion.  Absent a situation involving self-defense or defense of another, a bailiff shall not make physical contact with anyone in the gallery.

    g. Witnesses are not allowed to sit as spectators before they testify unless permitted by the military judge.  If the witness is present only to testify during the sentencing phase of the trial, however, the witness may observe the findings portion of the trial before testifying.

    h. The bailiff will announce loudly, "ALL RISE," on the following occasions:

        (1)  Each time the judge enters or leaves the courtroom while wearing the judicial robe.

        (2)  Each time the court members collectively enter or exit the courtroom.

23

APPENDIX A-268

i.  The bailiff will ensure the members are in proper order before they enter the courtroom. Members should refer to the seating chart posted in the deliberations room, for reference.

j.  As counsel call for a witness, the bailiff will quickly leave the courtroom to obtain the witness and escort the witness into the courtroom.  Counsel should provide to the bailiff a list of witnesses and the order in which they are to be called, so the bailiff can position the next witness close to the courtroom (in the event the witness waiting area is located some distance from the courtroom).  After the witness testifies, the bailiff will escort the witness from the courtroom while obtaining the next witness.

k.  The bailiff will not discuss the testimony of witnesses or the happenings within the courtroom with the court members,  with other witnesses, spectators, or anyone else while the trial is ongoing.

l.  After each trial day and after the trial terminates, the bailiff will assist the trial counsel in restoring the courtroom, deliberation room, waiting room area, and latrines to a neat and orderly appearance.  This duty may include emptying the trash containers in these rooms and ensuring each latrine contains an adequate supply of toilet paper, paper towels and soap.

m.  After trial concludes, the bailiff is responsible for entering the deliberations room and recovering all notes, slips of paper and other written documents.  The bailiff will not read any of these documents, but will take them directly to the nearest shredder and destroy them.

n.  The bailiff's duties continue until the trial counsel releases the bailiff after trial.

APPENDIX A-269

**APPENDIX E**

Court Member Questionnaire

This questionnaire is submitted to detailed court members under Rule for Courts-Martial 912(a)(1), Manual for Courts-Martial.  Its purpose is to provide counsel with general information relevant to a member's participation in a particular case.  This information will be made available to trial and defense counsel before trial so that they may have general information about a member's background before assembly of the court and is also available to the military judge.  Disclosure of this information is voluntary. Nondisclosure may require a member to provide such matters at trial.  By requesting this information on a one-time basis before you actually serve as a member, repetitive questions and unnecessary delay can be avoided.  Your responses should be forwarded to the Office of the Staff Judge Advocate, ATTN: Chief, Criminal Law Division.

1.  Full name: _____

                                  Last        First            Middle

2.  Rank: _____

3.  Date of rank: _____     4.  Sex: _____     5.  Race: _____

6.  Date of birth: _____     7.  Marital Status: _____

8.  Sex, age and number of dependents: _____

_____

9.  Home of Record: _____

10.  Current unit to which assigned and duty assignment: _____

_____

11.  Civilian education:

                      <u>First</u>                      <u>Second</u>

a.  Name of school: _____     _____

b.  Location:     _____     _____

c.  Years attended:     _____     _____

d.  Major:     _____     _____

e.  Degree received:     _____     _____

12.  Military Education:

        a.  _____

        b.  _____

APPENDIX A-270

c. _____

d. _____

13.  Past duty assignments (last 10 years).

From/To                    Command                    Position

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____
Signature

APPENDIX A-271

**APPENDIX F**

**Witness Identification Form**

Rank (if military): _____

Full Name: _____
                          First                          Middle                    Last

(If military):  Unit of Assignment: _____

                       Installation & State: _____


(If Civilian):      City, State: _____

27

**APPENDIX G**

<div style="border: 1px solid black">

**AUTHENTICATION OF THE RECORD OF TRIAL**

**IN THE CASE OF**

[NAME, SSN, RANK]

[UNIT AND ADDRESSS]


I received the completed record of trial for review and authentication on _____(date)_____.


_____
(Name of Military Judge)
  (MAJ)(LTC)(COL), JA
Military Judge

DATE:_____


ACKNOWLEDGEMENT OF RECEIPT AND EXAMINATION


I received the record of trial for review in the foregoing case on _____(date)_____ .


_____
(Name of Defense Counsel)
  (CPT)(MAJ)(LTC), JA
Defense Counsel

DATE:_____


The record of trial was served on defense counsel on _____(date)_____ . After verifying receipt with defense counsel on _____date_____ and conferring with the military judge on review by defense counsel on _____date_____, the record was forwarded for authentication without completion of defense counsel's review.


_____
(Name of CoJ)
  (CPT)(MAJ)(LTC), JA
Chief, Military Justice

</div>

28

APPENDIX A-273

**UNITED STATES ARMY TRIAL JUDICIARY**

**RULES OF PRACTICE BEFORE ARMY COURTS-MARTIAL**

**Index**

| A |
|---|

Addressing the judge, 6
Appendix A
   Docket Notification Form, 16
Appendix B
   Docketing order format, 19
Appendix C
   Motion and response format, 21
Appendix D
   Bailiff's duties, 23
Appendix E
   Court Member Questionnaire, 25
Appendix F
   Witness Identification Form, 27
Appendix G
   Authentication of Record of Trial, 28

| C |
|---|

Closing arguments, 11
Conduct
   Bailiff responsibilities, 14
   Conduct of counsel, 10
   Communications, *ex parte,* 6
   Prohibitions, 6
   Punctuality, 5
   Spectators, 7
      General, 7
      Restrictions, 7
      Sanctions, 7
Continuances, 1
Court Reporter, 11

| D |
|---|

Decorum, 5
   Bar of the courtroom, 6
   Facility cleanliness, 6
   Uniform requirements, 6
      Civilian, 7
      Civilian counsel and court reporters, 6
      Exceptions, 7
      Military, 7
Docketing procedures and continuances, 1

| E |
|---|

Effective date, 15
Exhibits, 8
   Copies, 9
   Demonstrative evidence, 9
   Judicial Notice, 11
   Marking, 8
   Safeguarding evidence and firearms, 9
   Substitution, 9
*Ex parte* communications, 6

| F |
|---|

Findings and sentence worksheets, 12

| I |
|---|

Instructions, 12

| N |
|---|

Notice requirements
   Defense counsel requirements, 3
      Evidence and discovery issues, 4
      General, 3
      Notice of certain defenses, 4
      Pleas, 3
      Witness lists, 4
   Trial counsel requirements, 2
      Alternate disposition, 2
      Court members, 2
      Court reporter (notification), 3
      Pretrial agreements, 2
      Trial documents, 3
      Witness lists, 3
      Witnesses, 2

| O |
|---|

Objections, 11
Opening statements, 8

| P |
|---|

Post-trial matters, 13
   Post-trial and appellate rights, 13
   Records of trial, 13

APPENDIX A-274

Presentation of the accused, 12
Pretrial practice and notice requirements, 2
    Motions, 4
        Speedy trial motions, 5
        Stipulations in motions hearings, 5
    Pretrial sessions, 5
        Arraignments, 5
        Court reporter (notification), 3
        Requests, 5

**R**

Record of trial, 13
    Court reporter responsibility, 14
    Defense counsel review, 13
    Errata, 13
    Time for review, 13
    Trial counsel review, 13
Restraint of the accused and witnesses, 12
    Accused, 12
    Witnesses, 12

**S**

Supporting trial personnel, 14
    Bailiff, 14
    Courtroom security, 14
    Guards, 14

**T**

Trial procedure, 7
    Pleas, 7
    Stipulations, 7
    Voir dire, 8
    Withdrawal by counsel, 12
        Detailed defense counsel, 12
        Individual counsel, 12
        Trial counsel, 12
    Witnesses, 10
Trial procedure guide, 12

**V**

Voir dire, 8
    Conduct, 8
    Individual voir dire, 8
    Questionnaires, 25

**W**

Weapons, 9, 14
Witnesses, 10
    Oaths and identification, 10
    Preparation, 10
    Presence in the courtroom during trial, 10
    Witness Identification Form, 27

APPENDIX A-275

IN THE UNITED STATES COURT OF APPEALS
FOR THE ARMED FORCES

| | |
|---|---|
| Center for Constitutional Rights, et al.,<br>      Petitioners-Appellants | ) GOVERNMENT SUPPLEMENTAL BRIEF ON<br>) THE COURT'S SPECIFIED ISSUES<br>) |
| v. | ) **Crim. App. Dkt. No. Misc. 20120514**<br>) |
| UNITED STATES OF AMERICA | ) **USCA Misc. Dkt. No. 12-8027/AR**<br>)<br>) |
| and | )<br>) |
| Colonel DENISE LIND<br>Military Judge,<br>     Respondents-Appellees. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CHAD M. FISHER
Captain, U.S. Army
Office of the Judge Advocate
  General, United States Army
Appellate Government Counsel
U.S. Army Legal Services
  Agency
9275 Gunston Road
Fort Belvoir, Virginia 22060
(703) 693-0783
chad.m.fisher.mil@mail.mil
**Lead Counsel**
C.A.A.F. Bar Number 34883

AMBER J. ROACH
Lieutenant Colonel, U.S. Army
Acting Chief, Government
  Appellate Division
C.A.A.F. Bar Number 35224

## Index to Brief

Table of Cases, Statutes, and Other Authorities ............iii

Specified Issues ............................................1

Summary of Argument ........................................2

Law and Argument ...........................................3

    1. **Scope of the All Writs Act** .......................... 3

    2. **The military judge does not have authority
    to affirmatively release the record of trial to the
    public** .............................................. 6

    3. *ABC, Inc. v. Powell* and *United States v. Hershey*
    are not applicable here ............................. 15

    4. **Standing** .......................................... 17

Conclusion ............................................... 20

Certificate of Service ................................... 21

APPENDIX A-277

## Table of Cases, Statutes, and Other Authorities

### Supreme Court of the United States

*Cafeteria Workers v. McElroy*,
    367 U.S. 886 (1961) ....................................14

*Clinton v. Goldsmith*,
    526 U.S. 529 (1999) ..................................2, 3

*FTC v. Dean Foods Co.*,
    384 U.S. 597 (1966)......................................5

*Greer v. Spock*,
    424 U.S. 828 (1976) ....................................14

*Lewis v. Casey*,
    518 U.S. 343 (1996) ....................................17

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................17, 18

*McClaughry v. Deming*,
    186 U.S. 49 (1902) .....................................12

*Nixon v. Warner Communications*,
    435 U.S. 589 (1978) ....................................11

*Roche v. Evaporated Milk Association*,
    391 U.S. 21 (1943) ......................................5

*United States v. Craft*,
    535 U.S. 274 (2002) ......................................8

*United States v. Denedo*,
    556 U.S. 904 (2009) ...................................3, 4

### Federal Circuit Courts of Appeal

*Capital Cities Media, Inc. v. Chester*,
    797 F.2d 1164 (3rd Cir. 1986) ...........................9

APPENDIX A-278

**United States Court of Appeals for the Armed Forces**

*ABC, Inc. v. Powell,*
    47 M.J. 363 (C.A.A.F. 1997) .........................15, 16

*Courtney v. Williams,*
    1 M.J. 267 (C.M.A. 1976) ................................5

*Denedo v. United States,*
    59 M.J. 478 (C.A.A.F. 2004) ............................4

*Font v. Seaman,*
    43 C.M.R. 227 (C.M.A. 1971)............................5

*United States v. Chisholm,*
    59 M.J. 151 (C.A.A.F. 2003) ...........................17

*United States v. Hershey,*
    20 M.J. 433 (C.M.A. 1985) .........................15, 16

*United States v. Johnson,*
    48 C.M.R. 665 (C.M.A. 1974) ..........................12

*United States v. Lopez de Victoria,*
    66 M.J. 67 (C.A.A.F. 2008) ............................4

*United States v. Ryan,*
    5 M.J. 97 (C.M.A. 1978) ..............................12

*United States v. Snyder,*
    40 C.M.R. 192 (C.M.A. 1969).............................5

*United States v. Travers,*
    25 M.J. 61 (C.M.A. 1987) .............................16

*United States v. Weichmann,*
    67 M.J. 456 (C.A.A.F. 2009) ..........................11

*United States v. Weiss,*
    36 M.J. 224 (C.M.A. 1992) .........................11, 12

*United States v. Wuterich,*
    67 M.J. 63 (C.A.A.F. 2008) ...........................17

iv

## Courts of Criminal Appeals

*United States v. Dionne*,
   6 M.J. 791 (A.C.M.R. 1978) ..............................7

*United States v. Gragg,*
   10 M.J. 732 (N.M.C.R. 1980) ...........................11

*United States v. Seal,*
   38 M.J. 659 (A.C.M.R. 1993) ...........................8

## Uniform Code of Military Justice

Article 28 ...............................................7

Article 38(a) ............................................6

Article 54(a) ............................................6

Article 65 ...............................................7

Article 66 ...............................................3

Article 67 ...............................................3

## Federal Statutes

5 U.S.C. § 551 .....................................passim

5 U.S.C. § 552 .....................................passim

28 U.S.C. § 751 .........................................11

28 U.S.C. § 753 .........................................11

## Rules for Courts-Martial (R.C.M.)

R.C.M. 502, Discussion ...................................7

R.C.M. 808, Discussion ...................................7

R.C.M. 701 ...............................................8

R.C.M. 1103 ..............................................8

APPENDIX A-280

## Other Authorities

Army Regulation 27-10, Military Justice,
    3 October 2011.......................................passim

Army Regulation 25-55, The Department of the Army
    Freedom of Information Act Program,
    1 November 1997.....................................passim

U.S. Army Trial Judiciary, Rules of Practice Before
Army Courts-Martial, 26 March 2012............................7

Department of Justice Guide to the Freedom of
Information Act, Proactive Disclosures.......................10

Regulation for Trial by Military Commission, 2011............12

Brief for the Petitioners, *Clinton v. Goldsmith*
    1998 WL 880845...........................................5

APPENDIX A-281

TO THE HONORABLE, THE JUDGES OF THE
UNITED STATES COURT OF APPEALS FOR THE ARMED FORCES

<u>Specified Issues</u>

I.

