IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

_____ x
                                        :
                                        :
CENTER FOR CONSTITUTIONAL               :
RIGHTS, *et al.*,                       :
                                        :
                    Plaintiffs,         :
                                        :
                                        :
            v.                          :   Civil Action No. 13-1504
                                        :
                                        :
CHIEF JUDGE COL. DENISE LIND,           :
*et al.*,                               :
                                        :
                    Defendants.         :
                                        :
                                        :
_____ x

**~~PROPOSED~~ BRIEF ON BEHALF OF THE REPORTERS COMMITTEE
FOR FREEDOM OF THE PRESS AND 35 NEWS MEDIA
ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

INDEX

TABLE OF AUTHORITIES ...................................................................................... iii

IDENTITY AND INTEREST OF *AMICI CURIAE* ......................................................v

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................1

ARGUMENT

I.   The First Amendment and this circuit's jurisprudence affirm a right of public
     access to judicial documents in courts-martial......................................................6

A. It is well established that open judicial proceedings provide accountability and oversight. ...............................................................................................7

B. The interest in open proceedings extends to courts-martial documents and dockets...................................................................................................11

C. The public policy implications of secrecy highlight the importance of a constitutional right of access to courts-martial documents.........................16

CONCLUSION .......................................................................................................20

CERTIFICATE OF SERVICE ...............................................................................25

CORPORATE DISCLOSURE STATEMENT ........................................................26

# TABLE OF AUTHORITIES

**Cases**

*ABC, Inc. v. Powell*,
  47 M.J. 363 (C.A.A.F. 1997).................................................................................10

*Globe Newspaper Co. v. Superior Court*,
  457 U.S. 596 (1982) ................................................................ 6, 7, 8

*Hartford Courant Co. v. Pellegrino*,
  380 F.3d 83 (2d Cir. 2004).................................................................14

*In re N.Y. Times Co.*,
  828 F.2d 110 (2d Cir. 1987).................................................................12

*In re Providence Journal Co., Inc.*,
  293 F.3d 1 (1st Cir. 2002).................................................................12

*In re Washington Post Co.*,
  807 F.2d 383 (4th Cir. 1986).................................................................8, 9

*N.Y. Times Co. v. United States*,
  403 U.S. 713 (1971) .................................................................5

*Nixon v. Warner Communications, Inc.*,
  435 U.S. 589 (1978) .................................................................6

*Press-Enterprise Co. v. Superior Court*,
  464 U.S. 501 (1984) .................................................................8

*Press-Enterprise Co. v. Superior Court*,
  464 U.S. 501, 509 (1984) ("*Press-Enterprise I*") .................................................................6

*Press-Enterprise Co. v. Superior Court*,
  478 U.S. 1 (1986) ("*Press-Enterprise II*") .................................................................6, 7

*Richmond Newspapers, Inc. v. Virginia*,
  448 U.S. 555 (1980) (plurality opinion).................................................................4, 8, 19

*Union Oil Co. v. Leavell*,
  220 F.3d 562 (7th Cir. 2000).................................................................5

*United States v. Hershey*,
  20 M.J. 433 (C.M.A. 1985).................................................................11

*United States v. Ortiz*,
  66 M.J. 334 (C.A.A.F. 2008).................................................................10

*United States v. Progressive, Inc.*, 467 F. Supp. 990, *reh'g denied*,
  486 F. Supp. 5 (W.D. Wis.), *appeal dismissed*, 610 F.2d 819 (7th Cir. 1979).................................................................5

iii

*United States v. Scott*,
    48 M.J. 663 (A. Ct. Crim. App. 1998) ........................................................ 11, 12
*United States v. Travers*,
    25 M.J. 61 (C.M.A. 1987) ................................................................................11
*United States v. Valenti*,
    987 F.2d 708 (11th Cir. 1993) .................................................................... 13, 14
*Wash. Post v. Robinson*,
    935 F.2d 282 (D.C. Cir. 1991)..........................................................................12

**Other Authorities**

Barr, *Rep. Mike Rogers: Execute WikiLeaks Leaker*,
    POLITICO, Aug. 3, 2010 ...................................................................................16
Carr, *In Leak Case, State Secrecy in Plain Sight*, N.Y. Times, March 25, 2013 ......2
Fantz, *Through Supporters, Bradley Manning Still Fights*, CNN.com...................17
Glantz, *Jailed Soldier Has Support of Resisters*,
    N.Y. Times, Dec. 26, 2010, at A33 ..................................................................17
The Guardian, *Bradley Manning Trial: Read the Documents Released by the
    Pentagon*, Feb. 27, 2013 ....................................................................................2
O'Brien, *Pfc. Bradley E. Manning's Statement for the Providence Inquiry* .............3
Rehnquist, *Sunshine in the Third Branch*, 16 Washburn L.J. 559 (1977)................7
Ryan, *WikiLeaks' Disclosure of Documents Sows Seeds for Next Terrorist Attack*,
    Cent. Pa. Bus. J., Sept. 17, 2010, at 16.............................................................17
Savage, *Army Analyst Celebrated As Antiwar Hero*,
    Wash. Post, Aug. 14, 2010 ................................................................................17
Shane, *Accused Soldier Stays in Brig As WikiLeaks Link Is Sought*,
    N.Y. Times, Jan. 14, 2011, at A1 .....................................................................18
Sledge, *Alexa O'Brien Is Bradley Manning Trial's One-Woman Court Records
    System*, The Huffington Post, April 16, 2013.......................................................4
Tate, *Pentagon Finally Releases Some Pre-trial Documents From Bradley
    Manning Case*, Wash. Post, February 27, 2013 ...................................................2
U.S. Army, *Freedom of Information Act Electronic Reading Room* .......................3

**Rules**

Rule for Courts-Martial 806(b)(2) .........................................................................10

## IDENTITY AND INTEREST OF *AMICI CURIAE*

The Reporters Committee for Freedom of the Press is a voluntary, unincorporated association of reporters and editors that works to defend the First Amendment rights and freedom of information interests of the news media. The Reporters Committee has provided representation, guidance and research in First Amendment and Freedom of Information Act litigation since 1970.

ABC, Inc., alone and through its subsidiaries, owns and operates, inter alia, ABC News, abcnews.com and local broadcast television stations, including WABC-TV in New York City, which regularly gather and report news to the public.  Programs produced and disseminated by ABC News include "World News with Diane Sawyer," "20/20," "Nightline," "Good Morning America" and "This Week."

Allbritton Communications Company is the parent company of entities operating ABC-affiliated television stations in the following markets: Washington, D.C.; Harrisburg, Pa.; Birmingham, Ala.; Little Rock, Ark.; Tulsa, Okla.; and Lynchburg, Va.  In Washington, it operates broadcast station WJLA-TV, the 24-hour local news service, NewsChannel 8 and the news websites WJLA.com and TBD.com. An affiliated company operates the ABC affiliate in Charleston, S.C.

