**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
-- Northern Division --

| | | |
|---|---|---|
| CENTER FOR CONSTITUTIONAL RIGHTS, *et al.* | | |
| Plaintiffs, | | |
| v. | | Civil Action No. 13-1504 |
| CHIEF JUDGE COL. DENISE LIND, *et al.*, | | |
| Defendants. | | |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

## I.  INTRODUCTION

Defendants' basic response to the motion for preliminary injunction is that they have re-solved the bulk of plaintiffs' claims by taking a series of post-filing remedial measures, and in light of those measures it would be imprudent if not improper for this Court to interfere with a court-martial. Defendants' remedial measures are a sign that plaintiffs' claims have merit, not the opposite. Nevertheless, while it is disappointing that defendants' measures came only after the filing of an injunctive action in this Court, and not during the preceding year of litigation in the military courts, access to the proceedings by the press and public has improved dramatically over the last week. Contrary to defendants' assertions, however, the case is *not* moot, and this Court can and should award relief. Defendants have refused to concede that the *Manning* proceedings are subject to principles of access under the First Amendment and the common law, and their commitment to providing access on an ongoing basis is too dilatory, too tepid, and too condi-tional to avoid declaratory and injunctive relief on four core aspects of plaintiffs' motion.

First, the thousands of pages of recently released pretrial documents are FOIA releases, which is highly problematic since FOIA allows for automatic redaction of large categories of

information that could not be withheld from public view under the First Amendment's strict scrutiny standard. A preliminary review has already revealed many instances of redactions pursuant to FOIA exemptions that would not be permissible under a First Amendment standard. If defendants' intent is to redact any information that may be redacted under FOIA, then their production of existing documents will not satisfy the full scope of access to documents mandated by the First Amendment as a matter of law.

Second, as to documents that become part of the judicial record in the trial going forward, the government's filing announces that "[t]he Army will *endeavor* to produce those documents *as soon as possible*, with *the goal* of providing documents to the public within one to two business days after filing, *except in exceptional circumstances*." Dkt. 18-1 (Van Eck Decl.), at ¶ 15 (emphasis added). That tepid "commitment" is simply not sufficient to avoid judicial relief, particularly given defendants' woeful record of production before the filing of this action.

Third, as to *trial* transcripts, defendants rely on Judge Lind's recent order allowing stenographers (funded by public donations) into the media room, where they can use their electronic equipment to produce a daily transcript of the trial. As to *past* transcripts of pre-trial proceedings, defendants now definitively state that they do not exist—a clarification they have not previously made in a year of litigation through the military appellate courts—and claim that the digital audio files from which official transcripts of past sessions will eventually be made are not "part of the record" and therefore need not be made available to the media. The case law makes clear, however, that the First Amendment right of access includes access to audio files in such circumstances.

Finally, as to the R.C.M. 802 conferences, defendants argue that they are not traditionally open court proceedings and thus plaintiffs have no argument to compel access. As set forth be-

low, however, First Amendment standards apply to bench conferences as they do to other aspects of proceedings. That does not mean every conference must be open. But the parties may not waive away the public's right to at least a memorialization on the record of substantive matters argued and decided in an 802 conference.

## II.  ARGUMENT

### A.  The Claims in the Case are not Moot.

#### 1.  Constitutional Mootness.

Defendants argue that they have mooted plaintiffs' claim by making "the substantial majority of the Manning court-martial documents available to the public on its website," Dkt. No. 18 (Gov't Br.), at 12, and by making a commitment to behave better in releasing documents going forward. As a result, they argue, a decision by this Court that "these records are subject to the First Amendment's requirement of public access" would be "purely advisory," *id.* at 13, and the case is "constitutionally" moot, albeit only as to "those documents that the military has made (or has agreed to make) public."  *Id.* at 13 n.5.

Defendants' argument is without merit.  As the Supreme Court has repeatedly held:

> It is well settled that *a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice*. Such abandonment is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice, but that is a matter relating to the exercise rather than the existence of judicial power.

*City of Mesquite* v. *Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982) (emphasis added); *see also Friends of the Earth, Inc.* v. *Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 174 (2000). This is particularly true when the voluntary cessation occurs after the plaintiff has filed suit. *Chesapeake Bay Foundation, Inc.* v. *Gwaltney of Smithfield, Ltd.*, 890 F.2d 690, 696 (4th

Cir. 1989) ("It is well established that the simple cessation of illegal activity upon the filing of a complaint does not moot a case.").

Defendants quote *Bahnmiller* v. *Derwinski*, 923 F.2d 1085, 1089 (4th Cir. 1991), for the proposition that "[w]ithdrawal or alteration of administrative policies can moot an attack on those policies." Gov't Br. at 14. This is true, but woefully incomplete. When jurisdiction is properly acquired at the outset, as it was in this case, it will abate by voluntary cessation of challenged conduct only if "(1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *County of Los Angeles* v. *Davis*, 440 U.S. 625, 631 (1979) (citations and quotations omitted). "The burden of demonstrating mootness" in this context "is a heavy one." *Id.*; *see also Parents Involved in Comm'y Schools* v. *Seattle School Dist. No. 1*, 551 U.S. 701, 719 (2007). That burden is not on plaintiffs, as defendants maintain, Gov't Br. at 14, but on defendants, the parties who are asserting mootness based on cessation of the challenged conduct. *Already, LLC* v. *Nike, Inc.*, 133 S. Ct. 721, 727 (2013) ("our cases have explained that a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur") (citations and quotations omitted).

