IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CENTER FOR CONSTITUTIONAL
RIGHTS, *et al.*,

    *Plaintiffs*,

    v.

COL. DENISE LIND, *et al.*,

    *Defendants*.

Civil Action No. ELH-13-1504

## MEMORANDUM OPINION

This case arises from the general court-martial of Private First Class Bradley E. Manning, and involves issues with respect to public access to the court-martial proceedings. Pretrial proceedings in the court-martial began in March 2012, pursuant to Article 39(a) of the Uniform Code of Military Justice ("UCMJ"), codified in 10 U.S.C. ch. 47. The bench trial began on June 3, 2013, at Fort George G. Meade, within the geographic territory of the District of Maryland, and is expected to last about twelve weeks. Plaintiffs, who are several journalists, advocacy organizations, and media enterprises,[1] have filed suit in this Court under the First Amendment to the Constitution of the United States, seeking to obtain greater public access to the court-martial proceedings. This Memorandum Opinion resolves only the Motion for Preliminary Injunction (ECF 2) that plaintiffs filed with their complaint.

### Background

During PFC Bradley Manning's service as an Intelligence Analyst in the United States

---

[1] The plaintiffs are the Center for Constitutional Rights; Wikileaks ITC, Inc.; Julian Assange; Glenn Greenwald; Jeremy Scahill; The Nation Company LP; Amy Goodman; Democracy Now! Productions, Inc.; Chase Madar; and Kevin Gosztola.

Army, he allegedly transmitted to the Wikileaks organization, without authorization, numerous sensitive and/or classified documents, including but not limited to databases of military field reports of significant activities in Iraq and Afghanistan, diplomatic cables of the United States, and video depicting certain incidents occurring in the theater of war. Wikileaks then made the documents available to the public.

On March 1, 2011, the United States Army charged Manning with twenty-two violations of the UCMJ, including that he provided "intelligence to . . . the enemy," in violation of Article 104 of the UCMJ, and that he provided "information relating to the national defense" to a "person not entitled to receive it," in violation of Article 134 of the UCMJ and 18 U.S.C. § 793(e). *See* ECF 2-2 at A80-88 (statement of charges). On February 3, 2012, Major General Michael S. Linnington, the Commanding General of the Military District of Washington and the convening authority, referred the charges to a general court-martial. Colonel Denise Lind was assigned as the presiding judge.

PFC Manning's conduct and the government's prosecution of him have generated intense and widespread public interest, both nationally and around the world. Since the inception of the pretrial proceedings, the court-martial of PFC Manning has been open to the public, except for sessions that were closed because they involved discussion of classified information.[2] However, prior to the instant litigation the docket of written documents filed in the case was not made publicly available.

Shortly after the pretrial proceedings began, the Center for Constitutional Rights ("CCR"), on behalf of Wikileaks ITC, Inc. ("Wikileaks") and its founder and editor-in-chief,

_____

[2] Plaintiffs have represented that they do not seek to challenge in this suit the withholding of classified information from public view.

Julian Assange, wrote two letters to Judge Lind and to PFC Manning's defense counsel, seeking

access to documents filed in the court-martial, transcripts of court hearings, and off-the-record

conferences conducted under Rule 802 of the Rules for Courts-Martial ("R.C.M."). On April 24,

2012, in open court, Judge Lind received CCR's letters into the record, under a single docket

entry, as Appellate Exhibit 66. She interpreted the second of the two letters as a motion by CCR

to intervene for purposes of seeking the relief requested, and denied the request.

Judge Lind stated:

> While the Court acknowledges the existence of a common law right of access to public records, including judicial documents, that right is not absolute; *Nixon versus Warner Communications Inc., 435 U.S. 589 at 599, (1978).*

> The Court also notes the existence of a Congressionally devised system of access to government documents, the Freedom of Information Act or FOIA.

> When Congress has created an administrative procedure for processing and releasing to the public on terms meeting with Congressional approval the common-law right of access may be satisfied under the terms of that Congressionally devised system of access. *Id.* at *603* to *606*. Nor does the 1st Amendment guarantee of freedom of the press or the 6th Amendment guarantee of a public trial mandate access to or copying by non-parties of exhibits admitted during a court-martial. Constitutional interpretation aside, the Court notes that under the military justice system, the Court does not call a court-martial into existence, nor is the Court the custodian of exhibits in the case; whether appellate, prosecution, or defense exhibits, which become part of a record of trial. See for example, Rules for Courts-Martial 503(a) and (c); 601(a); 808 and 1103(b)(1)(a) and (d)(5).

> Neither is the Court the release authority for such documents if requested under FOIA. Requests for access to exhibits in this case should be directed to the appropriate records custodian.[3]

---

[3] A transcript of Judge Lind's oral ruling is at A173-75 in the appendix of exhibits submitted by plaintiffs (ECF 2-2). The reasons articulated by Judge Lind seem to be consistent with her views as stated in a law review article she wrote several years ago, which appears to be one of the most significant academic discussions of issues concerning media access to U.S. military courts-martial. *See* Denise R. Lind, *Media Rights of Access to Proceedings, Information, and Participants in Military Criminal Cases*, 163 MIL. LAW REV. 1 (2000).

Thereafter, in May 2012, pursuant to the All Writs Act, 28 U.S.C. § 1651(a), the plaintiffs in this case filed in the Army Court of Criminal Appeals ("ACCA") a "Petition for Extraordinary Relief in the Nature of a Writ of Prohibition and Mandamus," challenging Judge Lind's ruling.[4] The ACCA denied the petition, without an opinion, on June 21, 2012. Plaintiffs then appealed the ACCA's decision to the United States Court of Appeals for the Armed Forces ("CAAF"), which is the highest appellate court in the military justice system.[5] The CAAF heard oral argument on October 10, 2012, and issued its opinion on April 16, 2013. *See Center for Constitutional Rights v. United States*, 72 M.J. 126 (C.A.A.F. 2013).

In a 3-2 decision, the CAAF ruled that it lacked jurisdiction under the All Writs Act to consider the merits of plaintiffs' claims. The CAAF noted that "the accused [*i.e.*, Manning] has steadfastly refused to join in the litigation, or, despite the Court's invitation, to file a brief on the questions presented." *Id.* at 129. In the view of the CAAF majority, plaintiffs were asking the CAAF "to adjudicate what amounts to a civil action, maintained by persons who are strangers to the court-martial, asking for relief—expedited access to certain documents—that has no bearing on any findings and sentence that may eventually be adjudged by the court-martial." *Id.* According to the majority, such issues were outside of the CAAF's statutory jurisdiction, which is limited to review of "the findings and sentence as approved by the convening authority and as affirmed or set aside as incorrect in law by the Court of Criminal Appeals." *Id.* at 129 (quoting

---

[4] The All Writs Act provides: "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).

[5] The CAAF consists entirely of "'civilian judges completely removed from all military influence or persuasion.'" *Hennis v. Hemlick*, 666 F.3d 270, 276 (4th Cir.) (quoting *Hamdan v. Rumsfeld*, 548 U.S. 557, 586 (2006)) (internal citations omitted in *Hennis*), *cert. denied*, 132 S. Ct. 2419 (2012).

UCMJ, art. 67(c)). The CAAF majority also observed that the government "suggest[ed] that review by an Article III court is the appropriate forum for litigation of any TJAG [the Judge Advocate General] decision respecting the release of documents," arguing "that the authority to release the documents 'is committed by statute and regulation to the Judge Advocate General (TJAG),' not the military judge" or the military appellate courts. *Id.* at 128 (quoting government).

Pursuant to the statute governing Supreme Court review of the CAAF's decisions, 28 U.S.C. § 1259, further review by the Supreme Court of the CAAF's decision, by way of certiorari, was not available. Thus, the two dissenters opined that "collateral appeal to Article III courts" was the only remaining available avenue for plaintiffs to press their claims. *Id.* at 132 (Baker, C.J., dissenting).

In the meantime, on February 28, 2013, PFC Manning pleaded guilty to ten of the twenty-two charges against him. Twelve counts remained to be tried. Manning also elected to be tried by way of a bench trial, with Judge Lind as the sole finder of fact, rather than to avail himself of his right to trial by a jury of other servicemembers.

On May 22, 2013, just over a month after the CAAF issued its ruling, plaintiffs filed suit in this Court against Colonel Denise Lind; Maj. General Michael Linnington; Lieutenant General Dana Chipman, the Army Judge Advocate General; and Secretary of Defense Charles T. Hagel. All of the defendants were sued in their official capacities. Plaintiffs' complaint contains three counts: (1) a request for injunctive relief under the First Amendment; (2) a request for a writ of mandamus under the First Amendment; and (3) a request for a writ of mandamus under the common law and R.C.M. 806, which provides that courts-martial generally are to be "open to the

public." They seek a declaratory judgment, the issuance of various directives and/or writs of mandamus to the Manning court-martial, and an award of attorneys' fees and costs.