WHETHER, IN LIGHT OF <u>DENEDO v. UNITED
STATES</u>, 556 U.S. 904 (2009), <u>CLINTON v.
GOLDSMITH</u>, 526 U.S. 529 (1999), <u>UNITED
STATES v. LOPEZ de VICTORIA</u>, 66 M.J. 67
(C.A.A.F. 2008), <u>UNITED STATES v. HERSHEY</u>,
20 M.J. 433 (C.M.A. 1985), ARTICLES 36, 66,
AND 67, UCMJ, AND RULE FOR COURTS-MARTIAL
806, THIS COURT AND THE UNITED STATES ARMY
COURT OF CRIMINAL APPEALS HAVE SUBJECT-
MATTER JURISDICTION OVER APPELLANTS' REQUEST
FOR EXTRAORDINARY RELIEF.

II.

WHETHER APPELLANTS, NON-PARTIES TO THE
COURT-MARTIAL, HAVE STANDING IN THIS COURT
OR THE UNITED STATES ARMY COURT OF CRIMINAL
APPEALS TO FILE A REQUEST FOR EXTRAORDINARY
RELIEF IN THIS MATTER.

III.

ASSUMING JURISDICTION, (1) IN THE CONTEXT OF
THE RECORDS NOW AT ISSUE, WHICH OFFICIALS
ARE LAWFULLY AUTHORIZED TO DIRECT PUBLIC
RELEASE OF SUCH RECORDS, AND (2) TO WHAT
EXTENT MUST APPELLANTS FIRST DEMONSTRATE
THAT THEY HAVE MADE THEIR INITIAL REQUEST TO
AN APPROPRIATE RECORDS CUSTODIAN AND HAD
SUCH REQUEST DENIED.

APPENDIX A-282

## Summary of Argument

The court's subject matter jurisdiction in this case turns on whether the military judge has authority to publicly release the requested documents.  If she has such authority, then a judge's denial of public access would be within this Court's jurisdiction to review.  If not, then the judge's action was not within the scope of the military justice system.

Here, the military judge does not have authority to affirmatively release these documents.  That authority is committed by statute and regulation to the Judge Advocate General (TJAG).  TJAG's decision to release or withhold court-martial records is not reviewable by this Court as it is a separate administrative decision, which the Court does not have jurisdiction to consider.[1]  Appellant is free to seek judicial review of TJAG's decision in an Article III court, the forum designated by Congress.

Further, since the military judge does not have authority to publicly release these documents, appellants have no standing at this court because they suffered no injury.  Appellants are not "denied" access to the record of trial when they request access from someone not empowered to grant it.

---

[1] *Clinton v. Goldsmith*, 526 U.S. 529, 536 (1999).

2

APPENDIX A-283

<u>Law and Argument</u>

1.   <u>Scope of The All Writs Act</u>[2]

This Court is an Article I court with limited jurisdiction that is "narrowly circumscribed."[3]  The Court's jurisdiction is restricted by statute to court-martial cases reviewed by a Court of Criminal Appeals (CCA) involving specific types of sentences.[4]

The All Writs Act is not an independent grant of jurisdiction, nor does it enlarge the Court's existing statutory jurisdiction.[5]  Rather, the Act provides that "all courts established by Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."[6]  The Act requires two separate determinations: first, whether the requested writ is "in aid of" the court's existing jurisdiction; and second, whether the requested writ is "necessary or appropriate."[7]

_____

[2] The Government believes this Court does have jurisdiction to resolve appellant's R.C.M. 802 complaint, but maintains its original position that the issue lacks merit.
[3] *Goldsmith*, 526 U.S. at 535.
[4] 10 U.S.C. § 866(b), 867(a).  If read narrowly, one could argue that under Article 67, this Court has no jurisdiction to hear *original* petitions for extraordinary relief; the court could only review petitions on appeal from a CCA.
[5] 28 U.S.C. § 1651(a); *Goldsmith*, 526 U.S. at 535 (internal citations omitted).
[6] 28 U.S.C. § 1651(a).
[7] *Denedo v. United States*, 66 M.J. 114, 119 (C.A.A.F. 2008); *Goldsmith*, 526 U.S. at 534-35.

APPENDIX A-284

The precise contours of the phrase "in aid of" have not been well-defined by the courts.  In *Denedo*, though, this Court stated that a petition for extraordinary relief is "in aid of" the Court's jurisdiction when the petitioner seeks to "modify an action that was taken within the subject matter jurisdiction of the military justice system."[8]  The Supreme Court subsequently affirmed that portion of *Denedo*: "As the text of the All Writs Act recognizes, a court's power to issue any form of relief – extraordinary or otherwise – is contingent on that court's subject-matter jurisdiction over the case or controversy."[9]

A writ petition may be "in aid of" this Court's statutory jurisdiction even though it addresses an interlocutory matter, where no finding or sentence has yet been entered in the court-martial.[10]  Thus, the government agrees with appellant that this Court may, as a general matter, hear interlocutory writ-petitions.[11]  The Supreme Court interpreted the All Writs Act this way in *Roche v. Evaporated Milk Association*:

---

[8] *Denedo*, 66 M.J. at 120.
[9] *United States v. Denedo*, 556 U.S. 904, 911 (2009).
[10] *See, e.g., United States v. Lopez de Victoria*, 66 M.J. 67, 75 (C.A.A.F. 2008)(Ryan, J., dissenting)(noting that an Article 62 appeal is an interlocutory matter which by its nature has no finding, sentence, or convening authority action).
[11] Appellant's Post-Argument Supplement Brief (ASB) at 1-2.

4

APPENDIX A-285

> As the jurisdiction of the circuit court of appeals is exclusively appellate, its authority to issue writs of mandamus is restricted by statute to those cases in which the writ is in aid of that jurisdiction. Its authority is not confined to the issuance of writs in aid of a jurisdiction already acquired by appeal but extends to those cases which are within its appellate jurisdiction although no appeal has been perfected. Otherwise the appellate jurisdiction could be defeated and the purpose of the statute authorizing the writ thwarted by the unauthorized action of the district court obstructing the appeal.[12]

This Court also recognized the authority to hear interlocutory matters on petition for extraordinary relief in *Courtney v. Williams*:

> We conclude, therefore, that in an appropriate case, this Court clearly possesses the power to grant relief to an accused prior to the completion of court-martial proceedings against him....We may resort to extraordinary writs where such will be in aid of our jurisdiction over cases properly before us or which may come here eventually...."[13]

Contrary to appellant though, the generic authority to hear interlocutory petitions does not necessarily mean

---

[12] *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 25 (1943).  The Government's brief in *Clinton v. Goldsmith* also recognized the doctrine of potential jurisdiction under the All Writs Act.  *See* Brief for the Petitioners, *Clinton v. Goldsmith*, 1998 WL 880845 at *15-16 (citing *FTC v. Dean Foods Co.*, 384 U.S. 597, 603 (1966)).

[13] 1 M.J. 267, n.2 (C.M.A. 1976); *see also United States v. Snyder*, 40 C.M.R. 192, 195 (C.M.A. 1969); *Font v. Seaman*, 43 C.M.R. 227, 230 (C.M.A. 1971)(noting that the All Writs Act "permits this Court to intervene in court-martial proceedings which may be subject to our review under Article 67(b)....").

there is jurisdiction in this case.[14]  Here, appellate review of the military judge's decision cannot be "in aid of" the Court's subject matter jurisdiction because the judge does not have authority to publicly release the record of trial.  Congress and the Secretary of the Army (SECARMY) committed that authority to TJAG through the Freedom of Information Act (FOIA).  Appellants have asked the military judge to do something she has no authority to do.

**2.   The military judge does not have authority to affirmatively release the record of trial to the public.**

Several provisions of the UCMJ address records of trial, but none discuss the authority to publicly release it.  Article 54(a), UCMJ, codifies the requirement for a record of trial: "Each general court-martial shall keep a separate record of the proceedings in each case brought before it, and the record shall be authenticated by the signature of the military judge."  Further, Article 38(a) states that the trial counsel, under the direction of the court, is responsible for preparing the record of trial.

---

[14] *See, e.g., Denedo*, 556 U.S. at 913 ("[T]he CAAF describes respondent's request for review as one 'under the All Writs Act.' This is correct, of course, if it simply confirms that the Act authorizes federal courts to issue writs 'in aid of' their jurisdiction; but it does not advance the inquiry into whether jurisdiction exists.").

6

Though not specifically mentioned in the UCMJ, custody of exhibits during the court-martial is the shared responsibility of the court reporter (who is appointed by the convening authority),[15] trial counsel,[16] and the military judge.[17]

Post-trial, Article 65, UCMJ vests control over disposition of records to TJAG and SECARMY.  SECARMY in turn promulgated Army Regulation (AR) 27-10, Military Justice, para. 5-49, which gives TJAG "authority to issue directions...changing the procedures for preparing, copying, serving, certifying, authenticating, or distributing records of trial...."  Under this statutory and regulatory structure, responsibility for and control over the record is not vested in a single person.  Rather,

_____

[15] Article 28, UCMJ; *United States v. Dionne*, 6 M.J. 791 (A.C.M.R. 1978); *see also* R.C.M. 502(d)(5), Discussion ("Trial counsel should: ensure that a suitable room, *a reporter* (if authorized) and necessary equipment and supplies are provided for the court-martial....")(emphasis added); AR 27-10, Military Justice, 3 October 2011, para. 5-11a ("Reporters will be detailed to all [special courts-martial] and [general courts-martial].").

[16] *See* R.C.M. 808, Discussion ("Trial counsel should also ensure that all exhibits and other related documents relating to the case are properly maintained for later inclusion in the record."); U.S. Army Trial Judiciary, Rules of Practice Before Army Courts-Martial, Rule 28.1 ("The assigned court reporter will maintain all original documents until the record of trial is assembled.").

[17] U.S. Army Trial Judiciary, Rules of Practice Before Army Courts-Martial, Rule 28.1 (Exhibits may not be altered, amended, or removed without the permission of the military judge).

responsibility is shared among the military judge, trial counsel, court reporter, and TJAG.  All have some degree of control over the record, and bear some responsibility for producing an accurate and complete record of proceedings.[18]

To be sure, the military judge exercises a substantial degree of control over the record prior to authentication. She may seal exhibits where appropriate,[19] and the trial counsel prepares the record under her direction.[20]  But the power to seal a document does not necessarily include the power to publicly release it.[21]  Neither the Code, the Rules for Courts-Martial (RCM), nor Army Regulation expressly grants the military judge (or TJAG) authority to release court-martial records to the public.  The code's silence on public release of records is not surprising given that Congress expressly provided for public release of court-martial records through a separate statute, the FOIA.[22]

In 5 U.S.C. § 551(1)(F), the definitions section of the FOIA, Congress specifically subjected courts-martial to

---

[18] *United States v. Seal*, 38 M.J. 659, 662 (A.C.M.R. 1993).
[19] R.C.M 701(g)(2), R.C.M. 806(d).
[20] R.C.M. 1103(b)(1).
[21] The Government submits that this is analogous to the "bundle of sticks" expression from property law.  *See, e.g., United States v. Craft*, 535 U.S. 274, 278 (2002).  While the judge has specific authority to seal portions of the record, that does not mean she has authority to release it.
[22] *See* 5 U.S.C. § 552.

8

APPENDIX A-289

FOIA's disclosure requirements.  The Department of the Army
promulgated Army Regulation 25-55, The Department of the
Army Freedom of Information Act Program, to meet this
Congressional mandate.  Under that regulation, TJAG is
authorized to act on requests for records relating to
courts-martial.[23]  There is no temporal limit on this
authority (i.e., pretrial or post-trial).  If anything, the
fact that Congress created a separate statutory mechanism
to provide public access to court-martial records cuts
against the argument that the judge has authority to
release the record.

    This statutory and regulatory design makes logical
sense.  Court-martial records are agency records of the
Department of the Army.[24]  If the military judge had
independent authority to release the record of trial, then
the military judge (and by extension this Court and the
CCA) would be responsible for deciding which information
"must be made available to the public and by what criteria
such decisions will be made."[25]  In essence, the court would
be required to "fashion a constitutional freedom of

_____

[23] AR 25-55, para. 5-200(d)(14).
[24] AR 25-55, para. 1-402 (defining agency record).
[25] *Capital Cities Media, Inc. v. Chester,* 797 F.2d 1164, 1167
(3rd Cir. 1986).