With some 500 members, American Society of News Editors ("ASNE") is an organization that includes directing editors of daily newspapers throughout the

Americas.  ASNE changed its name in April 2009 to American Society of News

Editors and approved broadening its membership to editors of online news

providers and academic leaders.  Founded in 1922 as American Society of

Newspaper Editors, ASNE is active in a number of areas of interest to top editors

with priorities on improving freedom of information, diversity, readership and the

credibility of newspapers.

The Associated Press ("AP") is a news cooperative organized under the Not-

for-Profit Corporation Law of New York, and owned by its 1,500 U.S. newspaper

members.  The AP's members and subscribers include the nation's newspapers,

magazines, broadcasters, cable news services and Internet content providers. The

AP operates from 300 locations in more than 100 countries.  On any given day,

AP's content can reach more than half of the world's population.

The Association of American Publishers, Inc. ("AAP") is the national trade

association of the U.S. book publishing industry.  AAP's members include most of

the major commercial book publishers in the United States, as well as smaller and

nonprofit publishers, university presses and scholarly societies.  AAP members

publish hardcover and paperback books in every field, educational materials for the

elementary, secondary, postsecondary and professional markets, scholarly journals,

computer software and electronic products and services.  The Association

represents an industry whose very existence depends upon the free exercise of rights guaranteed by the First Amendment.

Cable News Network, Inc. ("CNN"), a division of Turner Broadcasting System, Inc., a Time Warner Company, is the most trusted source for news and information. Its reach extends to the following: nine cable and satellite television networks; one private place-based network; two radio networks; wireless devices around the world; CNN Digital Network, the No. 1 network of news websites in the United States; CNN Newsource, the world's most extensively syndicated news service; and strategic international partnerships within both television and the digital media.

The California Newspaper Publishers Association ("CNPA") is a nonprofit trade association representing the interests of nearly 850 daily, weekly and student newspapers throughout California. For over 130 years, CNPA has worked to protect and enhance the freedom of speech guaranteed to all citizens and to the press by the First Amendment of the United States Constitution and Article 1, Section 2 of the California Constitution. CNPA has dedicated its efforts to protect the free flow of information concerning government institutions in order for newspapers to fulfill their constitutional role in our democratic society and to advance the interest of all Californians in the transparency of government operations.

California Newspapers Partnership is the publisher of more than two dozen daily newspapers and many weekly newspapers throughout California, including the *San Jose Mercury News*, *Oakland Tribune*, *Contra Costa Times*, *Marin Independent Journal*, *Santa Cruz Sentinel*, *Pasadena Star-News*, *San Gabriel Valley Tribune*, and many others.  It is a general partnership operated by Digital First Media, and includes Media News Group, Stephens Media, LLC, and Gannett Company, Inc. It is one of the largest news-gathering and reporting enterprises in California.

Dow Jones & Company, Inc., a global provider of news and business information, is the publisher of *The Wall Street Journal*, *Barron's*, MarketWatch, Dow Jones Newswires, and other publications.  Dow Jones maintains one of the world's largest newsgathering operations, with 2,000 journalists in more than fifty countries publishing news in several different languages.  Dow Jones also provides information services, including Dow Jones Factiva, Dow Jones Risk & Compliance, and Dow Jones VentureSource. Dow Jones is a News Corporation company.

The E.W. Scripps Company is a diverse, 131-year-old media enterprise with interests in television stations, newspapers, local news and information websites and licensing and syndication.  The company's portfolio of locally focused media properties includes: 19 TV stations (ten ABC affiliates, three NBC affiliates, one

independent and five Spanish-language stations); daily and community newspapers in 13 markets; and the Washington-based Scripps Media Center, home of the Scripps Howard News Service.

First Amendment Coalition is a nonprofit public interest organization dedicated to defending free speech, free press and open government rights in order to make government, at all levels, more accountable to the people.  The Coalition's mission assumes that government transparency and an informed electorate are essential to a self-governing democracy.  To that end, we resist excessive government secrecy (while recognizing the need to protect legitimate state secrets) and censorship of all kinds.

Forbes LLC is the publisher of *Forbes* and other leading magazines, including *Forbes Life* and *Forbes Asia*, as well as an array of investment newsletters and the leading business website, Forbes.com.  Forbes has been covering American and global business since 1917.

Fox News Network LLC ("Fox News") owns and operates the Fox News Channel, the top rated 24/7 all news national cable channel, and the Fox Business Network, as well as Foxnews.com, Foxbusiness.com, and the Fox News Radio Network.

Gannett Co., Inc. is an international news and information company that publishes 82 daily newspapers in the United States, including *USA TODAY*, as well

as hundreds of non-daily publications. In broadcasting, the company operates 23 television stations in the U.S. with a market reach of more than 21 million households.  Each of Gannett's daily newspapers and TV stations operates Internet sites offering news and advertising that is customized for the market served and integrated with its publishing or broadcasting operations.

Hearst Corporation is one of the nation's largest diversified media companies.  Its major interests include the following: ownership of 15 daily and 38 weekly newspapers, including the *Houston Chronicle*, *San Francisco Chronicle* and *Albany* (N.Y.) *Times Union*; nearly 300 magazines around the world, including *Good Housekeeping*, *Cosmopolitan* and *O, The Oprah Magazine*; 29 television stations, which reach a combined 18% of U.S. viewers; ownership in leading cable networks, including Lifetime, A&E and ESPN; business publishing, including a joint venture interest in Fitch Ratings; and Internet businesses, television production, newspaper features distribution and real estate.

Lee Enterprises, Inc., based in Davenport, Iowa, is the publisher of 46 daily newspapers nationwide, with a joint interest in four others.  Lee's markets include St. Louis, MO; Lincoln, NE; Madison, WI; Davenport, IA; Billings, MT; Bloomington, IL; and Tucson, AZ.

The McClatchy Company, through its affiliates, is the third-largest newspaper publisher in the United States with 30 daily newspapers and related websites as well as numerous community newspapers and niche publications.

The National Press Club is the world's leading professional organization for journalists.  Founded in 1908, the Club has 3,100 members representing most major news organizations.  The Club defends a free press worldwide. Each year, the Club holds over 2,000 events, including news conferences, luncheons and panels, and more than 250,000 guests come through its doors.

The National Press Photographers Association ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution.  NPPA's approximately 7,000 members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry.  Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism. The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

National Public Radio, Inc. is an award-winning producer and distributor of noncommercial news programming.  A privately supported, not-for-profit membership organization, NPR serves a growing audience of more than 26 million

listeners each week by providing news programming to 285 member stations that are independently operated, noncommercial public radio stations.  In addition, NPR provides original online content and audio streaming of its news programming. NPR.org offers hourly newscasts, special features and 10 years of archived audio and information.