Defendants have not come close to meeting their burden in this case. The only evidence they cite is a release of long-overdue materials the *day before* they filed their opposition, and a declaration from Col. Van Eck setting forth, in conditional and tentative terms, defendants' expected policy going forward. At this point, a few days into defendants' new policy, no reasonable observer could say "it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." As plaintiffs explained in their motion papers, defendants took as much as

a year to release opinions of the military court, and even then had to be prodded by plaintiffs' litigation in the military courts. *See* Dkt. No. 2-1 ("PI Br."), at 8. Likewise, many of the documents released by the military on June 5 were not remotely confidential, yet they too were withheld for months in many cases, and released only after the media filed a *second* action, this one in an Article III court.

Moreover, the new policy itself, as articulated by Col. Van Eck, is riddled with exceptions and escape valves. *See* Dkt. No. 18-1, at ¶ 15. Although government officials who claim voluntary cessation are sometimes given more deference than private parties, the Army's "endeavor" is not a commitment to anything, much less to full compliance with the First Amendment and common-law standards of access to the courts. Given the Army's abysmal record in this case of timely release of materials and its unwillingness even now to bind itself to a meaningful commitment going forward, defendants have failed to meet their heavy burden of showing no reasonable expectation that the violation will recur, much less that interim events have "completely and irrevocably eradicated" the effects of the violation. *Compare City of Mesquite*, 455 U.S. at 289 (repeal of offending language in an ordinance did not moot challenge where there was no assurance that municipality would not re-enact the initial language).

Even if defendants had issued a clear and binding commitment to release documents promptly to the media, the facts still would establish a live controversy. Plaintiffs seek all unclassified documents filed or docketed in the Manning case or introduced at trial. Documents are introduced at trial every day and, as defendants admit, these documents are *not* provided contemporaneously to plaintiffs. Plaintiffs contend that documents introduced in open court at a public court-martial must be furnished to the media contemporaneously with the proceedings to which they relate. Dkt. No. 2-1, at 17-19. Plaintiffs argue that this obligation arises from the First

Amendment and common law, not from FOIA. Defendants never concede that First Amendment and common-law access principles apply to documents used in military proceedings, and their promise of accelerated FOIA releases is demonstrably insufficient to satisfy plaintiffs' demands, given that the government's obligation to release documents under FOIA is not nearly as broad as its obligations under the First Amendment. Dkt. No. 2-1, at 8-9; *see also infra*, Part C.1. The parties' dispute over the source of the defendants' obligation to produce court documents clearly establishes a live controversy.[1]

## 2. Prudential Mootness.

Defendants also insist that their recent actions have rendered the case "prudentially moot," a less well-developed doctrine in which some federal courts have held that they may avoid deciding certain issues when the case is practically if not technically moot. Defendants rely on three "prudential concerns" as articulated by a district judge interpreting precedent from the Fourth Circuit. *See* Dkt. No. 18, at 14 (citing *Smyth* v. *Carter*, 88 F. Supp. 2d 567, 571 (W.D. Va. 2000)). Before finding prudential mootness, a court must determine at minimum that (1) it is unable to give an effective remedy because of developed circumstances; (2) the dispositive issue is sensitive and/or difficult; *and* (3) the issue is not likely to evade review. No such concerns are present in this case.

**This Court may still give an effective remedy**. Defendants argue that the Army's decision to release certain documents and to commit to releasing others eliminates this Court's ability to offer any effective relief. On the contrary, the Army has not bound itself to anything like the

---

[1]    Additionally, the Court could hear this case under the "capable of repetition, yet evading review" exception to mootness, which applies when the challenged action is too short to be fully litigated prior to cessation or expiration and there is a reasonable expectation that the same complaining party will be subject to the same action again. *Spencer* v. *Kemna*, 523 U.S. 1, 17 (1998).  The challenged action is clearly too short to be fully litigated if defendants can moot it by releasing documents a day before responding to a motion for preliminary injunction.  Moreover, defendants have not suggested that their new policy applies to any other court-martial proceedings, and the plaintiffs in this case are reporters who cover military tribunals.

standards of access under the First Amendment and common law, which is the core dispute in this case. As set forth in more detail below, the Army continues to release judicial documents pursuant to FOIA, with all the FOIA redactions and exceptions. *See infra* Part II(C). The only change is the Army's sudden decision, in the face of a preliminary-injunction motion, to expedite its FOIA releases according to a schedule of its own choosing. An order establishing that First Amendment and common-law standards apply will eliminate many of the Army's FOIA redactions, and will compel defendants to release the documents contemporaneously with the proceedings to which they relate, not after some period of review and redaction.

No case cited by defendants suggests that the Army's recent release of documents combined with a conditional commitment to continue doing so is enough to satisfy the standard for prudential mootness. In *United States* v. *(Under Seal)*, 757 F.2d 600 (4th Cir. 1985), for instance, a target of a grand jury investigation learned that government agents had inadvertently reviewed privileged material in contravention of a court order. The district court disqualified the affected agents from further work on the investigation, but that order was stayed on appeal, and an indictment was returned before the appeal was heard on the merits. The Court of Appeals decided on prudential grounds not to reach the difficult question of first impression concerning the judiciary's ability to control a grand jury investigation, particularly when the *same* issues could now be pressed in pretrial criminal proceedings. And in *S-1* v. *Spangler*, 832 F.2d 294 (4th Cir. 1987), plaintiffs got the full relief they sought—a tuition rebate—and still wanted an injunction barring the board that raised their tuition from deciding on tuition increases in the future, despite the fact that the issues were not capable of repetition, *id.* at 298. The Fourth Circuit declined on prudential grounds to address the merits of that claim. *Cf.* Gov't Br. at 14-17 (citing *S-1 & S-2 passim*).