As noted, plaintiffs also filed, along with their complaint, a motion to obtain preliminary injunctive relief. The Motion for Preliminary Injunction (ECF 2) was fully briefed by the parties, and oral argument was presented to the Court on June 17, 2013.[6]

Additional facts are included in the Discussion.

### Discussion

Notwithstanding the intense public interest in PFC Manning's court-martial, and the corresponding questions concerning national security that pervade PFC Manning's alleged offenses, the merits of the government's prosecution of PFC Manning have limited relevance to the issues before me. I must first determine whether this Court possesses jurisdiction to resolve the Motion and, if so, I must discern and apply the law with respect to public access to an ongoing general court-martial, within the parameters established by binding Supreme Court and Fourth Circuit precedent and other persuasive authority, and in the context of a request for preliminary injunctive relief.

### A. Jurisdiction

Plaintiffs assert that this Court has subject matter jurisdiction under the general grant of federal question jurisdiction, 28 U.S.C. § 1331, and under the mandamus provisions of 28 U.S.C.

---

[6] I have considered plaintiffs' motion (ECF 2) and the accompanying memorandum (ECF 2-1) (collectively, "Motion"); defendants' Opposition (ECF 18); plaintiffs' Reply (ECF 21); a supplemental Notice filed by defendants (ECF 22); and a letter submitted by plaintiffs following the hearing, to clarify certain matters discussed during oral argument (ECF 24). In addition, I have considered an amicus brief in support of plaintiffs, filed by the Reporters Committee for Freedom of the Press and a host of other entities, including several of the most prominent news media organizations in the country. *See* ECF 17. Briefing of the Motion was complete as of June 10, 2013. No evidence was presented at the preliminary injunction hearing.

§ 1361.[7]

As to federal question jurisdiction, plaintiffs invoke the principle that a federal court has jurisdiction to issue preliminary and permanent injunctive relief against federal officials in their official capacities to enjoin a violation of the First Amendment. *See, e.g.*, *United States v. Minor*, 228 F.3d 352, 356-57 (4th Cir. 2000) ("When constitutional interests are . . . clearly implicated, federal courts have broad discretion to fashion a remedy in equity.") (citing, *inter alia*, *Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[I]t is established practice . . . to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution.")); *see also R.I. Dept. of Envt'l Mgmt. v. United States*, 304 F.3d 31, 41 (1st Cir. 2002) ("[O]ur courts have long recognized that federal officers may be sued in their official capacity for prospective injunctive relief to prevent ongoing or future infringements of federal rights. Such actions are based on the grant of general federal-question jurisdiction under 28 U.S.C. § 1331 and the inherent equity powers of the federal courts.") (internal citations omitted).

With respect to mandamus, 28 U.S.C. § 1361 grants the federal district courts "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." However, mandamus is a "'drastic'" remedy, which is "reserved for 'extraordinary situations'" in which the petitioner "has 'no other adequate means to attain the relief he desires.'" *United States ex rel. Rahman v. Oncology Assocs., P.C.*, 198 F.3d 502, 511 (4th Cir. 1999) (quoting *Kerr v. U.S.*

---

[7] Plaintiffs also seek declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201. However, the declaratory request is not jurisdictionally relevant, because the Declaratory Judgment Act "is remedial only and neither extends federal courts' jurisdiction nor creates any substantive rights." *CGM, LLC v. BellSouth Telecommc'ns, Inc.*, 664 F.3d 46, 55 (4th Cir. 2011).

*Dist. Ct. for the N. Dist. of Cal.*, 426 U.S. 394, 402-03 (1976)).   A party seeking a writ of mandamus must demonstrate that

> (1) he has a clear and indisputable right to the relief sought; (2) the responding party has a clear duty to do the specific act requested; (3) the act requested is an official act or duty; (4) there are no other adequate means to attain the relief he desires; and (5) the issuance of the writ will effect right and justice in the circumstances.

*Rahman*, 198 F.3d at 511.

At least in the context of its own review of the decisions of federal district courts, the Fourth Circuit has stated that "'[m]andamus, not appeal, is the preferred method of review for orders restricting [public access] to criminal proceedings.'" *In re Application of the United States for an Order Pursuant to 18 U.S.C. § 2703(d)*, 707 F.3d 283, 288 (4th Cir. 2013) (quoting *Balt. Sun Co. v. Goetz*, 886 F.2d 60, 63 (4th Cir. 1989)) (internal citation and some internal quotation marks omitted).   However, the Fourth Circuit does not stand on form in applying this preference; rather, the appellate court treats petitions challenging restrictions on public access as petitions for mandamus, regardless of their label, so long as "the party seeking review has standing and has substantially complied with the requirements . . . concerning mandamus."[8]   *In re Washington Post Co.*, 807 F.2d 383, 388 (4th Cir. 1986); *accord In re Application*, 707 F.3d at 288-89 (citing *In re Washington Post*).   Moreover, the Fourth Circuit has stated that district courts have the authority to issue preliminary injunctive relief in mandamus actions arising under § 1361.   *See Starnes v. Schweiker*, 715 F.2d 134, 142 (4th Cir. 1983) ("Even if jurisdiction rests solely on § 1361, we think that the grant of interim injunctive relief was proper.   Mandamus jurisdiction

---

[8] Defendants do not challenge plaintiffs' standing.

under § 1361 permits flexible remedies, including injunctive or declaratory relief."), *cert. granted and vac'd on other grounds sub nom. Heckler v. Starnes*, 467 U.S. 1223 (1984).

Defendants do not appear to contest that this Court possesses subject matter jurisdiction. Instead, they argue that this Court should "abstain[ ] from the exercise [of] its equitable jurisdiction," Opposition at 23, in recognition of the "deference a federal court generally owes a coordinate military court." *Id*. at 17. In support of their position, defendants rely most heavily on the Supreme Court's decision in *Schlesinger v. Councilman*, 420 U.S. 738 (1975).

In *Councilman*, a servicemember who was being prosecuted by court-martial obtained an order from a federal district court enjoining the ongoing court-martial proceedings against the servicemember, on the ground that the drug related offenses with which he was charged "were not 'service connected' and therefore not within the military court-martial jurisdiction." *Id.* at 740. The Supreme Court held that the district court "had subject-matter jurisdiction" to issue such an injunction, *id.* at 753, but that it should have refrained from intervening. *Id.* at 758 ("We hold that when a serviceman charged with crimes by military authorities can show not harm other than that attendant to resolution of his cases in the military court system, the federal district courts must refrain from intervention, by way of injunction or otherwise."). The *Councilman* Court articulated a doctrine, now known as "*Councilman* abstention," which holds that "principles of comity, respect for the expertise of military judges, and judicial economy weigh against federal court intervention in pending court-martial proceedings and in favor of requiring exhaustion of all available remedies within the military justice system before a federal court's collateral review." *Hennis v. Hemlick*, 666 F.3d 270, 271 (4th Cir.), *cert. denied*, ____ U.S.

____, 132 S. Ct. 2419 (2012).[9]

Although *Councilman* is not on all fours with this case, its reasoning is instructive. The *Councilman* Court began its discussion of the merits by emphasizing the independence of the military justice system from the supervision of the Article III judiciary, 410 U.S. at 746:

> This Court repeatedly has recognized that, of necessity, "(m)ilitary law . . . is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment." Congress . . . [has] never deemed it appropriate to confer on this Court "appellate jurisdiction to supervise the administration of criminal justice in the military." Nor has Congress conferred on any Art. III court jurisdiction directly to review court-martial determinations. The valid, final judgments of military courts, like those of any court of competent jurisdiction not subject to direct review for errors of fact or law, have res judicata effect and preclude further litigation of the merits. This Court therefore has adhered uniformly to "the general rule that the acts of a court martial, within the scope of its jurisdiction and duty, cannot be controlled or reviewed in the civil courts, by writ of prohibition or otherwise." (Citations and footnote omitted.)

The Supreme Court gleaned from this discussion that "the balance of factors governing exercise of equitable jurisdiction by federal courts normally weighs against intervention, by injunction or otherwise, in pending court-martial proceedings." *Id.* at 740. It pointed out, however, that this general principle of military judicial independence is subject to a "qualification—that the court-martial's acts be 'within the scope of its jurisdiction and duty.'" *Id.* (citation omitted in original). The Court determined that collateral review for voidness of final judgments of courts-martial came within the subject-matter jurisdiction of the district courts. *See id.* at 747-53. However, the Court remarked: "This is not to say. . . that for every

---

[9] Although the "holding of *Councilman* suggest[s] that abstention is a mandatory doctrine subject to exceptions," the Fourth Circuit has not decided "whether *Councilman* abstention is a mandatory doctrine subject to exceptions or a discretionary doctrine." *Hennis*, 666 F.3d at 275. Because, as I will explain, this case does not fall within *Councilman*'s holding, I need not resolve this unsettled issue.