9

information act."[26]  Congress and the Department of the Army have already created that system, delegating responsibility to release records to TJAG,[27] and judicial review to the Article III courts.[28]  If appellant wishes to challenge the constitutionality of that system, the proper forum is federal district court, not this Court.[29]

Notwithstanding the statutory structure, appellant argues the military judge has inherent authority to release the record of trial.  Relying on *Nixon v. Warner Communications*, appellant argues that "[e]very court has supervisory power over its own records and files" and federal courts have "frequently relied on their inherent powers over their own records to expunge judicial

---

[26] *Id.* (Noting that "[t]he founding fathers intended affirmative rights of access to government-held information, other than those expressly conferred by the Constitution, to depend upon political decisions made by the people and their elected representatives.").

[27] AR 25-55, para. 5-200(d)(14).

[28] 5 U.S.C. § 552(a)(4)(B).

[29] Certainly the FOIA does not prohibit OTJAG from affirmatively publishing portions of the record of trial in a reading room. http://www.justice.gov/oip/foia_guide09/proactive-disclosures.pdf.  However, this Court has no jurisdiction to review that decision.  That claim must be made in an Article III court.  The Government also notes that AR 25-55 cautions against the premature release of information during a court-martial because it may result in prejudice to the accused.  *See* AR 25-55, para. 5-101(d).

APPENDIX A-291

records...."[30]   This comparison to federal courts is inapposite, and is wrong for several reasons.

First, unlike a federal judge, military judges have no "inherent judicial authority separate from a court-martial to which they have been detailed."[31]   Military judges "have only such powers as are expressly granted them by statute, regulation, or decisional law."[32]   A federal judge may inherently "own" the record,[33] but a military judge does not.

Second, unlike federal courts, the military justice system has no standing courts at the trial level, and no standing clerk's office charged with maintaining records of trial.[34]   The first standing courts in the military justice system are the Courts of Criminal Appeals.   At the trial level, courts-martial are temporary courts created entirely

---

[30] ASB at 21, citing *Nixon v. Warner Communications*, 435 U.S. 589, 598 (1978).   *See also* 28 U.S.C. § 751(a) (each district court may appoint a clerk who shall be subject to removal by the court); 28 U.S.C. § 753(a) (each district court shall appoint court reporters); 28 U.S.C. § 753 (reporter shall file record of trial with the clerk who preserves them for not less than ten years).

[31] *United States v. Weiss*, 36 M.J. 224, 228 (C.M.A. 1992), *aff'd*, 510 U.S. 163 (1994); *United States v. Weichmann*, 67 M.J. 456, 461 (C.A.A.F. 2009).

[32] *United States v. Gragg*, 10 M.J. 732, 736 (N.M.C.R. 1980).

[33] *See* footnote 30, *supra*.

[34] *See* 28 U.S.C. § 751; Fed. R. Crim. P. 55 (2011) (Records).

APPENDIX A-292

by statute.[35]  They are the "creature of an order
promulgated by an authorized commander which convenes, or
creates, the court-martial entity.  Without such an order,
there is no court."[36]  Once its purpose is accomplished, the
court-martial is "dissolved."[37]

Third, federal courts are not subject to FOIA's
disclosure requirements.[38]  Notably though, even under the
military commissions system, which is subject to FOIA,[39] the
military judge does not release records to the public.
Rather, the Deputy Secretary of Defense created the Chief
Clerk of the Trial Judiciary,[40] who is responsible for
releasing information (filings, opinions, etc.) to the
custodian of the Office of Military Commissions website.[41]

These fundamental and systemic differences make any
comparison to the federal system unpersuasive.  The
military judge simply does not have "inherent" authority to
release the record.

---

[35] *United States v. Johnson*, 48 C.M.R. 665, 666 (C.M.A. 1974).
[36] *United States v. Ryan*, 5 M.J. 97, 101 (C.M.A. 1978)(internal
citations omitted); *see also McClaughry v. Deming*, 186 U.S. 49,
62 (1902).
[37] *Weiss*, 36 M.J. at 228.
[38] 5 U.S.C. § 551(1)(B).
[39] 5 U.S.C. § 551(1)(F).
[40] *See* Regulation for Trial by Military Commission, Rule 17-1(b)
(2011 Edition).
[41] *See* Regulation for Trial by Military Commission, Rule 19-4(a).

APPENDIX A-293

Appellant also suggests that the military judge can release the record because she has already "ordered that [defense briefs] may be published" on the internet.[42]  This strained argument is not supported by the facts in the record.  The military judge did not affirmatively authorize publication of the record; rather, as the military judge noted, *defense counsel* notified the government of its intent to publish all previous defense filings *unless* subject to protective order by the Court.[43] Consequently, the judge issued a protective order to ensure defense counsel did not publish classified or MRE 506 privileged information exchanged in discovery.[44]  This was entirely appropriate given that there had already been two classified information spillages in this case.[45] Appellant's version of the facts is simply unsupported, and this example only furthers the distinction between the judge's authority to prohibit release of information, and the separate authority to publicly release it.

Finally, appellant argues this issue is within the court's jurisdiction because it impacts the public trial right, and "the integrity of the trial will be irreparably

_____

[42] ASB at 24.
[43] R. 13.
[44] R. 15.
[45] R. 15.

13

damaged by failure to grant the relief sought here....”[46] But the fact that an executive or agency action impacts the public's First Amendment public trial right, standing alone, is not sufficient to trigger this court's jurisdiction.  There are many actions that may impact the First Amendment public trial right.  Hypothetically, an installation commander may restrict public access to a military installation for security reasons.[47]  Certainly that could impact the media's and the public's ability to access or attend ongoing court-martial proceedings.  But such action is not reviewable in this Court and it could only be heard in an Article III court.  Impact alone is not enough; the court must also focus on the cause.  The action complained of must be tied to the Code.

In sum, the military judge has no statutory, regulatory, or inherent authority to publicly release the record of trial.  Her control over the record of trial is limited, and cannot be equated to an Article III judge.  In the military justice system, responsibility for preparing

---

[46] ASB at 4.

[47] *See, e.g.*, *Greer v. Spock*, 424 U.S. 828, 838 (1976), quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 893 (1961) (“A necessary concomitant of the basic function of a military installation has been ‘the historically unquestioned power of (its) commanding officer summarily to exclude civilians from the area of his command.’ ”)

14

APPENDIX A-295

the record of trial is shared between the military judge,
the court reporter, and the trial counsel.  Post-trial
disposition of the record of trial rests with TJAG.  And,
pursuant to FOIA, public release is committed to TJAG as
well.  Since the military judge has no authority to release
the record to the public, review of her order directing
appellants to the proper record custodian is not "in aid
of" the subject matter jurisdiction of this court.

**3.   _ABC, Inc. v. Powell_ and _United States v. Hershey_ are
not applicable here.**

This Court's decisions in _ABC, Inc. v. Powell_ and
_United States v. Hershey_ are not applicable to this case
because as of the date of the judge's challenged ruling,
the proceedings in _United States v. Manning_ have been open,
and appellant did not allege that any document has actually
been sealed by the judge.[48]  In _ABC, Inc._, the special
court-martial convening authority (SPCMCA) closed the
entire Article 32 investigation to the public.[49]  In
_Hershey_, the military judge closed the courtroom during the

_____

[48] R. 19, 20. _United States v. Hershey_, 20 M.J. 433 (C.M.A.
1985); _ABC, Inc. v. Powell_, 47 M.J. 363 (C.A.A.F. 1997).
[49] _ABC, Inc._, 47 M.J. at 364.

15

APPENDIX A-296

merits testimony of the complaining witness.[50]  Neither has

happened in this case.

If the military judge were to actually close the

courtroom, or seal a document, that would be an exercise of

her authority under R.C.M. 806 and would be within this

court's subject-matter jurisdiction to review.  If and when

either of those two actions occur, as the government noted

in its original brief, appellant could file an

extraordinary writ at the CCA or this Court.

As noted above, the military judge's power to seal

documents does not necessarily include the power to grant

affirmative access to the record.  In the military justice

system, these two powers are given to different people.

The military judge has authority to seal a document under

R.C.M. 806.  TJAG has authority to release the record under

the FOIA and AR 25-55.  These two powers are discrete and

---

[50] *Hershey*, 20 M.J. at 435.  This Court has been less than clear
in its opinions regarding the application of the First Amendment
public trial right to courts-martial.  In *Hershey*, the Court
stated: "Without question, the sixth amendment right to a public
trial is applicable to courts-martial."  20 M.J. at 435-36.  But
when discussing the First Amendment, the Court was much less
explicit stating only that, "In addition to the sixth-amendment
right of an accused to a public trial, the Supreme Court has
held that the press and general public have a constitutional
right under the first amendment to access criminal trials."  20
M.J. at 436.  This Court then went on to hold that the Supreme
Court's first amendment test was not met.  *Id.; see also United
States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987).

16

cannot be lumped together just because both may result in withholding a particular document from the public.

**4.   Standing**

Separate from the lack of subject-matter jurisdiction, appellant also has no standing to bring this claim because he suffered no injury.  "The jurisdictional concept of standing normally concerns the limitation of the judicial power of the United States to [c]ases and [c]ontroversies."[51]  This Court, as an Article I court, "has applied the principles from the 'cases' and 'controversies' limitation as a prudential matter."[52]

The constitutional minimum of standing is designed to prevent "courts of law from undertaking tasks assigned to the political branches."[53]  It contains three elements.  First, the petitioner must have suffered an "injury in fact," which is the "invasion of a legally protected interest" that is "concrete and particularized."[54]  Second, "there must be a causal connection between the injury and the conduct complained of."[55]  Third, "it must be likely as

---

[51] *United States v. Wuterich*, 67 M.J. 63, 69 (C.A.A.F. 2008) (alterations in original), citing U.S. Const. art. III, § 2.
[52] *Id.*, citing *United States v. Chisholm*, 59 M.J. 151, 152 (C.A.A.F. 2003).
[53] *Lewis v. Casey*, 518 U.S. 343, 349 (1996).
[54] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).
[55] *Id.*

17

APPENDIX A-298

opposed to merely speculative, that the injury will be redressed by a favorable decision."[56]

The problem here is not that appellant is a member of the public, or that the injury is too speculative.[57] Rather, appellant cannot satisfy the first element of standing because he has not been injured at all. Appellant's entire standing argument is premised on the fact that the military judge denied him access to the record.[58] That simply did not happen; the military judge did not "deny" appellant access to anything. The only entity authorized by statute or regulation to grant or deny appellant access to the record is the Office of the Judge Advocate General.[59] Here, the military judge recognized she did not have authority to release the record to the public and directed appellant to the proper record custodian.[60] This is no different than had appellant asked the bailiff for access to the record. The military judge could not have denied appellant access to the record because she had no authority to grant it in the first place.

---

[56] *Id.* at 561 (internal quotations omitted).
[57] ASB at 15-16.
[58] ASB at 21 ("Petitioner-Appellants here have made their request and been denied; they clearly have standing.").
[59] AR 25-55, para. 5-200(d)(14).
[60] R. 20-21.

18

Moreover, the delays associated with appellant's FOIA request only further the argument that he has no standing and is in the wrong forum.[61]  Under the FOIA and AR 25-55, a requester may seek an order from a United States District Court to compel release of a record after administrative remedies have been exhausted.[62]  By statute, remedies are considered exhausted when an agency fails to comply with applicable time limits.[63]  Thus, if appellant believes the Army has not timely complied with his FOIA request, he has a perfected claim for an Article III court, not this Court.

---

[61] *See* Supplemental Declaration of Shayana Kadidal, para. 3., attached to ASB.
[62] *See also* AR 25-55, para. 5-400(b).
[63] 5 U.S.C. 552(a)(6)(C)(i); AR 25-55, para. 5-400(b).

19

## Conclusion

The decision to publicly release or withhold court-martial records is not an action within the subject-matter jurisdiction of this Court.  The authority to release court-martial records is committed to TJAG, and review of those decisions to Article III courts.

Wherefore, the Government respectfully requests this Honorable Court deny the petition for a writ-appeal.


CHAD M. FISHER
Captain, JA
Office of the Judge Advocate
   General, United States Army
Appellate Government Counsel
9275 Gunston Road
Fort Belvoir, VA 22060
(703) 693-0783
Chad.m.fisher.mil@mail.mil
**Lead Counsel**
C.A.A.F. Bar Number 34883

AMBER J. ROACH
Lieutenant Colonel, JA
Acting Chief, Government
   Appellate Division
U.S.C.A.A.F. Bar No. 35224

20

IN THE UNITED STATES COURT OF APPEALS
FOR THE ARMED FORCES

| | | |
|---|---|---|
| CENTER FOR CONSTITUTIONAL RIGHTS, *et al.*, | ) ) ) | MOTION OF GUARDIAN NEWS AND MEDIA LLC FOR LEAVE TO FILE DECLARATION OF ED PILKINGTON |
| *Appellants*, | ) ) | |
| v. | ) ) | Crim. App. No. |
| UNITED STATES *and* Colonel DENISE R. LIND, Military Judge, | ) ) ) ) | Misc. 20120514 |
| *Appellees*. | ) ) | USCA Misc. Dkt. No. 12-8027/AR |

TO THE HONORABLE, THE JUDGES OF THE UNITED STATES
COURT OF APPEALS FOR THE ARMED FORCES

Pursuant to Rule 30, Guardian News and Media LLC ("the Guardian"), 6th Floor, 536 Broadway, New York, NY 10012, and for the reasons set forth in Guardian's Motion for Leave to File Memorandum as *Amicus Curiae* and Memorandum as *Amicus Curiae*, respectfully moves for leave to file the attached Declaration of Ed Pilkington.