The New York Times Company is the publisher of *The New York Times*, *The Boston Globe*, and *International Herald Tribune* and operates such leading news websites as nytimes.com and bostonglobe.com.

The New Yorker is an award-winning magazine, published weekly in print, digital, and online.

Newspaper Association of America ("NAA") is a nonprofit organization representing the interests of more than 2,000 newspapers in the United States and Canada. NAA members account for nearly 90% of the daily newspaper circulation in the United States and a wide range of non-daily newspapers.  The Association focuses on the major issues that affect today's newspaper industry, including protecting the ability of the media to provide the public with news and information on matters of public concern.

The Newsweek/Daily Beast Company LLC publishes *Newsweek* magazine and operates the website TheDailyBeast.com.  The 80-year-old *Newsweek* magazine became an industry leader by going all-digital in 2013.  It is now one of

the largest tablet magazines in the world. Available weekly across digital platforms, *Newsweek* is written with a global perspective for a global audience. The Daily Beast, founded by Newsweek/Daily Beast Editor in Chief Tina Brown in 2008, offers award-winning journalism spanning every major news vertical, from politics and world news to fashion, film, and art. Winner of the 2012 Webby Award for Best News Website, *The Daily Beast* attracts over 16 million unique visitors per month and is among the fastest-growing news destinations on the web.

North Jersey Media Group Inc. ("NJMG") is an independent, family-owned printing and publishing company, parent of two daily newspapers serving the residents of northern New Jersey: *The Record* (Bergen County), the state's second-largest newspaper, and the *Herald News* (Passaic County). NJMG also publishes more than 40 community newspapers serving towns across five counties and a family of glossy magazines, including (201) Magazine, Bergen County's premiere magazine. All of the newspapers contribute breaking news, features, columns and local information to NorthJersey.com. The company also owns and publishes Bergen.com showcasing the people, places and events of Bergen County.

Online News Association ("ONA") is the world's largest association of online journalists. ONA's mission is to inspire innovation and excellence among journalists to better serve the public. ONA's more than 2,000 members include news writers, producers, designers, editors, bloggers, technologists, photographers,

academics, students and others who produce news for the Internet or other digital delivery systems.  ONA hosts the annual Online News Association conference and administers the Online Journalism Awards.  ONA is dedicated to advancing the interests of digital journalists and the public generally by encouraging editorial integrity and independence, journalistic excellence and freedom of expression and access.

POLITICO LLC is a nonpartisan, Washington-based political journalism organization that produces a series of websites, video programming and a newspaper covering politics and public policy.

Radio Television Digital News Association ("RTDNA") is the world's largest and only professional organization devoted exclusively to electronic journalism.  RTDNA is made up of news directors, news associates, educators and students in radio, television, cable and electronic media in more than 30 countries. RTDNA is committed to encouraging excellence in the electronic journalism industry and upholding First Amendment freedoms.

The Seattle Times Company, locally owned since 1896, publishes the daily newspaper *The Seattle Times*, together with *The Issaquah Press*, *Yakima Herald-Republic*, *Walla Walla Union-Bulletin*, *Sammamish Review* and *Newcastle-News*, all in Washington state.

Society of Professional Journalists ("SPJ") is dedicated to improving and protecting journalism.  It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior.  Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists and protects First Amendment guarantees of freedom of speech and press.

Stephens Media LLC is a nationwide newspaper publisher with operations from North Carolina to Hawaii.  Its largest newspaper is the *Las Vegas Review-Journal*.

Time Inc. is the largest magazine publisher in the United States. It publishes over 90 titles, including *Time*, *Fortune*, *Sports Illustrated*, *People*, *Entertainment Weekly*, *InStyle* and *Real Simple*.  Time Inc. publications reach over 100 million adults, and its websites, which attract more visitors each month than any other publisher, serve close to two billion page views each month.

Tribune Company operates broadcasting, publishing and interactive businesses, engaging in the coverage and dissemination of news and entertainment programming.  On the broadcasting side, it owns 23 television stations, a radio station, a 24-hour regional cable news network and "Superstation" WGN America.  On the publishing side, Tribune publishes eight daily newspapers — *Chicago*

*Tribune*, *Hartford* (Conn.) *Courant*, *Los Angeles Times*, *Orlando Sentinel* (Central Florida), *The* (Baltimore)*Sun*, *The* (Allentown, Pa.) *Morning Call*, (Hampton Roads, Va.) *Daily Press* and *Sun-Sentinel* (South Florida).

WP Company LLC (d/b/a The Washington Post) publishes one of the nation's most prominent daily newspapers, as well as a website, www.washingtonpost.com, that is read by an average of more than 20 million unique visitors per month.

WNET is the parent company of THIRTEEN, WLIW21, Interactive Engagement Group and Creative News Group and the producer of approximately one-third of all primetime programming seen on PBS nationwide.  Locally, WNET serves the entire New York City metropolitan area with unique on-air and online productions and innovative educational and cultural projects.  Approximately five million viewers tune in to THIRTEEN and WLIW21 each month.

## INTRODUCTION AND SUMMARY OF ARGUMENT

*Amici curiae* are national and regional news organizations, nonprofit associations representing newsgatherers and their interests and trade groups whose journalists and members regularly gather and disseminate news and information to the public through their newspapers, magazines, television, radio stations and via the Internet.[1]  As described more fully in the accompanying motion for leave to file this brief, *amici* have a strong interest in ensuring that journalists covering the court-martial of Pfc. Bradley Manning ("Manning") are able to do so meaningfully by being able to view documents filed in the proceeding as it progresses.

There can be little doubt that the issues at stake in this case are profound: national security and its relation to wartime operations and intelligence reports; the military's treatment of service members; the governmental response to military

---

[1] *Amici* are The Reporters Committee for Freedom of the Press, ABC, Inc., Allbritton Communications Company, American Society of News Editors, The Associated Press, The Association of American Publishers, Inc., Cable News Network, Inc., California Newspaper Publishers Association, California Newspapers Partnership, Dow Jones & Company, Inc., The E.W. Scripps Company, First Amendment Coalition, Forbes LLC, Fox News Network LLC, Gannett Co., Inc., Hearst Corporation, Lee Enterprises, Inc., The McClatchy Company, The National Press Club, National Press Photographers Association, National Public Radio, Inc., The New York Times Company, The New Yorker, Newspaper Association of America, The Newsweek/Daily Beast Company LLC, North Jersey Media Group Inc., Online News Association, POLITICO LLC, Radio Television Digital News Association, The Seattle Times Company, Society of Professional Journalists, Stephens Media LLC, Time Inc., Tribune Company, The Washington Post, and WNET.