By contrast, in *Feldman* v. *Pro Football, Inc.*, 579 F. Supp. 2d 697 (D. Md. 2008), *aff'd on other grounds*, 419 Fed. Appx. 381 (4th Cir. 2011), a group of deaf plaintiffs alleged that the owner of the Washington Redskins violated the Americans with Disabilities Act by failing to provide close captioning services at football games. After plaintiffs filed suit, the Redskins began providing the captioning and averred that they intended to continue "indefinitely." Nevertheless, Judge Williams concluded that the Redskins' commitment was insufficient to render the case prudentially moot. *See also Colorado Env'tl Coalition* v. *Office of Legacy Mgmt.*, 819 F. Supp. 2d 1193 (D. Colo. 2011) (declining to find prudential mootness after the Department of Energy committed to preparing an environmental impact statement in connection with issuing mining leases on public land, in part because the DOE did not concede that it had violated federal statutes that required an impact statement); *reconsid. denied in part*, 2012 WL 628547 (D. Colo. 2012).

**The dispositive issue is neither difficult nor sensitive**. Defendants have tried to obscure the core issue in this case—whether the media and public have a First Amendment and common law right of access to public court-martial proceedings—by suggesting that the question can only be answered through a document-by-document analysis of the materials introduced in the *Manning* trial. None of the cases they cite indicates such an analysis is required here. *State of W.Va.* v. *Moore*, 902 F. Supp. 715 (S.D. W. Va. 1995), is a district court decision in which the news media sought discovery materials (deposition transcripts) *never actually used* in a *civil* case filed by the state against its former governor, which eventually settled. That seems utterly irrelevant here, in a criminal matter where plaintiffs seek documents actually used in the proceedings. *Moore* cites an unpublished Fourth Circuit case dealing with discovery materials improperly filed with a motion to dismiss, and thus not considered by the court. *See In re Policy Mgmt. Sys.*

*Corp.*, 67 F.3d 296, 1995 WL 541623 (4th Cir. 1995) (unpublished). In general the federal courts have not recognized a right of access to discovery materials not introduced in the proceedings. *Cf.* PI Br. at 21 (common-law right extends to "'judicial documents' including at a minimum, documents that play a role in determining the litigants substantive rights."). In *In re Balt. Sun. Co. v. Goetz*, 886 F.2d 60 (4th Cir. 1989), the media sought access to a search warrant affidavit—the sort of document not traditionally open for obvious reasons, and again far afield from the judicial documents sought here. Finally, *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178 (4th Cir. 1988), involved a blanket secrecy order that the Court of Appeals voided—in part for failure to give interested parties the opportunity to object prior to imposition of the closure. None of these cases can defeat the presumption—never substantively challenged by the government in the CAAF proceedings[2]—that the judicial documents at issue here are covered by the First Amendment. (Nor can any of them overturn *United States v. Scott*, 48 M.J. 663 (Army Ct. Crim. App. 1998). *See* PI Br. at 22.)

The *Manning* court-martial is, in all material respects, a criminal proceeding of public importance akin to a federal criminal trial. Although defendants emphasize the military's prerogatives and its need for autonomy, these factors are simply not of concern in the *Manning* trial, which is being held not in a war zone but some 20 miles from the Nation's capital. This Court can resolve the legal issue of public and media access to the court-martial proceedings without undue intrusion on military prerogatives.

**Unless answered now, the question will evade review.** The government has not "confessed the wrongdoing of its agents," as it did in *United States* v. *(Under Seal)*, 757 F.2d 600, 604 (4th Cir. 1985); on the contrary, defendants never acknowledge that the First Amendment or

---

[2]        *Cf.* CAAF Reply Br. at 19-23, A-126-30.

common-law right of access applies to court-martial proceedings. Indeed, they do not even acknowledge that they violated FOIA, the one law that they concede applies. Instead, the government views its new policy as an act of its own grace, which by definition is subject to its own retraction. Nor have defendants agreed to any binding or firm commitments in releasing documents going forward. Without relief in this Court, plaintiffs have no other forum where they may one day seek effective vindication of their constitutional rights.

### B.  This Court Need Not Defer to the Military Courts on an Issue That the Military Courts Have Left to the Article III Courts.

The government's abstention argument relies heavily on *Schlesinger v. Councilman*, 420 U.S. 738 (1975). That case was brought by a serviceman challenging whether a drug possession offense was sufficiently "service connected" to come within court-martial subject matter jurisdiction. Notably, the decision of the district court in Oklahoma that enjoined Councilman's trial by court-martial (finding insufficient service-connection of the offense) conflicted with precedents of the then-Court of Military Appeals. *Id*. at 743. The relief Councilman acquired from the district court brought a halt to the court-martial, several days before the start of trial, and shortly after the court-martial itself had considered the issue of service-connectedness on the merits. *Id*. at 741-42.

The issues in the instant case have nothing to do with military discipline, unlike the many service-connection cases cited by defendants (which are almost *entirely* about whether the offense has a tendency to degrade military discipline and order). Instead it concerns the right of the public—both other members of the armed forces and civilians—to have meaningful access to the *Manning* proceedings, and with ensuring the proper, accurate functioning of courts-martial—a shared interest of the military judge, the prosecutors, the defense, and the public. The Supreme Court noted in *Councilman* that service connection was a matter "as to which the expertise of

military courts is singularly relevant," *id*. at 760; here, under article 36 of the UCMJ, 10 U.S.C. § 836, the experience of federal courts is equally relevant to the question whether the public has a right of access to judicial documents and off-the-record conferences.