[serious] consequence [of a court-martial conviction] there is a remedy in Art. III courts." *Id.* at 752.

The Court articulated a test for when "whether a court-martial judgment properly may be deemed void." *Id.* at 753. It instructed district courts to consider "the nature of the alleged defect, and the gravity of the harm from which relief is sought," and to assess both of those factors "in light of the deference that should be accorded the judgments of the carefully designed military justice system established by Congress." *Id.* Applying this test to the scenario of a servicemember seeking an injunction against his ongoing court-martial, the Court ruled that, although the claim fell "within the limited jurisdiction conferred on the federal courts," it was not "consistent[ ] with the principles governing equitable relief" for a district court to "exercise its remedial powers" in that circumstance. *Id.* at 754.

Relying on the deference to military tribunals mandated by *Councilman* and the distinct features of courts-martial, defendants urge this Court not to reach the merits of plaintiffs' claims, and to defer to systems put in place by the Army to ensure public access to the Manning court-martial, which are consistent with the distinct procedural attributes of courts-martial. They insist that this case does not present the "extraordinary grounds" necessary in order for a federal civilian court to interfere with court-martial proceedings. Opposition at 20. Defendants observe, Opposition at 9-10 (footnotes omitted):

> In contrast to civilian courts, courts-martial are not "independent instruments of justice," *Williams v. Sec'y of Navy*, 787 F.2d 552, 561 (Fed. Cir. 1986); the "trial of soldiers to maintain discipline is merely incidental to [the military's] primary fighting function," *Middendorf v. Henry*, 425 U.S. 25, 46 (1976). Courts-martial, therefore, are designed to be convened quickly, and in far-flung locales. *See, e.g.*, *Wade v. Hunter*, 336 U.S. 684, 686 (1949) (noting that soldiers "had advanced about 22 miles farther into Germany to a place called Pfalzfeld," where a court-martial was convened); *Ex parte Reed*, 100 U.S. 13, 20

(1879) (considering "a general court-martial . . . on board the United States ship 'Essex,' then stationed at Rio Janeiro, in Brazil"). . . . As might be expected in such a system, there are no standing trial courts. . . .

Owing to the construct of courts-martial, they do not have clerks' offices with responsibility to maintain electronic judicial dockets for the filing and retrieval of court records as they are generated in the course of a court-martial proceeding. In a court-martial, it is the responsibility of the trial counsel (the prosecuting attorney), under the direction of the presiding judge, to prepare the record of trial. *See* 10 U.S.C. § 838(a) ("The trial counsel of a general or special court-martial shall . . . under direction of the court, prepare the record of the proceedings."). Custody of exhibits during the court-martial is then the shared responsibility of the court reporter (who is appointed by the convening authority), trial counsel, and the military judge.

Plaintiffs respond that the substantive issues in this case have nothing to do with military discipline, a matter they concede is within the distinctive expertise of courts-martial. Rather, they posit that the issues concern the First Amendment rights of the public to access court proceedings. Thus, plaintiffs claim that the relief they request will not be instrusive. They "ask this Court to simply correct the errors of law made by the court-martial—primarily its decision that the First Amendment does not govern the access sought—and then return the matter to the military judge to work out the details of implementing that right." Reply at 11. In the absence of such relief, they assert, "there will be no timely and therefore meaningful vindication of the First Amendment right of public access," and "the judges of the CAAF clearly understood that these issues of public access would henceforth have to be resolved by Article III courts." *Id.*

In addition, plaintiffs point out that intervention into the affairs of Article I courts, by way of injunction, for the protection of the public's First Amendment right of access, is not unprecedented. They cite *Detroit Free Press v. Ashcroft*, 195 F. Supp. 2d 937 (E.D. Mich. 2002), *aff'd*, 303 F.3d 681 (6th Cir. 2002), in which a federal district court enjoined on First Amendment grounds the practice of Article I immigration courts, in the wake of the September

11 attacks, of designating certain removal proceedings ("primarily [against] young men of Arab or Muslim background") as so-called "special interest cases" that were "closed to the press and public." 195 F. Supp. 2d at 940. The Sixth Circuit affirmed the injunction, rejecting the government's argument for "deferential review" in light of the "government's plenary power over immigration." 303 F.3d at 685. It reasoned: "We are unpersuaded by the Government's claim, which would require complete deference in all facets of immigration law, including non-substantive immigration laws that infringe upon the Constitution. We hold that the Constitution meaningfully limits non-substantive immigration laws and does not require special deference to the Government." *Id.* Plaintiffs argue: "The same logic should apply here; . . . this Court owes the military courts no deference on issues involving the public's right of access . . . ." ECF 24 at 2.

I am cognizant of the deference owed to a coordinate tribunal, particularly a military court in the midst of conducting a court-martial. Nevertheless, *Councilman* does not foreclose this Court's exercise of jurisdiction under the circumstances presented here. As plaintiffs point out, this case does not involve a servicemember's challenge to a court-martial's jurisdiction or its interlocutory rulings. Nor does it concern the distinctive competency of courts-martial in matters of military discipline. Moreover, plaintiffs have exhausted all avenues to relief within the military justice system, by litigating their claims through two layers of appeal, to a final decision by the CAAF, the highest military court, which determined that it lacks jurisdiction to resolve plaintiffs' claims.[10]

---

[10] This factor is relevant to plaintiffs' mandamus claim because, assuming the other requirements of mandamus are satisfied, it demonstrates that "there are no other adequate means to attain the relief [plaintiffs] desire[ ]." *Rahman*, *supra*, 198 F.3d at 511.

These facts make this case a far cry from the situation in *Councilman*. The *Councilman* Court stated that the "congressional judgment" in establishing a separate "military court system . . . must be respected and that it must be assumed that the military court system will vindicate *servicemen's* constitutional rights." *Councilman*, 420 U.S at 758 (emphasis added). Accordingly, the *Councilman* Court limited the availability of federal court collateral review of challenges by *servicemembers* to "military authorities' decision to convene the court-martial and the refusal of the military judge to dismiss the charges." *Id.* at 749. But, this case does not involve the validity of the charges against PFC Manning or Manning's constitutional rights as an accused servicemember. Rather, it involves the asserted constitutional rights of the press and public to access fully Manning's trial. Manning has a concomitant right (protected by the Sixth Amendment, rather than the First) to a public trial, but he chose not to join in plaintiffs' challenge to Judge Lind's rulings in the military appellate courts. It was precisely because the constitutional rights of the court-martialed servicemember were *not* at issue that the CAAF ruled that it lacked jurisdiction to resolve the matter, leaving recourse to the Article III judiciary as plaintiffs' only forum in which to assert their constitutional claims.

The rights that plaintiffs assert pertain to fundamental constitutional values of openness of court proceedings; such access is vital in our democracy, and helps to inspire public confidence in the integrity of such proceedings. The Fourth Circuit, even in cases concerning its appellate authority over federal district courts, has said that the duty to observe First Amendment protections need not "disrupt" an ongoing trial, and that a trial court can "attend" to this duty "as expeditiously as it can, giving all necessary attention to the conduct of the trial." *In re Time Inc.*, 182 F.3d 270, 272 (4th Cir. 1999).

To be sure, defendants' arguments counsel caution in collateral review of the rulings of a military tribunal. This Court is obliged to tread gingerly, but it cannot ignore its responsibilities to uphold federal rights. Although federal courts are courts of limited jurisdiction, where jurisdiction is established, federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Therefore, this Court will proceed to consider the merits of the preliminary injunction motion.

### B. Preliminary Injunction

In general, plaintiffs seek relief as to three categories of information pertinent to the court-martial: (1) the documents comprising the record; (2) transcripts of in-court proceedings; and (3) off-the-record conferences between Judge Lind and counsel, conducted pursuant to R.C.M. 802. As to all three categories, there is both a retrospective aspect and a prospective aspect: plaintiffs seek access to documents and information that have already been generated by the court-martial, as well as documents and information that will be generated during the course of the court-martial, going forward.

Plaintiffs' claims must be analyzed in the context of their Motion. In order to obtain a preliminary injunction, plaintiffs must satisfy all four factors articulated by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008): (1) that they are "likely to succeed on the merits," (2) that they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) that the "balance of equities tips in [their] favor," and (4) that "an injunction is in the public interest." *Accord Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir.

2013); *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011); *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009).