Respectfully submitted,

*Eugene R. Fidell*

Eugene R. Fidell (Bar No. 13979)
Feldesman Tucker Leifer Fidell LLP
1129 20th St., N.W., 4th Floor
Washington, DC 20036
(202) 256-8675 (cell)
efidell@ftlf.com

*Counsel for Movant Guardian News*

1

*& Media LLC*

February 12, 2013

## Certificate of Service

I certify that the foregoing Motion for Leave to File Declaration of Ed Pilkington was, on February 12, 2013 electronically filed with the Clerk of the Court and served on counsel for appellants, appellees, and *amicus curiae* The Reporters Committee for Freedom of the Press electronically or, in the case of David E. Coombs, Esq., by first-class mail, as follows:

1. Clerk of the Court
   United States Court of Appeals for the Armed Forces
   450 E Street, N.W.
   Washington, DC 20442-0001
   (efiling@armfor.uscourts.gov)

2. Shayana D. Kadidal, Esq.
   Center for Constitutional Rights
   666 Broadway, 7th Floor
   New York, NY 10012
   (shanek@ccrjustice.org)

3. David E. Coombs, Esq.
   11 South Angell Street, Suite 317
   Providence, RI
   (first-class mail only)

4. Captain Chad M. Fisher, JA
   Appellate Government Division
   U.S. Army Legal Services Agency
   9275 Gunston Road
   Ft. Belvoir, VA 22060
   (chad.m.fisher@mail.mil)

5. Gregg P. Leslie, Esq.
   The Reporters Committee for Freedom of the Press
   1101 Wilson Blvd., Suite 1100
   Arlington, VA 22209-2100

2

(gleslie@rcfp.org)

*Eugene R. Fidell*

Eugene R. Fidell (Bar No. 13979)
Feldesman Tucker Leifer Fidell LLP
1129 20th St., N.W., 4th Floor
Washington, DC 20036
(202) 256-8675 (cell)
efidell@ftlf.com

3

IN THE UNITED STATES COURT OF APPEALS
FOR THE ARMED FORCES

| | | |
|---|---|---|
| CENTER FOR CONSTITUTIONAL RIGHTS, *et al.*, | ) ) ) | DECLARATION OF ED PILKINGTON |
| *Appellants*, | ) ) ) | |
| v. | ) ) | |
| UNITED STATES *and* Colonel DENISE R. LIND, Military Judge, | ) ) ) ) | Crim. App. No. Misc. 20120514 |
| *Appellees*. | ) ) ) | USCA Misc. Dkt. No. 12-8027/AR |

State of New York    )
                     )    *ss.*:
City of New York     )

1. My name is Ed Pilkington. I make this declaration in support of the Memorandum of Guardian News and Media LLC ("the Guardian") in the above-captioned case. I am chief reporter of the Guardian, a media company incorporated in Delaware whose parent company is the Guardian News and Media Ltd., headquartered in London. I am based in New York City where the Guardian has a rapidly growing team, currently consisting of about 30 journalists, working to produce our U.S. website (www.guardiannews.com).

2. The Guardian's U.S. traffic topped 12.5 million unique monthly users in January 2013, growing at a year-on-year rate of 31%, according to web industry analyst ComScore. The Guardian's U.S. traffic exceeds that of both BBC News and Reuters in the

1

U.S. Globally, the Guardian reaches 36 million unique monthly users, with strong readership across Europe and in Asia, making it the fifth largest newspaper website in the world.

3. Since 2006 I have been based in New York, reporting across the 50 states. In that time I have covered two presidential elections, as well as specializing in a range of subjects that include U.S. immigration, the death penalty and civil liberties. I bring 25 years of journalistic experience to bear on my work, having served as both International News Editor and National News Editor of the Guardian in London before coming to the U.S. I am author of a book on British civil rights, "Beyond the Mother Country."

4. The Guardian has taken a very close interest in PFC Bradley Manning since his arrest in May 2010. The previous year, the Guardian assembled a coalition of international news outlets including *The New York Times*, *Le Monde* and *Der Spiegel*, to act as responsible publishers of a selection of the documents which PFC Manning is accused of having passed to WikiLeaks. (The documents published by the Guardian and our partners were carefully redacted to ensure the safety of individuals.)

5. I have led the Guardian's reporting on PFC Manning since he was apprehended at Forward Operating Base Hammer in Iraq on 26 May 2010. The assignment given to me by my editors was to follow in great detail PFC Manning's incarceration and prosecu-

2

tion as events unfolded. The editorial judgment was that as the alleged source of the biggest leak of state secrets in US history, and as the subject of the most high-profile prosecution of an alleged leaker in at least a generation, PFC Manning's story was of profound public interest.

6. As part of my fulfillment of that brief, I wrote a definitive profile of the soldier that was included as a chapter in a Guardian book, "WikiLeaks: Inside Julian Assange's War on Secrecy." In total, I have written 85 news stories for the Guardian relating to PFC Manning, the first on 2 August 2010 and the most recent on 17 January 2013.

7. Many of those articles have related to the legal process surrounding PFC Manning's court-martial. I have closely tracked the proceedings, from initial charges to the opening of the trial process and through a succession of pre-trial hearings held at Fort Meade, Maryland. I have personally attended several of those hearings -- 10 court days in all -- including the opening hearing on 19 December 2011, the hearing in which PFC Manning addressed the court for the first time on 29 November 2012 and the 8 January 2013 Article 13 ruling that provides the main example of this Declaration (*see* ¶ 27).

8. From the very start of the court-martial proceedings, the highly limited access to information in the case has been an impediment to my reporting. I would like to say at the outset

3

that I am sympathetic in a very complex and sensitive case such as this to the need for some aspects of the evidence to remain confidential between judge, prosecution and defence on grounds of national security. However, I believe that the hurdles I have encountered along the way have gone far beyond what could reasonably be considered necessary on national security grounds and amount to an abrogation of legitimate public access to a very important trial.

9. The importance that I, and my newspaper, attach to the proceedings stem not only from the significance of the charges as I have related above. The accused is also facing one of the stiffest penalties that can be meted out under military justice. Accused of having "aided the enemy" - in this case leaking information that he knew could be used by Al-Qaida - PFC Manning faces possible life in military custody with no chance of parole.

10. The case also has profound implications for press freedom in the U.S. that could have a chilling effect on the Guardian's work in this country and, by extension, my own. The prosecution team has made it clear in the course of the pre-trial hearings at Fort Meade that the "aiding the enemy" charge could still have been brought against the accused had he transferred state secrets to *The New York Times* and not to WikiLeaks as alleged.

4

11. Given the seriousness of the case both to PFC Manning personally and more generally to press freedom, I believe it is all the more vital to allow full public access to information within the acceptable boundaries imposed by national security concerns. By withholding information from me, the U.S. government is making it difficult for me to provide a fair and accurate account of the proceedings and thus running the risk that I and other reporters like me will provide a distorted picture of the trial to the American public and to our readers around the world.

12. I would add one further personal note. As a British citizen who spent the first 18 years of my journalistic career reporting and editing in the UK, I know what it is like to have to operate in a country without a written constitution and with no constitutionally-guaranteed freedom of speech or press. Over the past six years in the US, the last four as a US permanent resident (green card holder), I have grown ever more admiring of the First Amendment of the US constitution and the nurturing environment it provides for open public debate that is crucial in any democracy. I have found the restrictions imposed upon me and my fellow reporters in this case disappointingly out of tune with the First Amendment that I have come to respect so much.

APPENDIX A-309

13. The most onerous impediment that I have experienced covering the PFC Manning proceedings has been the lack of published material from the court. It has frequently been observed in court - not least by the judge in the case, Colonel Denise R. Lind, herself - that this court-martial is generating a vast mountain of legal material and that by the end of the proceedings more pages of documents might have been produced than in any other military trial in US history. Yet the public has been denied access to all but a tiny sample of those documents.

14. Among the documents that have been withheld are the transcripts of the court proceedings. This has been problematic on a number of levels. Reporting a complicated military case such as this is a challenging experience for a civilian reporter who is bombarded by a raft of unfamiliar acronyms: MCBQ PCF, SECNAVINST, RCM 706, NIPR, SIPRNET, ONCIX, HQDA, IRTF, and many more. Over time, the reporter inevitably picks up the vocabulary, but with no transcript to check against it is like learning Spanish without the benefit of a dictionary. The experience is uncomfortable, and more importantly it exposes the reporter to the possibility of making avoidable mistakes.

15. The absence of transcripts poses a particular problem to the reporter who is unable to attend a court hearing on any particular day. There have been several occasions when I have been forced to report the PFC Manning pre-trial hearings at Fort

6

Meade from my desk in New York. Despite our burgeoning presence in New York, the Guardian reporting team remains limited in number given the vast scale of news across the US, and I am not always able to clear my diary and drive the four hours to Fort Meade to attend the proceedings in person. Yet I continue to want to be able to follow the case intimately: it is, as I've explained, both in the public interest and in the Guardian's interest that I do so. Yet with no transcripts to draw from, I am forced to rely on the reporting of other reporters who have made it into court yet who may not provide me with the depth of detail or the specific angles that I am seeking.

16. The decision of the US government not to publish any government motions to the court has a similarly unsettling impact. It means that when the government's legal team, led by the clearly highly competent Major Ashden Fein, comes to present a particular motion to court it is very difficult accurately to record its content and to assess its significance.

17. A further side-effect of the paucity of accessible information is that my reporting tends to become skewed towards the defence. PFC Manning's equally able civilian lawyer, David E. Coombs, has taken the opposite approach to the prosecution and has published a series of defence motions on his website (http://www.armycourtmartialdefense.info/). Though many of the motions have been heavily redacted (apparently on the instruc-

7

tions of the government), they have provided rich source material for many of my articles. If a dispassionate reader were to review my coverage of this case, he or she might infer that I have been disproportionately focused on the defence position, when this is merely a reflection of the fact that the defence has published its motions while the prosecution has not.

18. The most egregious example of the adverse impact of lack of information that I have experienced reporting the PFC Manning prosecution was the Article 13 ruling on 8 January 2013. I was in court that day, and expectantly awaiting the ruling. This was one of the most important moments in the proceedings so far. The defence had accused the US military of subjecting PFC Manning to unlawful pre-trial punishment while he was being kept on Suicide Risk and Prevention of Injury orders in the brig at Quantico Marine Corps Base in Virginia, where he was held from July 2010 to April 2011. The treatment of the soldier at Quantico had attracted media attention from around the world, which in turn had led to an outcry from many human rights groups and from a UN rapporteur who had condemned his conditions as a form of torture. The military had countered that it was carrying out its duties to safeguard the well-being of PFC Manning amid evidence that he had suicidal thoughts.

19. The Article 13 motion produced dramatic testimony to the court at Fort Meade from both sides of the argument at a

8

pre-trial hearing that I attended last November. The witnesses included PFC Manning himself, who spoke in public for the first time since his arrest in 2010.

20. In the wake of the hearing, I awaited with keen interest Judge Lind's ruling on the Article 13 motion. Much was riding on it. Under the terms of the motion, she had the power to dismiss all charges against PFC Manning - she could have released him on the spot, unlikely though that would have been. Her ruling would also present to the public the court-martial's view of one of the most hotly disputed elements of PFC Manning's pretrial confinement: the claim that he was effectively subjected to torture at Quantico.

21. We were alerted on the morning on 8 January 2013 that the judge would be handing down her ruling that day. There was considerable anticipation among reporters, but also considerable trepidation. We had heard Col Lind read out previous rulings to the court and knew that, presumably as a time-saving measure, she did so at exceptional speed. She spoke at a rate that made it impossible for all but the most proficient stenographers or shorthand writers to keep up. (I do use shorthand, but I am nowhere near fast enough to keep up with Col Lind.)

22. Most reporters, including me, decided to stay in the court annex rather than go into the courtroom itself to hear Col Lind's Article 13 ruling. That had the benefit of allowing us to

9

APPENDIX A-313

use our laptops. I touch-type with all 10 fingers and pride my-
self on the speed with which I can take down testimony. But even
so I was not up to this job.

23. In the break before the ruling was announced, I asked
the JAG Corps officer who advises reporters on aspects of mili-
tary justice to pass a note from me asking that Col Lind read
her ruling slowly. The officer said he could not do that.

24. At that point another reporter in the room called out
to me and suggested that the Guardian join the petition for ex-
traordinary relief that was filed with the Army Court of Crimi-
nal Appeals last year seeking access to documents in PFC Man-
ning's court-martial. The comment struck a chord with me. Over
the months in which I had been reporting this case, and in the
context of the hurdles that I had experienced, I had grown in-
creasingly keen that the Guardian add its voice to those calling
for greater public access to documents.