1

members accused of committing crimes; and the role of journalism and

whistleblowing in an increasingly digital society.  Yet the overwhelming majority

of records filed in Manning's court-martial have remained shielded from public

view, even though the actual proceedings are largely open to the public. *See* David

Carr, *In Leak Case, State Secrecy in Plain Sight*, N.Y. Times, March 25, 2013, at

B1 (reporting that "basic information" was being withheld and that the limited

documents actually released "contained redactions that are mystifying at best and

at times almost comic").  Out of thousands of pages, 84 filings were made public in

February, with the promise from the Pentagon that "[m]ore than 500 pretrial

documents, including lengthy rulings issued by the military judge presiding over

the case, will be posted on the Department of Defense's Web site as they are

processed."  Julie Tate, *Pentagon Finally Releases Some Pre-trial Documents

From Bradley Manning Case*, Wash. Post, February 27, 2013, WorldViews Blog[2];

The Guardian, *Bradley Manning Trial: Read the Documents Released by the

Pentagon*, Feb. 27, 2013.[3]

---

[2] Available at
http://www.washingtonpost.com/blogs/worldviews/wp/2013/02/27/pentagon-
finally-releases-some-pre-trial-documents-from-bradley-manning-case/.

[3] Available at http://www.guardian.co.uk/world/interactive/2013/feb/27/bradley-
manning-wikileaks.

Since the February disclosures, only one additional document has been made public, a signed statement by Manning consenting to an inquiry on his partial plea agreement.  *See* Alexa O'Brien, *Pfc. Bradley E. Manning's Statement for the Providence Inquiry*,

http://www.alexaobrien.com/secondsight/wikileaks/bradley_manning/pfc_bradley_e_manning_providence_hearing_statement.html.  Other defense filings have been made public by Manning's lawyers.  *See generally*

http://www.armycourtmartialdefense.info/.

On May 29, 2013, the documents were accessible via a direct link to the U.S. Army's Freedom of Information Act Electronic Reading Room website, but on May 31, 2013, and subsequently, the link listed "No results available."  A search for "Manning" on the site returned no results,[4] unlike the 85 it returned two days before.  U.S. Army, *Freedom of Information Act Electronic Reading Room*, https://www.rmda.army.mil/foia/FOIA_ReadingRoom/Detail.aspx?id=83 (bad link) (formerly listing files made public in the Manning case).

This secrecy has extended to the court's docket.  Reporters covering the high-profile event are often unaware of what is occurring and when.  *See* Matt Sledge, *Alexa O'Brien Is Bradley Manning Trial's One-Woman Court Records*

---

[4] A search for Manning on June 5, 2013, returned 14 documents, all apparently related to the contemporaneous trial proceedings, none apparently identical to the 85 previously available.

*System*, The Huffington Post, April 16, 2013, *available at*

http://www.huffingtonpost.com/2013/04/16/alexa-obrien-bradley-

manning_n_3086628.html ("So the job of assembling a public docket and

transcripts for the case has been undertaken by one independent journalist, Alexa

O'Brien, who has transformed herself into a virtual, unofficial court records

system."). This lack of transparency creates a serious obstacle to effective

reporting on this matter of significant public interest and concern. The February

attempt to make some of the information in the case public was limited and fell

well short of the disclosure expected in a public trial. *See* Josh Gerstein, *Army*

*posts some Bradley Manning court-martial records*, Politico, Feb 28, 2013.[5]

Such an arrangement violates the First Amendment right of access. More

than thirty years ago, the U.S. Supreme Court recognized a presumptive right of

access to criminal proceedings. *See Richmond Newspapers, Inc. v. Virginia*, 448

U.S. 555, 573 (1980) (plurality opinion). As discussed below, the Court has

reiterated this holding repeatedly, circuits have expanded and adapted it, and the

---

[5] Available at http://www.politico.com/blogs/under-the-radar/2013/02/army-posts-some-bradley-manning-court-martial-records-158092.html ("The records posted were solely orders and opinions from the judge in the case . . . In addition, there were limited deletions in the public documents, including widely known and previously disclosed facts like the names of [presiding judge Col. Denise] Lind and military prosecutors.").

nation's military courts have applied the same reasoning to extend this right of public access to courts-martial.

*Amici* recognize that various interests, including the need to protect national security information, may justify sealed records in certain circumstances. They do not, however, justify complete secrecy. In fact, previous disputes about claims of national security have been litigated in the open. As one court noted: "Briefs in the Pentagon Papers case[6] and the hydrogen bomb plans case[7] were available to the press, although sealed appendices discussed in detail the documents for which protection was sought." *Union Oil Co. v. Leavell*, 220 F.3d 562, 567 (7th Cir. 2000).

The tradition of access is grounded in the recognition that openness helps to promote fairness and to foster a better-informed public. But by refusing to provide reasonable and proper notice of proceedings and descriptions of its dockets, the military justice system has severely undercut this foundational tenet of American democracy. The effects of such secrecy are particularly significant in a case that has ignited worldwide debates about whether the U.S. government keeps too many secrets. If the public is to have any faith in its government and the justice

---

[6] *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971).

[7] *United States v. Progressive, Inc.*, 467 F. Supp. 990, *reh'g denied*, 486 F. Supp. 5 (W.D. Wis.), *appeal dismissed*, 610 F.2d 819 (7th Cir. 1979).

5

administered by military tribunals, it needs to have confidence that the system is

operating in the open, where potential misconduct may be exposed.  Thus, *amici*

respectfully request that this Court grant Plaintiffs' Motion for a Preliminary

Injunction.

## ARGUMENT

I.   **The First Amendment and this circuit's jurisprudence affirm a right of public access to judicial documents in courts-martial.**

Both constitutional and common-law standards governing the right of public

access to the judicial system.  The Supreme Court has recognized a First

Amendment right of access to criminal proceedings, including some pre- and post-

trial proceedings.  *See, e.g.*, *Globe Newspaper Co. v. Superior Court*, 457 U.S.

596, 606 (1982); *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8–9 (1986)

("*Press-Enterprise II*").  To close such proceedings, a court must make a specific

finding that "closure is essential to preserve higher values and is narrowly tailored

to serve that interest."  *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 509

(1984) ("*Press-Enterprise I*").

The Supreme Court has not answered the question of whether this

constitutional standard applies to court records and other documents, and so the

somewhat lesser protection of a common-law right of access is required by the

high court in those cases.  *See Nixon v. Warner Communications, Inc.*, 435 U.S.

589, 597 (1978).  The common law standard also starts with a presumption of

access, but gives greater deference to the presiding judge in determining if other interests outweigh the interest in public access.  *Id.*

In deciding whether to apply a First Amendment right of access, courts look to whether a particular proceeding has been traditionally open and whether "public access plays a significant positive role in the functioning of the particular process in question."  *See Press-Enterprise II*, 478 U.S. at 8–9.  If the institutional value of public access to a proceeding is recognized in both logic and experience, then the First Amendment standard applies.  *See id.*; *Globe Newspaper Co.*, 457 U.S. at 606.  Lower courts have regularly extended the First Amendment right to include trial records, which are just as important in allowing the public to hold courts accountable and see that justice is served.  This interest is at its highest point in a case like the Manning prosecution, and this Court should recognize that this constitutional right of access attaches to military court records.