Finally, in *Councilman* the Supreme Court criticized the district court's issuance of an injunction barring further process in the military courts because it "presume[d] military courts would fail to enforce the law of the land," *id*. at 756; here, it is clear there will be no timely and therefore meaningful vindication of the First Amendment right of public access absent the relief plaintiffs seek from this court. In *Councilman*, the relief granted generated an immediate conflict between the Court of Military Appeals and the district court. *Id*. at 743. Here, that cannot happen: future media petitioners will be denied access to the military appellate courts under the CAAF's April 16, 2013 decision, and the judges of the CAAF clearly understood that these issues of public access would henceforth have to be resolved by Article III courts. *See CCR v. United States*, 72 M.J. 126 (C.A.A.F. 2013), A-335 (majority), A-346-48 (Baker, C.J., dissenting); A-349, A-353 (Cox, J., dissenting). Plaintiffs here ask this Court to simply correct the errors of law made by the court-martial—primarily its decision that the First Amendment does not govern the access sought—and then return the matter to the military judge to work out the details of implementing that right.

## C. The Military's Post-Filing Remedial Measures Do Not Obviate the Need for Injunctive and Declaratory Relief.

Finally, defendants argue that measures they have taken since the filing of this suit sufficiently remediate their unlawful conduct such that injunctive relief is no longer available. On the contrary, because defendants refuse to acknowledge that their conduct is subject to any law other than FOIA, injunctive and declaratory relief is appropriate and necessary.

**1. The Recent Release of Filings and Opinions may not Satisfy First Amendment Standards.**

An initial scan of the recently released documents indicates that for many, there are hardly any redactions, vindicating plaintiffs' initial assertions more than a year ago that the vast majority of these documents could have been released contemporaneously with the proceedings to which they related, rather than months later, after the trial had commenced, when most reporters interested in the pretrial filings are currently fully occupied with covering the trial. For other documents, there are redactions that are difficult to evaluate.  But the releases have been characterized as FOIA releases, which is highly problematic since FOIA allows for automatic redaction of large categories of information that would not be applicable categorically under the First Amendment's strict scrutiny standard.[3] If the government's intent is to redact from the documents it releases all items that may be redacted under FOIA, then the government's production of existing documents as well as future documents will be inadequate to satisfy the full scope of access to documents mandated by the First Amendment as a matter of law. The government should clarify this at the hearing on the instant motion.

"Even though the FOIA and the First Amendment both foster an atmosphere of governmental openness, ... the legal standards governing disclosure are not identical under the two provisions. ... [T]he government may overcome the FOIA's presumption of openness (i.e., disclosure) by demonstrating the applicability of an exemption [provided for in the FOIA statute.]" *Dayton Newspapers, Inc. v. United States Dep't of the Navy*, 109 F. Supp. 2d 768, 772-73 (S.D. Ohio 1999). Under the terms of the FOIA statute, the government may withhold, for exam-

---

[3]       The government's description of the nature of its redactions, Van Eck Decl. at 5-6, ¶ 14, does not indicate that the government is redacting everything that it could redact under FOIA.  The Van Eck declaration describes only "personally-identifying information," names of potential witnesses subject to a protective order, "proffered testimony" or other matters subject to the "protective order or seal," "classified information, and information tied to the operational security of the court-martial proceeding itself." *Id*. at 5-6.  However, the redactions are labeled with codes matching the FOIA exemptions. *See id*. at 6, nn.9-12.

ple, records relating to "internal personnel rules and practices"; most "inter-agency or intra-agency memoranda" including those subject to the deliberative process privilege; "personnel and medical files" implicating privacy interests; and various subcategories of "records or information compiled for law enforcement purposes" including those that "would disclose techniques and procedures for law enforcement investigations or prosecutions." 5 U.S.C. § 552(b)(2), (4)-(7). The "internal personnel rules" FOIA exemption might operate to exclude evidence of computer security policies at the intelligence facility where Manning worked; the "inter-agency or intra-agency memoranda" exemption might operate to exclude the damage assessments that have been the subject of intense discovery litigation before Judge Lind; "personnel and medical files" argu-ably implicating Manning's privacy might be withheld even though admitted into evidence; and untold amounts of evidence might be withheld under the (7)(E) exemption for law enforcement techniques and procedures.[4]

In *Dayton Newspapers*, the plaintiffs requested certain court-martial records, including the questionnaires filled out by the members (the military rough-equivalent of jurors), under FOIA and not under the First Amendment. The *Dayton Newspapers* court, citing the A.C.C.A.'s decision in *Scott*, 48 M.J. at 665, 666, implied that Army courts had recognized such a First Amendment right of access. 109 F. Supp. 2d at 773. The court noted that under the First Amendment, juror questionnaires in civilian criminal courts would generally be available to the media.  *Id*. at 772 (citing *Application of Washington Post*, No. 92-301, 1992 U.S. Dist. LEXIS 16882, 1992 WL 233354, at *4 (D.D.C. 1992)). However, because the newspapers had only

---

[4]     Indeed, prior media FOIA requests for documents generated in the Manning case—including defense fil-ings relating to speedy trial—were denied by the Army in their entirety on the grounds that they might interfere with law enforcement proceedings and deny the defendant a fair trial under Exemption 7(A) and (B) of FOIA. That is a truly astonishing ruling given that many of the documents requested *were filed by the defense*. *See* A-140-46 (FOIA request and appeal documents of Josh Gerstein of POLITICO).

made their request under FOIA, the court applied the "lesser" right to obtain information pursu-

ant to FOIA "rather than the constitutional [First Amendment] strict-scrutiny analysis set forth in

*Press-Enterprise* and *Washington Post*," *id*. at 773, and found that FOIA's exemption (b)(7)(C)

for records that if produced "could reasonably be expected to constitute an unwarranted invasion

of personal privacy" applied. *Id*. at 776.