In considering the likelihood of plaintiffs' success on the merits, the media's right of access under the First Amendment is coterminous with the public's right of access. *See Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 609 (1978) (noting that the right of the press is not "superior to that of the general public"). It is equally well established that, with respect to civilian cases, the public and the press enjoy a First Amendment right and/or a right under the common law to attend trial, *see Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980); to attend pretrial proceedings, *see Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) ("*Press-Enterprise II*"); and a general right to inspect and copy judicial records and documents, *Nixon*, 435 U.S. at 597; *In re Application*, *supra*, 707 F.3d at 290 ("[T]he common law presumes a right to access *all* judicial records and documents . . . .") (emphasis in original); *In re Washington Post Co.*, 807 F.2d 383, 390 (4th Cir.1986) ("[W]e hold that the First Amendment right of access applies to documents filed in connection with plea hearings . . . in criminal cases, as well as to the hearings themselves."). Such rights are not absolute, however. *Nixon*, 435 U.S. at 598. Moreover, the Supreme Court has recognized that, at least in the context of civilian courts, "[e]very court has supervisory power over its own records and files," *id.* at 598, and has observed that those cases recognizing a right of access have agreed that "the decision as to access is one best left to the sound discretion of the trial court," in light of the "relevant facts and circumstances of the particular case.[ ]" *Id.*at 599.

With respect to military courts-martial in general and the Manning court-martial in particular, the parties agree that the public has at least a qualified right of access. The highest

military appellate court has stated that "Congress intended that, to the extent 'practicable,' trial by court-martial should resemble a criminal trial in a federal district court," *United States v. Valigura*, 54 M.J. 187, 191 (C.A.A.F. 2000), and that "public confidence in matters of military justice would quickly erode if courts-martial were arbitrarily closed to the public." *United States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987). Similarly, the Army Court of Criminal Appeals has recognized that the "right of public access to criminal trials applies with equal validity to trials by courts-martial," *United States v. Scott*, 48 M.J. 663, 665 (ACCA 1998), and that the "qualified right of access to materials entered into evidence may apply with equal validity to exhibits that were presented in public at a trial by court-martial." *Id.* at 666. The right to a public trial is also embedded in R.C.M. 806, which provides: "Except as otherwise provided in this rule, courts-martial shall be open to the public."

Thus, the issues in this case do not concern whether there exists a right of public access to courts-martial. Rather, they concern the scope of that right, and the means by which the right is to be vindicated or effectuated.

Defendants argue correctly that not every document that has been or will be filed in the record of the Manning court-martial is necessarily subject to a right of access by the public. "For a right of access to a document to exist under either the First Amendment or the common law, the document must be a 'judicial record.'" *In re Application*, *supra*, 707 F.3d at 290. "[D]ocuments filed with [a] court are 'judicial records' if they play a role in the adjudicative process, or adjudicate substantive rights." *Id.* Thus, "judicially authored or created documents are judicial records," as are documents "filed with the objective of obtaining judicial action or relief." *Id.* On the other hand, "'the mere filing of a paper or document with [a] court is

insufficient to render that paper a judicial document subject to the right of public access.'" *Id.* at 290 n.6 (citation omitted).  To be sure, it is obvious that many or even most of the documents filed in a court-martial or other criminal proceeding are likely to be judicial records.  But, it is by no means necessarily the case that all of them are judicial records.

Even where a document is a judicial record, and thus subject to a *presumption* of public access under the common law, it does not necessarily follow that the document is subject to a First Amendment right of access, or that the public actually will have the right to access the document.  The common law presumption of public access can be rebutted if "the public's right of access is outweighed by competing interests." *In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984); *accord Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988). The common law right of access is buttressed, however, by the "more rigorous" right of access provided by the First Amendment, which applies to a more narrow class of documents, but is more demanding of public disclosure.  *Rushford*, 846 F.2d at 253.  If a court record is subject to the First Amendment right of public access, the record may be withheld from the public "only on the basis of a compelling governmental interest, and only if the denial is narrowly tailored to serve that interest." *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 178, 180 (4th Cir. 1988) (citing *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510 (1984) ("*Press-Enterprise I*")).

The test for whether a document is subject to a First Amendment right of public access is sometimes called the test of "experience and logic." *In re Application*, 707 F.3d at 291.  It asks: "(1) 'whether the place and process have historically been open to the press and general public,' and (2) 'whether public access plays a significant positive role in the functioning of the particular

process in question.'" *Id.* (quoting *Press-Enterprise II*, 478 U.S. at 8-10) (some internal citations and quotation marks omitted).

Defendants assert that neither the military appellate courts nor any Article III court considering judicial documents filed in a court-martial have ever squarely held that the more rigorous First Amendment right applies. As noted, in *Scott*, 48 M.J. at 665, the ACCA concluded only that the public "may" have a qualified right of access to documents filed in a court-martial, without deciding the issue. Defendants urge this Court, in light of considerations of deference and comity as to the tribunals of a coordinate branch of government, to refrain from deciding that issue in this case. Plaintiffs counter that, as to criminal trials in civilian courts, every federal appellate court to have considered the issue has concluded that documents entered into evidence at a criminal trial or filed in connection with at least some types of substantive pretrial criminal proceedings are subject to a First Amendment right of public access.[11] Thus,

---

[11] Plaintiffs observe that, of the thirteen federal appellate courts, only the Federal Circuit (which has no jurisdiction over criminal cases) has not considered the issue and, of the other federal appellate courts, only the Tenth Circuit has not resolved the issue. *See Globe Newspaper Co. v. Pokaski*, 868 F.2d 497 (1st Cir. 1989) (holding unconstitutional a state statute automatically sealing all court records in closed criminal cases, except with respect to cases in which no grand jury indictment was returned); *In re Globe Newspaper Co.*, 729 F.2d 47, 52 (1st Cir. 1984) ("[T]he public has a First Amendment right of access to pretrial proceedings setting and modifying bail, and to the documents on which the bail decisions are based. . ."); *United States v. Haller*, 837 F.2d 84, 87 (2d Cir. 1988) ("[T]he qualified first amendment right of access extends to plea hearings and thus to documents filed in connection with those hearings. . ."); *In re New York Times Co.*, 828 F.2d 110, 114 (2d Cir. 1987) ("[A] qualified First Amendment right of access extends to . . . written documents filed in connection with pretrial motions . . . ."); *cert. denied*, 485 U.S. 977 (1988); *United States v. Smith*, 787 F.2d 111, 116 (3d Cir. 1986) ("[T]he common law right of access to judicial records is fully applicable to transcripts of sidebar or chambers conferences during criminal trials at which evidentiary or other substantive rulings have been made . . . ."); *United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir. 1985) ("We conclude that the First Amendment right of access . . . extend[s] to bills of particulars because we think them more properly regarded as supplements to the indictment than as the equivalent of civil discovery."); *In re Washington Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986) ("[T]he First

- 19 -

they argue that this case does not present a difficult or sensitive legal issue as to which a federal district court should be reluctant to rule, out of deference to a tribunal in a coordinate branch of government.

As noted, in addition to the likelihood of success on the merits, the court must also consider the likelihood of irreparable harm in the absence of injunctive relief, as well as the balance of the equities and the public interest. In this case, several events have occurred since the filing of plaintiffs' complaint, which affect the Court's analysis of these factors.

First, at the time that plaintiffs filed their complaint, the Army had publicly released very little in the way of documents filed in the Manning court-martial. According to plaintiffs, the

---

Amendment right of access applies to documents filed in connection with plea hearings and sentencing hearings in criminal cases, as well as to the hearings themselves."); *In re Hearst Newspapers, L.L.C.*, 641 F.3d 168, 181 (5th Cir. 2011) ("[T]he press and public have a First Amendment right of access to sentencing proceedings."); *In re Applications of NBC*, 828 F.2d 340, 344 (6th Cir. 1987) (concluding that there is a First Amendment "right of the public and representatives of 'the media' to have access to documents filed in a district court at the preliminary stages of a criminal prosecution," including motions for disqualification of the judge or counsel); *United States v. Ladd (In re Associated Press)*, 162 F.3d 503, 506 (7th Cir. 1998) ("[T]he 'public's right of access to court proceedings and documents is well-established.'") (citation omitted); *United States v. Peters*, 754 F.2d 753, 763 (7th Cir. 1985) ("The public and press have a longstanding common law right of access to judicial records [including trial exhibits]."); *In re Search Warrant for Secretarial Area Outside Office of Gunn*, 855 F.2d 569 (8th Cir. 1988) (concluding that there is a public right to access documents filed in support of search warrants); *Oregonian Publ'g Co. v. United States Dist. Court*, 920 F.2d 1462 (9th Cir. 1990) ("Under the first amendment, the press and the public have a presumed right of access to court proceedings and documents."); *Associated Press v. United States Dist. Court*, 705 F.2d 1143 (9th Cir. 1983) ("We thus find that the public and press have a first amendment right of access to pretrial documents in general."); *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1028-31 (11th Cir. 2005) (mandating First Amendment access to sealed docket and judicial records in criminal case); *Washington Post v. Robinson*, 935 F.2d 282, 287-88 (D.C. Cir. 1991) (stating that the "first amendment guarantees the press and the public a general right of access to court proceedings and court documents unless there are compelling reasons demonstrating why it cannot be observed," and holding that the right of public access applies to plea agreements); *cf. United States v. McVeigh*, 119 F.3d 806, 811 (10th Cir. 1997) ("assum[ing] without deciding that access to judicial documents is governed by the analysis articulated in *Press-Enterprise II*").