25. The Guardian is not a litigious newspaper. We prefer to
report the news than to make it. But in the UK we have been at
the forefront of efforts to achieve greater freedom of infor-
mation which we see as central to our public function. In the
absence of constitutional rights in the UK, that effort has of-
ten involved petitioning the courts for a judicial remedy to ex-
cessive official secrecy, even where that secrecy resides in the
court system itself. Last year the Guardian successfully pressed

10

for open justice and media access to court documents in the case of *Guardian News and Media Limited v. City of Westminster Magistrates'* Court (http://www.bailii.org/ew/cases/EWCA/Civ/2012/420.html). The application arose out of extradition proceedings brought by the US Government against two British citizens and involved various documents that were cited in court but not made available to reporters. The Guardian won the case on appeal. In its judgment, the Court of Appeal wrote: "In a democracy, where power depends on the consent of the governed, the answer must lie in the transparency of the legal process. Open justice lets in the light and allows the public to scrutinise the workings of the law, for better or for worse."

26. When the petition for an extraordinary writ was first filed it was not an obvious thought for the Guardian to enjoin the legal action. As a traditionally British newspaper we are not accustomed to engaging in legal proceedings in other countries. But in recent months that has changed. The Guardian has established a US operation that is incorporated in this country, and we have become a domestic US publisher through our website. My reporting of the Manning case has been at the forefront of the coverage of this important case within America. We could no longer remain on the sidelines. Hence our desire to submit this Declaration to the Court of Criminal Appeals in support of the

11

APPENDIX A-315

writ appeal filed by the Center for Constitutional Rights and other parties.

27. When Col Lind began to deliver her ruling on 8 January 2013 my fears were realised. She sat down, pulled out a thick document that must have stretched to 50 or 60 pages and launched into her reading of it. She continued to read for the next hour and a half, pausing only to sip from a bottle of water.

28. Col Lind's ruling was even more significant than I had anticipated. It contained a wealth of information about PFC Manning himself: his state of mind at the time he committed the alleged offences; his suicidal state when he was first arrested and sent to Camp Arifjan in Kuwait; and a mass of detail on how he was treated in the brig in Quantico and his responses to that treatment. A full and unabridged version of the judgment would be an invaluable resource for my reporting, both on the day and thereafter. It would greatly enhance my understanding of PFC Manning himself and provide balance in my coverage of the controversy surrounding his treatment in pretrial confinement at Quantico.

29. By contrast, the typewritten notes that I managed to get down on my laptop are incomplete, disjointed and at times incomprehensible. I have kept the file in which I recorded her words, or those that I could catch. Here is a typical portion:

APPENDIX A-316

\* 30 june 2010 after inspection was unresponsibe to commands and began shouting unctronllobaly. refused to return to his cell. began baning bck of head against an adjact wall and floor. knotted sheets into nooses

\* reclassifed max security and SR

30. Such sketchy notes are problematic on several levels. They are devoid of the crucial detail in which the truth of a story, or its vitality, is often found. They are hard to decipher as the contextual material is missing. They are most worryingly prone to causing mistakes because of their jumbled nature and disjointedness. These problems become even graver when the subject is the statement and application of legal principles with which I, as a non-lawyer, have no prior familiarity.

31. The egregiousness of the experience of the Article 13 ruling was all the more serious, in my view, because it was utterly unnecessary. There were clearly no national security grounds for withholding from the public a document that was read in its entirety to the public. It was also out of step with all other walks of public life. Take President Obama's second inaugural address, delivered on 21 January 2013. About 10 minutes before he started speaking, I received in my email inbox a transcript of the speech, courtesy of the White House, that was embargoed against delivery. If such open access is satisfactory for the President, can it not be made to work in a military court?

13

APPENDIX A-317

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 11, 2013.

ED PILKINGTON

IN THE UNITED STATES COURT OF APPEALS
FOR THE ARMED FORCES

```
-------------------------------- x
                                 :
CENTER FOR CONSTITUTIONAL RIGHTS, :
GLENN GREENWALD, JEREMY SCAHILL,  : Crim. App. Misc.
THE NATION, AMY GOODMAN, DEMOCRACY : Dkt. No. 20120514
NOW!, CHASE MADAR, KEVIN GOSZTOLA, :
JULIAN ASSANGE, and WIKILEAKS,    : USCA Misc.
                                 : Dkt. No. 12-8027/AR
                    Appellants,   :
                                 :
                                 : General Court Martial
              v.                  : United States v. Manning,
                                 : Ft. Meade, Maryland
                                 :
UNITED STATES OF AMERICA and CHIEF :
JUDGE COL. DENISE LIND,           : Dated: 4 March 2013
                                 :
                    Appellees.    :
                                 :
-------------------------------- x
```

## MOTION TO SUPPLEMENT THE RECORD PURSUANT TO RULE 30 AND 30A

Pursuant to Rules 30 and 30A of this Court's Rules of Prac-
tice and Procedure, Petitioner-Appellants in this matter hereby
submit this motion to supplement the record by submission of the
attached *Supplemental Declaration of Kevin Gosztola*, a creden-
tialed journalist covering the proceedings in *United States v.
Manning* and a plaintiff in this matter. The supplemental decla-
ration adds to his earlier declaration of May 23, 2012, and
brings to the attention of this Court further difficulties mem-
bers of the press have had in covering the proceedings below in
light of the lack of public access to court orders and other

1

records of the proceedings that have transpired since the oral argument held before this Court on October 10, 2012.

The supplemental declaration also notes that the Army has published some of the orders of the trial court in redacted form pursuant to FOIA, and documents some of the shortcomings of those releases, as well as the fact that several categories of judicial documents Petitioner-Appellants seek here have still not yet been released to the public.

Finally, the declaration notes that PFC Manning has pled guilty to some charges and, as to the rest, has waived jury trial in favor of a bench trial. As noted in the declaration, the absence of a jury pool that might be contaminated by public release of sensitive information should greatly simplify the processing of documents for public release by the trial court under the First Amendment standard going forward.

Good cause exists for this Court to grant this motion, as the facts detailed in the supplemental declaration have arisen since the last briefing in this matter (the post-argument briefs filed by the parties on October 22 and 31, 2012).

Respectfully submitted,

_____/s/sdk_____
Shayana Kadidal
[C.A.A.F. Bar No. 35713]

2

c/o Univ. of Michigan Law School[1]
625 S. State St.
Ann Arbor, MI 48109
Tel: (646) 498-8498

J. Wells Dixon
Baher Azmy, Legal Director
Michael Ratner, President Emeritus
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6427
Fax: (212) 614-6499

Jonathan Hafetz
169 Hicks Street
Brooklyn, NY 11201
Tel: (917) 355-6896

*Counsel for Petitioner-Appellants*

Dated: 4 March 2013

---

[1]    Institutional affiliation noted for identification purposes only, and implies no endorsement by the University.

3

## <u>Certificate of Service</u>

I hereby certify on this 4th day of March, 2013, I caused the foregoing Motion to Supplement the Record Pursuant to Rule 30 and 30A to be filed with the Court and served on Respondents and Amici electronically via email (per this Court's Electronic Filing Order of 22 July 2010), and to be served on the trial and appellate courts below via mail, at the following addresses and facsimile numbers, respectively:

Clerk of the Court
U.S. Court of Appeals for the Armed Forces
450 E Street, NW
Washington, DC 20442-0001
Tel: (202) 761-1448
efiling@armfor.uscourts.gov

- and -

U.S. Army Court of Criminal Appeals
Office of the Clerk of Court
9275 Gunston Road
Fort Belvoir, VA  22060-5546

- and -

Chief Judge Col. Denise Lind
U.S. Army Trial Judiciary, 1st Judicial Cir.
U.S. Army Military District of Washington
Office of the Staff Judge Advocate
103 Third Ave., SW, Ste 100.
Ft. McNair, DC 20319

- and -

David E. Coombs (counsel for Pfc. Manning)
Law Office of David E. Coombs
11 South Angell Street, #317
Providence, RI  02906
Tel: (508) 689-4616
(COURTESY COPY)

- and -

Capt. Judge Advocate Chad M. Fisher
Appellate Government Counsel
Office of the Judge Advocate General
U.S. Army Legal Services Agency

4

9275 Gunston Rd.
Ft. Belvoir, VA 22060
Tel: (703) 693-0783
chad.m.fisher.mil@mail.mil

- and -

Gregg P. Leslie
Robert Tricchinelli
The Reporters Committee for
Freedom of the Press
1101 Wilson Blvd., Suite 1100
Arlington, VA 22209-2100
gleslie@rcfp.org
Tel: (703) 807-2100

- and -

Eugene Fidell
Feldesman Tucker Leifer Fidell LLP
1129 20th Street, NW
4th Floor
Washington, DC 20036
efidell@ftlf.com

                    /s/sdk
                    _____
                    Shayana Kadidal

5

IN THE UNITED STATES COURT OF APPEALS
FOR THE ARMED FORCES

```
-------------------------------- x
                                 :
CENTER FOR CONSTITUTIONAL RIGHTS, :
GLENN GREENWALD, JEREMY SCAHILL,  : Crim. App. Misc.
THE NATION, AMY GOODMAN, DEMOCRACY : Dkt. No. 20120514
NOW!, CHASE MADAR, KEVIN GOSZTOLA, :
JULIAN ASSANGE, and WIKILEAKS,    : USCA Misc.
                                 : Dkt. No. 12-8027/AR
                Appellants,      :
                                 : General Court Martial
            v.                   : United States v. Manning,
                                 : Ft. Meade, Maryland
                                 :
UNITED STATES OF AMERICA and CHIEF :
JUDGE COL. DENISE LIND,          : Dated: 3 March 2013
                                 :
                Appellees.       :
                                 :
-------------------------------- x
```

## SUPPLEMENTAL DECLARATION OF KEVIN GOSZTOLA

I, Kevin Gosztola, hereby declare as follows:

1.    I am a journalist credentialed to cover the court-martial proceedings for PFC Bradley Manning, and a plaintiff in this action. I previously submitted a declaration (dated May 23, 2012) in this action, describing the difficulties I and other credentialed reporters have had in covering the trial court proceedings in *United States v. Manning*. I submit this declaration to supplement my earlier declaration and bring to the attention of this Court developments in the trial court since the oral argument held before this Court on October 10, 2012.

2.    On January 8, 2013, Judge Lind read in open court her entire ruling on the defense's Article 13 motion. She determined PFC Manning had been "unlawfully punished" during his pretrial detention, and awarded him a 112-day sentencing credit. It took her approximately an hour and a half to read her ruling. She read the entire ruling without taking a single break. All members of the press present had to struggle mightily to keep up with her on their laptops in the media center, or by jotting

1

down what they could on paper in the courtroom. *Cf.* Decl. of Ed Pilkington (February 11, 2013) at ¶¶ 18-23. This would not have been necessary if the judge's rulings were made available to the press.

3.    Members of the press generally observe the proceedings from the media center, which is located at a distance from the court-room, because this allows them to use their laptop computers to type notes on the proceedings. (Members of the press and public are not allowed to bring computers into the courtroom.) Because there are no publicly-released versions of the court's orders, or audio or transcripts of the daily proceedings, members of the media are compelled to observe the proceedings from the media center so that we may use our laptops to type notes. *See* Decl. of Kevin Gosztola at ¶¶ 7-8.

4.    On January 16, 2013, there were technical problems with the courtroom feed to the media center. The public affairs officers did not realize it was malfunctioning to an extent that could not be fixed before the judge gaveled court into session. Judge Lind began to read a ruling on a critical motion to preclude the defense from discussing motive evidence during Bradley Manning's trial. As she read it, the members of the media were being transported to the courtroom and processed through security. The court did not wait for the media to be seated before reading the order and, when the media finally entered, the judge had read the first three or four pages of the motion. This motion was not made available to media afterwards so reporters could get what they had missed. Any details on the first pages had to be ob-tained through a military legal expert, who shared what he had heard while he was in the courtroom.

5.    On February 26, 2013, Judge Lind read her ruling on the de-fense's speedy trial motion in open court. It took two hours for her to complete reading this order. The order contained a large number of dates and abbreviations for government agencies and other military terminology that might have been readily compre-hensible in a written document but that we in the press could scarcely keep up with when listening to Judge Lind's rapid-fire oral delivery. A colleague of mine in the press room calculated that Judge Lind was reading at a rate of 180 words per minute, and that the entire ruling contained at least 23,000 words, an estimate which comports with my observations as well. (For com-parison, a very good professional typist can manage about 80 words per minute, and my understanding is that the absolute max-imum speed at which humans can type for extended periods is ap-proximately 150 words per minute.)

<div align="center">2</div>

6.   This situation is highly demoralizing to myself and to other members of the media attempting to cover the proceedings in an accurate, timely and  fair manner. In response to various complaints about the lack of access to documents, the Legal Matter Expert reiterated his statement that the press is free to submit FOIA requests for the court's orders.