A.    **It is well established that open judicial proceedings provide accountability and oversight.**

The open administration of justice is this nation's stated preference and historical practice.  As then-Justice William Rehnquist noted more than 30 years ago, "all of the business of the Supreme Court of the United States comes in the front door and leaves by the same door."  William H. Rehnquist, *Sunshine in the Third Branch*, 16 Washburn L.J. 559, 564 (1977).  Rehnquist's comment reflects

the Court's enduring commitment to open courts.  The open administration of justice provides "therapeutic value" to the community, allowing citizens to reconcile conflicting emotions about high-profile cases.  *See Richmond Newspapers, Inc.*, 448 U.S. at 570–71 (discussing openness in criminal trials).  Additionally, open access reassures the public that its government systems are working properly and enhances public scrutiny and understanding of the judicial process.  *Id.*

Open access to criminal proceedings is not just a beneficial practice but a constitutional mandate.  The First Amendment right of access "permits the public to participate in and serve as a check upon the judicial process — an essential component in our structure of self-government."  *Globe Newspaper Co.*, 457 U.S. at 606; *see also Richmond Newspapers, Inc.*, 448 U.S. at 596 (Brennan, J., concurring) (citation and internal quotation marks omitted) ("The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power[.]").  Allowing such access "enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system."  *Press-Enterprise I*, 464 U.S. at 508.

Case law in the Fourth Circuit reflects a deep appreciation for these access rights.  In *In re Washington Post Co.*, 807 F.2d 383, 388–89 (4th Cir. 1986), this

circuit held that the First Amendment protects the right of public access to plea

hearings and sentencing hearings because of the historical traditions of openness

and "the function of public access in serving important public purposes."  Relying

on the logic prong from *Press-Enterprise II* and on "the function of public access

in serving important public purposes," the court held that plea agreements can act

as a "substitute for a trial" and sentencing hearings "amount[] to the culmination of

a trial," both implicating the same First Amendment access rights as a trial itself.

*Id.*  As the court said,

> [E]ven if plea hearings and sentencing hearings are not
> considered a part of the trial itself, they are surely as
> much an integral part of a criminal prosecution as are
> preliminary probable-cause hearings, suppression
> hearings, or bail hearings, all of which have been held to
> be subject to the public's First Amendment right of
> access.

*Id.*

The Fourth Circuit has also recognized the value of thorough judicial

consideration of openness when national security concerns are implicated.  *See id.*

at 391.  The court weighed such concerns, but in the end the pull of the First

Amendment was stronger.  "We are equally troubled by the notion that the

judiciary should abdicate its decisionmaking responsibility to the executive branch

whenever national security concerns are present," the court wrote.  *Id.*  "History

teaches us how easily the spectre of a threat to 'national security' may be used to justify a wide variety of repressive government actions." *Id.*

These constitutional rights have been applied in the military court context as well. The Rules for Courts-Martial specifically provide that general courts-martial are open to the public unless there is a "substantial probability that an overriding interest will be prejudiced if the proceedings remain open." *See* Rule for Courts-Martial 806(b)(2). This presumption of openness that can only be overcome by case-specific findings that closure is narrow and less restrictive alternatives are not available. *See id.* The accompanying discussion to the rules indicates that "[o]pening trials to public scrutiny reduces the chance of arbitrary and capricious decisions and enhances public confidence in the court-martial process." *See id.*, discussion.

Furthermore, military courts have repeatedly endorsed openness. *See, e.g.*, *United States v. Ortiz*, 66 M.J. 334, 342 (C.A.A.F. 2008) (reversing the conviction of a military officer of child sexual offenses where the prosecutor had not clearly identified an overriding interest for closure and the military judge had not articulated specific factual findings, thereby violating the defendant's Sixth Amendment right to a public trial); *ABC, Inc. v. Powell*, 47 M.J. 363, 364, 366 (C.A.A.F. 1997) (holding that a preliminary hearing in the sexual misconduct case against Sgt. Maj. Gene McKinney had to remain open to the public unless the

10

Army could show a specific and substantial need for secrecy); *United States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987) (ruling that the constitutional right of public access to criminal trials extends to courts-martial such that the accused must demonstrate an "overriding interest" that could justify closure in order to bar the public from the courtroom and observing that "we believe that public confidence in matters of military justice would quickly erode if courts-martial were arbitrarily closed to the public"); *United States v. Hershey*, 20 M.J. 433, 435–36 (C.M.A. 1985) (finding that, "[w]ithout question," the Sixth Amendment right to a public trial is applicable to courts-martial and noting that "[a] public trial is believed to effect a fair result by ensuring that all parties perform their functions more responsibly, encouraging witnesses to come forward, and discouraging perjury"). This Court must recognize the constitutional and precedential value of openness in deciding this matter.

### B. The interest in open proceedings extends to court-martial documents and dockets.

Although the Supreme Court has not specifically extended the constitutional right of access to judicial records and documents, *see Nixon, supra,* the Army Court of Criminal Appeals recognized a qualified First Amendment-based right of public access to documents admitted in evidence at a pretrial proceeding open to the public. *United States v. Scott*, 48 M.J. 663, 666 (A. Ct. Crim. App. 1998) (overturning the decision of a military judge who sealed a stipulation of facts but

had made no findings of fact to support his conclusion that several people, whom

he did not specifically identify, had privacy interests that justified the sealing).

Moreover, federal appellate courts have acknowledged that the public policy

interest in access to documents mirrors the interest in open criminal proceedings,

justifying the recognition of a constitutional right of access to court records.

For example, the U.S. Court of Appeals for the District of Columbia, in

accordance with the rulings of other circuits, found that a First Amendment right of

access attached to plea agreements. *Wash. Post v. Robinson*, 935 F.2d 282, 288

(D.C. Cir. 1991). The court noted that the documents "have traditionally been

open to the public, and public access to them enhances both the basic fairness of

the criminal [proceeding] and the appearance of fairness so essential to public

confidence in the system." *Id.* (internal quotation marks omitted); *see also In re*

*Providence Journal Co., Inc.*, 293 F.3d 1, 10 (1st Cir. 2002) (internal quotation

marks omitted) ("[T]his constitutional right — which serves to ensure a full

understanding of criminal proceedings, thereby placing the populace in a position

to serve as an effective check on the system — extends to documents and kindred

materials submitted in connection with the prosecution and defense of criminal

proceedings."); *In re N.Y. Times Co.*, 828 F.2d 110, 114 (2d Cir. 1987) (construing

the constitutional right of access to apply to "written documents submitted in

12

connection with judicial proceedings that themselves implicate the right of

access").