The district judge in *Dayton Newspapers* noted that in previous cases he had observed in

dicta that the First Amendment would have mandated "public release" of all but the most "in-

tensely personal" information on the questionnaires. However, plaintiffs made their claims ex-

clusively under FOIA; accordingly, he had come to the conclusion that because of the statutory

exemptions built into FOIA, the documents could be withheld in their entirety. 109 F. Supp. 2d

at 775 n.5 ("Because the present case, unlike *Washington Post*, involves a FOIA request, rather

than the First Amendment, the Court need not engage in strict-scrutiny review."). *Dayton News-*

*papers* and similar cases make clear that FOIA's built-in legal exemptions from disclosure will

typically operate to produce far less access to records than the First Amendment demands.[5]

Even our cursory initial review of the new releases has discovered many documents

where material is redacted under FOIA that could not withstand the First Amendment's strict

scrutiny standard for nondisclosure. Appellate Exhibit (AE) 436 is a prosecution witness list (ap-

pended to this brief at B-1-18). Descriptions of some of the small handful of witnesses (24 in

total) scheduled to testify in classified session are redacted from the FOIA release of this docu-

---

[5]     *See, e.g., Freedberg v. Department of Navy*, 581 F. Supp. 3, 4 (D.D.C. 1982) (Gesell, J.) (allowing with-
holding in FOIA context of "NIS and JAG Manual investigations" of a murder despite the fact that "large portions"
of the same "are already in the public record of the courts-martial" for two of the four murder suspects already
tried); *cf. Doe v. Gonzales*, 500 F. Supp. 2d 379, 416 (S.D.N.Y. 2007) ("Plaintiffs' 'desire here is to exercise their
First Amendment rights, which distinguishes this case from those in which an individual seeks disclosure of infor-
mation ... pursuant to FOIA. Here, [Plaintiffs] seek to vindicate a constitutionally guaranteed right; they do not seek
to vindicate a right created, and limited, by statute.'"), *aff'd in part, rev'd in part on diff. grounds*, 549 F.3d 861 (2d
Cir. 2008).

ment, but the unclassified names of witnesses[6] scheduled to testify (presumably in open session) are also fully redacted, despite the fact that their identities would be highly useful to journalists attempting to follow the trial while keeping straight the 140-odd witnesses, and the fact that there will be no jury to contaminate in Manning's bench trial.[7] Even more heavily redacted is the defense witness list, AE 344 (B-19-42). The lion's share of the vast redactions there are marked as falling under FOIA exemption 7(A), covering information "compiled for law enforcement purposes [that] could reasonably be expected to interfere with enforcement proceedings"—despite the fact that these are defense witnesses. Finally, AE 250 (B-43-52), an admissibility motion, has all witness names redacted per FOIA exemption 7(C) ("unwarranted invasion of personal privacy"), despite the fact that these individuals are presumably expected to testify in open court. When that happens, how as a practical matter could a reporter readily relate their testimony (obviously of disputed relevance) back to this document given that their names are redacted?

**2.  The Government's Commitment to Provide Documents Created or Filed in the Ongoing Proceedings is not Sufficient to Satisfy First Amendment Standards.**

As to any documents that newly become part of the judicial record in PFC Manning's trial going forward, the government's filing announces that "[t]he Army will *endeavor* to produce those documents *as soon as possible*, with *the goal* of providing documents to the public within one to two business days after filing, *except in exceptional circumstances*." Gov't Br. at ¶ 15 (emphasis added). Appeals will be heard by the Army Office of General Counsel; any "interested party can challenge redactions or withholdings" *after the fact* by mailing a challenge to the Pen-

---

[6]    These names are preceded with a "(U)" marking, meaning the paragraph is entirely unclassified.

[7]    Because the redactions in AE 436 lack any markings indicating which FOIA exemption was invoked, it is unclear how one might proceed to appeal these redactions under the process announced in the Van Eck Declaration (at ¶ 17).

tagon, and "[t]he Office of Army General Counsel will respond to such challenges on an expedited basis." Van Eck Decl. at 7, ¶ 17.[8]

This new policy is not sufficient to satisfy First Amendment standards. Most importantly, it is ultimately ambiguous as to the time frames for providing documents and for deciding appeals. It does not acknowledge in any way the fact that in order to be meaningful, public access to documents must be contemporaneous with the proceedings to which they relate. Yet that is clearly demanded by the First Amendment (and the parallel public trial rights under the Due Process Clause and the Sixth Amendment). The right of public access exists not only to promote public confidence in judicial proceedings and assure public accountability of government officials involved in those proceedings, but also because transparency and public scrutiny have a tangible effect on the ability of judicial proceedings to produce accurate results. *See* PI Br. at 16-17. It should be quite obvious, as Petitioners' opening brief notes, *id.* at 17-19, that if public access is not contemporaneous with the actual proceedings, this error-correcting function of openness, especially with respect to factual matters, will be irretrievably lost.

More than sixty years of case law reinforce this point in the Due Process, Sixth Amendment, and First Amendment public access/open trial contexts. The Supreme Court noted that "contemporaneous review" was required as a "restraint on ... abuse of judicial power" as early as *In re Oliver*, 333 U.S. 257, 270 (1948). In that case the Court held that a defendant's Fourteenth Amendment Due Process Clause rights mandated reversal of a criminal contempt proceeding that took place behind closed doors. No less than the Due Process Clause, the Sixth Amendment right to public trial also mandates contemporaneous access to proceedings—for the same logical rea-

---

[8]    There is no indication that these are appeals governed by the Army FOIA regulations; indeed, it is not clear who filed the FOIA requests that these productions were made in response to, and ordinarily only that party could appeal, not any "interested party" as is the case under the process announced by Col Van Eck.

sons as the First Amendment cases describe: legitimacy, protection from official abuses, and error correction. The Sixth Amendment cases cited in the opening brief make this abundantly clear. *See* PI Br. at 17-18 (citing cases).