Army had made a collection of 84 documents, in heavily redacted form, available online in February 2013. *See* Complaint ¶ 34. In addition, Manning's defense counsel had obtained permission from Judge Lind to post on his own website the motions and memoranda filed by the defense. *See id.* ¶¶ 37-38. But, the publicly posted defense motions allegedly were also subject to heavy redactions (including, but not limited to, the redaction of any quotations from prosecution filings), and their release was often significantly delayed by the redaction process. *See id.* According to plaintiffs, none of the prosecution's memoranda and very few of Judge Lind's written rulings were publicly available.

Then, on June 4, 2013, after plaintiffs initiated this lawsuit, the Army released to the public, on the internet, in readily downloadable form, the vast majority of the documents that had been filed in the Manning court-martial up to that date. A small number of documents have been withheld because they are classified, and the documents have been subject to limited redactions. The Court certainly has not reviewed all of the more than 500 documents that were released, but from the documents that were reviewed, the redactions appear minimal and, in large part, unquestionably appropriate. Moreover, the redactions are much less extensive than the redactions of the documents previously released by the Army and the defense. Most of the redactions are marked with codes that correspond to the sections of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, that authorize withholding of certain categories of information from public documents. *See* 5 U.S.C. § 522(b)(1)-(9). The Army Records Management and Declassification Agency ("RMDA") has posted the documents that were filed during the pretrial proceedings of the Manning court-martial in an electronic "reading room," accessible at https://www.rmda.army.mil/foia/FOIA_ReadingRoom/Detail.aspx?id=84.

The second significant development is that the Army has represented to the Court, in the Declaration of Lt. Col. Nelson Van Eck, Chief of the Criminal Law Division of the Army Office of The Judge Advocate General ("OTJAG"), that it is "committed" to the public release of further documents "on a rolling basis" as the documents are filed with the court-martial, "with the goal" of a one to two business-day turnaround, needed to make any appropriate redactions or decisions as to withholding. Van Eck Decl. ¶ 15 (ECF 18-1). The Army RMDA is posting the documents from the Manning court-martial trial proceedings in a separate "reading room," accessible at https://www.rmda.army.mil/foia/FOIA_ReadingRoom/Detail.aspx?id=85.[12]

Finally, the court-martial has granted a request by the Freedom of the Press Foundation to make available additional seats in the press gallery for privately retained stenographers to create contemporaneous, unofficial transcripts of the open sessions of the trial proceedings. The Freedom of the Press Foundation, which is not a party to this case, began its transcription effort on the first day of trial (June 3, 2013), and is posting the daily unofficial transcripts on its website with less than a 24-hour turnaround. *See* https://pressfreedomfoundation.org/bradley-manning-transcripts/.

Plaintiffs characterize these developments as belated and long overdue. And, in certain respects, plaintiffs argue that these developments, commendable as they may be, are not

_____

[12] Lt. Col. Van Eck provided the website address of the reading room for the pretrial documents in his Declaration. *See* Van Eck Decl. ¶ 14 n.8. However, defendants did not provide in any of their papers the website address of the second reading room, containing the rolling releases of documents filed during the trial. This led to some confusion at the preliminary injunction hearing on June 17, 2013, when it became apparent that plaintiffs were unaware of the existence of the second reading room website. *See* ECF 24. Nevertheless, as of June 5, 2013, and through the date of the preliminary injunction hearing, links to both reading rooms were accessible on the Army RMDA's website collecting its various "reading rooms," *see* https://www.rmda.army.mil/foia/FOIA_ReadingRoom/index.aspx, established pursuant to the FOIA. *See id.* § 552(a)(2)(A)-(E) ("reading room" provisions of FOIA).

sufficient to satisfy fully the right to public access to the court-martial. However, the developments make a significant difference in the Court's analysis of the preliminary injunction factor of likelihood of irreparable injury in the absence of preliminary injunctive relief.

With this background, I consider the propriety of preliminary injunctive relief, as to both the retrospective and prospective aspects of each of the three categories of documents to which plaintiffs seek access.

### 1. Documents—Prospective Access

As indicated, in his Declaration, Lt. Col. Van Eck stated: "[T]he Army is committed to ensuring that motions, court rulings, or stipulated testimony published in open court, including any attachments, are made available on a rolling basis," and that the "Army will endeavor to produce those documents as soon as possible, with the goal of providing documents to the public within one to two business days after filing, except in exceptional circumstances." Van Eck Decl. ¶ 15.

Defendants claim that this representation renders moot the issue as to the documents. However, a "'defendant claiming that its voluntary compliance moots a case bears a formidable burden of showing that it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *McBurney v. Cuccinelli*, 616 F.3d 393, 404 n.10 (4th Cir. 2011) (internal quotation marks and citation omitted). As far as constitutional mootness is concerned, the Army's commitment that it will "endeavor" to meet a "goal" of providing documents within one to two business days may not suffice to meet defendants' "formidable burden" in order to moot this issue.

Additional considerations point away from a determination of constitutional mootness. First, the parties continue to have a fundamental disagreement over the applicable process and the identity of the proper decision maker for public release of the court-martial documents. Plaintiffs contend that, under the First Amendment and the common law, they have a qualified right of access to judicial documents filed in the court-martial, and that Judge Lind is the proper arbiter of any permissible limitations on their access under constitutional and common law principles. *See* Motion at 28-29 n.14. Defendants do not concede that plaintiffs' rights to access the documents stem from the First Amendment or the common law. Rather, they insist that plaintiffs' right of access can be satisfied through the arrangements the Army has recently made for expedited release of the documents and an expedited review process for challenges to redactions.

Relying on *Dayton Newspapers, Inc. v. U.S. Department of the Navy*, 109 F. Supp. 2d 768 (S.D. Ohio 1999), plaintiffs point out that the substantive grounds for withholding of information under FOIA are not necessarily coextensive with the more narrow grounds for shielding judicial documents from public view under the common law or the First Amendment. Moreover, the decision maker with respect to FOIA release and redaction is not Judge Lind. As Lt. Col. Van Eck explains, the Army Office of The Judge Advocate General ("OTJAG"), Criminal Law Division, has been delegated "initial denial authority" for FOIA requests for court-martial documents during an ongoing court-martial. *See* Van Eck Decl. ¶ 11. Review of the OTJAG Criminal Law Division's initial determinations is vested in the Army General Counsel. *Id.* Thus, the relief that defendants have made available going forward involves release decisions

made under a qualitatively different standard, and by a different decision maker, than that to which plaintiffs contend they are entitled.[13]

Second, as defendants appear to acknowledge, *see* Opposition at 13, denial of public access to court records and proceedings as to which there are First Amendment or common law rights of public access is one of the classic examples of an issue that comes within the exception to constitutional mootness for matters that are "capable of repetition yet evading review." The Supreme Court's landmark decisions in *Richmond Newspapers,* 448 U.S. 555, and *Press-Enterprise II*, 478 U.S. 1, among many other decisions, make this clear.

Nevertheless, there is a significant question as to whether this matter is *prudentially* moot. In *S-1 and S-2 v. Spangler*, 832 F.2d 294, 297 (4th Cir. 1987), the Fourth Circuit recognized that, even in a case that is not constitutionally moot, a court, in its discretion, has the power to withhold injunctive and declaratory relief for prudential reasons. The *Spangler* Court articulated three relevant "concerns" that could support a finding of prudential mootness: (1) "the specific relief sought . . . no longer has sufficient utility to justify decision of [the] case on the merits"; (2) "the difficulty and sensitivity of the constitutional issue at the core of [the] controversy"; and (3) the issues raised are not "capable of repetition yet likely to evade review" and thus do not "require immediate resolution." *Id.* at 297-98.

---

[13] At the hearing, defendants were reluctant to concede that the Army's release of the pretrial and trial documents is actually a release subject to FOIA, although the documents are released in an electronic FOIA reading room with FOIA-based redactions. *See* 5 U.S.C. § 552(a)(2)(D) (so-called "reading room" provision of FOIA, providing for agencies to make available for public inspection and copying "copies of all records, regardless of form or format, which have been released to any person under paragraph (3) and which, because of the nature of their subject matter, the agency determines have become or are likely to become the subject of subsequent requests for substantially the same records").

In *Spangler*, most, but not all, of the plaintiffs' education-based claims had been settled. Thus, the Court was of the view that it was difficult to justify a decision on the merits. As to possible future violations, the Court doubted that the precise violations of the Education of the Handicapped Act would recur. *Id.* at 298. And, of particular significance here, it assumed that the State Board would act in good faith to conform to its representations. *Id.*

Before reaching the issue of prudential mootness as a bar to final judgment on the merits, however, there is the question of whether plaintiffs meet the criteria for the preliminary injunction that they seek. Even if the government's representations do not render the issues prudentially moot on the merits, they render it unlikely that plaintiffs will be irreparably harmed in the absence of a preliminary injunction. Accordingly, even if I ultimately reach the merits and decide them in plaintiffs' favor, the fact that the government released a huge number of documents after suit was filed, and has committed to the release of documents from the court-martial going forward, and on an expedited basis, seriously diminishes the likelihood of irreparable harm to plaintiffs.