7.   Of course, various members of the media have made FOIA requests for records relating to the Manning proceedings over the course of the last two years, to no avail. However, on February 27, 2013, the Army's records management division, responsible for responding to requests made under the Freedom of Information Act, released 84 judicial orders and rulings made by the trial court in *Manning*. The records are available here: https://www.rmda.army.mil/foia/FOIA_ReadingRoom/Detail.aspx?id=83

8.   The publication of these orders is a long-overdue step towards increased transparency. However, it falls far short of what we have sought in our lawsuit. The First Amendment requires that the press and public have contemporaneous access to the four sets of materials we have requested: (1) the court's orders, (2) the government and (3) defense filings, and (4) transcripts (or some equivalent, such as audio files) of the daily proceedings in open court. The Army's release only provides a number of documents in the first category -- the court's rulings. Other than a small number of defense briefs published at the grace of defense counsel on his blog (with heavy redactions dictated by the government, not the court), the rest of the materials are still not available to the public in any way.

9.   Not all of the judge's orders to date have been published. The Article 13 ruling (the ruling on whether Manning was "unlawfully punished" by his pretrial conditions of confinement) has not been posted, despite the fact that the ruling was made on January 7 – some seven weeks ago – and concerns an issue that has attracted a tremendous amount of public attention. Neither has the Speedy Trial motion that I refer to above in ¶5 – despite the fact that it was read out loud *in toto* by Judge Lind in open court on February 26.

10.   Many of the orders that *were* published were issued over a year ago, and are only now being published in written form despite the fact that many of them had been read out loud in open court.

3

11.   We have no commitment from the military that it will make court orders or the other judicial documents we have requested available to journalists and the public on a timely basis going forward. Indeed, from the Army's press release accompanying the publication of the orders, indications are that the military intends to slowly work its way through the backlog of older documents, rather than producing documents relevant to current and upcoming hearings:

> *Due to the voluminous nature of these documents, it will take additional time to review, redact, and release all of the responsive documents. To date, more than 500 documents have been filed by the parties or issued by the military judge, totaling more than 30,000 pages. Documents will continue to be published as they are reviewed and prepared for release.[1]*

This is typical of the slow pace of release that is the norm under FOIA.[2] This sort of access is fine for historians, but not for press covering a trial in real time. For instance, if a motion is being argued in open court, the motion and the briefs should be made available to the press prior to the hearing, otherwise it becomes impossible for us to effectively follow what is being said in court. Moreover, as we have argued in our lawsuit, the error-correcting function of public scrutiny of trials can only work when the media covers trials in real time.[3] Indeed, the principle of contemporaneous public access to documents is predicated on the idea that public access and scrutiny makes trial outcomes more accurate.

12.   I have always believed that the vast majority of the material we seek in our lawsuit is not classified or otherwise so sensitive that it cannot be released to the public without harming the interests of the government or PFC Manning. That is proven by the minimal scope of the redactions in the court orders published on February 27. However, even a cursory analysis of those materials demonstrates that redactions have been applied in an arbitrary fashion. To give an example that has been

---

[1]   http://mentionedoncspan.tumblr.com/post/44154407282/dod-releases-pre-trial-documents-in-united-states-vs (The release incorrectly stated that the documents were published on Monday, Feb. 25; instead, the release and the documents were made public on Wednesday, Feb. 27.)

[2]   *See* Reply Br. at 15-17 (noting delays built into statute), *id.* at 16 n.14 (noting practical delays).

[3]   *See* Writ-App. Pet. at 14.

4

widely noted by journalists, the name of the trial judge, Lt.
Col. Denise Lind, has been redacted from each and every one of
her own orders. Yet her name is — obviously — a matter of public
record, and for many of these rulings, the fact that she made
the ruling is evident from the fact that she read the ruling out
in open court.

13.  To give another example, in one document, Judge Lind's rul-
ing on a defense motion to compel depositions, dated 16 March
2012,[4] language naming and a deponent requested by the defense
(an individual with the 1st Cavalry Division in Ft. Hood, Tex-
as), and the facts he was expected to testify to, is redacted
out of Paragraph 1(a). The listed FOIA exemption is Exemption
7(B), allowing withholding of records to prevent information
from becoming public that would "deprive a person of a fair tri-
al or an impartial adjudication." The redacted information was
heard in open court when the judge read the ruling; the individ-
ual, whose name is in my notes for that day of the proceedings,
did a classification review of three Apache gunship videos, and
was someone who would specifically testify that "they were not
classified at the time of release." Why that would prejudice the
accused is unclear.

14.  I can only conclude that this and numerous other redactions
in the orders released on February 27 are a demonstration of the
fact that application of the FOIA exemptions produces redactions
that are much broader in scope than would be permissible under
an ordinary First Amendment standard, as we have previously ar-
gued in this case.[5]

15.  During the proceedings on February 28, 2013, PFC Manning
pled guilty to certain counts and opted to have those counts to
which he pled not guilty tried in a bench trial. Because there
will be no military jury, there is no risk that public disclo-
sure of materials related to the case could contaminate the jury
pool. My understanding of the law is that even under application
of a First Amendment strict scrutiny standard, the government

---

[4]    This document is available at: https://www.rmda.army.mil/
foia/FOIA_ReadingRoom/(a)(2)(D)%20-
%20Records%20released%20to%20the%20public%20under%20t/PFC%20Brad
ley%20E.%20Manning/120316-
Rul-
ing%20(Defense%20Motion%20to%20Compel%20Depositions)(AE%2033)_Re
dacted.pdf
[5]    *See* Reply Br. at 14-15 (describing broad scope of FOIA ex-
emptions).

could argue on a case-by-case basis that certain items could re-
main under seal even under a strict scrutiny standard if their
release would potentially contaminate the jury pool. The fact
that there will be no jury in PFC Manning's trial should thus
vastly reduce the amount of material that the government can
plausibly argue deserves to remain under seal, hidden from pub-
lic view, on First Amendment standards. That in turn should make
the process of preparing materials for public released much eas-
ier for the trial court and the parties. In short, the fact that
there will be no jury trial here makes it much easier for the
trial court to apply the First Amendment standard that the law
mandates for release of the documents we have requested.

16.  During the proceedings on February 28, PFC Manning also
read in open court a lengthy statement as part of the providence
inquiry into guilty pleas he entered to a number of the charges
against him. The written statement appeared to be about 35 pages
long. However, once again, this document was not made public de-
spite the fact that it was being read in its entirety in open
court. A number of very newsworthy items were revealed in the
statement, which was the first factual account of his actions
Manning has presented to the public. Accordingly it attracted a
tremendous amount of coverage in the mainstream media, including
front page stories in the *New York Times* and *Washington Post*.
However, neither outlet was able to publish a copy of the state-
ment, because none was made available to the media by the court.
As far as we in the media know, the publication of the verbatim
text will occur on the same dilatory pace that has attended the
government's processing of defense filings for publication on
defense counsel's blog – or, worse yet, the still-slower process
for release of materials under FOIA.

17.  The issue of the scope of public access to military pro-
ceedings under the First Amendment will not go away on its own.
In addition to the Manning trial, a tremendous amount of public
scrutiny will attend the trials of Robert Bales (a soldier ac-
cused of murdering civilians in Afghanistan) and Nidal Hasan
(which involves an Army psychiatrist accused of going on a
shooting rampage at Fort Hood). Hasan's court martial recently
set a trial schedule in his case, which calls for the military
jury to be empaneled on May 29, 2013.

18.  In conclusion, neither the Army's belated, limited disclo-
sure of judicial orders nor Private Manning's partial guilty
plea resolves the important issues briefed and argued in this
case many months ago; rather, they underscore the need for this

6

Court to promptly rule that the First Amendment applies to this case.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

Executed this 3d day of March, 2013

Kevin Gosztola

7

CENTER FOR CONSTITUTIONAL RIGHTS et al., Appellants

v.

UNITED STATES and COLONEL DENISE LIND, Military Judge, Appellees

No. 12-8027

Crim. App. Misc. No. 20120514

United States Court of Appeals for the Armed Forces

Argued October 10, 2012

Decided April 16, 2013

STUCKY, J., delivered the opinion of the Court, in which ERDMANN and RYAN, JJ., joined.  BAKER, C.J., filed a dissenting opinion, in which COX, S.J., joined.  COX, S.J., filed a dissenting opinion in which BAKER, C.J., joined.

<u>Counsel</u>

For Appellants:  <u>Shayana D. Kadidal</u>, Esq. (argued); <u>J. Wells Dixon</u>, Esq., <u>Baher Azmy</u>, Esq., <u>Michael Ratner</u>, Esq., and <u>Jonathan Hafetz</u>, Esq. (on brief).

For Appellees:  <u>Captain Chad M. Fisher</u> (argued); <u>Lieutenant Colonel Amber J. Roach</u> (on brief); <u>Major Robert Rodrigues</u>.

Amicus Curiae for Appellants on Behalf of the Reporters Committee for Freedom of the Press and Thirty-One News Media Organizations:  <u>Gregg P. Leslie</u>, Esq., <u>Kristen Rasmussen</u>, Esq. et al. (on brief).

Military Judge:  Denise Lind

<u>**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION**</u>.

<u>Center for Constitutional Rights et al. v. United States</u>,
No. 12-8027/AR

Judge STUCKY delivered the opinion of the Court.

Appellants[1] appeal the United States Army Court of Criminal
Appeals' (CCA) summary denial of their petition for a writ of
mandamus and prohibition.  <u>See</u> <u>Center for Constitutional Rights</u>
<u>v. United States and Colonel Denise Lind</u>, Misc. No. 20120514 (A.
Ct. Crim. App. June 21, 2012).  Appellants summarized their
request to this Court, as follows:

> (1) Petitioner-Appellants request a writ of
> mandamus and prohibition to compel the trial court to
> grant public access to documents filed in <u>United</u>
> <u>States v. Manning</u>, including without limitation
> (a) all papers and pleadings filed by the parties,
> including particularly the government's motion papers
> and responses to defense motions, (b) court orders,
> and (c) transcripts of all proceedings, and that any
> further restrictions on public access to the
> proceedings or documents therein only occur following
> notice to the public of any contemplated restrictions,
> an opportunity for interested parties to be heard, and
> case-by-case specific findings of necessity after
> consideration of less-restrictive alternatives; and

> (2) Petitioner-Appellants request a writ of
> mandamus and/or prohibition ordering the trial judge
> to reconstitute past R.C.M. 802 conferences in the
> <u>Manning</u> case in open court, in a matter not
> inconsistent with the First Amendment right of public
> access, and to conduct all future conferences in a
> matter not inconsistent with the First Amendment right
> of public access.

---

[1] Center for Constitutional Rights, Glenn Greenwald, <u>Salon.com</u>,
Jeremy Scahill, <u>The Nation</u>, Amy Goodman, <u>Democracy Now!</u>, Chase
Madar, Kevin Gosztola, Julian Assange, and Wikileaks.

2

APPENDIX A-332

<u>Center for Constitutional Rights et al. v. United States</u>,
No. 12-8027/AR

We hold that this Court is without jurisdiction to grant the
requested relief.[2]

I.   Background

Charges were preferred against Private First Class (PFC)
Bradley E. Manning [hereinafter the accused], alleging, inter
alia that he provided intelligence to the enemy; provided
national security information to a person not entitled to
receive it; stole, purloined, or knowingly converted to his own
use or the use of another certain United States databases,
providing intelligence to the enemy, and violated certain lawful
general regulations.  Articles 92, 109, and 134, Uniform Code of
Military Justice (UCMJ), 10 U.S.C. §§ 892, 909, 934 (2006).

We denied an earlier writ-appeal submitted by some of the
appellants seeking guaranteed access to seats in the gallery of
the hearing room for the accused's Article 32, UCMJ, 10 U.S.C.
§ 832 (2006), investigation and the right to be present for all
sessions of the hearing, including those closed to the public.
<u>Assange and Wikileaks v. United States and Lieutenant Colonel
Paul Almanza</u>, 71 M.J. 100 (C.A.A.F. 2012) (summary disposition).
The charges were referred to a general court-martial on February
3, 2012.

---

[2] In light of our jurisdictional holding, we need not reach the
granted or other specified issues.

3

APPENDIX A-333

Center for Constitutional Rights et al. v. United States,
No. 12-8027/AR

After oral argument was had on the current writ-appeal, we specified three issues for the parties to brief: (1) whether this Court and the CCA have subject-matter jurisdiction over Appellants' request for extraordinary relief; (2) whether Appellants, as non-parties, have standing to file a request for extraordinary relief in this Court or the CCA; and (3) assuming jurisdiction, which officials are lawfully authorized to direct release of the records and to what extent Appellants must first demonstrate that they requested release from an appropriate release official. We invited counsel for the accused to file a brief on the issues, but they declined to do so.

## II. Arguments of the Parties

Appellants argue that, for issues arising before the findings and sentence of a court-martial, military appellate courts have potential, also known as anticipatory, jurisdiction to entertain petitions for extraordinary relief. To a great extent, they rely on the Supreme Court's potential jurisdiction jurisprudence from Federal Trade Comm'n v. Dean Foods Co., 384 U.S. 597, 603—04 (1966), and this Court's judgment in ABC, Inc. v. Powell, 47 M.J. 363 (C.A.A.F. 1997).

The Government argues that the authority to release the documents "is committed by statute and regulation to the Judge Advocate General (TJAG)," not the military judge, and that this administrative decision is not subject to review by the CCA or

4

Center for Constitutional Rights et al. v. United States,
No. 12-8027/AR

this Court.  The Government suggests that review by an Article

III court is the appropriate forum for litigation of any TJAG

decision respecting the release of documents.