The military court here has not even published a docket, forcing journalists

to independently undertake the laborious compilation and categorization of the

documents that have been made available.  *See* Alexa O'Brien, *Reconstructed*

*Appellate Exhibit List*.[8]  Imposing these administrative costs on journalists

significantly burdens their access rights, and thus the access of the public as well.

Federal appellate courts have struck down secret docket schemes.  In *United*

*States v. Valenti*, 987 F.2d 708 (11th Cir. 1993), the *St. Petersburg Times*

challenged the use of dual dockets by the district courts, which permitted cases to

be placed on either a public or a sealed docket.  The U.S. Court of Appeals for the

Eleventh Circuit concluded that the use of a dual-docketing system was

"inconsistent with affording the various interests of the public and the press

meaningful access to criminal proceedings." *Id.* at 715.  The court observed that

the "dual-docketing system can effectively preclude the public and the press from

seeking to exercise their constitutional right of access to the transcripts of closed

bench conferences" and held that this system was "an unconstitutional

---

[8] Available at
http://www.alexaobrien.com/secondsight/wikileaks/bradley_manning/appellate_ex
hib/reconstructed_appellate_list_for_the_secret_trial_us_v_pfc_manning.html.

infringement on the public and press's qualified right of access to criminal

proceedings." *Id.*

   In *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 96 (2d Cir. 2004), the

U.S. Court of Appeals for the Second Circuit held that "docket sheets enjoy a

presumption of openness and that the public and the media possess a qualified First

Amendment right to inspect them."  Otherwise, the court explained, "the ability of

the public and press to attend civil and criminal cases would be merely

theoretical." *Id.* at 93.  A right of access to docket sheets, according to the court,

was necessary to "endow the public and press with the capacity to exercise their

rights guaranteed by the First Amendment." *Id.*  Thus, the court concluded that

there was not only a historical tradition of public access to docket sheets but that

such access allows the public to "discern the prevalence of certain types of cases,

the nature of the parties to particular kinds of actions, information about the

settlement rates in different areas of law, and the types of materials that are likely

to be sealed." *Id.* at 94–96.

   As these cases indicate, the public and news media's well-established right

of access to judicial proceedings is nearly meaningless where the docket fails to

provide reasonable and proper notice of a particular proceeding and the nature and

contents of documents filed in connection with that proceeding beforehand.

Journalists rely heavily on court documents to gain and provide to readers the

14

background of and context surrounding a legal controversy.  Prior access to the

materials also allows reporters, many of whom have no legal education, to process

the often complex legal theories beforehand, or to interview a legal expert who

could explain the issues, so they are better equipped to understand what is

transpiring in a proceeding they attend and accurately report on it to the public.

Here, the lack of available transcripts, combined with the speed at which

Chief Judge Col. Lind has read orders from the bench, has stymied reporting

efforts.  According to journalist Ed Pilkington of The Guardian, "The restrictions

that they have imposed on us make it vastly more difficult to do a good job."  *See*

David Carr, *supra*.  Although Judge Lind granted the defense permission to publish

redacted versions of court filings online, public release of this information is

subject to government review and redaction.  Moreover, the decision about which

documents to publicly disclose pending government approval rests solely with the

defense, making it incredibly difficult for journalists to ensure that they have

obtained all the information needed for a balanced report.  In short, the inability to

view court documents filed in connection with a particular judicial proceeding

burdens the news media's constitutionally protected right to collect and

disseminate the news and severely limits the public's understanding of important

proceedings.

**C.** **The public policy implications of secrecy highlight the importance of a constitutional right of access to courts-martial documents.**

Despite the principles of openness articulated in both rules and judicial decisions discussed above, one study reported that access to docket and schedule information for military proceedings is often extremely limited[9] — a trend clearly represented by the Manning prosecution.  And the effect of this secrecy is significant: It raises the question of whether secrecy is being used to protect the government from scrutiny, in direct contravention of the very rationale underlying the presumptive openness.

One need look no further than the facts of this case to see the alarming results when the public is deprived of its ability to oversee the proceedings by which military personnel have their day in court to answer to and defend against allegations of serious offenses.  Despite the gravity of Manning's alleged actions — which provoked official responses ranging from a call for execution if found guilty of the treasonous behavior[10] to an accusation that the leak sowed "[t]he

---

[9] The Reps. Comm. for Freedom of the Press & Tully Ctr. for Free Speech at Syracuse Univ.'s S.I. Newhouse Sch. of Pub. Commc'ns, *Off Base: Fighting for Access to Military Court Dockets and Proceedings* (2008), http://www.rcfp.org/base-fighting-access-military-court-dockets-and-proceedings.

[10] Andy Barr, *Rep. Mike Rogers: Execute WikiLeaks Leaker*, POLITICO, Aug. 3, 2010, http://www.politico.com/news/stories/0810/40599.html.

seeds of the next 9/11 terrorist attack"[11] — the man many others dubbed a "hero"[12]

developed a strong coalition of supporters worldwide in the weeks and months

following the disclosure.  This support reflected a sentiment among a large

segment of society that the U.S. government keeps too many secrets in an attempt

to shield itself from public scrutiny of misconduct.  *See* Ashley Fantz, *Through*

*Supporters, Bradley Manning Still Fights*, CNN.com, Aug. 21, 2012, *available at*

http://www.cnn.com/2012/08/21/world/bradley-manning-update.  Manning's

supporters founded the nonprofit Bradley Manning Support Network in 2010,

which "has organized rallies across the country for Manning" and established "a

strong social media presence."  *Id.; see also* Michael W. Savage, *Army Analyst*

*Celebrated As Antiwar Hero*, Wash. Post, Aug. 14, 2010, at A2[13] (describing

Manning as "an instant folk hero" to thousands of grassroots activists disturbed by

U.S. foreign policy).  A fund to raise money for Manning's legal defense has also

raised more than $1 million from approximately 17,000 donors.  *See The Bradley*

---

[11] Frank Ryan, *WikiLeaks' Disclosure of Documents Sows Seeds for Next Terrorist Attack*, Cent. Pa. Bus. J., Sept. 17, 2010, at 16, 16, *available at* 2010 WLNR 19198737.

[12] Aaron Glantz, *Jailed Soldier Has Support of Resisters*, N.Y. Times, Dec. 26, 2010, at A33, *available at* http://www.nytimes.com/2010/12/26/us/26bcmanning.html.

[13] Available at http://www.washingtonpost.com/wp-dyn/content/article/2010/08/13/-AR2010081305820.html.

*Manning Defense Fund*, http://couragetoresist.org/donate/bradley-manning.html
(last visited June 3, 2013).