The common logic of the Due Process, Sixth Amendment and First Amendment policies favoring open trial is reflected in the frequent citation to *Oliver* in the Supreme Court cases recognizing a First Amendment right of public access:

> *Oliver* recognized that open trials are bulwarks of our free and democratic government: public access to court proceedings is one of the numerous "checks and balances" of our system, because "contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power," [333 U.S.] at 270.

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 592 (1980) (Brennan, J., concurring, with Marshall, J.); *id*. at 597 n.22 ("the [later] availability of a trial transcript is no substitute for a public presence ... the 'cold' record is a very imperfect reproduction of events that transpire in the courtroom."); *id*. at 573 n.9 (citing *Oliver*) (Burger, C.J., joined by White & Stevens, JJ.).

As plaintiffs' declarations and opening brief make clear, restrictions on contemporaneous access have perhaps their sharpest impact on the media. *See* Gosztola Decl. at ¶¶ 3-9 (A-69-70), Pilkington Decl. at ¶¶ 13-23, 27-31 (A-310-17). The Supreme Court and some of our finest legal scholars have recognized as much. *See, e.g.*, *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 572-73 (1976) (Brennan, J., concurring) ("discussion of public affairs in a free society cannot depend on the preliminary grace of judicial censors"); *id*. at 609 ("Indeed it is the hypothesis of the First Amendment that injury is inflicted on our society when we stifle the immediacy of speech." (quoting Alexander Bickel, The Morality of Consent 61 (1975))). Unsurprisingly, most of the First Amendment cases mandating contemporaneous access to documents involve media petitioners. *See* PI Br. at 18-19 (citing three such cases: *Chicago Tribune Co.*; *Associated Press*; and *United States v. Smalley* (involving the *Dallas Morning News* and *Forth Worth Star Telegram*)).

The government claims that it need not provide contemporaneous access to documents generated during the Manning trial not because the First Amendment does not guarantee contemporaneous access to documents, and not because delayed access creates no special burden for the press. Rather, defendants simply claim that in "contrast to Article III courts, records are made part of court-martial proceedings without first redacting sensitive, sometimes classified information." Gov't Br. at 8; *see also id.* at 21 ("Owing to the construct of this system, trial counsel, defense counsel, and the court file records in an ongoing court-martial without first redacting sensitive information"). Contrary to the implication, there is nothing unique to the military about this arrangement; no document produced for any court system is born redacted at the very time it is written, and every document prepared for the eyes of a court is submitted for that court's review in unredacted form. Redaction is by definition an additional step.

The question presented here is whether it satisfies the First Amendment for some entity other than the trial court to provide redacted versions "within [the 'goal' of] one to two business days" or whether instead it is the trial court's responsibility to ensure that public versions of documents are available contemporaneously with the proceedings to which they relate. For example, if a matter is to be argued in open court and certain details need to be redacted from the parties' filings relating to that matter—social security numbers, to use the government's example, Gov't Br. at 21—then it cannot satisfy the right of public access to have redacted versions first available two days *after* the argument. In the unusual event that such simple redactions could not be done in time—and most of the redactions in the documents produced are equally trivial— delaying the argument for a day or two while pressing the parties to complete the redaction process more quickly would be a far preferable way of managing the right of public access. Alternatively the trial court might choose to force the government's hand and demand more rapid pro-

duction of a redacted version.  Leaving all such logistical and practical decisions in the hands of the trial judge (rather than the Army FOIA office's or General Counsel's hands) will ensure that the press and public's right of access can be protected. Here, all that will require is that this Court instruct the trial court that the First Amendment right of access applies, leaving all practical application to Judge Lind.

### 3.  Audio Files Are Subject to the First Amendment Right of Access.

While this case was before the C.A.A.F., the government professed ignorance as to whether transcripts of the court-martial proceedings existed. After further research following CAAF oral argument, counsel for plaintiffs determined that a stenographer was present at some but not all of the pretrial proceedings, and that all pretrial proceedings (excluding of course the R.C.M. 802 conferences) were subject to audio recording. (Supp. Kadidal Decl., ¶ 2, A-234.) The audio recordings appear to be digital, as defense counsel was given at the end of each pretrial hearing a copy of the audio files from that session on a CD-ROM.

The government argues that "plaintiffs' request for transcripts moving forward has been mooted" by Judge Lind's June 3 decision to permit private stenographers, paid for with funding provided by the American public through the auspices of the Press Freedom Foundation, "to transcribe proceedings in open court." Gov't Br. at 31. The government's account simplifies what was a rather chaotic situation on the first day of trial: the lack of adequate space for the press seeking access to the media center (where electronic devices like the stenography computer could be used) caused a member of the press to have to give up a seat to make room for one stenographer, and even this was not ideal since the preferred practice is to have space for two stenographers for long proceedings so that one can set up while the other is working. Notwithstanding the logistical burdens encountered thus far, and the great expense borne by the public, so long as this practice continues, plaintiffs will have the access to transcripts that they have sought

for trial proceedings going forward. However, the issue is not moot because it is capable of repetition and of evading review, and this Court should make clear that effective access for privately-funded stenographers is mandatory if the court-martial refuses to release transcripts or audio tapes of the proceedings.