To be sure, the documents will not be released instantaneously; the government represents that, in general, it will need one to two business days after a document is submitted. But, there is no indication that such a brief delay is unreasonable, unnecessary, or would work irreparable injury to plaintiffs, and the cases cited by plaintiffs are not to the contrary.

In *Chicago Tribune Co. v. Ladd (In re Associated Press)*, 162 F.3d 503, 506 (7th Cir. 1998), the Seventh Circuit stated that "the values that animate the presumption in favor of access require as a 'necessary corollary' that, once access is found to be appropriate, access ought to be 'immediate and contemporaneous.'" (Citation omitted.) But, that statement was *dicta*. Notably,

the request for unsealing of documents in *Chicago Tribune* came after trial was completed. *See id.* at 506 ("[A]fter Mr. Berger had been acquitted of all charges, the Press . . . filed a Petition for Release of various documents that were filed under seal in connection with Mr. Berger's trial."). The Seventh Circuit faulted the district court for failing to "examine[ ] the documents [and] articulate[ ] the factual basis for keeping the documents sealed," a process which necessarily cannot happen instantaneously. There is no indication in *Chicago Tribune* that a delay of one to two business days to permit such review, analogous to the expedited release that the military has committed to in this case, would not be sufficiently "immediate and contemporaneous" to comply with First Amendment requirements.

Plaintiffs also rely on *Associated Press v. United States District Court*, 705 F.2d 1143 (9th Cir. 1983), in which the Ninth Circuit vacated a district court order imposing a mandatory 48-hour preliminary sealing period on all documents filed in a high-profile criminal case. But, the Ninth Circuit found fault in the district court's failure to articulate the bases for sealing on a document-by-document basis. In remanding for further proceedings, the court permitted the parties a three-day period in which to make motions for sealing on a document-by-document basis. There is no indication that the expedited, individual document-by-document review by the OTJAG, to which defendants have committed, will not be as effective as individual review by a court for purposes of sealing, so as to secure timely public release of minimally redacted documents.

In addition, plaintiffs cited *United States v. Smalley*, Crim. No. 82-301, 9 Media L. Rep. 1255 (N.D. Tex. Feb. 4, 1983), a district court decision that is not reported in the Federal Supplement, in which the court permitted news media intervenors to have "contemporaneous

access" to already-prepared transcripts of tape recordings that were being introduced in evidence during the trial. *Id.* at 1256. The court reasoned: "Without contemporaneous access to the transcripts of the tape recordings introduced into evidence, the press would be foreclosed from reporting at all on a significant portion of the prosecution's evidence in this important and newsworthy criminal proceeding." *Id.* Notably, the court observed that the "jury already has been provided with the transcripts." *Id.* Thus, the *Smalley* Court's decision to provide "contemporaneous" access did not equate with instantaneous access. Once again, there is no indication that public release of documents within one to two business days after their introduction at trial is insufficiently "contemporaneous" to vindicate First Amendment interests.

At the preliminary injunction hearing, plaintiffs maintained that the Army already has failed to adhere to its representations of an anticipated one-to-two-day time frame for release of documents. However, plaintiffs did not submit any testimony or other admissible evidence to that effect. Moreover, it became clear at the hearing that plaintiffs were unaware that the Army has been releasing the documents filed during the trial via a separate webpage on the same site. *See* note 12 and accompanying text, *supra*. Thus, they were mistaken in their belief that the Army had not released anything since its release of the pretrial documents shortly after suit was filed.

In their post-hearing correspondence (ECF 24), plaintiffs state that their "preliminary analysis" after the hearing suggested that approximately 70 documents had been filed or introduced in the court-martial between June 10 and 12, but did not yet appear on the Army's website. However, plaintiffs provided no analysis, document by document, to indicate what records they contend were withheld or unduly delayed. And, plaintiffs acknowledged that, as of

the early morning of the day after the hearing, and shortly before they filed their letter (ECF 24), the Army had uploaded another thirteen documents consisting of trial exhibits.

At the hearing, defendants acknowledged that there had been some "startup glitches" or "kinks in the system" in providing rolling access to the documents on the tight time frame the OTJAG had set as its goal. But, there was no indication that the Army intended to back away from the averments made by Lt. Col. Van Eck, under oath. This Court, in reliance on the commitments made by Lt. Col Van Eck, may "take the government at its word and . . . hold it to it." *Wheaton College v. Sebelius*, 703 F.3d 551, 552 (D.C. Cir. 2012).

Particularly in a context in which the preliminary injunctive relief sought by plaintiffs would involve the issuance of mandatory directives to a military trial judge who is in the midst of a complicated and complex court-martial trial,[14] and in light of plaintiffs' failure to provide any evidence or analysis of the Army's alleged failure to comply with its commitment to provide rolling access to the documents submitted during trial, I conclude that plaintiffs have not established a likelihood of irreparable harm, so as to warrant a preliminary injunction.

## *2. Documents—Retrospective Access*

I am likewise satisfied that there is virtually no likelihood of irreparable injury to plaintiffs as to documents previously submitted in connection with pretrial proceedings in the court-martial. Whatever injury plaintiffs have suffered until now has been alleviated by way of

---

[14] It is noteworthy that, in *Nixon v. Warner Communications, Inc.*, *supra*, 435 U.S. 589, a seminal case concerning the public right of access to court documents, which arose out of the trial of the conspirators in the Watergate burglary scandal that ultimately ended the presidency of Richard Nixon, the matters concerning media access to audio tapes played at trial were referred to a second district judge because the historic criminal trial "was consuming all of [the trial judge's] time." *Id.* at 594. There is no indication that Judge Lind has such reinforcements available to her.

the government's release of documents, except to the extent that plaintiffs claim that the few redactions from the documents are too extensive. Moreover, plaintiffs acknowledge that for many of the documents "there are hardly any redactions." Reply at 12.

In particular, plaintiffs take issue with the redaction of witness names in the parties' witness lists and in one motion. *See* Reply at 14-15. However, Lt. Col. Van Eck addressed the issue of redaction of witness names in his Declaration (ECF 18-1). He stated that the "identities" of "potential witnesses . . . are subject to a protective order issued in the case." Van Eck Decl. ¶ 14.[15] Plaintiffs cite no authority for the proposition that the identities of prospective witnesses are subject to a common law or First Amendment right of access and, although I need not resolve that issue definitively, I am satisfied that plaintiffs have not established a likelihood of success on the merits as to a right of public access to prospective witness lists. Such lists ordinarily are filed to provide the opposing side with notice of the evidence that may be presented at trial; the submission of a prospective witness list does not invite a substantive ruling from a trial judge, nor are lists of prospective witnesses submitted to the fact-finder.[16] Thus, it is questionable whether a prospective witness list would be considered a judicial document at all. Even if a witness list is a judicial document, it is unclear that such a document would qualify under the test of "experience and logic" as subject to public access under the First Amendment, or that

---

[15] Plaintiffs have not controverted this assertion, despite their insistence that the public is entitled to the names on the witness lists before the witnesses are called, and even if they are ultimately not called at all.

[16] Notably, the government has also released the stipulated testimony of many witnesses, introduced into evidence, and the identities of the witnesses are not redacted in those documents. This is consistent with relevant precedent cited by plaintiffs, which endorses a First Amendment right of public access to "documentary exhibits *admitted into evidence*." *In re Associated Press*, 172 F. App'x 1, 5, (4th Cir. 2006) (emphasis added).

redaction of the actual identities of witnesses would not be permissible under common law or First Amendment standards.

In sum, as to the issue of retrospective access to documents filed in the court-martial, I am amply persuaded that there is no longer any substantial likelihood of irreparable injury to plaintiffs, in light of the Army's release of documents after the filing of plaintiffs' suit.

### 3. Transcripts—Prospective Access

As indicated, the public sessions of the trial are being transcribed unofficially by privately retained stenographers, at the request of the Freedom of the Press Foundation. According to its website, the Freedom of the Press Foundation estimates that it will cost between $60,000 and $120,000 to transcribe the twelve-week trial. However, plaintiffs do not argue that they are entitled to contemporaneous transcripts of the trial at government expense. Moreover, the Freedom of the Press Foundation is not a party to this case and so the costs it is incurring are not relevant to the legal issues before me. And, plaintiffs seem to concede that there is no longer a live issue as to transcripts of the trial, going forward. Preliminary injunctive relief clearly is not warranted as to this issue, nor do plaintiffs seem to seek it at this juncture.