### III.  Jurisdiction

> Federal courts are courts of limited
> jurisdiction.  They possess only that power authorized
> by Constitution and statute, which is not to be
> expanded by judicial decree.  It is to be presumed
> that a cause lies outside this limited jurisdiction,
> and the burden of establishing the contrary rests upon
> the party asserting jurisdiction

Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377

(1994) (citations omitted); see generally Henry M. Hart Jr., The

Power of Congress to Limit the Jurisdiction of Federal Courts:

An Exercise in Dialectic, 66 Harv. L. Rev. 1362 (1953) (for the

classical treatment of the subject).  "The requirement that

jurisdiction be established as a threshold matter 'springs from

the nature and limits of the judicial power of the United

States' and is 'inflexible and without exception.'"  Steel Co.

v. Citizens for a Better Environment, 523 U.S. 83, 94─95 (1998)

(citing Mansfield, Coldwater & Lake Mich. Ry. Co. v. Swan, 111

U.S. 379, 382 (1884)).  "On every writ of error or appeal, the

first and fundamental question is that of jurisdiction . . . .

This question the court is bound to ask and answer for itself,

even when not otherwise suggested . . . ."  Great Southern Fire

Proof Hotel Co. v. Jones, 177 U.S. 449, 453 (1900).

5

Center for Constitutional Rights et al. v. United States,
No. 12-8027/AR

In particular, this Court, and courts-martial in general,
being creatures of Congress created under the Article I power to
regulate the armed forces, must exercise their jurisdiction in
strict compliance with authorizing statutes.  As the Supreme
Court held in Clinton v. Goldsmith:

> When Congress exercised its power to govern and
> regulate the Armed Forces by establishing the CAAF,
> see U.S. Const. Art. I, § 8, cl. 14; 10 U.S.C. § 941;
> see generally Weiss v. United States, 510 U.S. 163,
> 166-169 (1994), it confined the court's jurisdiction
> to the review of specified sentences imposed by
> courts-martial:  the CAAF has the power to act "only
> with respect to the findings and sentence as approved
> by the [court-martial's] convening authority and as
> affirmed or set aside as incorrect in law by the Court
> of Criminal Appeals."  10 U.S.C. § 867(c).

526 U.S. 529, 533-34 (1999); see also United States v. Padilla,
1 C.M.A. 603, 606, 5 C.M.R. 31, 34 (1952) (noting that courts-
martial are "tribunals of special and limited jurisdiction" and
"must be convened strictly in accordance with statutory
requirements").  Although Congress has authorized the CCAs a
somewhat broader scope of review, it has similarly limited their
jurisdiction.  See Article 66(c), UCMJ, 10 U.S.C. § 866(c)
(2006).

This Court is empowered to issue extraordinary writs under
the All Writs Act.  Goldsmith, 526 U.S. at 534 (citing Noyd v.
Bond, 395 U.S. 683, 695 n.7 (1969)).  That act provides that:
"[A]ll courts established by Act of Congress may issue all writs
necessary or appropriate in aid of their respective

6

Center for Constitutional Rights et al. v. United States,
No. 12-8027/AR

jurisdictions and agreeable to the usages and principles of

law." 28 U.S.C. § 1651(a) (2006). "[T]he express terms of the

Act confine the power of the CAAF to issuing process 'in aid of'

its existing statutory jurisdiction; the Act does not enlarge

that jurisdiction." Goldsmith, 526 U.S. at 534-35; see United

States v. Denedo, 556 U.S. 904, 911 (2009) ("As the text of the

All Writs Act recognizes, a court's power to issue any form of

relief -- extraordinary or otherwise -- is contingent on that

court's subject-matter jurisdiction over the case or

controversy."). As the Supreme Court noted, this Court "is not

given authority, by the All Writs Act or otherwise, to oversee

all matters arguably related to military justice." Goldsmith,

526 U.S. at 536. We recognized long ago that the "Act does not

increase the areas of this Court's jurisdiction beyond the

limitations set out in [Article 67], UCMJ." Hendrix v. Warden,

23 C.M.A. 227, 228, 49 C.M.R. 146, 147 (1974).

Article 67(c), UCMJ, 10 U.S.C. § 867(c) (2006), our

jurisdictional statute, states:

> In any case reviewed by it, the Court of Appeals for the
> Armed Forces may act only with respect to the findings and
> sentence as approved by the convening authority and as
> affirmed or set aside as incorrect in law by the Court of
> Criminal Appeals.

It is vital to note what we are faced with here. This is

not a case like United States v. Lopez de Victoria, where the

question was the interpretation of our Article 67 jurisdiction

7

Center for Constitutional Rights et al. v. United States,
No. 12-8027/AR

within an existing (Article 62) statutory framework.  66 M.J. 67

(C.A.A.F. 2008).  This case is not like Denedo v. United States,

where the question was the availability of the writ of error

coram nobis in cases other than those in which fundamental

jurisdictional objections were asserted.  66 M.J. 114 (C.A.A.F.

2008), aff'd., 556 U.S. 904 (2009).  Nor is it like Hasan v.

Gross, where the harm alleged by the appellant -- that the

military judge was biased -- had the potential to directly

affect the findings and sentence.  71 M.J. 416 (C.A.A.F. 2012).

Finally, this case differs in a very important respect from

Powell, 47 M.J. 363.  In that case, which dealt with the closure

of an Article 32 investigation to the press and the public, the

accused joined in the proceedings in order to vindicate his

right to a public trial.  Id.  Here, the accused has steadfastly

refused to join in the litigation, or, despite the Court's

invitation, to file a brief on the questions presented.  We thus

are asked to adjudicate what amounts to a civil action,

maintained by persons who are strangers to the court-martial,

asking for relief -- expedited access to certain documents --

that has no bearing on any findings and sentence that may

eventually be adjudged by the court-martial.

Appellants assert that (1) the trial court "had

jurisdiction to consider -- and did consider -- [Appellants']

claims"; (2) the CCA had potential jurisdiction to issue

8

<u>Center for Constitutional Rights et al. v. United States</u>,
No. 12-8027/AR

extraordinary relief because PFC Manning could receive a
sentence that would invoke the CCA's appellate jurisdiction; and
(3) this Court has potential jurisdiction under Article 67 to
review the CCA's judgment.  Appellants premise their potential
jurisdiction argument on <u>Dean Foods Co.</u>, 384 U.S. at 603–04, an
antitrust case in which the Supreme Court held that the Federal
Trade Commission had implied authority under the All Writs Act
to seek injunctive relief in a federal court of appeals.  In
that case, however, the Supreme Court confined the doctrine of
potential jurisdiction to cases "within the appellate
jurisdiction of the higher court" and "cases which are within
its appellate jurisdiction although no appeal has been
perfected." <u>Id.</u> at 603.  Ultimately, then, any potential
jurisdiction we may have in this case must turn on the extent of
our own statutory jurisdiction, which is to be found in Article
67, UCMJ, as interpreted by the Supreme Court.

     Appellants suggest that this case does not differ
significantly from our decision in <u>Powell</u>, and that Congress has
done nothing in the intervening years to preclude the relief
they are requesting.  But (1) <u>Powell</u> was decided before
<u>Goldsmith</u> clarified our understanding of the limits of our
authority under the All Writs Act, and (2) we assumed
jurisdiction in that case without considering the question.
More immediately, the accused in <u>Powell</u> joined the media as a

9

<u>Center for Constitutional Rights et al. v. United States</u>,
No. 12-8027/AR

party in seeking a writ of mandamus to vindicate his

constitutional right to a public trial -- something which had

immediate relevance to the potential findings and sentence of

his court-martial.  We are not foreclosing the accused from

testing the scope of public access, but he has not done so here.

On these facts, we hold that Appellants failed to meet

their burden of establishing that this Court or the CCA has

jurisdiction to grant Appellants the relief they seek.

<div align="center">IV.   Judgment</div>

Appellants' writ-appeal is dismissed.

<div align="center">10</div>

APPENDIX A-340

<u>Center for Constitutional Rights et al. v. United States</u>,
No. 12-0827/AR

BAKER, Chief Judge, with whom COX, Senior Judge, joins
(dissenting):

The general public has a qualified constitutional right of
access to criminal trials.  <u>Richmond Newspapers, Inc. v.
Virginia</u>, 448 U.S. 555 (1980) (plurality opinion).  Public
access to a criminal trial includes appropriate access to
filings.  <u>Nixon v. Warner Commc'ns, Inc.</u>, 435 U.S. 589, 597
(1978).  "Congress intended that, to the extent 'practicable,'
trial by court-martial should resemble a criminal trial in a
federal district court."  <u>United States v. Valigura</u>, 54 M.J.
187, 191 (C.A.A.F. 2000).  The right to a public trial is
embedded in Rule for Courts-Martial (R.C.M.) 806, which provides
that "[e]xcept as otherwise provided in this rule, courts-
martial shall be open to the public."

However, what the scope of this right might be in general,
or in the context of this specific court-martial, remains
unknown, and will remain so.[1]  That is because this Court has
determined that a military judge's application of R.C.M. 806 to
an ongoing court-martial falls outside this Court's jurisdiction

---

[1] The analysis to R.C.M. 806 recognizes as much, stating "[t]he
applicability of these [Supreme Court] cases to courts-martial
is not certain . . . .  Nevertheless the rule and the discussion
are based on recognition of the value to the public of normally
having courts-martial open to the public.  That is particularly
true since the public includes members of the military
community."  <u>Manual for Courts-Martial, United States</u>, Analysis
of the Rules for Courts-Martial app. 21 at A21-48 (2012 ed.).

Center for Constitutional Rights et al. v. United States,
No. 12-0827/AR

to review.  As this Court and the Army Court have previously
concluded, "public confidence in matters of military justice
would quickly erode if courts-martial were arbitrarily closed to
the public."  United States v. Scott, 48 M.J. 663, 665 (A. Ct.
Crim. App. 1998) (quoting United States v. Travers, 25 M.J. 61,
62 (C.M.A. 1987)).  As a result, I respectfully dissent.

There are two threshold issues in this case.  First, does
the Court have jurisdiction to hear this extraordinary writ
petition?  Second, does a nonparty to the court-martial have
standing to assert a right to public access to this court-
martial in a context where the accused has not asserted such a
right himself?

It is well settled that the media have standing to complain
if access to courts has been denied or unconstitutionally
restricted.  Press-Enterprise Co. v. Superior Court, 478 U.S. 1,
7 (1986) ("The right to an open public trial is a shared right
of the accused and the public, the common concern being the
assurance of fairness."); Globe Newspaper Co. v. Superior Court,
457 U.S. 596, 603 (1982); ABC, Inc. v. Powell, 47 M.J. 363, 365
(C.A.A.F. 1997) ("[W]hen an accused is entitled to a public
hearing, the press enjoys the same right and has standing to
complain if access is denied."); see also Washington Post v.
Robinson, 935 F.2d 282, 288-290 (D.C. Cir. 1991) (holding that
the press and the public should have notice of closure to have

2

APPENDIX A-342

Center for Constitutional Rights et al. v. United States,
No. 12-0827/AR

an opportunity to raise a First Amendment right of access
claim).

On the jurisdictional question, the majority relies on
Clinton v. Goldsmith, 526 U.S. 529 (1999), which is
distinguishable from Appellants' case.  While Goldsmith provides
the current state of the law regarding this Court's ability to
issue writs under the All Writs Act, neither the facts of
Goldsmith nor the jurisdictional proscriptions contained therein
apply to Appellants' case.  Goldsmith concerned an
administrative matter that was completely unreviewable by this
Court.  Id. at 535.  In contrast, the writ before this Court
appeals a specific ruling of a specific Rule for Courts-Martial
in a specific and ongoing court-martial.  The issue does not
address the application of the Freedom of Information Act, a
clear collateral matter entrusted to other courts, but a
military judge's application of R.C.M. 806 to a specific court-
martial.  Appellate review of military judges' rulings in
courts-martial is at the core of this Court's jurisdiction.
That is what we do.

Furthermore, what Goldsmith proscribes does not apply here.
Goldsmith bars this Court from exercising "continuing
jurisdiction" over a previously resolved matter or from
intervening with the "independent action" of a separate military
agency or the executive branch.  526 U.S. at 536.  In the

3

Center for Constitutional Rights et al. v. United States,
No. 12-0827/AR

current case, the court-martial underlying this writ-appeal has
not been resolved, nor would exercising jurisdiction here
constitute intervening with the "independent action" of a
separate military agency or the executive branch.

In solely isolating the text of Article 67, Uniform Code of
Military Justice (UCMJ), 10 U.S.C. § 867 (2006), the majority
misses the greater whole.  Congress established a three-tier
military justice system with adoption of the Uniform Code of
Military Justice, and four tiers when Supreme Court review was
added in 1984, when the Military Justice Act of 1983 took
effect.  Military Justice Act of 1983, Pub. L. No. 98-209, § 10,
97 Stat. 1393, 1405-06 (1983) (codified as amended at 28 U.S.C.
§ 1259 and 10 U.S.C. § 867a).  Congress did not intend for
military judges to operate without review when applying the
Rules for Courts-Martial or the Military Rules of Evidence.
Neither did Congress intend that review to come in the form of
collateral appeal to Article III courts in the context of
ongoing courts-martial.  That would not provide for a uniform
application of the law between services and between courts-
martial.  It would also be unworkable.