In later months, accusations from supporters that Manning was being

mistreated while held in a military prison — including speculation that the alleged

abuse was an attempt to pressure him to testify against Wikileaks founder Julian

Assange — "rallied many on the political left to his defense."  Scott Shane,

*Accused Soldier Stays in Brig As WikiLeaks Link Is Sought*, N.Y. Times, Jan. 14,

2011, at A1.[14]

Regardless of whether one views Manning as a hero or a villain, the criminal

prosecution of an American service member for the alleged leak of the largest

amount of classified information in U.S. history is a matter of intense public

interest and controversy.  The "logic" of allowing access to documents filed in a

court-martial is evident: Without access to the documents that flesh out the charges

and defenses, there is no meaningful public oversight of the proceeding.  Such

oversight is of vital importance, as it ensures fairness, enhances quality, and

heightens respect for the entire process.  Indeed, the interest in openness in this

case is not mere curiosity but rather a concern about the integrity of this nation's

government and military courts.  But the pervasive secrecy underlying the

---

[14] Available at
http://query.nytimes.com/gst/fullpage.html?res=9B00E4D7173FF937A25752C0A
9679D8B63

Manning prosecution has reinforced and indeed fueled a theory that the U.S. government keeps far too many secrets in an attempt to evade public oversight.

While *amici* recognize that various interests, including the need to protect national security information, may justify sealed records, it is hard to fathom that the overwhelming majority of documents still secret in this case consist of information of such a confidential nature that no part of them can be publicly disclosed.  If the public is to have faith in the justice administered by military tribunals overseeing cases of significant public interest and concern, it needs to have confidence that any misconduct or attempts to shield such behavior is exposed and resolved openly.  "People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing."  *Richmond Newspapers, Inc.*, 448 U.S. at 572.

This case presents a stark example of the dangerous extent to which pervasive secrecy in military court proceedings undercuts the appearance of fairness essential to public confidence in the system and fundamental to the proper administration of justice.  But this Court has the opportunity to restore public faith in the nation's military courts by holding that the First Amendment protects a right of public access to courts-martial and a corresponding right of access to the documents filed therein.

## CONCLUSION

For the foregoing reasons, *amici* respectfully request that this Court grant

Plaintiffs' motion for a preliminary injunction.

Arlington, VA
June 5, 2013

Respectfully submitted,

*/s/ Bruce D. Brown*
Bruce D. Brown (Bar # 14895)
   *Counsel of Record*
Gregg P. Leslie
Robert J. Tricchinelli
The Reporters Committee for
   Freedom of the Press
1101 Wilson Blvd., Suite 1100
Arlington, VA 22209-2100
bbrown@rcfp.org
(703) 807-2100
* *Additional counsel appearances listed on*
*following pages*

*Additional *amici* counsel:

| | |
|---|---|
| John Zucker | David C. Vigilante |
| Indira Satyendra | Johnita P. Due |
| ABC, Inc. | Cable News Network, Inc. |
| 77 W. 66th Street | 1 CNN Center |
| New York, NY 10023 | Atlanta, GA 30303 |

Jerald N. Fritz
Senior Vice President
Legal and Strategic Affairs
and General Counsel
Allbritton Communications Company
1000 Wilson Blvd., Suite 2700
Arlington, VA 22209
*Counsel for POLITICO LLC*

Jim Ewert
General Counsel
California Newspaper Publishers
Association
2000 O Street, Suite 120
Sacramento, California 95811

Kevin M. Goldberg
Fletcher, Heald & Hildreth, PLC
1300 N. 17th St., 11th Floor
Arlington, VA 22209
*Counsel for American Society of News
Editors*

Marshall W. Anstandig
General Counsel
California Newspapers Partnership
T. Andrew Huntington
Bay Area News Group
General Counsel
750 Ridder Park Drive
San Jose, CA 95190

Karen Kaiser
Associate General Counsel
The Associated Press
450 W. 33rd Street
New York, NY 10001

Mark H. Jackson
Jason P. Conti
Jacob P. Goldstein
Dow Jones & Company, Inc.
1211 Avenue of the Americas
7th Floor
New York, NY 10036

Jonathan Bloom
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
*Counsel for The Association of
American Publishers, Inc.*

David M. Giles
Vice President/
Deputy General Counsel
The E.W. Scripps Company
312 Walnut St., Suite 2800
Cincinnati, OH 45202

Peter Scheer
First Amendment Coalition
534 Fourth St., Suite B
San Rafael, CA 94901

Kai Falkenberg
Editorial Counsel
Forbes LLC
60 Fifth Avenue
New York, NY 10011

Dianne Brandi
Executive Vice President
Legal and Business Affairs
Fox News / Fox Business
1211 Avenue of the Americas,
15th Floor
New York, New York 10036

Barbara W. Wall
Vice President/Senior
Associate General Counsel
Gannett Co., Inc.
7950 Jones Branch Drive
McLean, VA 22107

Jonathan Donnellan
Kristina Findikyan
Hearst Corporation
Office of General Counsel
300 W. 57th St., 40th Floor
New York, NY 10019

J.P. Cratty
Corporate Attorney
Lee Enterprises, Inc.
201 North Harrison Street, Suite 600
Davenport, IA 52801

Karole Morgan-Prager
Juan Cornejo
The McClatchy Company
2100 Q Street
Sacramento, CA 95816

Charles D. Tobin
Holland & Knight LLP
800 17th Street, NW
Suite 1100
Washington, DC 20006
*Counsel for The National Press Club*

Mickey H. Osterreicher
1100 M&T Center, 3 Fountain Plaza,
Buffalo, NY 14203
*Counsel for National Press
Photographers Association*

Denise Leary
Ashley Messenger
National Public Radio, Inc.
1111 North Capitol St. NE
Washington, D.C. 20002

David McCraw
V.P./Assistant General Counsel
The New York Times Company
620 Eighth Avenue
New York, NY 10018

Lynn Oberlander
General Counsel
The New Yorker
4 Times Square
New York, NY 10036

22

Kurt Wimmer
Covington & Burling LLP
1201 Pennsylvania Ave., NW
Washington, DC 20004

Randy L. Shapiro
The Newsweek/
Daily Beast Company LLC
555 W. 18th St., 2nd Floor
New York, NY 10011

Jennifer A. Borg
General Counsel
North Jersey Media Group Inc.
1 Garret Mountain Plaza
Woodland Park, NJ 07424

Jonathan D. Hart
Dow Lohnes PLLC
1200 New Hampshire Ave., NW
Washington, DC 20036
*Counsel for Online News Association*

Kathleen A. Kirby
Wiley Rein LLP
1776 K St., NW
Washington, DC 20006
*Counsel for Radio Television Digital
News Association*

Bruce E. H. Johnson
Davis Wright Tremaine LLP
1201 Third Ave., Suite 2200
Seattle, WA 98101
*Counsel for The Seattle Times Co.*