As to the *past* pretrial hearings, the public has access to neither privately-created transcripts nor the audio files that are now the only record of courtroom proceedings. Federal courts have held that the First Amendment right of access applies to audio *tapes* if transcripts are not available, even where the proceedings in question were open to public attendance:

> In light of *Richmond Newspapers*, decided two years later, we cannot read [*Nixon v.*] *Warner Communications* as laying down a general rule for all criminal cases that once the substance of testimony and evidence has been exposed to public view, there is no right of access to visual and aural means of preserving it. For such an extension arguably would mean that once an open trial is held, a permanent barrier can be erected against inspection of exhibits, audiotapes, videotapes, and any papers to which the public had no 'physical access.' Proceedings that were recorded only on tape—as many are—would be forever insulated from inspectors. Moreover, there would be no opportunity to check whether, in light of a tape, a paper record or transcript had been altered.

> We therefore conclude that, after *Richmond Newspapers*, a blanket prohibition on the disclosure of records of closed criminal cases of the types at issue here implicates the First Amendment. This threshold decision does not leave the state helpless. The Commonwealth simply has the burden to demonstrate why more access is not better than less.

*See Globe Newspaper Co. v. Pokaski*, 868 F.2d 497, 504-05 (1st Cir. 1989) (Coffin, J.); *cf. United States v. Antar*, 38 F.3d 1348, 1359-60 (3d Cir. 1994) ("the right of access … encompasses equally the live proceedings and the transcripts which document those proceedings."). To the extent that the court-martial decided that releasing actual audio tapes risked the same harms that some courts have attributed to televising court proceedings—essentially, that the proceedings might devolve into a circus as participants preened for the public—perhaps the military could

make the audio tapes available to stenographers for transcription in a controlled setting (though it would involve far less expense to simply allow the audio files to be posted publicly).

The government's argument that plaintiffs have no entitlement to the audio files of past proceedings because "the audio recordings themselves are not 'records' of the court-martial," Gov't Br. at 32, is an exercise in semantics. Essentially the government is saying "the audio files are not records of the court-martial, even though we will use them to produce the official record after any conviction." This position is not well-founded, and none of the cases the government cites are to the contrary. *Fisher v. King*, 232 F.3d 391, 397 (4th Cir. 2000), involved a request by convicted prisoner under the First Amendment for audio tapes *in addition to* a transcript of those tapes that *had already been created* at his criminal trials. *Id.* (criminal convict already "possesses a copy of the verbatim transcript [of the tape of his 911 call, an exhibit at trial] that was filed in open court" during his two criminal trials). For this Court to mandate that plaintiffs have access to these audio files as a means for providing public access to past pretrial proceedings is hardly an "extreme measure[]," Gov't Br. at 32; it would be consistent with the *Globe Newspaper* and *Antar* precedents, and would place a negligible practical and logistical burden on the military.

### 4. 802 Conferences Are Subject to First Amendment Right of Access, at Least in Part.

Defendants claim that plaintiffs' contention that the military judge has decided substantive matters without appropriately memorializing them on the record "is not supported by the record and does not in any event constitute irreparable injury." Gov't Br. 26; *see also id.* at 33. In open court on June 6, 2012, when the defense argued a motion challenging the trial court's R.C.M. 802 practices, Judge Lind noted that three specific conferences "ha[ve] been synopsized" on the record and the parties were invited to supplement the synopsis. (A-73.) Without full transcripts of all public sessions (and full knowledge of all occasions on which R.C.M. 802 conferences have been held) it is impossible for plaintiffs to know whether all 802 conferences have

been adequately summarized on the record, but the language of the trial court's statement implies that if *the parties* fail to object to an inadequate synopsis, the court has no further duty to provide public access.  That cannot be adequate to satisfy the right of public access – which, it bears repeating, is a right that belongs to the public and not to the parties, and therefore cannot be waived by the parties.[9]

The government claims that plaintiffs have failed to identify any instances of decisions made without being memorialized on the record at the next public session of the court-martial. Gov't Br. at 26 (plaintiffs' allegations "not supported by the record"). That is simply wrong: despite not having transcripts of the public sessions for comparison, plaintiffs' supporting exhibits note that several orders were not disclosed on the record even though their existence was alluded to (e.g. a pretrial order, A-56-57, and an order on posting of defense briefs, A-50-51). Moreover, the *Defense Motion to Record and Transcribe All R.C.M. 802 Conferences*, A-77-79, notes that there has "sometimes [been] confusion about what exactly was decided during [an] 802 session." JA-79, ¶ 10.  In any event, it is sufficient at this point for this Court to order that the trial court ensure that its past and future R.C.M. 802 practices conform to First Amendment principles, leaving specific implementation of the remedy to the trial court in the first instance.

The government is wrong to imply that certain areas of adversary proceedings and judicial decision-making—such as bench conferences in federal courts or substantive R.C.M. 802 conferences in courts-martial—may be placed *entirely* outside the scope of the First Amendment. The "practice of many Article III courts," Gov't Br. at 33, is not to the contrary. In PFC Manning's court-martial, as in federal courts, minor administrative matters can continue to be re-

---

[9]      Compare Manual for Courts Martial (2012), R.C.M. 806(b)(2), Discussion, stating "that the prosecution and defense jointly seek to have a session closed does not, however, automatically justify closure, for the public has a right in attending courts-martial."

solved in private session; the results will be easy to report fully on the public record at the next court session or by written order. (Scheduling conferences and the like are common, non-problematic examples.) In federal jury trials, bench conferences are kept private in order to prevent jury taint. No one contests that under strict scrutiny there is a compelling interest in preventing jury taint. Usually, however, the sidebars or bench conferences are transcribed and the transcript released after the jury has finished its work.[10] That accommodates the interests of all parties—the least restrictive alternative that satisfies the compelling interest—and thus typically satisfies strict scrutiny. (Of course, here PFC Manning has now waived jury trial.) Many issues in federal court are resolved by consent motions, but after a party files a consent motion, the motion itself is on the public record, and will contain the reasons the relief is justified and should be entered by the court (e.g. an explanation for why the relief is within the court's power, not against public policy, etc.). After that the court enters a ruling on the consent motion, which is also on the record.