### 4. Transcripts—Retrospective Access

Plaintiffs maintain that they are entitled under the First Amendment to access the transcripts of the pretrial proceedings with respect to matters that occurred earlier in the court-martial. Defendants respond that transcripts of the pretrial proceedings have not yet been prepared. Although preparation of the transcripts from audio recordings is underway, those transcripts that have been prepared thus far are still in unreviewed draft form and, under the Rules for Courts-Martial, will not be completed or authenticated until after the conclusion of the

trial.  *See* Van Eck Decl. ¶¶ 8-10; R.C.M. 1103 & 1104.  Plaintiffs counter that, in lieu of transcripts, they should have access to the audio recordings of pretrial proceedings.

It is important to reiterate that the pretrial proceedings were open to the press and the public.  To some extent, plaintiffs' request for transcripts or recordings of the pretrial proceedings was driven initially by the fact that the documentary records had not previously been made available.  Plaintiffs' declarants have complained that Judge Lind made a practice of reading her rulings into the record at a high rate of speed, making it difficult for attendees of the proceedings accurately to capture them, especially given the lack of access to the filings that were under discussion.  Without copies of the parties' motion papers, the observers of pretrial proceedings were often unaware of the context for discussions that occurred on the record, making the in-court proceedings difficult to comprehend.  To the extent that plaintiffs seek the transcripts of pretrial proceedings as a substitute for access to the documents, the need for the transcripts has been alleviated by the Army's release of the court-martial records, including Judge Lind's written rulings and the parties' motions and memoranda.

Nonetheless, plaintiffs also assert a right to access transcripts and/or audio recordings in their own right.  Plaintiffs have cited case law for the proposition that they have a First Amendment right to access these documents, but none of the case law they cite supports the proposition that they have an immediate or contemporaneous right of access to *audio recordings* of proceedings while the court-martial is ongoing; to government preparation of transcripts on demand; or to access to transcripts in draft form.

In *United States v. Antar*, 38 F.3d 1348 (3d Cir. 1994), upon which plaintiffs rely, the press requested a transcript toward the very end of the trial, as to voir dire proceedings from

which the press had been absent because of courtroom overcrowding.  The trial court, sua sponte, immediately sealed the portion of the transcript concerning the voir dire proceedings, although it had not yet been transcribed.  *Id.* at 1352.  The jury reached its verdict in July 1993, but the transcripts remained under seal until December 1993.  *See id.* at 1351-52.

In this context, the Third Circuit emphasized that the public, inclusive of the press, had a right to transcripts of jury selection hearings that had been open to the public, but from which the press was absent because of space limitations.  It said: "[T]he fact that the courtroom was open during those three days in June is of little import, as we find that the right of access to voir dire examinations encompasses equally the live proceedings and the transcripts which document those proceedings."  *Id.* at 1359.  The court reasoned: "[D]ocumentary access is not a substitute for concurrent access, and vice versa. The right of access encompasses both forms, and both are vitally important."  *Id.* at 1360 n.13.  Moreover, the *Antar* Court stated, *id.* at 1360:

> [O]penness is ongoing—a status rather than an event.  At the heart of the Supreme Court's right of access analysis is the conviction that the public should have access to information; the Court never has suggested that an open proceeding is only open to those who are able to be bodily present in the courtroom itself.[1] True public access to a proceeding means access to knowledge of what occurred there. It is served not only by witnessing a proceeding firsthand, but also by learning about it through a secondary source. In fact, recognition of the crucial role of secondary representation is the basis for the Court's protection of the rights of the media, who have been described by the Court as "functioning as surrogates for the public."  *Richmond Newspapers, Inc.*, 448 U.S. at 574.[1]    Access to the documentation of an open proceeding, then, facilitates the openness of the proceeding itself by assuring the broadest dissemination. It would be an odd result indeed were we to declare that our courtrooms must be open, but that transcripts of the proceedings occurring there may be closed, for what exists of the right of access if it extends only to those who can squeeze through the door?

Notably, the *Antar* Court was not faced with a request for preparation of a transcript while trial testimony was ongoing. Nor was there a request for access to an audio recording of the voir dire proceeding. Months elapsed between the end of the trial and the requested release.

In *Globe Newspapers v. Pokaski*, 868 F.2d 497 (1st Cir. 1989), on which plaintiffs also rely, the First Circuit ruled invalid, under the First Amendment, a Massachusetts statute limiting public inspection of records in certain types of *closed* criminal cases. The court rejected the contention "that once the substance of testimony and evidence has been exposed to public view, there is no right of access to visual and aural means of preserving it." *Id.* at 504. It commented that such a rule

> arguably would mean that once an open trial is held, a permanent barrier can be erected against inspection of exhibits, audiotapes, videotapes, and any papers to which the public had no 'physical access.' Proceedings that were recorded *only* on tape—as many are—would be forever insulated from inspectors. Moreover, there would be no opportunity to check whether, in light of a tape, a paper record or transcript had been altered.

*Id.* (emphasis in original).

However, the issues in *Pokaski* were limited to access to the records of completed proceedings. *Pokaski* does not stand for the proposition that the press or the public has an unfettered First Amendment right to access audio tapes of proceedings during an ongoing criminal trial.

Certainly, a member of the public ordinarily may request a transcript of a federal court proceeding, at his or her own expense, on an expedited basis. Typically, higher fees attach to expedited preparation. But, plaintiffs have not convinced me that there is a likelihood of success on the merits with respect to a claim that they have a right *under the First Amendment* to the availability of expedited preparation services for transcripts, and certainly not at government

expense.  Nor am I persuaded that there is a likelihood of success as to their claim that the military must give them access to audio recordings of a court-martial while it is still ongoing.  In this connection, I note that the Manning court-martial is occurring on United States soil, but that is not the case for every court-martial; they may be conducted in the field, and on foreign soil.

Moreover, at Judge Lind's directive, the prosecution has submitted a plan for expedited preparation of suitably redacted transcripts of the testimony of the few witnesses during the court-martial as to whom Judge Lind has ruled that testimony must be taken in closed proceedings due to concerns about classified information.  *See* Appellate Exhibit 548.  The government's plan shows the limits of the government's resources to prepare transcripts on an expedited basis, and convinces me that to order the government to provide expedited transcripts of already completed proceedings would be a serious and unwarranted interference in the operation of the court-martial.[17]

For all of the foregoing reasons, and in the present posture of the court-martial, plaintiffs have not established a likelihood of success on the merits with respect to transcripts or audio recordings of pretrial proceedings, so as to warrant the extraordinary remedy of a preliminary injunction that would interfere with the conduct of an ongoing judicial proceeding.

---

[17] In the prosecution's submission, it informed Judge Lind that the Army has allocated all three of the court reporters on the permanent or temporary staff of the Military District of Washington to the Manning court-martial, and has also procured the services of a private transcription company to provide five additional court reporters, two of whom have the requisite security clearances to attend and transcribe the proceedings in closed court involving classified information.  (All three of the staff court reporters also have the appropriate security clearance.) The services of the eight court reporters will be fully consumed by the demands of recording the ongoing trial, providing expedited transcription of the closed hearings, and transcribing the open sessions on a non-expedited basis.

*5. R.C.M. 802 Conferences—Prospective and Retrospective Access*

Plaintiffs also challenge, both retrospectively and prospectively, Judge Lind's alleged practice of resolving substantive legal issues in private, off-the-record conferences pursuant to R.C.M. 802, and then failing to summarize adequately her rulings on the record.

R.C.M. 802(a) provides: "[T]he military judge may, upon request of any party or sua sponte, order one or more conferences with the parties to consider such matters as will promote a fair and expeditious trial." R.C.M. 802(b) states: "Conferences need not be made part of the record, but matters agreed upon at a conference shall be included in the record orally or in writing. Failure of a party to object at trial to failure to comply with this subsection shall waive this requirement." In addition, R.C.M. 802(c) states: "No party may be prevented under this rule from presenting evidence or from making any argument, objection, or motion at trial." The official "Discussion" notes to the rule confirm that the purpose of R.C.M. 802 conferences "is to inform the military judge of anticipated issues and to expeditiously resolve matters on which the parties can agree, not to litigate or decide contested issues." The notes also provide:

> A conference may be appropriate in order to resolve scheduling difficulties, so that witnesses and members are not unnecessarily inconvenienced. Matters which will ultimately be in the military judge's discretion, such as conduct of voir dire, seating arrangements in the courtroom, or procedures when there are multiple accused may be resolved at a conference. Conferences may be used to advise the military judge of issues or problems, such as unusual motions or objections, which are likely to arise during trial.

> Occasionally it may be appropriate to resolve certain issues, in addition to routine or administrative matters, if this can be done with the consent of the parties. For example, a request for a witness which, if litigated and approved at trial, would delay the proceedings and cause expense or inconvenience, might be resolved at a conference.