The point is illustrated with respect to the application of
R.C.M. 806, the rule at issue in this case.  It states:

(a)  In general.  Except as otherwise provided in this
rule, courts-martial shall be open to the public.  For

4

Center for Constitutional Rights et al. v. United States,
No. 12-0827/AR

> purposes of this rule, "public" includes members of both
> the military and civilian communities.

Public access includes appropriate access to court records and
filings.  In Nixon v. Warner Communications, for example, the
Court stated:  "[i]t is clear that the courts of this country
recognize a general right to inspect and copy public records and
documents, including judicial records and documents."  435 U.S.
at 597 (footnote omitted).  As the Third Circuit stated in
United States v. Antar, "[i]t would be an odd result indeed were
we to declare that our courtrooms must be open, but that
transcripts of the proceedings occurring there may be closed,
for what exists of the right of access if it extends only to
those who can squeeze through the door?"  38 F.3d 1348, 1360 (3d
Cir. 1994).  However, the right to judicial records is not
absolute.  As the Supreme Court noted, "[e]very court has
supervisory power over its own records and files, and access has
been denied where court files might have become a vehicle for
improper uses."  Nixon, 435 U.S. at 598.

As detailed above, this Court, like other courts, has
determined that members of the public have standing to assert
the right to public access.  The question, then, is one of
appellate jurisdiction to review a military judge's application
of R.C.M. 806, or, perhaps, the failure to apply R.C.M. 806.
Under the majority's reading of the UCMJ, R.C.M. 806 rulings

5

<u>Center for Constitutional Rights et al. v. United States</u>,
No. 12-0827/AR

regarding public access to courts-martial are unreviewable by
those courts established by Congress to adjudicate military
justice appeals because public access issues are raised before
the findings and sentence are approved by the convening
authority.  Of course public access issues would arise before
the findings and sentence are approved; a public trial
necessarily occurs <u>before</u> findings and sentencing.

Moreover, though the majority claims otherwise, today's
opinion bars this Court from exercising jurisdiction in an
appeal arising from an accused's assertion of his R.C.M. 806
right to a public trial.  That is because the majority's view of
jurisdiction hinges entirely on the words in Article 67, UCMJ:
"[t]he Court of Appeals for the Armed Forces may act only with
respect to the findings and sentence as approved by the
convening authority."

The majority's interpretation leaves collateral appeal to
Article III courts as the sole mechanism to vindicate the right
to a public trial found in R.C.M. 806 beyond the initial good
judgment of the military judge.  This is unworkable and cannot
reflect congressional design or presidential intent.  Among
other things, such a reading would result in the uneven
application of the law depending, as it would, on the fortuity
of the geographic locale where a court-martial is convened.  In
the case of overseas courts-martial it is not clear how this

6

APPENDIX A-346

Center for Constitutional Rights et al. v. United States,
No. 12-0827/AR

would work at all.  Military judges would presumably apply, or

not apply, R.C.M. 806 without appellate review, for it is not

clear which Article III courts, if any, would have jurisdiction

to address collateral R.C.M. 806 appeals arising overseas.

A system dependent on Article III courts' review of R.C.M.

806 appeals by either the media or an accused will yield three

other untenable consequences.

First, the military judge will be compelled to conduct a

trial with the prospect that an unknown collateral court, rather

than the trial judge herself, will determine who has access to

the trial -- as well as when and whether any documents,

including evidence, are disclosed to the parties or to the

public, as part of what it means to have a public trial.  As

Senior Judge Cox ably argues, based on the law and his

experience as a trial judge, a trial judge must have the

authority to control her own courtroom.  The majority's

interpretation usurps that authority by creating a system

dependent on collateral review.

Second, in the event of conviction, a collateral court's

ruling regarding the application of R.C.M. 806 will be subject

to review by military appeals courts and this Court should an

accused allege that a violation of his right to a public trial

impacted his right to a fair trial, the findings in his case, or

the sentence.

7

Center for Constitutional Rights et al. v. United States,
No. 12-0827/AR

Third, and most likely, collateral courts might exercise
comity and wisely avoid the prospect of interfering in an
ongoing court-martial without knowing all the facts and
circumstances within that court-martial.  This, however, would
leave the public and the accused without a mechanism to
vindicate or test the scope of public access provided by R.C.M.
806 until after the trial because, under the majority's view,
only then would military appellate courts and this Court have
jurisdiction to review issues of public access.  This defeats
the purpose of the rule.

This array of absurd consequences is most assuredly not
what Congress intended when it established a uniform system of
military justice.  And it is most assuredly not what the
President intended when he promulgated R.C.M. 806, pursuant to
his Article 36, UCMJ, 10 U.S.C. § 836 (2006), authority.

> [J]urisdiction is conferred ultimately by the Constitution,
> and immediately by statute.  However, this principle does
> not mean that our jurisdiction is to be determined by
> teasing out a particular provision of a statute and reading
> it apart from the whole.  Since the beginning of
> jurisprudence under the UCMJ, we have read the statutes
> governing our jurisdiction as an integrated whole, with the
> purpose of carrying out the intent of Congress in enacting
> them.

United States v. Lopez de Victoria, 66 M.J. 67, 69 (C.A.A.F.
2008).  That is, until today.  As a result, I respectfully
dissent as well as join Senior Judge Cox's analysis regarding
the role of the military judge.

8

Center for Constitutional Rights et al. v. United States,
No. 12-8027/AR

COX, Senior Judge, with whom BAKER, Chief Judge, joins
(dissenting):

I agree with the well-reasoned opinion of Chief Judge
Baker. I write separately because I believe without reservation
that a military judge has the jurisdiction, indeed the
responsibility, to insure that a military court-martial is
conducted so that the military accused and the public enjoy the
same rights to a fair and public hearing as is envisioned in the
Bill of Rights and embodied in the Rules for Courts-Martial
(R.C.M.). I also believe without reservation that the United
States Court of Appeals for the Armed Forces has the
jurisdiction, indeed the responsibility, to insure that military
judges faithfully perform their duties in accordance with law.[1]

In denying standing to Appellants the majority incorrectly
distinguishes this case from the legion of cases giving standing
to the media in cases such as this one. Globe Newspaper Co. v.
Superior Court, 457 U.S. 596, 603-05 (1982); ABC, Inc. v.
Powell, 47 M.J. 363, 365 (C.A.A.F. 1997) ("[W]hen an accused is
entitled to a public hearing, the press enjoys the same right
and has standing to complain if access is denied."); see also

---

[1] This case would have been an appropriate matter for the Judge
Advocates General to have filed an amicus brief. It is bizarre
that the services would advocate that an Article III court
review the conduct of a military judge in the midst of a court-
martial. It would be interesting to learn if that were indeed
their view.

Center for Constitutional Rights et al. v. United States,
No. 12-8027/AR

Washington Post v. Robinson, 935 F.2d 282, 292 (D.C. Cir. 1991)
(holding that the press and the public should have notice of
closure to have an opportunity to raise a First Amendment right
of access claim).

Clinton v. Goldsmith, 526 U.S. 529 (1999), while providing
the current state of the law regarding this Court's ability to
issue writs under the All Writs Act, concerned an administrative
matter that was found by the Supreme Court to be unreviewable by
this Court.  In contrast, this is an ongoing court-martial and,
as so well noted by the opinion of Chief Judge Baker, is clearly
within the four-tiered court system created by Congress by the
Uniform Code of Military Justice (UCMJ).

This case is about the "office" of military judge.  United
States v. Weiss, 36 M.J. 224 (C.M.A. 1992); John S. Cooke, The
United States Court of Military Appeals, 1975-1977:
Judicializing the Military Justice System, 76 Mil. L. Rev. 43
(1977).  Therefore, in my judgment, this case is about the
authority of a military judge to manage her courtroom and to
supervise the preservation of evidence, create an accurate
record of trial, and control the ebb and flow of spectators and
members of the press into the courtroom.  This case is about
process, not the constitutional rights of Appellants.  The
military judge's confusion as to what authority she possesses

2

<u>Center for Constitutional Rights et al. v. United States</u>,
No. 12-8027/AR

over trial documents is evident from the record.[2]  In the same

Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2006), session, the

military judge approved the publication of defense motions,

pursuant to an agreement with the Government, on a defense

website, yet then stated she does not possess the authority to

authorize release of court documents in response to Appellants'

original request before the court, a request which included

documents filed with the court such as defense motions.

To me the fundamental questions are what is the role of the

military judge in the conduct of a court-martial and are her

actions reviewable by the appellate courts.  We are remiss,

therefore, in not taking this opportunity to clarify what

authority the military judge has regarding the control of the

court-martial process, including documents, evidence, and

transcripts produced during the trial.

"Military judges perform duties prescribed by statute and

the executive order when detailed to a specific court-martial."

<u>Weiss</u>, 36 M.J. at 228.  When the position of the military judge

was created, the intention was that the military judge would

preside over a court-martial in the same manner as a federal

district judge, with "roughly equivalent powers and functions."

---

[2] Interestingly the most scholarly work done on the issues
presented in this case was done by the presiding military judge,
Colonel Denise Lind.  <u>See</u> Denise Lind, <u>Media Rights of Access to
Proceedings, Information, and Participants in Military Criminal
Cases</u>, 163 Mil. L. Rev. 1 (2000).

APPENDIX A-351

Center for Constitutional Rights et al. v. United States, No. 12-8027/AR

Sam J. Ervin Jr.,[3] The Military Justice Act of 1968, 45 Mil. L. Rev. 77, 89 (1969); see also United States v. Graf, 35 M.J. 450, 465 (C.M.A. 1992) ("In our view, the Uniform Code of Military Justice contemplates that a military judge be a real judge as commonly understood in the American legal tradition"); United States v. Valigura, 54 M.J. 187, 191 (C.A.A.F. 2000) (finding that Congress intended courts-martial to resemble a federal criminal trial, to the extent it was practicable).

Once a court-martial is convened, the military judge controls its proceedings, subject to the proscriptions in the R.C.M.  United States v. Stringer, 5 C.M.A. 122, 140, 17 C.M.R. 122, 140 (1954) (Latimer, J., concurring).  R.C.M. 801 sets forth the responsibilities of the military judge, including exercising "reasonable control over the proceedings to promote the purposes" of the R.C.M. and the Manual for Courts-Martial, United States.  R.C.M. 801(a)(3).  R.C.M. 806 gives the military judge the responsibility to make sure the court-martial shall be open to the public.  The military judge has the authority to seal portions of the record during trial or prevent parties from divulging information that is not part the public record during trial.  R.C.M. 701(g)(2); R.C.M. 806(d).  R.C.M. 1104 gives

---

[3] Senator Ervin introduced and sponsored the bill that became the Military Justice Act of 1968.

4

APPENDIX A-352

<u>Center for Constitutional Rights et al. v. United States</u>,
No. 12-8027/AR

responsibility to the military judge to authenticate a record of trial in certain cases.

The fact of the matter is there is no rule that states that the documents, filings, evidence, and record transcripts created during an ongoing court-martial do not fall under the authority given to the military judge to exercise control over the court-martial and ensure public access to the proceedings.  If the plain language of R.C.M. 801 does not expressly provide the authority to control the documents created during the court-martial process, then surely the rule implies that every military judge has the authority to regulate the release of those documents.  That rule read in conjunction with R.C.M. 806 is certainly broad enough to allow the military judge to grant the relief asked for by the Center for Constitutional Rights if it can be done reasonably and without disruption to the trial and the processes attendant thereto.

In my judgment, this Court possesses jurisdiction under the All Writs Act and under the common law of our Anglo-American jurisprudential heritage to aid the military judge in the performance of her duties.  Certainly we are in a better position to do that than is a federal district judge to solve the issues presented.  <u>See generally</u> <u>Schlesinger v. Councilman</u>, 420 U.S. 738, 758 (1975).

5

APPENDIX A-353

<u>Center for Constitutional Rights et al. v. United States</u>,
No. 12-8027/AR

It is the responsibility of a military judge to fashion a remedy in these cases given the various conditions and circumstances as one might find at a particular court-martial. The military judge has the information and knowledge as to what logistical support a court-martial may have in an individual circumstance.  Given that courts-martial over history have been convened in the field, onboard ships at sea, and in small posts, camps, and stations around the world, a military judge must have broad latitude to decide on how she should deal with requests for information such as we have before us.[4]  However, we must make it clear that this Court does have jurisdiction and the ability to tell a military judge, "You have authority to release portions of the record of trial, briefs, other non-classified evidence, etc., under such circumstances and under such conditions as you find to be fair and reasonable and in compliance with R.C.M. 806 and the other applicable rules." Like other rulings of a military judge, our review would be to determine whether a military judge abused her discretion in a particular case.

Accordingly, I would reverse the Army Court of Criminal Appeals and remand the case to the military judge to carry out her responsibilities in this regard.

---

[4] We do not set any rules for making this happen.  Rather, we only recognize that the military judge has the authority to deal with the issues presented.

APPENDIX A-354