Bruce W. Sanford
Laurie A. Babinski
Baker & Hostetler LLP
1050 Connecticut Ave., NW
Suite 1100
Washington, DC 20036
*Counsel for Society of Professional
Journalists*

Mark Hinueber
Vice President/General Counsel &
Director of Human Resources
Stephens Media LLC
P.O. Box 70
Las Vegas, NV 89125

Andrew Lachow
Vice President and Deputy
General Counsel – Litigation
Time Inc.
1271 Avenue of the Americas
New York, NY 10020

David S. Bralow
Assistant General Counsel/
East Coast Media
Karen H. Flax
Assistant General Counsel/
Publishing & Litigation
Tribune Company
220 E. 42nd St., Suite 400
New York, NY 10017

John B. Kennedy
James A. McLaughlin
Kalea S. Clark
The Washington Post
1150 15th Street, N.W.
Washington, D.C. 20071

Bob Feinberg
Vice President, General
Counsel & Secretary
WNET
825 Eighth Avenue
New York, NY 10019

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2013, I electronically filed the foregoing

motion for leave to file a brief *amici curiae* with the U.S. District Court for the

District of Maryland and contemporaneously served electronically Shayana D.

Kadidal, Counsel for Plaintiffs, at shanek@ccrjustice.org, and John Tyler, Counsel

for Defendants, at John.Tyler@usdoj.gov.

Arlington, VA
June 5, 2013

                                    */s/ Bruce D. Brown*
                                    Bruce D. Brown
                                    Counsel for *amicus curiae*
                                       The Reporters Committee for
                                       Freedom of the Press

## CORPORATE DISCLOSURE STATEMENT

The Reporters Committee for Freedom of the Press is an unincorporated association of reporters and editors with no parent corporation and no stock.

ABC, Inc. is an indirect, wholly owned subsidiary of The Walt Disney Company, a publicly traded corporation.

Allbritton Communications Company is an indirect, wholly owned subsidiary of privately held Perpetual Corporation and is the parent company of entities operating ABC-affiliated television stations in the following markets: Washington, D.C.; Harrisburg, Pa.; Birmingham, Ala.; Little Rock, Ark.; Tulsa, Okla.; and Lynchburg, Va.

American Society of News Editors is a private, non-stock corporation that has no parent.

The Associated Press is a global news agency organized as a mutual news cooperative under the New York Not-For-Profit Corporation law. It is not publicly traded.

The Association of American Publishers, Inc. is a nonprofit organization that has no parent and issues no stock.

Cable News Network, Inc. is a wholly owned subsidiary of Turner Broadcasting System, Inc., which itself is a wholly owned subsidiary of Time Warner Inc., a publicly traded corporation.

California Newspaper Publishers Association is a mutual benefit corporation organized under state law for the purpose of promoting and preserving the newspaper industry in California.

California Newspapers Partnership is a general partnership operated by Digital First Media, and includes Media News Group, Stephens Media, LLC, and Gannett Company, Inc.

News Corporation, a publicly held company, is the indirect parent corporation of Dow Jones, and Ruby Newco LLC, a subsidiary of News Corporation and a non-publicly held company, is the direct parent of Dow Jones. No publicly held company owns 10% or more of Dow Jones' stock.

The E.W. Scripps Company is a publicly traded company with no parent company. No individual stockholder owns more than 10% of its stock.

First Amendment Coalition is a nonprofit organization with no parent company. It issues no stock and does not own any of the party's or amicus' stock.

Forbes has no parent corporation and no company owns 10% or more of its stock.

Fox News Network, LLC ("Fox News"), owner of the Fox News Channel and Fox Business Network, states that News Corporation, a publicly held company which is publicly traded, is the ultimate parent of Fox News. No other publicly held corporations own 10% or more of Fox News's stock.

Gannett Co., Inc. is a publicly traded company and has no affiliates or subsidiaries that are publicly owned.  No publicly held company holds 10% or more of its stock.

Hearst Corporation is privately held and no publicly held corporation owns 10% or more of Hearst Corporation.

Lee Enterprises, Inc. is a publicly traded corporation with no parent company. Based upon the most recent filings with the United States Securities and Exchange Commission, no publicly held company holds ten percent (10%) or more of the outstanding stock of Lee Enterprises, Incorporated.

The McClatchy Company is publicly traded on the New York Stock Exchange under the ticker symbol MNI.  Contrarius Investment Management Limited owns 10% or more of the common stock of The McClatchy Company.

The National Press Club is a not-for-profit corporation that has no parent company and issues no stock.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company.  It issues no stock and does not own any of the party's or amicus' stock.

National Public Radio, Inc. is a privately supported, not-for-profit membership organization that has no parent company and issues no stock.

The New York Times Company is a publicly traded company and has no affiliates or subsidiaries that are publicly owned.  No publicly held company owns 10% or more of its stock.

The New Yorker is a national magazine published by Condé Nast, which is a division of Advance Magazine Publishers Inc. Advance Magazine Publishers Inc., a non-governmental corporate party, is a wholly-owned subsidiary of The Patriot-News Co.  One hundred percent of the stock of The Patriot-News Co. is held by Advance Publications, Inc., the shares of which are not publicly traded.  There is no publicly held corporation that owns 10% or more of its stock.

Newspaper Association of America is a nonprofit, non-stock corporation organized under the laws of the commonwealth of Virginia. It has no parent company.

The Newsweek/Daily Beast Company LLC: IAC/InterActiveCorp, a publicly traded company, and the Sidney Harman Trust are owners of The Newsweek/Daily Beast Company LLC., with IAC holding a controlling interest.

North Jersey Media Group Inc. is a privately held company owned solely by Macromedia Incorporated, also a privately held company.

Online News Association is a not-for-profit organization.  It has no parent corporation, and no publicly traded corporation owns 10% or more of its stock.

POLITICO LLC is a wholly owned subsidiary of privately held Capitol News Company, LLC.

Radio Television Digital News Association is a nonprofit organization that has no parent company and issues no stock.

The Seattle Times Company: The McClatchy Company owns 49.5% of the voting common stock and 70.6% of the nonvoting common stock of The Seattle Times Company.

Society of Professional Journalists is a non-stock corporation with no parent company.

Stephens Media LLC is a privately owned company with no affiliates or subsidiaries that are publicly owned.

Time Inc. is a wholly owned subsidiary of Time Warner Inc., a publicly traded corporation.  No publicly held corporation owns 10% or more of Time Warner Inc.'s stock.

Tribune Company is a privately held company.

WP Company LLC (d/b/a The Washington Post) is a wholly-owned subsidiary of The Washington Post Company, a publicly held corporation. Berkshire Hathaway, Inc., a publicly held company, has a 10 percent or greater ownership interest in The Washington Post Company.

WNET is a privately supported, not-for-profit organization that has no parent company and issues no stock.