However, as to contested, substantive matters, no federal court would resolve them without at least having each side's arguments spelled out on paper (whether the contested issue was resolved on the papers or after a transcribed argument). The R.C.M. 802 conferences in which contested or substantive issues were decided[11] should be reconstituted on the record if they cannot now be accurately memorialized. Perhaps the parties will agree on more outcomes now than

---

[10]     *See, e.g.*, *United States v. Smith*, 787 F.2d 111, 114-15 (3d Cir. 1986) (approving press access to transcript of sidebar conference by applying common-law principles, 787 F.2d at 113 n.1, without reaching First Amendment: "Although the public and press may be justifiably excluded from sidebar and chambers conferences even when substantive rulings are made, the public interest in the ruling is not diminished. ... the public interest in observation and comment must be effectuated in the next best possible manner."); *In re Associated Press*, 172 Fed. Appx. 1, 5, 2006 WL 752044 (4th Cir. 2006) (unpublished) ("prompt post-trial release of transcripts" of bench conferences satisfies public access right).

[11]     One such example we have identified is the pretrial publicity order. The positions of the parties with respect to that order remain relevant to the public understanding of this case even though the pretrial phase has ended and the trial has begun.

they did during the pretrial proceedings—issues that were contested a year ago might no longer be contested. But the problems identified by defense counsel—inadequate summaries, and especially inconsistent factual representations by the government, *see* A-78-79 (¶¶ 8-9)—surely merit either reconstituting the 802 conferences in open court or having another 802 conference but transcribing the discussion.

This is important not just to create the *appearance* of fairness, but also to enforce fairness itself: memorializing a summary of legal and factual positions taken by the parties in an 802 conference ensures that the parties do not have the opportunity to profit from taking inconsistent positions on and off the record. The record shows that the defense has asserted that the government has taken one position in an 802 conference and then taken an inconsistent position in a motion or oral argument—but the lack of any memorialization of the discussion in the 802 conference prevents that behavior from being exposed. (A-72.) The Supreme Court has repeatedly said that one purpose of openness is to prevent this sort of behavior from prosecutors.

A public record of Rule 802 conferences also will ensure that the parties will not be able to argue substantive issues behind closed doors, and then by consent waive away the public's right to know the substance of the legal arguments made and the factual positions taken. This might well happen in instances where both parties have a mutual interest in secrecy that diverges from the public interest in transparency. In short, the waiver provision of R.C.M. 802(b) is inconsistent with both the verbatim record requirement of R.C.M. 1103, *see* PI Mem. at 31 n.18, and with the First Amendment, and the court-martial should be instructed that this is so, contrary to Judge Lind's ruling of June 6, 2012 (A-73-74).

## III.   CONCLUSION

Despite its significant recent concessions to transparency, the government still believes that it, not the trial court, has authority to disclose or not disclose information on a selective ba-

sis, on a schedule unrelated to the needs of the media, and without conducting the required First

Amendment compelling interest and narrow tailoring least-restrictive-means analyses. It is per-

haps understandable that the trial court, fearful in light of what it (mistakenly) perceives as a lack

of clear precedent for application of the First Amendment, has been complicit in blanketing the

Manning proceedings in secrecy. But its default presumption against transparency serves no

one's interests—least of all the interests of the government, which will see the legitimacy of any

conviction questioned simply owing to past failures. The relief plaintiffs request here is not bur-

densome. Simply making a legal ruling that the First Amendment applies to the various forms of

access sought here, and returning this matter to the good judgment of the military judge for ap-

plication of the First Amendment standard, is all that should be necessary to preserve the interest

that all parties ultimately have in openness here. Doing so is vital to vindicate Congress' intent

(expressed in UCMJ 836) that the military justice system be taken seriously as the equivalent of

the civilian criminal justice system in terms of fairness, accuracy and transparency.

<div style="margin-left:40%">

Respectfully submitted,

_____/s/ William J. Murphy_____
William J. Murphy, Bar No. 00497
John J. Connolly, Bar No. 09537
ZUCKERMAN SPAEDER LLP
100 East Pratt St., Ste. 2440
Baltimore, MD 21202-1031
wmurphy@zuckerman.com
Tel: (410) 949-1146
Fax: (410) 659-0436


_____/s/ Shayana D. Kadidal_____
Shayana D. Kadidal, *Pro Hac Vice* No. 800111
J. Wells Dixon
Baher Azmy, Legal Director
Michael Ratner, President Emeritus
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor

</div>

New York, New York 10012
kadidal@ccrjustice.org
Tel: (212) 614-6438
Fax: (212) 614-6499

Jonathan Hafetz
169 Hicks Street
Brooklyn, NY 11201
Tel: (917) 355-6896

*Counsel for Plaintiffs* [12]

Dated: June 10, 2013

---

[12]    Counsel acknowledge the invaluable assistance of law students Matthew W. Daloisio and Michael Mangels to this brief.

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing Reply Memorandum in Support of Preliminary Injunction, together with its Appendix, with the Clerk of the Court for the United States District Court for the District of Maryland by using the CM/ECF system on June 10, 2013.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Shayana D. Kadidal
Shayana D. Kadidal
*Attorney for Plaintiffs*