However, the notes emphasize that "this could only be done by an agreement of the parties and not by a binding ruling of the military judge," and that "[s]uch a resolution must be included in the record." Moreover, the notes state: "No party may be compelled to resolve any matter at a[n] [R.C.M. 802] conference."

At points, plaintiffs seem to be bringing a constitutional challenge to R.C.M. 802 itself, to the extent that the rule permits substantive issues to be resolved in private conferences by agreement of the judge and the parties. Plaintiffs claim that they have an independent, First Amendment right to access the court-martial proceedings, which the parties cannot waive away.[18] At other points, plaintiffs seem to argue that Judge Lind has failed to comply with R.C.M. 802 because she did not sufficiently summarize on the record the resolution of issues that are decided in R.C.M. 802 conferences. As a remedy for Judge Lind's alleged failure to comply with this requirement, plaintiffs ask this Court to order Judge Lind to "reconstitute" past R.C.M. 802 conferences on the record.

Regardless of which argument plaintiffs advance, I am satisfied that plaintiffs have minimal likelihood of success as to this issue, either prospectively or retrospectively. It follows that there is no likelihood of irreparable harm in the absence of an injunction, and that neither equity nor the public interest counsels entry of preliminary injunctive relief on this issue.

_____

[18] Plaintiffs also assert that R.C.M. 802(b)'s authorization of waiver by the parties is in tension with another R.C.M. provision, R.C.M. 1103(b)(2)(B), which states that, in the verbatim transcript of a general court-martial, "[c]onferences under R.C.M. 802 need not be recorded, but matters agreed upon at such conferences must be included in the record," without making any reference to the ability of the parties to waive this requirement. Even assuming that resolving asserted inconsistencies in the R.C.M. is a component of the legal issues properly before this Court, I need not resolve this issue in light of my ruling on other grounds.

As a starting point, plaintiffs have not made a factual showing that the Manning court-martial is in any way out of compliance with R.C.M. 802, at least going forward. I have reviewed all of the exhibits plaintiffs submitted in connection with their Motion, including the declarations of plaintiffs' counsel, Mr. Kadidal; Kevin Gosztola, one of the plaintiffs who is covering the Manning court-martial as a writer for the website Firedoglake; and Alexa O'Brien and Ed Pilkington, journalists who are covering the Manning court-martial but who are not plaintiffs in this suit. None of the declarants alleges from personal knowledge any instance in which the resolution of substantive matters discussed at an R.C.M. 802 conference was not adequately placed on the record in open court. Mr. Gosztola and Mr. Pilkington do not discuss the R.C.M. 802 issue at all. Mr. Kadidal recounts that, in CCR's letters to Judge Lind and defense counsel, CCR brought up the issue of R.C.M. 802 conferences; however, Mr. Kadidal does not discuss any particular instance in which compliance with R.C.M. 802 was unsatisfactory.

Ms. O'Brien deals the most extensively with the R.C.M. 802 issue, but she does not recount from personal knowledge any particular instance of unsatisfactory compliance with R.C.M. 802. Rather, she recounts a hearing in early June 2012, in which the defense brought a motion for all R.C.M. 802 conferences to be recorded (Appellate Exhibit 121), and Judge Lind denied that motion (Appellate Exhibit 129). The judge's reasons were set forth on the record in open court. Ms. O'Brien recounts from her notes Judge Lind's orally stated reasons for denying the defense motion, but I note that Judge Lind's written order denying the motion has now been made publicly available by the Army.

In Manning's motion, it was alleged that the prosecution was changing its position between R.C.M. 802 conferences and subsequent proceedings in open court; that the prosecution was using R.C.M. 802 conferences as a means to relitigate already-decided issues under the rubric of seeking "clarification" of Judge Lind's rulings; and that there was sometimes confusion about what exactly was decided in R.C.M. 802 conferences. In denying Manning's motion to record the R.C.M. 802 conferences, Judge Lind noted that, until that defense motion was filed, the defendant had not objected to conducting R.C.M. 802 conferences, and that both the prosecution and the defense had raised in R.C.M. 802 conferences substantive issues that required swift resolution, so as not to delay trial. She stated that the court-martial would continue to hold R.C.M. 802 conferences in order to address administrative, logistical, and scheduling issues, but that if any party objected to discussing a particular issue in an R.C.M. 802 conference, the conference would be terminated and the issue would be addressed at the next session of open court. She also committed to adding additional court sessions to the schedule, as well as holding ad hoc sessions as necessary, so as to resolve substantive issues on the record.

Plaintiffs have advanced absolutely no evidence of any inadequacy in the court-martial's R.C.M. 802 procedures following Judge Lind's ruling in early June 2012. Even as to the period before Judge Lind's ruling, essentially the only evidence of any concern regarding the R.C.M. 802 conferences is the Manning motion discussed above. As I see it, plaintiffs have not made an adequate evidentiary presentation to convince me that there are or were any issues in connection with the R.C.M. 802 hearings. That alone is a sufficient basis to deny preliminary injunctive relief on this point.

Nor am I persuaded that plaintiffs' constitutional argument for greater access to the R.C.M. 802 conferences has a likelihood of success on the merits. As defendants point out, conducting off-the-record conferences among court and counsel is not a practice that is confined to courts-martial. Fed. R. Civ. P. 77(b), applicable to the federal district courts, requires: "Every trial on the merits must be conducted in open court and, so far as convenient, in a regular courtroom." But, it also provides that "[a]ny other act or proceeding may be done or conducted by a judge in chambers . . . ."

In *Richmond Newspapers*, in which the Supreme Court recognized, in a plurality opinion, a First Amendment right of the press and the public to attend criminal trials, members of the Court pointed out that, "when engaging in interchanges at the bench, the trial judge is not required to allow public or press intrusion upon the huddle. Nor does this opinion intimate that judges are restricted in their ability to conduct conferences in chambers, inasmuch as such conferences are distinct from trial proceedings." 448 U.S. at 598 n.23 (Brennan, J., concurring, joined by Marshall, J.). In *Globe Newspapers, Inc. v. Superior Court for Norfolk County*, 457 U.S. 596 (1982), in which the Court reaffirmed the holding of *Richmond Newspapers*, the Court also reaffirmed "the traditional authority of trial judges to conduct in camera conferences." *Id.* at 609 n.25.

Subsequent decisions of the federal appellate courts have protected the discretion of trial judges to resolve off-the-record and in-chambers matters that do not form part of the trial on the merits or substantive pretrial proceedings. For instance, in *B.H. v. McDonald*, 49 F.3d 294 (7th Cir. 1995), the Seventh Circuit held that there was no public right of access to in-chambers conferences concerning implementation of a consent decree regarding adequacy of care for

children provided by the Illinois Department of Children and Family Services. In *Rovinsky v. McKaskle*, 722 F.2d 197, 201 (5th Cir. 1984), the Fifth Circuit said that the public right of access to criminal trials did not include a "right to intrude uninvited into conferences at the bench and in chambers." And in *United States v. Valenti*, 987 F.2d 708, 714 (11th Cir.), *cert. denied*, 510 U.S. 907 (1993), the Eleventh Circuit upheld a district court's "traditional authority to conduct closed bench conferences."

R.C.M. 802 appears consistent with the foregoing principles. Certainly, R.C.M. 802 requires that, if substantive matters are resolved in an R.C.M. 802 conference, the resolution of the issue must be placed on the record. But, plaintiffs have not made an adequate evidentiary showing that R.C.M. 802 has not been followed in this regard in the Manning court-martial, or that it is likely that R.C.M. 802 will not be followed as trial goes forward. Accordingly, plaintiffs have not met their heavy burden to show that preliminary injunctive relief is warranted on these grounds—particularly the extraordinarily intrusive relief that plaintiffs request, in the form of directing a military judge to interrupt an ongoing court-martial in order to attempt to "reconstitute" past in-chambers hearings.

## Conclusion

In sum, as to certain aspects of plaintiffs' claims, I do not find that there is a substantial likelihood of success on the merits. And, in light of the actions taken by defendants after this case was filed—to release documents, to commit to expedited release of documents going forward, and to permit unofficial transcription of proceedings by privately retained stenographers—I do not see a substantial likelihood of irreparable harm in the absence of a

preliminary injunction. Under these circumstances, the balance of the equities and the public interest do not favor granting a preliminary injunction.

In considering the equities of the case and the public interest, I am mindful of the keen public interest in the court-martial, the right of public access to such proceedings, as well as the extraordinary nature of the relief plaintiffs seek. They ask this Court to intervene collaterally in an ongoing court-martial and issue dictates to the military judge conducting the proceedings, in regard to the management of public disclosures. In light of the measures that defendants have taken to provide the press and the public with access to the ongoing court-martial proceedings, such preliminary, equitable relief is not warranted here. Therefore, plaintiffs' motion for preliminary injunction is denied by the Order that accompanies this Memorandum.

Date:   June 19, 2013                                      _____/s/_____

                                                                  Ellen Lipton Hollander
                                                                  United States District Judge